James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO**
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Scott A. Bursor
Joseph I. Marchese
**BURSOR & FISHER, P.A.**
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 989-9113

Antonio Vozzolo
Christopher Marlborough
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLENE DZIELAK, SHELLEY BAKER, FRANCIS ANGELONE, BRIAN MAXWELL, JEFFERY MCLENNA, JEFFERY REID, KARI PARSONS, CHARLES BEYER, JONATHAN COHEN, and JENNIFER SCHRAMM on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WHIRLPOOL CORPORATION, LOWE'S COMPANIES, INC., SEARS HOLDINGS CORPORATION, THE HOME DEPOT, INC., FRY'S ELECTRONICS, INC., and APPLIANCE RECYCLING CENTERS OF AMERICA, INC.,<br><br>Defendants. | Civil Action No. 12-cv-0089 (SRC)(MAS)<br><br><br>**FIRST AMENDED CONSOLIDATED COMPLAINT and <u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery McLenna, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, and Jennifer Schramm (collectively "Plaintiffs") by way of Complaint against Defendants, say:

## NATURE OF THE ACTION

1.      This is a class action against defendants Whirlpool Corporation ("Whirlpool"), Lowe's Companies, Inc. ("Lowe's"), Sears Holdings Corporation ("Sears"), The Home Depot, Inc. ("The Home Depot"), Fry's Electronics, Inc. ("Fry's Electronics"), and Appliance Recycling Centers of America, Inc. ("ARCA") (collectively "Defendants") for misrepresenting the energy efficiency of Maytag Centennial washing machines, model numbers MVWC6ESWW0, MVWC6ESWW1, and MVWC7ESWW0 (the "Mislabeled Washing Machines") by promoting them as ENERGY STAR®-qualified and labeling them with the ENERGY STAR® logo.[1]  In fact, the Mislabeled Washing Machines do **not** meet the ENERGY STAR® standards.

2.      ENERGY STAR®-qualified washing machines are required by the U.S. Department of Energy ("DOE") to exceed minimum standards for energy and water efficiency. Qualified washing machine models use approximately 37% less energy and 50% less water than standard models.  They are more expensive than standard models, but they come with the promise of reduced energy and water bills that, over time, will generate enough savings to recoup the higher price.  This is the fundamental bargain the ENERGY STAR® program offers: consumers pay a higher up-front price initially but save more on energy bills over time using the product.

---

[1] The MVWC6ESWW1 is the basic model.  The MVWC6ESWW0 adds an EMI/RFI filter to reduce electrical and radio interference.  It shares the same ENERGYGUIDE label as the MVWC6ESWW1.  The MVWC7ESWW0 adds a glass top for cosmetic purposes.  Otherwise, the interior and exterior parts are virtually identical.  These three models share the same motor, cabinet, electric wiring, control knobs, timer knobs, wash basket, agitator, drive tube, pump, and clutch.  Furthermore, they have identical energy usage, water usage, and load capacity.

3.      Defendants' misrepresentations and false labels rendered that bargain illusory. For class members who purchased the Mislabeled Washing Machines, the promised savings from reduced energy bills never came.  Instead, class members were hit with a costly double-whammy: a higher up-front price due to the substantial price premium that ENERGY STAR® washing machines command in the marketplace, followed by higher energy bills over the washing machine's useful life, since its energy efficiency is substantially worse than what was promised.  Each class member paid a higher initial price for their washing machine and will pay higher energy bills every month – month after month and year after year – for as long as the washing machine remains in use.

4.      Plaintiffs seek relief in this action individually, and as a class action on behalf of similarly situated purchasers of the Mislabeled Washing Machines, for violation of the Magnuson-Moss Warranty Act, breach of express warranty, breach of implied warranty of merchantability, unjust enrichment, violation of the New Jersey Consumer Fraud Act, violation of the California Consumer Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*, Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 *et seq.*, False Advertising Law ("FAL"), Business & Professions Code §§ 17500 *et seq.*, Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*, Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et. seq.,* Violation of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01, *et seq.*, Violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.*, Violation of Indiana's Deceptive Consumer Sales Act, Ind. Code. Ann. § 24-5-0.5-1, *et seq.*, and Violation of the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41, *et seq.*

**THE PARTIES**

5.      Plaintiff Charlene Dzielak is a citizen of New Jersey, residing in Middlesex County.

6.      Plaintiff Shelley Baker is a citizen of California, residing in Rancho Cucamonga, California.

7.      Plaintiff Francis Angelone is a citizen of New Jersey, residing in Cinnaminson, New Jersey.

8.      Plaintiff Brian Maxwell is a citizen of California, residing in Roseville, California.

9.      Plaintiff Jeffery McLenna is a citizen of Michigan, residing in Metamora, Michigan.

10.      Plaintiff Jeffery Reid is a citizen of Florida, residing in Tampa, Florida.

11.      Plaintiff Kari Parsons is a citizen of Ohio, residing in Dublin, Ohio.

12.      Plaintiff Charles Beyer is a citizen of Indiana, residing in Martinsville, Indiana.

13.      Plaintiff Jonathan Cohen is a citizen of Texas, residing in Houston, Texas.

14.      Plaintiff Jennifer Schramm is a citizen of Virginia, residing in Springfield, Virginia.

15.      Defendant Whirlpool is a Delaware corporation with its principal place of business in Benton Harbor, Michigan.  Whirlpool is one of the world's leading manufacturers of home appliances.  Whirlpool represents that it "is an industry leader in developing high-performance appliances that help conserve the earth's resources and allow homeowners to use resources more efficiently."  Whirlpool's Chairman and CEO, Jeff M. Fettig, boasts on Whirlpool's corporate website that, "At Whirlpool Corporation, we take our environmental responsibilities very seriously.  Just as we have taken a global approach to our home appliance

4

business, we believe our world's environmental issues, such as climate change, must be addressed in a similarly comprehensive way. This is why we continue to develop innovative products that minimize their impact on the environment while making our consumers' lives easier."

16.    Defendant Lowe's is a North Carolina corporation with its principal place of business in Mooresville, North Carolina. Lowe's is the second largest home improvement retailer in the world and has approximately 1,725 home improvement stores in the United States, Canada, and Mexico. Lowe's is a seven-time recipient of the ENERGY STAR® Partner of the Year Award in the Partner Retailer Category.

17.    Defendant Sears is a Delaware corporation with its principal place of business in Hoffman Estates, Illinois. Sears is the parent company of Sears, Roebuck and Co., the nation's fourth largest broadline retailer with approximately 3,900 full-line and specialty retail stores in the United States and Canada, and claims to be "the leading home appliance retailer." Sears has made public statements claiming it sells more Energy Star rated appliances than any other retailer.

18.    Defendant The Home Depot is a Delaware corporation with its principal place of business in Atlanta, Georgia. The Home Depot is the world's largest home improvement specialty retailer and the fourth largest retailer in the United States. It has more than 2,200 retail stores in the United States, Canada, Mexico and China. The Home Depot represents, "For a typical home, appliances account for about 20% of the energy bills. That's up to $380 per year. ENERGY STAR® qualified appliances use 10-50% less energy and water than standard models . . . By replacing your 10 year old refrigerator, dishwasher, room air conditioner and clothes washer with ENERGY STAR® labeled equipment, you could save about $180 a year." The

website boasts that The Home Depot has sold 389,194,856 ENERGY STAR® products,

resulting in an estimated energy savings of $1,334,690,630.

19.     Defendant Fry's Electronics is a California corporation with its principal place of

business in San Jose, California.  Fry's Electronics is a major retailer of computers, consumer

electronics, and appliances, with roughly 35 stores in 10 states.  The chain's extensive inventory

includes computer software and components, industry magazines, movies, music, refrigerators,

washers and dryers, small appliances, stereo equipment, and televisions.

20.     Defendant ARCA is a Minnesota corporation with its principal place of business

in Minneapolis, Minnesota.  The company's retail business operates about 20 ApplianceSmart

Factory Outlet stores in Minnesota, Georgia, Ohio, and Texas that sell new, reconditioned, and

"special-buy" appliances from manufacturers such as Electrolux, GE, and Whirlpool.

21.     At all times relevant to the allegations in this matter, Defendants Whirlpool,

Lowe's, Sears, The Home Depot, Fry's Electronics, and ARCA acted in concert, with the

knowledge and approval of the other defendant and/or as the agent of the other defendant within

the course and scope of the agency, regarding the acts and omissions alleged.

### JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal

question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C.

§ 1367.

23.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)

because there are more than 100 class members and the aggregate amount in controversy exceeds

$5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of

a state different from Defendants.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants Whirlpool, Lowe's, Sears, and The Home Depot do business throughout this district, and a substantial part of the events giving rise to Ms. Dzielak's claims took place within this judicial district.

## FACTS COMMON TO ALL CLAIMS

25.     The Energy Policy and Conservation act of 1975 ("EPCA"), 42 U.S.C. § 6291, *et seq.*, established an energy conservation program for major household appliances.  EPCA was amended by the National Energy Conservation Policy Act of 1978 ("NECPA"), Pub. L. 95-619, to, among other things, give the DOE authority to regulate the minimum energy efficiency of several products, including washing machines.  Further amendments to EPCA in the National Appliance Energy Conservation Act of 1987 ("NAECA"), Pub. L. 100-12, established minimum energy efficiency standards for washing machines.

26.     ENERGY STAR® is a government-backed program to "identify and promote energy-efficient products in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards."  *See* 42 U.S.C. § 6294a.  The program is jointly administered by the DOE and the Environmental Protection Agency ("EPA").  In order to qualify for the ENERGY STAR® program, most washing machines must be at least 37% more energy efficient than the minimum energy efficiency standards mandated by federal law.

27.     Participation in the ENERGY STAR® program has a significant impact on the marketability of products. The message conveyed by the ENERGY STAR® logo is that the consumer can maximize his or her energy savings while helping to protect the environment.  The

7

national retailers that dominate the appliance market rely extensively on ENERGY STAR®-related promotions to bring consumers to the store and sell washing machines.

28.    Whirlpool and its retail partners aggressively marketed the Mislabeled Washing Machines based on their ENERGY STAR® rating.  For example, the listing of features for model MVWC6ESWW on Amazon.com begins:

> This 4.0 cu. ft. I.E.C. energy star qualified washer pays for itself in just over six years compared to pre-2004 conventional washers, based on lifetime water and energy savings.

*See* http://www.amazon.com/Maytag-Centennial-MVWC6ESWW-Top-Load-Washer/dp/B002ACHJF0/ref=cm_cr_pr_product_top/185-2908430-1600761 (accessed Jan. 4, 2012).

29.    On November 27, 2009, Plaintiff Francis Angelone purchased a Maytag Centennial MVWC6ESWW* washing machine at a The Home Depot retail store in Delran, New Jersey.  He paid $299.00 plus tax, which included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification.  The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his energy savings while helping to protect the environment. He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would

not have purchased the Maytag Centennial MVWC6ESWW* if he had known that it was not, in fact, ENERGY STAR® compliant. He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool. He also understood that the purchase involved a direct transaction with between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

30.     On November 27, 2009, Plaintiff Brian Maxwell purchased a Maytag Centennial MVWC6ESWW* washing machine at a Fry's Electronics retail store in Roseville, California. He paid $399.00 plus tax, which included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification. The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine. He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his energy savings while helping to protect the environment. He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW* if he had known that it was not, in fact, ENERGY STAR® compliant. He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool. He also

understood that the purchase involved a direct transaction with between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

      31.    On November 28, 2009, Plaintiff Jonathan Cohen purchased a Maytag Centennial MVWC6ESWW* washing machine at a The Home Depot retail store in Houston, Texas. He paid $299.00 plus tax, which included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification. The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine. He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his energy savings while helping to protect the environment. He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW* if he had known that it was not, in fact, ENERGY STAR® compliant. He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool. He also understood that the purchase involved a direct transaction with between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer,

indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

32.     On November 30, 2009, Plaintiff Charlene Dzielak purchased a Maytag Centennial MVWC6ESWW* washing machine at a Lowe's retail store near her home in Middlesex County.  She paid $409.00 plus tax, which included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her energy savings while helping to protect the environment. She relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW* if she had known that it was not, in fact, ENERGY STAR® compliant.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  She also understood that the purchase involved a direct transaction with between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

33.    In January 2010, Plaintiff Jennifer Schramm purchased a Maytag Centennial MVWC6ESWW* washing machine at a Lowe's retail store in Alexandria, Virginia.  Her purchase included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her energy savings while helping to protect the environment.  She relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW* if she had known that it was not, in fact, ENERGY STAR® compliant.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  She also understood that the purchase involved a direct transaction with between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

34.    On February 27, 2010, Plaintiff Jeffery McLenna purchased a Maytag Centennial MVWC6ESWW* washing machine at a The Home Depot retail store in Lapeer, Michigan.  He paid $476.10 plus tax, which included a substantial price premium due to its supposed energy

efficiency and ENERGY STAR® qualification.  The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine. He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his energy savings while helping to protect the environment.  He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW* if he had known that it was not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  He also understood that the purchase involved a direct transaction with between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

35.    On March 27, 2010, Plaintiff Kari Parsons purchased a Maytag Centennial MVWC6ESWW* washing machine at an ApplianceSmart Factory Outlet retail store in Columbus, Ohio.  She paid $492.99 plus tax, which included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the

washing machine. She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her energy savings while helping to protect the environment. She relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW* if she had known that it was not, in fact, ENERGY STAR® compliant. She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool. She also understood that the purchase involved a direct transaction with between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

36.    On March 18, 2010, Plaintiff Charles Beyer purchased a Maytag Centennial MVWC6ESWW* washing machine at a Sears retail store in Martinsville, Indiana. He paid $457.49 plus tax, which included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification. The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine. He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy

efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his energy savings while helping to protect the environment.  He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW* if he had known that it was not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  He also understood that the purchase involved a direct transaction with between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

37.     On December 1, 2010, Plaintiff Shelley Baker purchased a Maytag Centennial MVWC6ESWW* washing machine at a Sears retail store in Ontario, California.  She paid $439.93 plus tax and delivery, which included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her energy savings while helping to protect the environment.  She relied on these representations and warranties in deciding to purchase the washing machine,

and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW* if she had known that it was not, in fact, ENERGY STAR® compliant.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  She also understood that the purchase involved a direct transaction with between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

38.    In 2010, Plaintiff Jeffery Reid purchased a Maytag Centennial MVWC6ESWW1 washing machine from a nearby Air Force base.  He paid for the machine with cash, which included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification.  The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his energy savings while helping to protect the environment.  He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW* if he had known that it was not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval

16

of Whirlpool and/or as the agent of Whirlpool.  He also understood that the purchase involved a direct transaction with between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

39.    On September 8, 2010, Springboard Engineering (a division of Underwriters Laboratories Verification Services) laboratories in Newton, Iowa completed DOE efficiency testing of a Maytag Centennial MVWC6ESWW1.  The results showed the unit did not meet ENERGY STAR standards.

40.    On September 20, 2010, the DOE notified Whirlpool that DOE-initiated testing revealed that Whirlpool's model MVWC6ESWW1 did not meet the applicable ENERGY STAR energy efficiency requirements.

41.    After consulting with Whirlpool, the DOE proceeded with testing of additional units.

42.    From January 3 through January 12, 2011, Springboard Engineering laboratories conducted DOE efficiency testing of four additional units of the Maytag Centennial MVWC6ESWW1.  The results showed again that these units did not meet ENERGY STAR® standards.

43.    On January 19, 2011, the DOE notified Whirlpool that the second round of testing confirmed that model MVWC6ESWW1 does not meet ENERGY STAR® requirements.

44.    On March 16, 2011, the DOE referred the matter to the EPA, the brand manager for ENERGY STAR®, for appropriate action.

45.    On information and belief, Whirlpool avoided a formal disqualification from the Energy Star program by representing that it had discontinued the sale or manufacture of the

Mislabeled Washing Machines, and that none were remaining in inventory – rendering a formal disqualification moot by the time the issue was presented to the EPA.  Whirlpool and the EPA thus reached an informal and private agreement whereby Whirlpool agreed to cease and desist from the manufacture or sale of the Mislabeled Washing Machines.  However, persons who had already purchased these Mislabeled Washing Machines, including Plaintiffs, were given no notice of this agreement, or of the Mislabeled Washing Machines' noncompliance with the ENERGY STAR® standard.

46.    Plaintiffs Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery McLenna, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, and Jennifer Schramm, and each purchaser of the Mislabeled Washing Machines, paid a price premium due to their Mislabeled Washing Machine's supposed energy efficiency and ENERGY STAR® qualification.  The amount of the price premium can be reasonably quantified by an appropriate market study of the prices for comparable washing machines sold with and without the ENERGY STAR® logo, or through a contingent valuation study, or through other means regularly employed by economic and valuation experts.

47.    Plaintiffs Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery McLenna, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, and Jennifer Schramm, and each purchaser of the Mislabeled Washing Machines, paid more money in additional energy costs to operate the Mislabeled Washing Machines than each would have paid if the washing machines had actually met the ENERGY STAR® standards as promised.  The additional energy costs can be reasonably quantified by an appropriate study, and through objective mathematical processes, based on the data from the DOE-initiated testing described herein.

## CLASS ACTION ALLEGATIONS

48.    Plaintiffs seek to represent a class defined as all persons in the United States who purchased a Mislabeled Washing Machine (hereafter, the "Class").

49.    Plaintiffs also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of New Jersey (hereafter, the "New Jersey Subclass").

50.    Plaintiffs also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of California (hereafter, the "California Subclasses").

51.    Plaintiffs also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Michigan (hereafter, the "Michigan Subclass").

52.    Plaintiffs also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Florida (hereafter, the "Florida Subclass").

53.    Plaintiffs also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Ohio (hereafter, the "Ohio Subclass").

54.    Plaintiffs also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Indiana (hereafter, the "Indiana Subclass").

55.    Plaintiffs also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Texas (hereafter, the "Texas Subclass").

56.    Plaintiffs also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the Commonwealth of Virginia (hereafter, the "Virginia Subclass").

57.    Members of the Class and Subclasses are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclasses number in the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class members may

be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

58.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

(a)    whether the Mislabeled Washing Machines were sold bearing false labels misrepresenting them as ENERGY STAR® compliant;

(b)    whether Class members suffered an ascertainable loss as a result of the Defendants' misrepresentations;

(c)    whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution, injunctive, and/or monetary relief and, if so, the amount and nature of such relief.

59.    Plaintiffs' claims are typical of the claims of Class and Subclass members because Plaintiffs and all Class members purchased a Mislabeled Washing Machine bearing a false label misrepresenting it as ENERGY STAR® compliant, when in fact it was not.

60.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

61.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation

increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*)

62.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

63.     Plaintiffs bring this Count I individually and on behalf of the members of the Class and Subclasses against all Defendants.

64.     The Mislabeled Washing Machines are consumer products as defined in 15 U.S.C. § 2301(1).

65.     Plaintiffs and Class members are consumers as defined in 15 U.S.C. § 2301(3).

66.     Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

67.     In connection with the sale of the Mislabeled Washing Machines, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the products met the energy efficiency requirements of the ENERGY STAR® program.

68.     In fact, the Mislabeled Washing Machines did not meet the energy efficiency requirements of the ENERGY STAR® program.

69.     By reason of Defendants' breach of warranties stating that the Mislabeled Washing Machines met the energy efficiency requirements of the ENERGY STAR® program, Defendants violated the statutory rights due Plaintiffs and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiff and Class members.

70.     Plaintiffs and Class members were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy costs for as long as they continue to use the Mislabeled Washing Machines.

## COUNT II
### (Breach of Express Warranty)

71.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

72.     Plaintiffs bring this Count II individually and on behalf of the members of the Class and Subclasses against all Defendants.

73.     Defendants, as the designer, manufacturer, marketers, distributors, or sellers expressly warranted that the Mislabeled Washing Machines were fit for their intended purpose in that they would function properly as energy efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.

74.     In fact, the Mislabeled Washing Machines were not fit for such purposes because they do not function properly as energy efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.

75.     Plaintiffs and Class members were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy costs as long as they continue to use the Mislabeled Washing Machines.

## COUNT III
### (Breach of Implied Warranty of Merchantability)

76.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

77.     Plaintiffs bring this Count III individually and on behalf of the members of the Class and Subclasses against all Defendants.

78.     Defendants as the designer, manufacturer, marketers, distributors, and/or sellers impliedly warranted that the Mislabeled Washing Machines were fit for their intended purpose in that they would function properly as energy efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.

79.     Defendants breached the warranty implied in the contract for the sale of the Mislabeled Washing Machines in that the Mislabeled Washing Machines could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose in that

they did not function properly as energy efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.  As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendants to be merchantable.

80.    In reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose, Plaintiffs and Class members purchased the Mislabeled Washing Machines for use as energy efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.

81.    The Mislabeled Washing Machines were not altered by Plaintiffs and Class members.  The Mislabeled Washing Machines were defective when they left the exclusive control of Defendants.

82.     Defendants knew the Mislabeled Washing Machines would be purchased and used without additional testing for energy efficiency by Plaintiffs and Class members.  The Mislabeled Washing Machines were defectively designed and unfit for their intended purpose, and Plaintiffs and Class members did not receive the goods as warranted.

83.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy costs for as long as they continue to use the Mislabeled Washing Machines.

## <u>COUNT IV</u>
### (Unjust Enrichment)

84.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

85.     Plaintiffs bring this Count IV individually and on behalf of the members of the Class and Subclasses against all Defendants.

86.      "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences.  In all states, the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched.  At the core of each state's law are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff.  The focus of the inquiry is the same in each state."  *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007)).

87.     "Since there is no material conflict relating to the elements of unjust enrichment between the different jurisdictions from which class members will be drawn," *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. at 58, New Jersey law applies to those claims.

88.     Plaintiffs and Class members conferred a benefit on Whirlpool, Lowe's, and Sears by purchasing the Mislabeled Washing Machines.

89.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' purchases of the Mislabeled Washing Machines.  Retention under these circumstances is unjust and inequitable because Whirlpool,Lowe's, and Sears misrepresented that the Mislabeled Washing Machines complied with ENERGY STAR® standards, when in fact they did not, and misrepresented the energy efficiency of the Mislabeled

Washing Machines, which caused injuries to Plaintiffs and Class members because (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy costs for as long as they continue to use the Mislabeled Washing Machines.

90.    Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

<u>**COUNT V**</u>
**(Violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*)**

91.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

92.    Plaintiffs bring this Count V individually and on behalf of the members of the Class and New Jersey Subclass against all Defendants.

93.    Defendants misrepresented that the Mislabeled Washing Machines complied with ENERGY STAR® standards when in fact they did not, and misrepresented the energy efficiency of the Mislabeled Washing Machines.

94.    Plaintiffs, Class members, and New Jersey Subclass members suffered an ascertainable loss caused by Defendants' misrepresentations because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did

not perform as promised; and (d) they have paid and will continue to pay higher energy costs for as long as they continue to use the Mislabeled Washing Machines.

## <u>COUNT VI</u>
**(Violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*)**

95.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

96.    Plaintiffs bring this Count VI on behalf of the California Subclass under California law.

97.    CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Defendants violated this provision by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency of the Mislabeled Washing Machines.

98.    CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Defendants violated this provision by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency of the Mislabeled Washing Machines.

99.    CLRA § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."   Defendants violated this provision by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency of the Mislabeled Washing Machines.

100.    At the time they made these representations and made sales to plaintiffs and class members, defendants were aware of the defect because they were aware that DOE-initiated testing had shown the Mislabeled Washing Machines did not comply with ENERGY STAR® standards.

101.    Plaintiffs and the California Subclass members suffered injuries caused by Defendants' misrepresentations because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and the California Subclass members have paid and will continue to pay higher energy costs for as long as they continue to use the Mislabeled Washing Machines.

102.    On November 11, 2011, prior to the filing of this Complaint, a CLRA notice letter was served on Defendants Whirlpool and Sears which complies in all respects with California Civil Code § 1782(a).  Plaintiff Baker sent Defendants a letter *via* certified mail, return receipt requested, advising Defendants that they are in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.  Defendants were further advised that in the event that the relief requested has not been provided within thirty (30) days, Baker would file this Complaint.  A true and correct copy of Plaintiff Baker's CLRA letter is attached hereto as Exhibit A.

103.    On November 16, 2011, prior to the filing of this Complaint, a CLRA notice letter was served on Defendant Whirlpool which complies in all respects with California Civil Code § 1782(a).  Plaintiff Brian Maxwell sent Whirlpool a letter *via* certified mail, return receipt requested, advising Whirlpool it was in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.  Whirlpool was further

advised that in the event that the relief requested has not been provided within thirty (30) days, Maxwell would file this Complaint.  A true and correct copy of Plaintiff Maxwell's CLRA letter is attached hereto as Exhibit B.

104.    Wherefore, Plaintiffs seek damages, restitution, and injunctive relief for this violation of the CLRA.

<u>**COUNT VII**</u>
**(Violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*)**

105.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

106.    Plaintiffs bring this Count VII on behalf of the California Subclass under California law.

107.    Defendants are subject to the Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200 *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

108.    Defendants' conduct, described herein, violated the "unlawful" prong of the UCL by violating the EPCA, NECPA, NAECA, and regulations promulgated thereunder, governing the energy efficiency of washing machines.

109.    Defendants' conduct, described herein, violated the "unfair" prong of the UCL by violating the policy or spirit of the EPCA, NECPA, NAECA, and regulations promulgated thereunder, governing the energy efficiency of washing machines.

110.    Defendants' conduct, described herein, violated the "fraudulent" prong of the UCL by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency of the Mislabeled Washing Machines.

111.    Plaintiffs and California Subclass members suffered lost money or property as a result of Defendants' UCL violations because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) they have paid and will continue to pay higher energy costs for as long as they continue to use the Mislabeled Washing Machines.

### COUNT VIII
**(False Advertising)**
**(False Advertising Law, Business & Professions Code § 17500 *et seq.*)**

112.    Plaintiffs repeat the allegations contained in the above paragraphs as if fully set forth herein.

113.    Plaintiffs bring this claim on behalf of the California Subclass under California law.

114.    California's False Advertising Law (*Bus. & Prof. Code* § 17500, *et seq.*) makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

115.    Defendants committed acts of false advertising, as defined by §17500, by using false and misleading statements to promote the sale of Mislabeled Washing Machines, as described above.

116.    Defendants knew or should have known, through the exercise of reasonable care that the statements were untrue and misleading.

117.    Defendants' actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

118.    Plaintiffs and California Subclass members suffered lost money or property as a result of Defendants' FAL violations because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) they have paid and will continue to pay higher energy costs for as long as they continue to use the Mislabeled Washing Machines.

### COUNT IX
**(Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*)**

119.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

120.    Plaintiffs bring this claim on behalf of the members of the Class and Michigan Subclass against all Defendants.

121.    Defendants misrepresented the energy efficiency of the Mislabeled Washing Machines after learning of their defects with the intent that Plaintiffs relied on such representations in their decision regarding the purchase, lease and/or use of the Mislabeled Washing Machines.

122.    Plaintiffs did, in fact, rely on such representations in their decision regarding the purchase, lease and/or use of the Mislabeled Washing Machines.

123. Through those misleading and deceptive statements and false promises, Defendants violated the Michigan Consumer Protection Act.

124. The Michigan Consumer Protection Act applies to Defendants' transactions with Plaintiffs because Defendant Whirlpool has its principal place of business in Michigan, and Defendants' deceptive scheme was carried out in Michigan and affected Plaintiffs.

125. Plaintiffs relied on Defendants' silence as to known defects in connection with their decision regarding the purchase, lease, servicing and/or use of the Mislabeled Washing Machines.

126. As a direct and proximate result of Defendants' deceptive conduct and violation of the Michigan Consumer Protection Act, Plaintiffs have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT X
### (Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et. seq.*)

127. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

128. Plaintiff Jeffery Reid brings this claim on behalf of the members of the Florida Subclass against all Defendants.

129. The purpose of the FDUTPA is to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce.

130. The sale of Mislabeled Washing Machines to Plaintiff Reid and the Florida Subclass as described herein constitutes the "conduct of any trade or commerce" within the meaning of FDUTPA, Fla. Stat. §§ 501.201, *et. seq.*

131.    Defendants' misrepresentations and material omissions in its labeling, marketing, and advertising of the Mislabeled Washing Machines as described herein constitute false, deceptive, misleading, and unconscionable practices in violation of the FDUTPA.

132.    Plaintiff Reid and the Florida Subclass have suffered damages by virtue of buying Mislabeled Washing Machines that they would not have purchased but for Defendants' unfair marketing, advertising, packaging, and labeling.  Plaintiff Reid and the Florida Subclass did not receive the benefit of their bargain in that the Mislabeled Washing Machines are not energy efficient and are not Energy Star compliant, and their Mislabeled Washing Machines have suffered a diminution in value.

133.    Defendants' conduct proximately caused the injuries to Plaintiff Reid and the Florida Subclass.

134.    Defendants' misrepresentations and material omissions impact the public interest because Plaintiff Reid and the Florida Subclass were injured in exactly the same way as thousands of others purchasing and/or leasing Mislabeled Washing Machines as a result of Defendants' generalized course of deception.

135.    Given the vast numbers of consumers who have purchased Mislabeled Washing Machines, Plaintiff Reid and the Florida Subclass have been damaged and will continue to be damaged by the false, deceptive, misleading, and unconscionable labeling, advertising, and marketing of the Mislabeled Washing Machines.

136.    Pursuant to Fla. Stat. Ann. § 501.201, Plaintiffs will serve the Florida Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

## COUNT XI
### (Violation of the Ohio Deceptive Trade Practices Act,
### Ohio Rev. Code Ann. § 4165.01, *et seq.*)

137.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

138.    Plaintiff Kari Parsons brings this claim on behalf of the members of the Ohio Subclass against all Defendants.

139.    By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices both before and during consumer transactions with Plaintiff Parsons and members of the Ohio Subclass in violation of O. R. C. §§ 4165.02, by falsely representing that the Mislabeled Washing Machines were Energy Star compliant, and failing to disclose that the Mislabeled Washing Machines did not meet Energy Star Standards:

- (A)(2) "Caus[ing] likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;"

- (A)(7) "Represent[ing] that goods . . . have sponsorship, approval, characteristics, ingredients, uses [or] benefits . . . that they do not have;"

- (A)(9) "Represent[ing] that goods . . . are of a particular standard, quality or grade [when] they are of another;" and

- (A)(11) "Advertis[ing] goods . . . with intent not to sell them as advertised."

140.    Defendants are persons as defined in O.R.C. § 4165.01(D).

141.    Based on knowledge and belief, Whirlpool manufactured the Mislabeled Washing Machines from its plant in Clyde, Ohio, targeting both Ohio consumers and consumers nationwide.

142.   Defendants' false and misleading representations regarding the energy efficiency of the Mislabeled Washing Machines had a tendency to mislead a substantial segment of consumers regarding the appliances' energy efficiency.

143.   Defendants made false or misleading statements of fact concerning the Mislabeled Washing Machines — *i.e.*, that such appliances were Energy Star compliant — when Defendants, in fact, knew that they were not.

144.   Defendants' false and misleading representations regarding the energy efficiency of the Mislabeled Washing Machines were material and were likely to influence consumers' purchasing decisions.

145.   Defendant's conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or reckless and/or was in conscious disregard for the rights of Plaintiff Parsons and the Ohio Subclass.

146.   Plaintiff Parsons and members of the Ohio Subclass were misled by Defendants' false, deceptive, and misleading claims about the energy efficiency of the Mislabeled Washing Machines and purchased said washing machines at a materially higher price than they would have otherwise paid for other comparable washing machines in the absence of Defendants' unlawful promotional activity.  As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and members of the Ohio Subclass suffered actual injury.

147.   Plaintiff Parsons and members of the Ohio Subclass have been damaged in an amount to be determined at trial.

148.   Pursuant to O.R.C. § 4165.03(A)(2), Plaintiff Parsons and Ohio Subclass members are entitled to recover their actual damages.

149.     Pursuant to O.R.C. § 4165.03(B), Plaintiff Parsons and Ohio Subclass members are entitled to their attorneys' fees since Defendants willfully engaged in the foregoing deceptive trade practices knowing them to be deceptive.

150.     On behalf of herself and other Ohio Subclass members, Plaintiff Parsons seeks damages and/or rescission, equitable and/or injunctive relief, and also seeks equitable and declaratory relief, together with a reasonable counsel or attorneys' fees, and such other relief as the Court may deem necessary or appropriate to remedy these violations.

## COUNT XII
### (Violation of the Ohio Consumer Sales Practices Act,
### Ohio Rev. Code Ann. § 1345.01, *et seq.*)

151.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

152.     Plaintiff Kari Parsons brings this claim on behalf of the members of the Ohio Subclass against all Defendants.

153.     Plaintiff Parsons and members of the Ohio Subclass are persons who purchased Mislabeled Washing Machines primarily for personal, family, and/or household use.  Therefore, the purchases of Mislabeled Washing Machines by Plaintiff Parsons and members of the Ohio Subclass are "consumer transactions" as that term is defined in O. R. C. § 1345.01(A).

154.     Defendants routinely engage in the business of effecting and/or soliciting consumer transactions on a nationwide basis.  As described herein, Defendants purposefully solicited consumer transactions for those products on a nationwide basis.  As a result, Defendants are "suppliers" covered by the Ohio Consumer Sales Practices Act which applies to all persons "engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer."  O.R.C. § 1345.01(C).

155.    By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices both before and during consumer transactions with Plaintiff and members of the Class in violation of O. R. C. § 1345.02 by falsely representing that the Mislabeled Washing Machines were Energy Star compliant and failing to disclose that the Mislabeled Washing Machines did not meet Energy Star Standards.

156.    By the acts and conduct alleged herein, Defendants committed unconscionable acts and practices acts both before and during consumer transactions with Plaintiff Parsons and members of the Ohio Subclass in violation of O. R. C. § 1345.03 by falsely representing that the Mislabeled Washing Machines were Energy Star compliant and failing to disclose that the Mislabeled Washing Machines did not meet Energy Star Standards.

157.    Defendants committed the unfair, deceptive, and/or unconscionable acts and practices in Ohio, targeting both Ohio consumers and consumers nationwide.

158.    Defendants' false, unfair, deceptive, and unconscionable acts have previously been declared to be false, unfair, deceptive, or unconscionable.  The Ohio Attorney General has made the following materials, among others, publicly available for inspection, which materials declare similar actions unfair, deceptive, and unconscionable:

- Judgment Entry in *State ex rel. Brown v. Lyons, Rogers v. Airborne Health, Inc.*, No. A742156, Court of Common Pleas, Franklin County, Public Inspection File No. 1000304;

- Judgment Entry in *State ex rel. Cordray v. The Dannon Company, Inc.*, No. 10 CVH-12-18225, Court of Common Pleas, Franklin County, Public Inspection File No. 10002917;

- Judgment Entry in *State ex rel. Dewine v. GlaxoSmithKline, LLC*, No. CI-2011-3928, Court of Common Pleas, Franklin County, Public Inspection FileNo. 10002956.

159.    Plaintiff Parsons and members of the Ohio Subclass relied to their detriment on Defendants' false, deceptive, misleading, and unconscionable claims about the energy efficiency of the Mislabeled Washing Machines and purchased said products at a materially higher price than they would have otherwise paid for them or other comparable products in the absence of Defendants' unlawful promotional activity.  As a direct and proximate result of Defendants' unfair, deceptive, and/or unconscionable acts and practices, Plaintiff Parsons and members of the Ohio Subclass suffered actual injury.

160.    Plaintiff Parsons and members of the Ohio Subclass have been damaged in an amount to be determined at trial.

161.    On behalf of herself and other Ohio Subclass members, Plaintiff Parsons seeks damages and/or rescission, equitable and/or injunctive relief, and also seeks equitable and declaratory relief, together with a reasonable counsel or attorneys' fees, and such other relief as the Court may deem necessary or appropriate to remedy these violations.

162.    Pursuant to O.R.C. §1345.09(E), this Complaint will be served upon the Ohio Attorney General.

**COUNT XIII**
**(Violation of Indiana's Deceptive Consumer Sales Act,**
**Ind. Code. Ann. § 24-5-0.5-1, *et seq.*)**

163.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

164.    Plaintiff Charles Beyer brings this claim on behalf of the members of the Indiana Subclass against all Defendants.

165.    Indiana's Deceptive Consumer Sales Act prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits

that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; . . . (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; . . . (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

166.    Defendants are persons with the meaning of IND. CODE § 24-5-0.5-2(2).  In the course of Defendants' business, they willfully failed to disclose and actively concealed the Mislabeled Washing Machines' failure to meet Energy Star standards for energy efficiency. Accordingly, Defendants engaged in unlawful trade practices, including representing that the Mislabeled Washing Machines have characteristics, uses, benefits, and qualities which they do not have, representing that the Mislabeled Washing Machines are of a particular standard and quality when they are not, and otherwise engaging in conduct likely to deceive.

167.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

168.    Defendants' conduct proximately caused injuries to Plaintiffs and the class.

169.    Plaintiff Beyer and the Indiana Subclass were injured as a result of Defendants' conduct in that they did not receive the benefit of their bargain because the Mislabeled Washing Machines have diminished power and fuel efficiency, and their appliances have suffered a

diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

170.    Plaintiff Beyer and the Indiana Subclass seek injunctive relief and, if awarded damages under Indiana Deceptive Consumer Protection Act, treble damages pursuant to IND. CODE § 24-5- 0.5-4(a)(1).

171.    Plaintiff Beyer and the Indiana Subclass also seeks punitive damages based on the outrageousness and recklessness of Defendants' conduct and their high net worth.

**COUNT XIV**
**(Violation of the Texas Deceptive Trade Practices Act,**
**Tex. Bus. & Com. Code §§ 17.41, *et seq.*)**

172.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

173.    Plaintiff Jonathan Cohen brings this claim on behalf of the members of the Texas Subclass against all Defendants.

174.    Defendants engaged in false, misleading, and deceptive practices in violation of the DTPA, which Plaintiff Cohen and other Texas Subclass members relied on to their detriment.

175.    By failing to disclose and actively concealing the Mislabeled Washing Machines' noncompliance with Energy Star standards, Defendants engaged in deceptive business practices prohibited by the Texas DTPA, including (1) representing that Mislabeled Washing Machines have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Mislabeled Washing Machines are of a particular standard, quality, and grade when they are not, and (3) failing to disclose information concerning the Mislabeled Washing Machines with the intent to induce consumers to purchase or lease the appliances.

176.     As alleged above, Defendants made numerous statements about the energy efficiency of the Mislabeled Washing Machines.  Each of these statements contributed to the deceptive context of Defendants' unlawful representations as a whole.

177.     Defendants' unfair or deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Cohen, about the true energy efficiency of the Mislabeled Washing Machines.

178.     In purchasing the Mislabeled Washing Machines, Plaintiff Cohen and the Texas Subclass relied on the misrepresentations and/or omissions of Defendants with respect to the appliances' energy efficiency.  Defendants' representations turned out not to be true because the Mislabeled Washing Machines were not, in fact, Energy Star compliant.  Had Plaintiff Cohen and members of the Texas Subclass known this they would not have purchased or leased the Mislabeled Washing Machines and/or paid as much for them.

179.     Defendants also breached express and implied warranties to Plaintiff Cohen and the Texas Subclass, as set out above, and are, therefore liable to Plaintiff Cohen and the Texas Subclass for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA.  Defendants' actions also constitute an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

180.     Plaintiff Cohen and the Texas Subclass sustained damages as a result of Defendants' unlawful acts and are, therefore, entitled to damages and other relief provided for under § 17.50(b) of the Texas DTPA.  Because Defendants' conduct was committed knowingly and/or intentionally, the Plaintiffs and the class are entitled to treble damages.

181.     For Texas Subclass members who wish to rescind their purchases, they are entitled under § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

182.    Pursuant to DTPA § 17.50(b)(2), Plaintiff Cohen seeks an order enjoining Defendants' acts or failures to act that violate the DTPA.  Pursuant to DTPA § 17.50(b)(3), Plaintiff Cohen and the Texas Subclass seek orders necessary to restore to them all money acquired from them by Defendants in violation of the DTPA.  They also seek orders necessary to restore to class members whose identities are known to or ascertainable by Defendants all money acquired from them by Defendants in violation of the DTPA.  Plaintiffs and the class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

183.    Pursuant to DTPA § 17.50(b)(4), Plaintiff Cohen and the Texas Subclass seek all other relief which the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.      For an order certifying the nationwide Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclasses and Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass members;

b.      For an order declaring the Defendants' conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiffs, the nationwide Class, and the Subclasses on all counts asserted herein;

d.      For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For injunctive relief as pleaded or as the Court may deem proper; and

h.      For an order awarding Plaintiffs and the Class and Subclasses their reasonable attorneys' fees and expenses and costs of suit.

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO**
Attorneys for Plaintiffs

Dated: April 30, 2012            By:_____/s/ James E. Cecchi_____
                                            JAMES E. CECCHI

Antonio Vozzolo
Christopher Marlborough
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, New York  10017
(212) 983-9330

Scott A. Bursor
Joseph I. Marchese
**BURSOR & FISHER, P.A.**
369 Lexington Avenue, 10th Floor
New York, New York  10017
(212) 989-9113

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO**
Attorneys for Plaintiffs

Dated: April 30, 2012              By: _____/s/ James E. Cecchi_____
                                        JAMES E. CECCHI

Antonio Vozzolo
Christopher Marlborough
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

Scott A. Bursor
Joseph I. Marchese
**BURSOR & FISHER, P.A.**
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 989-9113

**EXHIBIT A**

# BURSOR & FISHER
P.A.

1990 NORTH CALIFORNIA BLVD.
SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

L. TIMOTHY FISHER
Tel: 925.300.4455
Fax: 925.407.2700
ltfisher@bursor.com

November 11, 2011

***Via Certified Mail - Return Receipt Requested***

Whirlpool Corporation
2000 N. M-63
Benton Harbor, MI 49022-2692

Sears Holdings Corporation
Legal Department
3333 Beverly Road
Hoffman Estates, IL 60179

Re:     *Demand Letter Pursuant to California Civil Code § 1782*

To Whom It May Concern:

This letter serves as a preliminary notice and demand for corrective action by Whirlpool Corporation ("Whirlpool") and Sears Holdings Corporation ("Sears") pursuant to the provisions of California Civil Code § 1782, on behalf of our client, Shelley Baker, and all other persons similarly situated.

This notice concerns Maytag brand washing machine model MVWC6ESWW1 (the "Mislabeled Washing Machine"). Whirlpool affixes ENERGY STAR® labels to the Mislabeled Washing Machine, but the appliance uses more energy than indicated.

Ms. Baker purchased this washing machine on December 3, 2010 at a Sears store in Ontario, California. Ms. Baker paid $439.93, plus a non-refundable $69.99 delivery fee, a $10.00 Haul-Away Fee, and sales tax of $38.49, for a total of $558.41. When Ms. Baker purchased her Mislabeled Washing Machine from Sears, it was expressly represented that her washing machine was energy efficient and complied with ENERGY STAR® standards for energy efficiency. However, testing by the U.S. Department of Energy later showed this washing machine uses more energy than indicated, which exceeds allowable ENERGY STAR® energy efficiency requirements.

BURSOR&FISHER
P.A.

By misrepresenting, mislabeling and selling the Mislabeled Washing Machine, Whirlpool and Sears have violated numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(5), (7), and (9).

We hereby demand that Whirlpool and Sears immediately (1) cease and desist from further illegal sales of the Mislabeled Washing Machine, (2) issue an immediate recall of the Mislabeled Washing Machine; (3) make full restitution to all purchasers of the Mislabeled Washing Machine of all purchase money obtained from sales thereof; and (4) compensate all purchasers for the increased energy costs they have incurred as a result of the Mislabeled Washing Machine's failure to conform with the energy efficiency standards of the ENERGY STAR® program.

It is further demanded that Whirlpool and Sears preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.    All documents concerning tests of the energy efficiency of the Mislabeled Washing Machine;

2.    All communications with the DOE concerning the energy efficiency of this appliance;

3.    All documents concerning the advertisement, marketing and/or sale of the Mislabeled Washing Machine; and

4.    All communications with customers concerning complaints or comments concerning the Mislabeled Washing Machine.

Please comply with this demand within 30 days from receipt of this letter.

We are willing to negotiate with Whirlpool and Sears to attempt to resolve the demands asserted in this letter.  If Whirlpool and Sears wish to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that Whirlpool and Sears are not interested in resolving this dispute short of litigation.

If Whirlpool and Sears contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

L. Timothy Fisher
ltfisher@bursor.com

**EXHIBIT B**

# BURSOR & FISHER
P.A.

**1990 North California Blvd.**
**Suite 940**
**Walnut Creek, CA 94596**
**www.bursor.com**

**L. Timothy Fisher**
**Tel: 925.300.4455**
**Fax: 925.407.2700**
**ltfisher@bursor.com**

November 16, 2011

*Via Certified Mail - Return Receipt Requested*

Whirlpool Corporation
2000 N. M-63
Benton Harbor, MI  49022-2692

Re:      *Demand Letter Pursuant to California Civil Code § 1782*

To Whom It May Concern:

This letter serves as a preliminary notice and demand for corrective action by Whirlpool Corporation ("Whirlpool") pursuant to the provisions of California Civil Code § 1782, on behalf of our client, Brian Maxwell, and all other persons similarly situated.

This notice concerns Maytag brand washing machine model MVWC6ESWW1 (the "Mislabeled Washing Machine").  Whirlpool affixes ENERGY STAR® labels to the Mislabeled Washing Machine, but the appliance uses more energy than indicated.

Mr. Maxwell purchased this washing machine on November 27, 2009 at a Fry's Electronics store in Roseville, California.  Mr. Maxwell paid $399.99, plus a sales tax of $34.00, for a total of $433.99.  When Mr. Maxwell purchased his Mislabeled Washing Machine from Fry's, it was expressly represented that his washing machine was energy efficient and complied with ENERGY STAR® standards for energy efficiency.  However, testing by the U.S. Department of Energy later showed this washing machine uses more energy than indicated, which exceeds allowable ENERGY STAR® energy efficiency requirements.

By misrepresenting, mislabeling and selling the Mislabeled Washing Machine, Whirlpool has violated numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(5), (7), and (9).

We hereby demand that Whirlpool immediately (1) cease and desist from further illegal sales of the Mislabeled Washing Machine, (2) issue an immediate recall of the Mislabeled Washing Machine; (3) make full restitution to all purchasers of the Mislabeled Washing Machine of all purchase money obtained from sales thereof; and (4) compensate all purchasers for the

BURSOR&FISHER
P.A.

increased energy costs they have incurred as a result of the Mislabeled Washing Machine's failure to conform with the energy efficiency standards of the ENERGY STAR® program.

It is further demanded that Whirlpool preserves all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.     All documents concerning tests of the energy efficiency of the Mislabeled Washing Machine;

2.     All communications with the DOE concerning the energy efficiency of this appliance;

3.     All documents concerning the advertisement, marketing and/or sale of the Mislabeled Washing Machine; and

4.     All communications with customers concerning complaints or comments concerning the Mislabeled Washing Machine.

Please comply with this demand within 30 days from receipt of this letter.

We are willing to negotiate with Whirlpool to attempt to resolve the demands asserted in this letter.  If Whirlpool wishes to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that Whirlpool is not interested in resolving this dispute short of litigation.

If Whirlpool contends that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

L. Timothy Fisher
ltfisher@bursor.com