## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHARLENE DZIELAK, SHELLEY BAKER, FRANCIS ANGELONE, BRIAN MAXWELL, JEFFREY MCLENNA, JEFFERY REID, KARI PARSONS, CHARLES BEYER, JONATHAN COHEN, and JENNIFER SCHRAMM,** | Civ. No. 2:12-0089 (KM) |

Civ. No. 2:12-0089 (KM)

OPINION

**Plaintiffs,**

**v.**

**WHIRLPOOL CORPORATION, LOWE'S COMPANIES, INC., SEARS HOLDINGS CORPORATION, the HOME DEPOT, INC., FRY'S ELECTRONICS, INC., APPLIANCE RECYCLING CENTERS of AMERICA, INC., and LOWE'S HOME CENTER,**

**Defendants.**

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes to the Court on Defendants' motions (Docket Nos. 37 and 38), pursuant to Fed. R. Civ. 12(b)(6), to dismiss the First Amended Consolidated Complaint ("FAC," Docket No. 29) in this putative class action. For the reasons set forth below, the motions to dismiss will be granted in part and denied in part. These dismissals are without prejudice to the filing of a Second Amended Complaint.

The named plaintiffs, purchasers of Maytag washing machines, are Charlene Dzielak, Francis Angelone, Shelley Baker, Brian Maxwell, Jeffrey McLenna, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, and Jennifer Schramm. The first named defendant is the Maytag washing machines' manufacturer, Whirlpool Corporation ("Whirlpool").[1] The remaining

---

[1]     Whirlpool is a Delaware corporation with its principal place of business in Benton Harbor, Michigan; Lowe's is a North Carolina corporation with its principal

defendants are the retailers from whom the plaintiffs purchased the Maytag washers: Lowe's Home Center[2] ("Lowe's"), Sears Holding Corporation ("Sears"), The Home Depot, Inc. ("Home Depot"), Fry's Electronics, Inc. ("Fry's"), and Appliance Recycling Centers of America, Inc. ("ARCA").[3]

The Department of Energy (DOE) Energy Star program authorizes manufacturers to affix an Energy Star label signifying that an appliance meets certain standards of energy efficiency. Each Maytag washing machine at issue in this case bore an Energy Star label at the time of purchase. Thereafter, however, DOE determined that Maytag Centennial washing machine model number MVWC6ESWW1 did not comply with Energy Star requirements, and EPA disqualified the machine from the Energy Star program. That noncompliance determination and disqualification allegedly apply equally to Maytag Centennial model numbers MVWC6ESWW0, MVWC6ESWW1, and MVWC7ESWW0.[4]

---

place of business in Mooresville, North Carolina; Sears is a Delaware corporation with its principal place of business in Hoffman Estates, Illinois; The Home Depot is a Delaware corporation with its principal place of business in Atlanta, Georgia; Fry's Electronics is a California corporation with its principal place of business in San Jose, California; and ARCA is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. FAC ¶¶ 4–6.

[2]     Via stipulation, Plaintiffs voluntarily dismissed Lowe's Companies, Inc., a party named in the First Amended Complaint. Docket No. 63. Lowes Home Center, a wholly owned subsidiary of Lowe's Companies, Inc., agreed to be substituted as a named defendant in the case, as it is responsible for the sale of the appliances at issue in this action. *Id.*

[3]     The original complaint, filed January 1, 2012, *Dzielak, et al v. Whirlpool Corp.*, et al., No. 12-cv-0089, alleged claims against Whirlpool, Sears, and Lowe's. Docket No. 1. Those Defendants proposed to consolidate *Dzielak* with a related case, *Angelone v. Whirlpool Corporation, et al*, 12-cv-1039. Home Depot, a defendant only in *Angelone*, consented to the consolidation. Docket No. 28. On April 30, 2012, Plaintiffs filed the First Amended Consolidated Complaint (*i.e.*, the FAC that is the subject of these motions to dismiss). The FAC includes claims against defendants Home Depot, Frye's Electronics, and ARCA, in addition to the defendants originally named in the unconsolidated *Dzielak* case. Docket No. 29. ARCA has not, to date, filed a motion to dismiss, and it does not appear to have been served.

[4]     Plaintiffs allege that MVWC6ESWW1 is the "basic model" machine. According to Plaintiffs, MVWC6ESWW1 adds an EMI/RFI filter to reduce electrical and radio

According to the FAC, Energy Star-qualified washing machines cost more than others, but save consumers money over time because they consume less energy. The FAC alleges that Plaintiffs paid a price premium attributable to "their Mislabeled Washing Machine's supposed energy efficiency and ENERGY STAR® qualification." FAC ¶ 46. But those non-compliant machines, say Plaintiffs, wound up costing more to operate than a truly Energy Star-compliant machine. *Id.* ¶ 47.

Plaintiffs assert causes of action for breach of express warranty, breach of the implied warranty of merchantability, unjust enrichment, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA"), and violations of New Jersey, California, Michigan, Florida, Ohio, Indiana, and Texas consumer fraud statutes.[5] Other purchasers of these washing machines, they say, stand in precisely the same shoes, and Plaintiffs have therefore filed their action as a putative class action on behalf of such purchasers. Named plaintiffs Dzielak and Angelone bought their washers in New Jersey; Baker, Maxwell in California; McLenna in Michigan; Reid in Florida; Parsons in Ohio; Beyer in Indiana; Cohen in Texas; and Schramm in Virginia. The putative class comprises subclasses of purchasers in those states—New Jersey, California, Michigan, Florida, Ohio, Indiana, Texas, and Virginia—eight subclasses in all.

The first motion to dismiss is filed jointly by Whirlpool, Fry's, Lowe's, and Sears, Docket No. 37. The second is filed by Home Depot, Docket No. 38.

---

interference, while MVWC7ESWW0 adds a glass top for cosmetic purposes. The interior and exterior parts are otherwise virtually identical and the machines have identical energy usage, water usage, and load capacity. The three models share the same motor, cabinet, electric wiring, control knobs, timer knobs, wash basket, agitator, drive tube, pump, and clutch. FAC ¶ 2, n.1.

[5]     Those state consumer fraud statutes are: New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1; California Consumer Legal Remedies Act, Civil Code § 17200, *et seq.*; California Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.*; California False Advertising Law, Business and Professions Code § 17500, *et seq.*; Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*; Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.*; Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*; and Texas Deceptive Trade Practices Act, Tex. Bus. Com. Code § 17.41, *et seq.*

Defendants argue that that the Complaint's allegations are insufficient as a matter of law. Defendants deny that they have engaged in any wrongful conduct or otherwise misrepresented any information in connection with the sales of the washers in question. They also allege that Plaintiffs have failed to plead claims sounding in fraud with the requisite particularity.

Defendants' motions to dismiss will be granted. The dismissals are without prejudice to the filing of a Second Amended Complaint that corrects the pleading deficiencies of the First.

I.   **BACKGROUND**[6]

**A. The Energy Star Program**

The Energy Policy and Conservation Act of 1975 ("EPCA"), 42 U.S.C. §§ 6291, *et seq.*, together with the National Energy Conservation Policy Act of 1978 ("NECPA") and National Appliance Energy Conservation Act of 1987 ("NAECA"), established an energy conservation program for major household appliances. These statutes and related regulations led to the Energy Star program, "a voluntary program to identify and promote energy-efficient products and buildings in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards." 42 U.S.C. § 6294(a). To qualify for the Energy Star program, a product must meet certain efficiency standards promulgated by the Department of Energy ("DOE"). *See* C.F.R. §§ 430.1, *et seq.*

For the Energy Star program, DOE has established minimum standards for energy and water efficiency. Qualified machine models must use approximately 37% less energy and 50% less water than standard models. FAC ¶ 2. The DOE has instituted a pilot program under which it tests retail products to ensure conformity with Energy Star program guidelines. DOE and the Environmental Protection Agency ("EPA") jointly administer the program. 42 U.S.C. § 6294a.

---

[6]   The allegations of the Complaints have not yet been tested by any fact finder. Solely for the purpose of analyzing the Rule 12(b)(6) motions, the Court, as it must, assumes their truth.

Energy Star program participants may affix the trademarked and federally-owned Energy Star logo to qualifying products. FAC ¶ 26. The Energy Star logo is an important marketing tool. Energy Star labeled machines are more expensive than standard models, but "come with the promise of reduced energy and water bills that, over time, will generate enough saving to recoup the higher price." *Id.* ¶ 2. As characterized by Plaintiffs, the Energy Star program rests on a fundamental bargain: pay more up front, but save on energy bills in the long run. *Id.*

## B. Disqualification from the Energy Star Program

As of 2009, certain Maytag washing machines (the FAC calls them "the Mislabeled Machines") were already on the market with the Energy Star label. As part of the pilot program, DOE tested the efficiency of Maytag washing machine model number MVWC6ESWW1. On September 20, 2010, DOE informed Whirlpool that model number MVWC6ESWW1 did not meet the Energy Star efficiency requirements. *Id.* ¶ 40. After consultation with Whirlpool, DOE agreed to test additional units. *Id.* ¶ 41. From January 3 to January 12, 2011, Springboard Engineering laboratories tested four additional units of the Maytag Centennial MVWC6ESWW1 model. These units, too, failed to comply with DOE standards. *Id.* at ¶ 42. On January 19, 2011, DOE notified Whirlpool of the results of that second round of testing. *Id.* ¶ 43. Thereafter, on March 16, 2011 DOE referred the matter to the EPA, which is the brand manager for Energy Star.

According to the FAC, "Whirlpool avoided a formal disqualification from the Energy Star program by representing" to the EPA "that it had discontinued the sale or manufacture of the Mislabeled Washing Machines, and that none were remaining in inventory—rendering a formal disqualification moot by the time the issue was presented to the EPA." *Id.* ¶ 45. Whirlpool and the EPA "reached an informal and private agreement whereby Whirlpool agreed to cease and desist from the manufacture or sale of the Mislabeled Washing Machines." *Id.* The FAC alleges that "persons who had already purchased these Mislabeled Washing Machines, including Plaintiffs, were given no notice of this agreement, or of the Mislabeled Washing Machines' noncompliance with the Energy Star standard." *Id.*

That situation apparently has changed to some extent. According to an exhibit attached to Plaintiffs' Opposition Brief ("Non-Lighting Products Disqualified from the ENERGY STAR® Program"), the EPA did in fact disqualify

5

machine model number MVWC6ESWW1 on May 7, 2012. Docket No. 47-3 at 2. That issue is discussed below.

## C. The Plaintiffs' Washing Machine Purchases

The named plaintiffs purchased washers in their home states, and purport to represent subclasses of purchasers in those eight states: New Jersey, California, Michigan, Florida, Ohio, Indiana, Texas, and Virginia. The washers at issue are alleged to be Maytag Centennial model numbers MVWC6ESWW0, MVWC6ESWW1, and MVWC7ESWW0.

As to each plaintiff, the FAC identically alleges the following: The washing machine bore the Energy Star logo in two places. The purchaser saw the logo before and at the time of purchase. The purchaser understood the logo to be a representation and warranty by both the manufacturer and retailer that the machine met Energy Star standards of efficiency. The plaintiff purchaser would not have bought the machine if he or she had known it did not in fact comply. Thus each plaintiff allegedly relied on the Energy Star logo when making the purchase.

As to the specific purchases by each named plaintiff, the FAC separately alleges the following:

On November 27, 2009, Francis Angelone purchased a "Maytag Centennial MVWC6ESWW* washing machine at a Home Depot retail store in Delran, New Jersey." Angelone paid $299.00, plus tax. FAC ¶ 29.

On November 27, 2009, Brian Maxwell purchased a "Maytag Centennial MVWC6ESWW* washing machine at a Fry's Electronics retail store in Roseville, California." Maxwell paid $399.00, plus tax. *Id.* ¶ 30.

On November 28, 2009, Jonathan Cohen purchased a "Maytag Centennial MVWC6ESWW* washing machine at a Home Depot retail store in Houston, Texas." She paid $299.00, plus tax. *Id.* ¶ 31.

On November 30, 2009, Charlene Dzielak purchased a "Maytag Centennial MVWC6ESWW* washing machine at a Lowe's retail store near her home in Middlesex County," New Jersey. She paid $409.00, plus tax. *Id.* ¶ 32.

In January 2010, Jennifer Schramm purchased a "Maytag Centennial MVWC6ESWW* washing machine" at a Lowe's retail store in Alexandria, Virginia. *Id.* ¶ 33. The purchase price is not given.

On February 27, 2010, Jeffery McLenna purchased a "Maytag Centennial MVWC6ESWW* washing machine" at a Home Depot retail store in Lapeer, Michigan." He paid $476.10, plus tax. *Id.* ¶ 34.

On March 27, 2010, Kari Parsons purchased a "Maytag Centennial MVWC6ESWW* washing machine" at an ApplianceSmart Factory Outlet retail store in Columbus, Ohio." She paid $492.99, plus tax. *Id.* ¶ 35.

On March 18, 2010, Plaintiff Charles Beyer purchased a "Maytag Centennial MVWC6ESWW* washing machine at a Sears retail store in Martinsville, Indiana." He paid $457.49, plus tax. *Id.* ¶ 36.

On December 1, 2010, Plaintiff Shelly Baker purchased a "Maytag Centennial MVWC6ESWW* washing machine" at a Sears retail store in Ontario, California." She paid $439.93, plus tax and delivery. *Id.* ¶ 37.

In 2010, Plaintiff Jeffrey Reid, who lives in Florida, purchased a "Maytag Centennial MVWC6ESWW1 washing machine from nearby Air Force base." He paid for the machine in cash. *Id.* ¶ 38.

## II.   LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party, ordinarily the defendant, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). For purposes of a motion to dismiss, the well-pleaded factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (established "reasonable inferences" principle not undermined by intervening Supreme Court case law).

In recent years, the United States Supreme Court has elaborated on the standards that a court is to apply in analyzing a Rule 12(b)(6) motion to dismiss, particularly in light of the pleading requirements of Federal Rule of

Civil Procedure 8(a)(2). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, demonstrating that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

The United States Court of Appeals for the Third Circuit has explicated the *Twombly/Iqbal* standard on several occasions. *See, e.g., Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 70-73 (3d Cir. 2011); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129-30 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209-211 (3d Cir. 2009). The Court of Appeals recently summarized the three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See [Iqbal*, 556 U.S.] at 675; *Argueta*, 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

Defendants assert that the state consumer protection law claims sound in fraud and therefore must be pleaded with heightened particularity. For claims of fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement, over and above that of Rule 8(a). Specifically, it requires

that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." *Id.* That heightened pleading standard requires the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007) (internal quotation and citation omitted).

In general, "[t]o satisfy this heightened standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* "Plaintiff must also allege who made the misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.,* 361 F.3d 217, 224 (3d Cir. 2004) (internal citation omitted); *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir. 2006) ("Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.") (internal quotation and citation omitted)).

> [Plaintiffs] need not, however, plead the "date, place or time" of the fraud, so long as they use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." The purpose of Rule 9(b) is to provide notice of the "precise misconduct" with which defendants are charged and to prevent false or unsubstantiated charges. Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.

*Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir. 1998) (quoting *Seville Indus. Machinery v. Southmost Machinery,* 742 F.2d 786, 791 (3d Cir. 1984) and citing *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 99 (3d Cir. 1983)).

## III.   LEAVE TO AMEND/JUDICIAL NOTICE

Both motions to dismiss assert that the FAC does not properly plead that plaintiffs have suffered an injury in fact. To look at the issue another way, defendants assert that the FAC does not state a cause of action unless it is

9

supplemented by judicial notice in a manner that is at least awkward, if not wholly unwarranted.

Judicial notice is a discretionary doctrine. *See* Fed. R. Evid. 201; *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider . . . items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.") (citing Wright & Miller, Federal Practice & Procedure: Civil 3d § 1357; internal citations omitted)). Rather than deal with evolving facts and arguments by means of independent research, I will grant Plaintiffs leave to replead their allegations in complete and updated form.

Some doubt surrounds the specific model number(s) of Maytag washers that are the subject of this action. Only one plaintiff, Reid, is squarely alleged to have purchased model number MVWC6ESWW1, the one actually tested by DOE and found noncompliant. The remaining nine plaintiffs are alleged to have purchased model number MVWC6ESWW*. That asterisk designation leaves some ambiguity as to precisely what model was purchased. (And it may implicitly rest on plaintiff's assertion that three models (not just one) should be considered disqualified, *see infra*.)

Plaintiffs have invoked judicial notice as to subsequent developments that may significantly alter the basis or scope of their claims. As to the fact of disqualification, the plaintiffs have requested that the Court take judicial notice of an EPA document attached to their Opposition Brief (Non-Lighting Products Disqualified from the ENERGY STAR® Program). Docket No. 47-3 at 2.[7] That document, they say, establishes that model number MVWC6ESWW1 was disqualified from the Energy Star Program by the EPA on May 7, 2012. That disqualification, subsequent to the complaint and FAC, may moot certain arguments for dismissal. (Defendants contend, for example, that they cannot be faulted for failure to "disclose" an event that had not occurred as of the date the complaint or FAC was filed.) Alternatively it may shift the basis of the claims, or suggest other lines of attack. Even standing alone, this development suggests that it might be more productive to permit Plaintiffs to revise their allegations.

---

[7]     This exhibit is a public document, seemingly created by the DOE and EPA and accessible on the federal government's Energy Star website. *See* www.energystar.gov/ia/partners/downloads/Disqualified_Non-Lighting_Products.pdf.

Plaintiffs have also invoked judicial notice in an attempt to establish that the EPA's disqualification of model number MVWC6ESWW1 should be deemed to include the MVWC6ESWW0 and MVWC7ESWW0 models (assuming that any plaintiff bought them, which is unclear). In a Joint Status Report, Plaintiffs asserted that this was so "because disqualifications and noncompliance determinations affect all units of the same 'Basic Model.'" Docket No. 54 at 5. In a request for judicial notice, Docket No. 53, Plaintiffs cite a federal regulation, 10 CFR § 430.2, which defines the term "basic model." Defendants respond that the version of the regulation provided by Plaintiffs has been ineffective since April 6, 2011. Docket No. 62-1 at 3.[8] And they dispute Plaintiffs' legal assertion that this definition brings the other Maytag models within the scope of the noncompliance and disqualification determinations.[9]

I could opine about these legal issues but I am not confident that judicial notice can straighten this out. The briefing has not adequately explored the

---

[8]     The current version of 10 CFR § 430.2 (eff. May 21, 2014) defines "basic model" as follows:

> "Basic model means all units of a given type of covered product (or class thereof) manufactured by one manufacturer, having the same primary energy source, and which have essentially identical electrical, physical, and functional (or hydraulic) characteristics that affect energy consumption, energy efficiency, water consumption, or water efficiency. . . .".

Plaintiffs have requested that the Court take judicial notice of a prior version of the regulation, which defines basic model as follows:

> Basic model means all units of a given type of covered product (or class thereof) manufactured by one manufacturer and— . . . (10) With respect to clothes washers, which have the same primary energy source, which have electrical characteristics that are essentially identical, and which do not have any differing physical or functional characteristics that affect energy consumption.

This version appears to have been effective from January 18 through April 5, 2011.

[9]     Plaintiffs also submit a screen shot of the homepage of the Energy Star website and a copy of "National Awareness of Energy Star for 2011: Analysis of CEE Household Survey." The intent seems to be to support Plaintiff's express warranty claim that the energy star logo, standing alone, signifies certain specific representations regarding energy efficiency.

11

effect of the amendments to the regulations. And even if I had a clear picture of the law, I would still lack a clear set of allegations to which to apply that analysis. In short, a properly pleaded complaint must tell the reader which plaintiff purchased exactly which model—a fact probably easy to ascertain from the machine itself. *See* "Locate Your Model Number," www.maytag.com/owners-center/locate-model-number.content.html. And it must set forth Plaintiffs' plausible basis for concluding that the regulatory noncompliance and disqualification determinations covered that particular model.

Were I to update and supplement the allegations of the complaint in the manner suggested, I would be shadowboxing. The better course is to grant the Plaintiffs leave to amend the FAC so they can reframe their allegations in their currently operative form. Any amended pleading should allege exactly who bought which washer and should plausibly allege how the particular machine was affected by the EPA/DOE noncompliance and disqualification determinations.

## IV.   DISCUSSION OF THE CLAIMS

In the interests of judicial economy, I will discuss Defendants' other asserted grounds for dismissal of claims as if I had not entered the blanket dismissal in Part III, *supra*. My disposition of the other asserted grounds for dismissal of Plaintiffs' claims may guide the drafting of any amended pleading. I here assume for purposes of discussion that each plaintiff purchased a "mislabeled" washing machine (although only Reid has clearly alleged that he did so).

I note also that the FAC tends to lump all plaintiffs and claims together. Each plaintiff may, for example, sue the retailer from whom she bought the washer under the consumer protection laws of the state where the purchase occurred. As it currently reads, however, the FAC could be interpreted to assert claims by *each* plaintiff against *all* defendants under the laws of all eight states. The following discussion proceeds on the assumption that this was not intended. *See* Section IV.E, *infra*. In the inevitable Second Amended Complaint, this should be clarified.

## A. Breach of Express Warranty (Count II)

I find that the FAC sufficiently alleges that the Energy Star logo constitutes an express warranty, which defendants breached. Any disclaimer in the user manual's Limited Warranty is ineffective; at any rate, such a disclaimer cannot be presumed effective as a matter of law for purposes of a motion to dismiss.

### 1. Choice of state law as to privity

I must decide which state's law applies to each state-law express warranty claim as to each plaintiff-defendant pair. *See Gray v. Bayer Corp.*, Civ. No. 08-4716, 2011 WL 2975768, at *5 (D.N.J. July 21, 2011) (Linares, J.) ("While it might be desirable for the sake of efficiency to settle upon one state, such as New Jersey, and apply its law in lieu of the other 49 jurisdictions, due process requires individual consideration of the choice of law issues raised by each class member's case before certification.") (quoting *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 457 (D.N.J. 1998)).

"[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011), *aff'd sub nom. Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453, 460 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143, 962 A.2d at 453).

If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. For contract claims, the applicable Restatement

section is § 188. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 N.J. 96, 102, 629 A.2d 885, 888 (1993).

The parties agree that New Jersey law does not require direct privity to support an express warranty claim. Defendants contend that California, Indiana, and Michigan law conflict with the New Jersey no-privity rule because those three states require that a plaintiff stand in direct privity with a defendant to bring a claim of breach of express warranty. *See* Docket No. 37 at 34) (citing *Garcia v. M-F Athletic Co., Inc.*, No. Civ. 11-2430, 2012 WL 531008, at *2 (E.D. Cal. Feb. 17, 2012); *In re SCBA Liquidation, Inc.*, 451 B.R. 747, 770 (Bankr. W.D. Mich. 2011); *Pizel v. Monaco Coach Corp.*, 364 F. Supp. 2d 790, 793 (N.D. Ind. 2005)). Such a conflict, if it existed, would be consequential because Plaintiffs Baker, Maxwell, Beyer, and McLenna assert claims under California, Indiana, and Michigan law against the manufacturer, Whirlpool, an entity with which they are not in privity. (Putative class members, all retail purchasers, are similarly unlikely to be in privity with the manufacturer.) On further examination, however, I conclude that there is no true conflict, except as to the law of Michigan.

*California: No conflict.* Privity is not a requirement where the express warranty appears on the product's label or advertising. "Privity is generally not required for liability on an *express* warranty because it is deemed fair to impose responsibility on one who makes affirmative claims as to the merits of the product, upon which the remote consumer presumably relies." *Cardinal Health 301, Inc. v. Tyco Electronics Corp.*, 169 Cal. App. 4th 116, 143-44, 87 Cal. Rptr. 3d 5, 27 (2008) (emphasis in original). Thus California's privity requirement does not apply where a purchaser bases an express warranty claim on a manufacturer's written representations in labels or advertising. *See Sanders v. City of Fresno*, 65 Fed. R. Serv. 3d 960 (E.D. Cal. 2006) (recognizing "exceptions to the privity requirement, such as: (1) reliance on the manufacturer's written representations in labels or advertising materials").

*Indiana: No conflict.* The Indiana authorities cited by Defendants do not address the privity requirement as it relates to express warranties. And the state's intermediate court of appeals, reversing summary judgment for defendant, has allowed a purchaser to assert an express warranty claim against a manufacturer despite the absence of privity. *Prairie Prod., Inc. v. Amchem Div.-Pennwalt Corp.*, 514 N.E.2d 1299, 1302 (Ind. Ct. App. 1987). In that case, as here, the plaintiff alleged that the manufacturer made express warranties in the form of "advertisements, brochures and product labels." *Id.*

14

*Michigan: Conflict.* The highest court of Michigan has not yet spoken on the express warranty/privity issue. I am therefore required to predict how that court, if confronted by the issue, would rule. *Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 220-21 (3d Cir. 2008).

The Sixth Circuit has held that "it seems clear to us that Michigan's rejection of privity is not limited to tort actions as opposed to actions based on warranty whether express or implied." *Reid v. Volkswagen of Am., Inc.,* 512 F.2d 1294, 1298 (6th Cir. 1975). That language, however, is general and the case is nearly 40 years old. A bankruptcy court within the Sixth Circuit, speaking in 2011, was not so sure: "under current Michigan law, it is unclear whether purchasers may successfully maintain breach of warranty claims against a remote manufacturer if the parties are not in privity of contract." *In re SCBA Liquidation, Inc.,* 451 B.R. at 770.

Michigan's intermediate appellate court, writing in 2009, concluded that privity is required:

> Our Supreme Court in *Piercefield* [*v. Remington Arms Co., Inc.,* 375 Mich. 85, 133 N.W.2d 129 (1965)] and *Spence* [*v. Three Rivers Builders & Masonry Supply, Inc.,* 353 Mich. 120, 90 N.W.2d 873 (1958)] considered the issue of privity in the context of *implied* warranties. Our research has revealed no modern case in which the Supreme Court has ever held that privity of contract is unnecessary to enforce and *express* warranty. Indeed, because an express warranty is a term of the contract itself, MCL 440.2313; 1 Hawkland, Uniform Commercial Code Series, § 2-313:2, pp. 526-527, we conclude that privity of contract *is* necessary for a remote purchaser to enforce a manufacturer's express warranty.

*Heritage Res., Inc. v. Caterpillar Fin. Servs. Corp.,* 284 Mich. App. 617, 774 N.W.2d 332, 343 n.12 (2009).

*Heritage Resources* is the best guide I can find as to the law of Michigan on this question. I will not disregard this authoritative statement of the Court of Appeals based on more generalized impressions about the "better" view or the "emerging trends" in the law. I conclude that, under Michigan law, an express warranty claim requires privity.

The FAC does not clearly allege that plaintiff McLenna, who purchased a washer from a retail intermediary, was in privity with the manufacturer, Whirlpool. McLenna's express warranty claim, as against Whirlpool only, is dismissed for lack of privity.

I therefore set aside the Michigan express warranty claims against Whirlpool for purposes of the rest of this discussion. Otherwise, the parties have not identified any other potential conflict as to the elements of an express warranty claim. Accordingly, I find that there is no true conflict between the laws of the various states (except Michigan) as to a claim for breach of express warranty based on a manufacturer's advertisement. *Snyder*, 792 F. Supp. at 717 ((quoting *P.V.*, 197 N.J. at 142–43, 962 A.2d at 453). I will apply the law of the forum, New Jersey, to those express warranty claims.[10]

## 2. Analysis

Under New Jersey law, to state a claim for breach of express warranty, "Plaintiffs must properly allege: (1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that

---

[10]   Before going forward, I briefly address Defendants' argument that the claims for both breach of express warranty and breach of implied warranty of merchantability must be dismissed for failure to provide pre-suit notice. Pre-litigation notice, a requirement of New Jersey, Florida, Indiana, Michigan, Ohio, Texas, and Virginia law, would potentially affects Plaintiffs Dzielak, Angelone, Reid, Beyer, McLenna, Parsons, Cohen, and Schramm.

Plaintiffs maintain that two Plaintiffs, Baker and Maxwell, provided notice to Whirlpool (and Sears, in the case of Baker) in letters attached to the Complaint. Plaintiffs maintain that these letters were provided on behalf of "'all other persons similarly situated' which includes the next eight plaintiffs that joined the lawsuit." Docket No. 47 at 12. Plaintiffs maintain that "[t]wo letters is enough notice. Ten is overkill." *Id.* In addition, although not all of the same Defendant-retailers were involved, a class action involving the same product, *Savett v. Whirlpool Corp.*, 12 CV 310, 2012 WL 3780451 (N.D. Ohio) was filed on February 28, 2012.

For purposes of a motion to dismiss (and because the issue might be better handled in connection with an amended pleading, on summary judgment, or at the class certification stage), I find the allegation of notice adequate.

the product ultimately did not conform to the affirmation, promise or description." *Snyder*, 792 F. Supp. 2d at 721 (citing N.J. Stat. Ann. § 12A:2–313) (other internal citation omitted). *See also Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 824 (3d Cir. 1999). Defendants contend that that the Energy Star logo is not an express affirmation or promise about the product, and that the FAC fails to identify the specific affirmations that became a part of the basis of the bargain. I disagree, and will deny the motion to dismiss on this ground.

a.   Energy Star logo as an affirmation or promise

The New Jersey UCC Section 12A:2–313(1) defines an "express warranty" as:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

"A statement can amount to a warranty, even if unintended to be such by the seller, 'if it could fairly be understood . . . to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance.'" *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 570 (7th Cir. 1993) (applying New Jersey law and quoting *Gladden v. Cadillac Motor Car Div., General Motors Corp.*, 416 A.2d 394, 396, 83 N.J. 320 (1980)), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014). "[W]hether a given statement constitutes an express warranty is normally a question of fact for the jury." *Snyder*, 792 F. Supp. 2d at 721-22; *see also Union Ink Co., Inc. v. AT & T Corp.*, 352 N.J. Super. 617, 645, 801 A.2d 361 (N.J. Super. Ct. App. Div. 2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact.").

The FAC alleges that DOE requires that Energy Star-qualified washers exceed certain minimum standards for energy efficiency. In particular, qualified machine models must use approximately 37% less energy and 50% less water than standard models. FAC ¶ 2. "Defendants, as the designer, manufacturer, marketers, distributors, or sellers expressly warranted that the Mislabeled Washing Machines were fit for their intended purpose in that would function properly as energy efficient washing machines within the parameters established by federal law and the ENERGY STAR® program." FAC ¶ 73. The FAC further alleges that Plaintiffs saw the logo before and at time of sale; understood the logo to mean that the machine complied with the program's efficiency standards; and would not have purchased the washers had their true energy efficiency had been known. As a result of their understanding, they paid a price premium attributable to the labeling of the machines as Energy star-qualified; that the mislabeled machines did not perform as promised; and that Plaintiffs have and will continue to pay higher energy costs as long as they continue to use the mislabeled machines. *Id.* at 22. That is a legally sufficient allegation that, by attaching the Energy Star label to the washing machines, Defendants affirmed that the washers qualified for the program and met its efficiency standards. *See Taylor v. JVC Americas Corp.*, Civ. No. 07-4059, 2008 WL 2242451, at *5 (D.N.J. May 30, 2008) (warranty claim sufficiently pled by allegations that packaging said the product was a "1080p" television, but television did not accept a 1080p signal).

In an earlier opinion, I distinguished certain cases holding that the Energy Star logo, standing alone, did not support a claim for breach of express warranty. *See Avram v. Samsung Elecs. Am.*, Inc., No. 11–CV-6973 KM, 2013 WL 3654090 (D.N.J. July 11, 2013). For example, in *Savett v. Whirlpool Corp.*, the court found that the complaint failed to allege any particular statement or promise that the logo was understood to convey. No. 12-CV-310, 2012 WL 3780451, at *9 n.8 (N.D. Ohio Aug. 31, 2012) ("Notably, plaintiff does not allege the he saw or understood any purported meaning of the logo."). Here, however, Plaintiffs allege that they understood the logo to mean that the machine was compliant with the federal program and that compliant machines use approximately 37% less energy and 50% less water than standard models. *Rossi v. Whirlpool Corp.*, Civ. No. 12-125, 2013 WL 1312105 (E.D. Cal. Mar. 28, 2013), cited by both sides, relies on California law; New Jersey law is broader. *See Hemy v. Perdue Farms, Inc.*, No. 11-CV-888, 2013 WL 1338199, at *7, *10 (D.N.J. Mar. 31, 2013) (complaint sufficiently alleges that a "humanely raised" label would be understood by consumers to encompass the slaughtering

process); *Taylor, supra,* 2008 WL 2242451 at *5. In any event, the *Rossi* Court later found that a second amended complaint did state a claim for breach of express warranty. It held that "affixing this logo to the product satisfies the definition of an express warranty" because it was "an affirmation of fact that the product adheres to the Energy Star product, and because "it sufficiently describes the product as meeting the Energy Star requirements." *Rossi v. Whirlpool Corp.*, No. 12-CV-00125, 2013 WL 5781673, at *4 (E.D. Cal. Oct. 25, 2013) (citing *Avram*, 2013 WL 3654090).

Applying New Jersey law, I find that the Amended Complaint adequately alleges that the Energy Star logo would be understood by consumers as an affirmation of fact or a promise regarding the energy efficiency of the washing machines—namely, that the machines met the efficiency standards set forth as part of the Energy Star program. The *Rossi* Court reasoned that it could not "fathom any other reason to affix an Energy Star logo to a product other than for the purpose of expressing that the product meets the Energy Star requirements." *Rossi*, No. 12-CV-00125, 2013 WL 5781673, at * 5 (E.D. Cal. Oct. 25, 2013). I agree and find that the FAC adequately alleges an express warranty claim.

### b. Basis of the bargain and breach

"Under New Jersey law, a representation is presumed to be part of the basis of the bargain 'once the buyer has become aware of the affirmation of fact or promise' and can be rebutted by 'clear affirmative proof that the buyer knew that the affirmation of fact or promise was untrue.'" *Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 469 (D.N.J. 2007) (quoting *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 825 (3d Cir. 1999) (internal quotation omitted)), *on reconsideration in part*, No. 05-CV-538, 2007 WL 2746713 (D.N.J. Sept. 18, 2007), *aff'd sub nom. Viking Yacht Co., Inc. v. Composite One LLC*, 385 F. App'x 195 (3d Cir. 2010).

Here, Plaintiffs allege that they saw and relied on the Energy Star labels, that they understood the labels to be a representation and warranty that the machines met the Energy Star program efficiency standards, and that they would not have purchased the machines if they had known the washers did not comply. FAC ¶¶ 29–38. And they allegedly did not comply. FAC ¶ 1 ("In fact, the Mislabeled Washing Machines do ***not*** meet the Energy Star standards."). Those allegations adequately set forth a claim that the warranty was part of the basis of the bargain, and that Defendants breached it.

### c.   The one-year "Limited Warranty"[11]

Finally, Defendants argue that a written one-year "limited warranty," confined to the cost of "factory specified parts and repair labor to correct defects in materials or workmanship," effectively precludes any broader express warranty claim based on Energy Star. Docket No. 37 at 33. The limited warranty, say Defendants, is exclusive, and it operates as a disclaimer of any broader warranty regarding energy efficiency.

A disclaimer of express warranty is qualitatively different from a disclaimer of an implied warranty. The courts have been particularly wary of disclaimers that take away with one hand what was given with the other. Thus a disclaimer of an express warranty must be "clear and conspicuous." *Viking Yacht Co.*, 496 F. Supp. 2d at 470 (quoting *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320, 331–32, 416 A.2d 394 (1980)). "To be conspicuous, a disclaimer must be 'so written that a reasonable person against whom it is to operate ought to have noticed it.'" *Id.* (also quoting N.J.S.A. § 12A:1–201(10)). And even a clear and conspicuous disclaimer may be deemed inoperative if it is "unreasonably inconsistent" with an express warranty. *Id.*

I agree with Plaintiffs that this limited warranty, which does not so much as mention energy efficiency, does not constitute an explicit and conspicuous disclaimer of the Energy Star express warranty.[12]

---

[11]   Defendants argue that the limited warranty is relied on by Plaintiffs in the Amended Complaint and is, therefore, properly before the Court on these motions. Plaintiffs do not appear to contest this point. It is worth noting that the paragraphs Defendants refer to (FAC ¶¶ 62–75) do not appear to rely on the limited warranty, but instead rely on what Plaintiffs allege to be the express warranty invoked here—the Energy Star logo. If the limited warranty is not referred to in the Amended Complaint, it would not ordinarily be considered as part of a motion to dismiss. I nevertheless consider it here and find it ineffective to the extent that Defendants argue that the limited warranty precludes the finding of an express warranty.

[12]   Defendants cite *Cooper v. Samsung Electronics Am., Inc.*, 374 F. App'x 250, 253 (3d Cir. 2010). There, the plaintiff explicitly based his breach of warranty claim on a limited warranty that only covered "manufacturing defects in materials and

To summarize, then, I apply New Jersey law and deny the motion to dismiss the express warranty claims, with one exception. The Michigan express warranty claim of plaintiff McLenna is dismissed as against defendant Whirlpool only, on grounds of lack of privity.

## B. Breach of Implied Warranty of Merchantability (Count III)

Defendants argue that the implied warranty of merchantability claims should be dismissed. The motion is granted in part, and the implied warranty claims of plaintiffs Maxwell, Baker, Parsons, and Reid are dismissed as against Whirlpool only. Under applicable Ohio, California, and Florida law, privity is required, and these plaintiffs are not in privity with the manufacturer, Whirlpool (as opposed to the retail seller). The motion is otherwise denied.

### 1. Choice of law and privity

The parties do not offer a choice of law analysis and generally agree that New Jersey law governs the elements of the implied warranty claims. Defendants do point out, however, that the states' laws differ as to whether privity is required. The analysis is parallel to, but not identical with, the analysis of express warranty. *See* Section IV.A.1., *supra*.

As to privity, the laws of New Jersey, Michigan, Indiana, Texas, and Virginia are similar; privity is not required. As to those five states, the privity issue presents a nonexistent or "false conflict," wherein "the laws of the ... jurisdictions would produce the same result on the particular issue presented." *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997). New Jersey forum law will therefore govern those claims.

There is a genuine conflict, however, between the law of New Jersey and that of Ohio, California, and Florida (potentially affecting plaintiffs Maxwell, Baker, Parsons, and Reid). Courts in those three states have held that, under

workmanship" in a television. *Id.* Substantively, however, his complaint was that the television did not perform as promised in its advertisements and packaging. The Court concluded that, because plaintiff had not alleged a manufacturing defect, his claim under the limited warranty could not survive. *Id.* at 253–54. Here, Plaintiffs base their claim on a separate express warranty—the Energy Star logo—not the limited warranty provided by the manufacturer.

local law, privity of contract is required to assert a claim for breach of implied warranty of merchantability. *See McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 757 (N.D. Ohio 2010) ("Consumer failed to allege privity of contract with vitamin producer, as required to state claim for breach of implied warranty of merchantability under Ohio law."); *Paramount Farms, Inc. v. Ventilex B.V.*, 735 F. Supp. 2d 1189, 1217 (E.D. Cal. 2010) (quoting *U.S. Roofing, Inc. v. Credit Alliance Corp.*, 279 Cal. Rptr. 533, 538 (Cal. Dist. Ct. App. 1991) ("Vertical privity is a prerequisite in California for recovery on a theory of breach of the implied warranties of fitness and merchantability."); *Smith v. Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1342 (S.D. Fla. 2009) (quoting *Mesa v. BMW of N. Am., LLC,* 904 So.2d 450, 458 (Fla. Dist. Ct. App. 2005)) ("It is now well-settled that, barring certain exceptions, '[u]nder Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity.'").[13]

A court that is presented with a genuine conflict must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in Section 188 of the Restatement (Second) of Conflict of Laws. *Gilbert Spruance Co.*, 134 N.J. at 102, 629 A.2d at 888. Those factors are: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Spence-Parker v. Delaware River & Bay Auth.*, 656 F. Supp. 2d 488, 498-99 (D.N.J. 2009) (citing Restatement (Second) of Conflicts § 188(2)).

Those five Restatement factors dictate that the law of the state in which the Plaintiffs purchased their machines (Ohio, California, or Florida) should govern their implied warranty of merchantability claims against the manufacturer, Whirlpool. The Plaintiffs shopped for, purchased, installed and used their washing machines in their home states. They live there, and presumably continue to use their washing machines there. Those facts imply that the first four factors favor their home states. The fifth at best balances evenly as between plaintiffs and defendants.

The plaintiffs are plausibly alleged to be in privity with the retailers who sold them the washers, but there is no allegation that any plaintiff is in direct

---

[13]    Whatever special circumstances may undermine the privity requirement as to an express warranty made by the manufacturer, *see* IV.A.1, *supra*, are not urged here with regard to implied warranty.

privity with the manufacturer, Whirlpool. Accordingly, the privity requirement of Ohio, California, and Florida law would preclude an implied warranty of merchantability claim against defendant Whirlpool.

The privity requirement of applicable Ohio, California, and Florida law bars the implied warranty claims of Maxwell, Baker, Parsons, and Reid as against defendant Whirlpool. Those claims are therefore dismissed for failure to state a legal cause of action.

## 2. Analysis of the Remaining Claims

The rest of the implied warranty claims are not barred by any privity requirement. Maxwell, Baker, and Parsons (whose warranty claims against Whirlpool I have just dismissed) nevertheless may assert implied warranty claims against the retail sellers, with whom they are in privity.[14] All of the other plaintiffs live in states where privity is not required, and therefore may assert implied warranty claims against Whirlpool, as well as the retailers from whom they bought their washers. Privity aside, the elements of a claim for breach of the implied warranty of merchantability do not vary across the states. I therefore analyze all of the remaining implied warranty claims under New Jersey law.

Defendants move to dismiss the implied warranty claims because the FAC fails to allege that the washers were not fit for their "intended and ordinary purpose." That ordinary purpose, say Defendants, is to clean clothes, not to operate at any particular level of efficiency.

Plaintiffs respond that this appliance had a more particular "ordinary purpose": it was sold as a high-efficiency washer that would wash clothes *in compliance with Energy Star efficiency standards*. Thus the FAC alleges that "the goods were unfit for their intended and ordinary purpose in that they did not function properly as energy efficient washing machines in the parameters established by federal law and the Energy Star program." FAC ¶ 78.

"[T]he UCC, as adopted by New Jersey, specifically states that an implied warranty of merchantability ensures that goods sold are 'fit for the ordinary purposes for which such goods are used.'" *Arlandson v. Hartz Mountain Corp.,*

---

[14]    Plaintiff Reid, who purchased the washer on a military base, does not sue any retailer, but only the manufacturer, Whirlpool.

792 F. Supp. 2d 691, 706 (D.N.J. 2011) (quoting N.J. Stat. Ann. § 12A:2–314(f); *Henderson v. Volvo Cars of N. Am., LLC*, No. 09-CV-4146, 2010 WL 2925913, at *9, 2010 (D.N.J. July 21, 2010)). It "does not impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality." *Lieberson v. Johnson & Johnson Consumer Companies, Inc.*, 865 F. Supp. 2d 529, 542 (D.N.J. 2011) (internal quotations and citations omitted). "[M]erchantability is defined as the product sold 'should be of the general kind described and reasonably fit for the *general* purpose for which it should have been sold.'" *Id.* (quoting *Ferrari v. American Honda Motor Co., Inc.*, A-1532-07T2, 2009 WL 211702, at *3 (N.J. Super. Ct. App. Div. Jan. 30, 2009)) (other internal quotation and citation omitted) (emphasis added). Generally, a court will find a good to be unfit for its ordinary purpose "when [it] can identify one of three general types of defects: manufacturing defects, design defects, and failure to give the buyer proper instructions with respect to the goods." *Id.*

An "ordinary purpose" of a product is one that is central to the product's value or function. *Compare Zabriskie Chevrolet, Inc. v. Smith*, 99 N.J. Super. 441, 450, 240 A.2d 195, 200 (Law Div. 1968) (where the car the plaintiff purchased broke down less than a mile from the dealership, the car was "substantially defective" and in breach of the implied warranty of merchantability), *with Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 283 (D.N.J. 2011) (rejecting implied warranty of merchantability claim that a single-cup brewing system, although it brewed beverages, failed to brew precisely one cup), *and Lieberson*, 865 F. Supp. 2d at 543 (finding no breach of the implied warranty of merchantability where soap and lotion did not help babies sleep, as advertised, because the soap was "clearly manufactured for the purpose of washing and moisturizing babies' skin" and it did do that).

I think that the Energy Star label is more analogous to the core transportation function of the car in *Zabriskie,* and less analogous to the incidental qualities of the coffeemaker in *Green* or the soap in *Lieberson.* As I noted in *Avram,* 2013 WL 3654090 at *13, "[s]oporific qualities and precise portion control do not, so far as I am aware, embody any settled consumer expectation as to baby soap or coffee makers. An Energy Star logo, by contrast, stands for a level of efficiency, defined in relation to statutory standards, for which consumers allegedly are willing to pay a premium."

Plaintiffs argue in the alternative that, even assuming that the washers' ordinary purpose is limited to cleaning, they still flunk the implied warranty test. That is, they would not "pass without objection in the trade under the contract description," or "conform to the promises or affirmations of fact made on the container or label," and that they are not "adequately ... labeled." Docket No. 47 at 12 (quoting N.J.S.A. § 12A:2-314). In short, according to Plaintiffs, they were not just promised that their clothes would be washed. The Energy Star label, they say, impliedly promised that their clothes would be washed efficiently.

The FAC adequately states a claim for breach of the implied warranty of merchantability. The motion to dismiss on these grounds, except as to the claims requiring privity, *see* Section B.1, above, is denied.

## C. Unjust Enrichment (Count IV)

### 1. Choice of Law

The parties seemingly agree that there is no genuine conflict among the eight states' laws as to unjust enrichment.[15] Indeed, many courts have suggested that there are no significant disparities in the unjust enrichment laws of the 50 states. *See Snyder*, 792 F. Supp. 2d at 723 ("Numerous courts have held that unjust enrichment laws do not vary in any substantive manner from state to state."); *In re Mercedes–Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) (finding that any differences under the laws of the various states are "not material and do not create actual conflict"); *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 464 (D.N.J. 2009) (concluding that "there are no actual conflicts among the laws of unjust enrichment"); *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007) (examining the unjust enrichment laws of the 50 states and concluding that, "[a]lthough there are numerous permutations of the elements of the cause of action in the various states, there are few real differences"). Accordingly, I will apply New Jersey law.

---

[15]   Defendants note, however, that by analyzing this claim under New Jersey law, they do not intend to waive any argument that another jurisdiction's law should apply to the non-New Jersey Plaintiffs.

2. <u>Analysis</u>

Under New Jersey law, to state a claim for unjust enrichment, "a plaintiff must allege that (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *Snyder*, 792 F. Supp. 2d at 723-24. At the pleading stage, a plaintiff "need only allege facts sufficient to show: 1) Plaintiff conferred a benefit on Defendant; and 2) circumstances are such that to deny recovery would be unjust." *Palmeri v. LG Electronics USA*, Inc., No. 07-CV-5706, 2008 WL 2945985, *5 (D.N.J. July 30, 2008) (citing *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 437, 608 A.2d 280 (1992)).

I will dismiss the unjust enrichment claim as against Whirlpool only, because the Plaintiffs conferred no direct benefit on Whirlpool. The requirement that a plaintiff must confer a benefit on the defendant "has been interpreted by New Jersey courts as a requirement that 'the plaintiff allege a sufficiently direct relationship with the defendant to support the claim.'" *Snyder* 792 F. Supp. 2d at 724 (quoting *Nelson v. Xacta 3000 Inc.,* Civ. No. 08–5426, 2009 WL 4119176, at *3 (D.N.J. Nov. 24, 2009)); *see also Cooper,* 2008 WL 4513924, at *10 (dismissing an unjust enrichment claim where consumer's purchase was through a retailer, as there was no relationship conferring any direct benefit on the manufacturer). "When consumers purchase a product from a third party, they confer a benefit on that third party, not on the manufacturer." *Snyder*, 792 F. Supp. 2d at 724. Each Plaintiff paid the purchase price to one of the retailer-defendants, not to Whirlpool. They did not confer a sufficiently direct benefit on Whirlpool to support an unjust enrichment claim.

I find, however, that Plaintiffs have adequately stated unjust enrichment claims as against the defendants other than Whirlpool. The FAC alleges that Plaintiffs conferred a direct benefit on the retailer-defendants. Plaintiffs allegedly paid those retail defendants "a price premium due to the mislabeling of the washing machines as Energy Star-qualified. They further allege that Defendants have been unjustly enriched by retaining the revenues derived from Plaintiffs' purchases." FAC ¶¶ 88, 89. That, I believe, sets forth the elements of an unjust enrichment claim.

Unjust enrichment is a backstop cause of action that often turns out to be superfluous if, for example, a breach of contract is shown. But Plaintiffs plead this claim in the alternative, as they are permitted to do. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out two or more statements of a claim or defense

alternatively or hypothetically, either in a single count or defense or in separate ones.") At this stage, it would be premature to dismiss an unjust enrichment claim simply because it may later be eclipsed by some other cause of action. *See Palmieri,* 2008 WL 2945985 at \*7 ("unjust enrichment is, by its nature, an alternative remedy to contract and tort remedies .... It is inherent in a claim for unjust enrichment that it is pled in the alternative to a claim for recovery on the contract.").

The unjust enrichment claims against Whirlpool will be dismissed for failure to state a legal cause of action. As to the other defendants, the motion to dismiss the unjust enrichment claims on these grounds is denied.

### D. Magnuson-Moss Warranty Act (Count I)

Magnuson-Moss is "a remedial statute designed to protect the purchasers of consumer goods from deceptive warranty practices." *Miller v. Willow Creek Homes, Inc.,* 249 F.3d 629, 630 (7th Cir. 2001) (citation omitted). The statute provides that "a consumer who is damaged by the failure of a . . . warrantor . . . to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310. "Magnuson–Moss claims based on breaches of express and implied warranties under state law depend upon those state law claims." *Cooper,* 2008 WL 4513924, at \*6 (citing *In re Ford Motor Co. Ignition Switch Prods. Liability Litig.,* 19 F. Supp. 2d 263, 267 (D.N.J. 1998)).[16]

Plaintiffs allege that the machines are consumer products as defined under 15 U.S.C. Section 3301(1); that Plaintiffs and class members are consumers as defined under Section 2301(3); that Defendants are suppliers and warrantors under Section 2301(4), (5); that Defendants issued written warranties as defined under Section 2301(6); and that Defendants violated Plaintiffs and putative class members' statutory rights under the MMWA when the machines did not meet the energy efficiency requirements of the Energy

---

[16]     Plaintiffs argue that only implied warranty claims are dependent on state law, while express warranty claims under the MMWA can be brought independent of state law. The issue is not consequential to my denial of the motion to dismiss; one way or the other, the FAC states a claim.

Star program, as warranted by the Energy Star logo.[17] FAC at 21–22. Defendants respond simply that the MMWA claims are invalid because the underlying state law warranty claims are invalid. Additionally, they contend that Plaintiffs' claims under the MMWA based on "written warranties" fail because the FCA fails to identify such a written warranty.

As discussed in Sections IV.A and B, above, all of the state-law causes of action for breach of express and implied warranties are legally sufficient, except for the express warranty claim brought by McLenna against Whirlpool and for the implied warranty claims brought by Maxwell, Baker, Parsons, and Reid against Whirlpool. The MMWA claim stands with them, and the motion to dismiss is denied on this ground.

As to Defendants' second argument, I look to the statutory definition of a "written warranty." A "written warranty" is:

> (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time . . .
>
> which . . . becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

15 U.S.C. § 2301(6).

As discussed above in Section IV.A, the FAC adequately alleges that the Energy Star logo constitutes a written affirmation of fact relating to the washers' performance that became part of the basis of the bargain.

---

[17]   "Consumer product" is defined as any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed). 15 U.S.C. § 2301(1). A "supplier" is any person engaged in the business of making a consumer product directly or indirectly available to consumers. 15 U.S.C. § 2301(4). There is no issue as to these elements.

Accordingly, the FAC states claims under MMWA, and the motions to dismiss Count I for failure to state a legal cause of action are denied.

### E. State Consumer Protection Statutes

A Plaintiff may bring state law claims only under the law of the state where he or she lived and the alleged injury occurred. *See, e.g., Cooper*, 374 F. App'x 250, 255 (3d Cir. 2010) ("Cooper, who purchased the television in his home state of Arizona, is not entitled to sue under the New Jersey consumer fraud statute."). Although the wording of the FAC is broad and imprecise, I will interpret it in accordance with that principle. Thus—particularly for purposes of assessing standing at the motion-to-dismiss stage—I deem the NJ Consumer Fraud Act claim to have been brought by Dzielak and Angelone individually and (putatively) on behalf of the New Jersey subclass; the California-law claims to have been brought by Baker and Maxwell individually and on behalf of the California subclass; and so on. Each claim, moreover, is deemed to be directed against the manufacturer, Whirlpool, and the particular retailer from whom the particular plaintiff purchased his or her washer.[18]

---

[18]   The reason for this approach should be clear. Article III standing requires that a plaintiff demonstrate that he or she suffered an "'injury in fact, that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 225 (3d Cir. 1998), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014) (citations omitted). The Supreme "Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335, (2006). The fact that a suit is brought as a class action "adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975). If this were not the case, a "plaintiff would be able to bring a class action complaint under the laws of nearly every state in the Union without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good-faith basis." *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *10.

Thus, in *Hemy v. Perdue Farms, Inc.*, 2011 WL 6002463, the putative class plaintiffs asserted claims with respect to the humane treatment of both "Harvestland" and general "Perdue" brand chicken. It appears, however, that the named plaintiffs

### 1. New Jersey Consumer Fraud Act[19]

To state a prima facie case under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-1 *et seq.*, a plaintiff must allege three elements: "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557, 964 A.2d 741 (2009) (citations omitted). Rule 9(b)'s heightened standard for pleading fraud, *see* Section II, *supra*, applies to a NJCFA claim. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

---

had purchased only "Harvestland" chickens. They argued that, "while they did not allege that they purchased 'Perdue' brand products, other potential class members may have purchased such products." *Id.* at *11. Citing standing law, Judge Wolfson of this Court ruled that "Plaintiffs' claims will be limited to only the Harvestland chicken products. Accordingly, Plaintiffs' challenges to the 'Perdue' brand products are hereby dismissed with prejudice and, for purposes of this motion, the Court will consider only Plaintiffs' allegations with regard to the Harvestland brand products." *Id.* (quoting *Lieberson*, 865 F. Supp. 2d at 537).

To be sure, courts have sometimes sidestepped Article III standing questions when simultaneously faced with dispositive class certification issues. See *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (exercising judicial discretion and declining to reach Article III standing questions where class certification issues were dispositive). As clarified in *In re Magnesium Oxide Antitrust Litig.*,

> *Amchem* and *Ortiz* stand for the proposition that, in cases where a court is presented with class certification and Article III standing issues simultaneously, and the class certification issues are dispositive in that they pertain to statutory standing—i.e. whether a statute authorizes a given party to sue in the first place, the certification issues are "logically antecedent" to the standing issues and the court may therefore elect to address the certification issues first in the interest of judicial restraint."

2011 WL 5008090, at * 10. That practical exception, employed for purposes of judicial economy, must be confined to its proper context. A court presented squarely with an issue of standing with respect to a named plaintiff must address that issue.

---

[19] Dzielak and Angelone are deemed to have asserted this NJCFA claim against Whirlpool, Lowe's, and Home Depot.

a.  Unlawful conduct

Unlawful conduct under the NJCFA falls into three general categories: "affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. §§ 56:8–2, 56:8–4." *Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641, 648 (D.N.J. 2013), *reconsideration denied*, 12-CV-00608 WHW, 2013 WL 1890276 (D.N.J. May 3, 2013) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17, 647 A.2d 454 (N.J. 1994).[20]

Plaintiffs maintain that they have sufficiently pleaded unlawful conduct by alleging that Whirlpool promoted the washing machines as Energy Star-compliant and labeled the machines with the Energy Star logo. FAC ¶ 1. In addition, the retailers allegedly "acted with knowledge and approval of Whirlpool and/or as the agent of Whirlpool." FAC ¶¶ 21, 29–38. In particular, the retailers adopted Whirlpool's misrepresentations as their own by promoting and selling the machines as Energy Star-compliant. *Id.* at 8–16, ¶¶ 29–38.

Defendants' arguments are by now familiar. They dispute that the Energy Star logo constituted a specific representation of energy efficiency; that Plaintiffs understood such representations; and that such representations were factually false. *See Viking Yacht Co., Inc. v. Composite One, LLC*, 385 F. App'x 195, 200 (3d Cir. 2010) (explaining that whether a representation is false is relevant to whether it is a misrepresentation). As previously discussed in section IV.A.2, *supra*, the FAC adequately alleges that the Energy Star logo would be understood by consumers as an affirmation of fact that the washers met the efficiency standards of the Energy Star program. Plaintiffs allege that they saw and understood the logo as such a representation, and that it was false: *i.e.*, that the machines "do *not* meet the Energy Star standards." FAC ¶

---

[20]     The statute provides that

>    The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. Ann. § 56:8–2.

1.[21] Accordingly, I find Plaintiffs' allegations sufficient to set forth a claim that the Energy Star logo was an affirmative misrepresentation under the NJCFA.

As I say, the foregoing is sufficient to sustain the claim.[22] I note for future reference, however, that the allegations that the retailer Defendants acted as agents of Whirlpool have a conclusory quality, especially when measured against the pleading standard of Fed. R. Civ. P 9(b). Plaintiffs also maintain, however, that the retailers adopted the misrepresentations as their own by promoting and selling the machines as Energy Star-certified devices. Each plaintiff alleges that he or she understood the Energy Star label "as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of energy efficiency established by the Energy Star program . . . ." FAC ¶¶ 29–38.

"A plaintiff must allege the 'who, what, when, where, and how' of" a NJCFA claim. *Crozier v. Johnson & Johnson Consumer Companies, Inc.*, 901 F. Supp. 2d 494, 506 (D.N.J. 2012) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004)). Of course proof is another matter entirely, but the FAC

---

[21]   The subsequent disqualification of model number MVWC6ESWW1 on May 7, 2012 lends additional plausibility, but is not necessary.

[22]   There are certain arguments in the alternative that the Court need not address at this time.

Plaintiffs assert that the unlawful conduct prong is satisfied because Defendants are in violation of pertinent New Jersey regulations. Docket No. 47 at 15.

Defendants assert that Plaintiffs have not alleged with specificity the marketing and promotional efforts (other than the Energy Star label) on which they rely. I agree that Plaintiffs cannot base their unlawful conduct allegation on "general statements and advertising" regarding the Energy Star program or the machines' energy efficiency unless they tie those representations to the Plaintiffs and their buying decisions. *See Lieberson*, 2011 WL 4414214, at *6 ("Plaintiff has not identified whether these statements were made in a television commercial, print advertisement, on a website or elsewhere. Moreover, Plaintiff has not identified when these statements were made or whether and when Plaintiff actually viewed them."). *See also Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 100 (D.N.J. 2011) ("Under New Jersey law, misrepresentations made to the public generally but not the plaintiff do not bear a sufficient nexus to an individual plaintiff's purchase and loss to satisfy the Consumer Fraud Act . . . ."). In any amended pleading, plaintiffs may wish to avoid a risk of dismissal by being more specific.

sufficiently alleges that the relevant defendants affirmatively misrepresented that the machines were Energy Star-compliant by affixing and displaying the Energy Star logo.

### b. Ascertainable loss and causation

"New Jersey courts have been chary to ascribe the term [ascertainable loss] a precise meaning." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 300 (D.N.J. 2009) (citing *Thiedemann v. Mercedes–Benz USA, LLC*, 183 N.J. 234, 248, 872 A.2d 783 (2005)). An ascertainable loss under the NJCFA "occurs when a consumer receives less than what was promised." *Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J. Super. 617, 646, 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002) (citation omitted). The statute does not, however, "require that the loss be monetary []or that it must be pled beyond a reasonable degree of certainty." *Arcand*, 673 F. Supp. 2d at 300.

Accordingly, a plaintiff must allege that a misrepresentation induced an objectively reasonable expectation about a product and that this expectation was not met. *Smajlaj*, 782 F. Supp. 2d at 99–100. A cognizable injury, however, must consist of more than just any unmet expectation. *Id.* (citing *Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. Appx. 257, 259 (3d Cir. 2010)). Thus, for example, "[a] consumer who expects a car that never requires resort to its comprehensive warranty . . . or who expects the life of a toner cartridge to be linked precisely to the amount of toner in the cartridge . . . has not experienced a loss when that expectation is not met." *Id.* (internal citations omitted). Only a consumer who has received a product that is worth objectively less than he or she may reasonable expect has endured an injury under the statute. *Id.* Under such a benefit-of-the-bargain theory, a plaintiff must proffer a "quantification of the difference in the value between the product received and the product promised." *Id.* The plaintiff need not, however, offer a calculation of the loss.

Here, Plaintiffs allege that, in the belief that the washer was Energy Star-compliant, they paid a premium price. Because the washer is not in fact Energy Star-compliant, they pay higher electricity bills. As Plaintiffs allege, the "fundamental bargain" of the Energy Star program is that "consumers pay a higher up-front price initially but save more on energy bills." FAC ¶ 2. It is thus plausible to assert that the value of that bargain would be subverted by a false statement that a washer is Energy-Star compliant.

The FAC alleges facts that would allow the Court to quantify a difference in value and even suggests a means to calculate loss: the price premium paid, plus increased energy costs over the lifetime of the appliance. FAC ¶ 46.[23] The precise amount of loss need not be known; it need only be measureable. *See Talalai v. Cooper Tire & Rubber Co.*, 360 N.J. Super. 547, 563, 823 A.2d 888, 898 (Ch. Div. 2001). Rule 9(b) does not require that a plaintiff allege a specific dollar amount to survive the pleadings stage. *Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, 3:08-CV-1057-FLW, 2008 WL 5381227, at *7 n.3 (D.N.J. Dec. 17, 2008) ("Although there is no specific dollar amount alleged in Plaintiff's Complaint, that level of specificity is not required by the case law and Rule 9(b)."). For their money, Plaintiffs "received something less than, and different from, what they reasonably expected in view of defendant's presentations. That is all that is required to establish 'ascertainable loss' . . . ." *Miller v. Am. Family Publishers*, 284 N.J. Super. 67, 90-91, 663 A.2d 643, 655 (Ch. Div. 1995).

Finally, I consider whether the FAC adequately pleads a causal nexus between the unlawful conduct and ascertainable loss. Plaintiffs saw the Energy Star logo before and at the time of purchase, understood the logo to signify that the machine was compliant with Energy Star standards, and purchased the machine at a premium with the understanding that they would save in energy costs over time. The machines allegedly did not comply with Energy Star standards and, as a result, Plaintiffs paid a price premium for the machines and increased energy costs. That is a sufficient allegation of causation.

Accordingly, the New Jersey purchasers, Dzielak and Angelone, have stated a claim under the NJCFA.

### 2. California Consumer Protection Statutes[24]

#### a. Consumer Legal Remedies Act

---

[23]     And, of course, unquantified is not the same as unquantifiable. "The amount of the price premium can be reasonably quantified by an appropriate market study of the prices for comparable washing machines sold with and without the Energy Star logo, or through a contingent variation study, or through other means regularly employed by economic and valuation experts." FAC ¶ 46.

[24]     The California consumer protection statutory claims may properly be brought by California purchasers Baker and Maxwell against Whirlpool, Sears, and Fry's Electronics.

California's Consumer Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Conduct that is "likely to mislead a reasonable consumer" violates the CLRA. *Colgan v. Leatherman Tool Grp., Inc.,* 38 Cal. Rptr. 3d 36 (Cal. Ct. App. 2006) (quoting *Nagel v. Twin Labs., Inc.,* 134 Cal. Rptr. 2d 420 (Ct. App. 2003)). The claim is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Rossi,* 2013 WL 5781673, at *9. To satisfy this heightened pleading requirementyu, "the allegations must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Rossi,* 2013 WL 5781673, at * 9. (quoting *Bruton v. Gerber Products Co.,* No. 12–CV–02412–LHK, 2013 WL 4833413, at *4 (N.D. Cal. Sept. 6, 2013)).

> The CLRA provisions cited by Plaintiffs are:
>
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.
>
> . . .
>
> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.
>
> . . .
>
> (9) Advertising goods or services with intent not to sell them as advertised.

Cal. Civ. Code § 1770(a)(5), (7), (9).

Defendants first argue that the Energy Star logo contains no specific representation regarding a machine's relative energy use or efficiency. I disagree. As previously discussed, *see* IV.A.2, *supra,* Plaintiffs have sufficiently pleaded that the Energy Star logo represents that a machine is compliant with

the program requirements with regard to energy use and efficiency. *See Rossi*, 2013 WL 5781673, at *4 (concluding "Defendant's adhesion of the Energy Star certification to its products falls within the statutory definition of an express warranty pursuant to California Law, and that Plaintiffs have alleged an express warranty with appropriate specificity" where Plaintiffs alleged that the product met the Energy Star program requirements).

Defendants also submit that the FAC fails to allege that Defendants knew the washers were non-compliant at the time of sale, and that any knowledge attributable to Whirlpool should not be attributed to the retailer-Defendants. "California federal courts have held that under the CLRA, plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss." *Rossi*, 2013 WL 5781673, at * 10. While Plaintiffs' argument was a winning one in *Rossi*, in that case the Plaintiffs specifically pleaded that the manufacturer either tested the machines before marketing them (and therefore knew they did not comply), or that it failed to test the machines (and therefore knew its representations to have not basis). *Rossi*, 2013 WL 5781673, at * 10.

Plaintiffs argue that the FAC allegations fall within *Rossi*. Thus Baker purchased her machine on December 1, 2010, seventy-two days after DOE notified Whirlpool that the appliance failed testing on September 20, 2010. FAC ¶¶ 37, 40. The same cannot be said for Maxwell, who purchased his machine on November 27, 2009, before Springboard Engineering ever completed DOE efficiency testing of the Maytag machine. FAC ¶ 39. Therefore, Maxwell's CLRA claim must be dismissed.

Plaintiffs argue that "from the allegations of the Complaint it can be inferred" that Defendants tested washers and knew they were non-compliant, or else that they failed to perform adequate testing. Docket No. 47 at 20. I will not "infer" what is not properly pleaded.[25]

---

[25]   Compare *Rossi*, where Plaintiffs specifically pleaded:

As such, Whirlpool either (a) tested the Mislabeled Refrigerators before marketing them and, at all times relevant hereto, knew that the models were non-compliant with the requirements of the ENERGY STAR® program or, in the alternative (b) affixed ENERGY STAR® labels to the Mislabeled Refrigerators without testing them, and thus knew the representation concerning their energy efficiency was baseless. This information is solely within Whirlpool's possession.

Finally, I will address Defendants' contention that any knowledge possessed by Whirlpool cannot be attributed to the retailer-Defendants. Here, Plaintiffs allege in a generalized fashion that "defendants were aware of the defect because they were aware that DOE-initiated testing had shown" that the machines were not Energy Star compliant. FAC ¶ 100. At the pleading stage, "knowledge, intent, or 'other conditions of a person's mind'" may be pleaded generally. *Rossi*, 2013 WL 5781673, at * 9 (quoting *Kowalsky v. Hewlett–Packard Co.*, No. 10–CV–02176–LHK, 2011 WL 3501715, at *3 (N.D. Cal. Aug.10, 2011) (quoting Fed. R. Civ. P. 9(b)). The FAC provides no supporting facts, and this issue may well be difficult to prove, but I will not dismiss the claims against the retailers on this basis.

The CLRA claim of Maxwell is dismissed. The motion to dismiss the CLRA claim of Baker for failure to state a claim is denied.

### b. Unfair Competition Law

The Unfair Competition Law ("UCL") prohibits acts or practices that are: (1) unlawful; (2) fraudulent; or (3) unfair. Cal. Bus. & Prof. Code § 17200. Each prong of the UCL constitutes a separate and distinct theory of liability. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). The UCL proscribes "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." § 17200. The California Supreme Court has held that the UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999) (internal quotations and citation omitted). At the same time, however, the available relief is limited: "A UCL action is equitable in nature; damages cannot be recovered." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003).

Plaintiffs allege that Defendants violated each of the three UCL prongs. Defendants argue that Plaintiffs fail to allege facts supporting any of the three prongs and, accordingly, move to dismiss the claim in its entirety.

The fraudulent practice prong of the UCL "has been understood to be distinct from common law fraud." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312,

---

*Rossi*, 2013 WL 5781673, at * 10.

207 P.3d 20, 29 (Cal. 2009). "'A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for injunctive relief' under the UCL." *Id.* (quoting *Day v. AT & T Corp.*, 74 Cal. Rptr. 2d 55, 60 (Cal. 1998)); *see In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1092 (S.D. Cal. 2010) ("Unlike common law fraud, a party can show a violation of the UCL's 'fraudulent practices'" prong without allegations of actual deception."). The term fraudulent, as used in the statute, then, requires only a likelihood: "a showing [that] members of the public 'are likely to be deceived.'" *Id.* (quoting *Puentes v. Wells Fargo Home Mortg., Inc.*, 72 Cal. Rptr. 3d 903, 909 (Cal. Dist. Ct. App. 2008)). Claims under this prong still require a plaintiff to plead that the alleged misrepresentation was directly related to the injurious conduct and that the plaintiff actually relied on the alleged misrepresentation. *Id.*

As discussed above, the FAC alleges that the Energy Star logo carries with it a representation that the washing machine meets certain energy efficiency standards, a representation that was not true. There is a sufficient allegation that Whirlpool made that representation and the retailers selling the machines adopted it as their own. *See* Section IV.A.2, *supra.* Baker and Maxwell allege that they saw and relied on the logo, and that they would not have made these purchases had they known the machines were not Energy Star complaint. *Id.* ¶¶ 30, 37.

Accordingly, the allegations of fraudulent conduct "likely to deceive" the public are adequate. The motion to dismiss the UCL claim for failure to state a cause of action will therefore be denied.

### c. False Advertising Law

Plaintiffs also allege that Defendants' misrepresentations about the washing machines' Energy Star compliance violate California's False Advertising Law ("FAL"). The FAL provides that it is:

> unlawful for any person . . . to make or disseminate or cause to be made or disseminated before the public in this state . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading

and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

Cal. Bus. & Prof. Code § 17500.

Defendants contend that the FAC fails to identify with particularity "specific advertisements, when and where they were shown, [and] how they were untrue or misleading." Docket No. 37 at 17–18 (quoting *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1093 (S.D. Cal. 2010)). And again they argue that the Energy Star logo does not constitute a specific representation.

Brian Maxwell allegedly purchased his washing machine at a Fry's Electronics retail store in Roseville, California on November 27, 2009. FAC ¶ 30. Plaintiff Shelly Baker purchased her machine at a Sears retail store in Ontario, California, on December 1, 2010. *Id.* ¶ 37. Each alleges that the machine bore the Energy Star logo in two places, that he or she saw the logo, that he or she understood it to be a representation by the manufacturer and retailer that the washer met Energy Start standards of energy efficiency, and that the washer was not, in fact, Energy Star compliant. *Id.* ¶ 1.

The *Rossi* Court found similar pleadings to be sufficient to state a claim under the FAL. *Rossi*, 2013 WL 5781673, at * 13 ("The Court finds the above allegations state the date, place, and medium in which Plaintiffs were exposed to Defendant's Energy Star advertisements."). I agree. The motion to dismiss the FAL claims for failure to state a cause of action is denied.

### 3. Michigan Consumer Protection Act[26]

The Michigan Consumer Protection Act ("MPCA") proscribes thirty-seven discrete acts. Mich. Comp. Laws § 455.903. To state a claim under the MPCA, a complaint must identify which proscribed act or acts the defendant has allegedly committed. The FAC alleges that, through "misleading and deceptive statements and false promises," Defendants violated the MPCA by misrepresenting the energy efficiency of the washing machines "after learning of the defects with the intent that Plaintiffs relied on such representations in their decision regarding" the purchase of the machines. FAC ¶¶ 121, 123.

---

[26]   McLenna, a Michigan plaintiff, may assert this claim against Whirlpool and Home Depot.

Defendants submit that the claim fails because the Complaint contains no factual allegations that Plaintiff McLenna's washer is primarily used for "personal, family, or household services," as required by Mich. Comp. Laws § 455.902(g). The FAC does, however, allege that the washer is a "consumer product" as defined under 15 U.S.C. § 2302(1). Moreover, the natural inference raised by this ordinary retail purchase of a single unit by a private individual is that McLenna bought the washer for home use.

Defendants argue with more force that the FAC fails to specify any particular MCPA section that Defendants allegedly violated. Plaintiffs concede this, but contend that the FAC alleges violations of CLRA § 1770(a)(5) and § 1770(a)(7), "which are identical to Mich. Comp. Laws § 445.903(c) and § 445.903(e)." They also attempt to supplement their allegations in their briefs.

The FAC fails to state a claim under the MCPA with the required specificity. *See Muneio v. Fed. Nat. Mortgage Ass'n*, 09-12973, 2010 WL 5146328, at *4 (E.D. Mich. Dec. 13, 2010) (finding that an MCPA claim could not survive a motion to dismiss because the plaintiffs did not "allege how it violated the MCPA, nor do they identify which MCPA sections it purportedly violated," and, therefore, failed to state a claim for a violation of the MCPA); *Meyer v. Citimortgage, Inc.*, 11-13432, 2012 WL 511995, at * 11 (E.D. Mich. Feb. 16, 2012) (reasoning that plaintiffs failed to state a claim under the MCPA where they offered "nothing more than a recitation of lists of prohibited activities under the MCPA, without identifying which sections were purportedly violated, without pleading any factually basis for the purported violations, and without identifying which defendant purportedly violated the acts"); *see also Innovation Ventures, LLC v. N.V.E., Inc.*, 747 F. Supp. 2d 853, 867 (E.D. Mich. 2010), *aff'd in part, rev'd in part and remanded*, 694 F.3d 723 (6th Cir. 2012) (granting summary judgment as to an MPCA allegation where defendant had not identified "which of the MCPA's provisions its counterclaim is asserted under").

The Court will not draw on statement in briefs or make unwarranted inferences to remedy deficient pleadings. Supplementation of the existing allegations must be done, if anywhere, in an amended pleading. The motion to dismiss the MCPA claims is granted on this basis.

4. <u>Florida's Deceptive and Unfair Trade Practices Act</u>

I find that Reid has adequately stated a claim under Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA") Fla. Stat. § 501.204(1). Such a FDUTPA claim has three elements: (1) a deceptive or unfair practice; (2) causation; (3) actual damages. Defendants maintain that Plaintiffs have failed to plead these elements. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d Dist. Ct. App. 2006).

### a. Reid's standing to pursue a FDUPTA claim

Defendants argue that Plaintiff Reid lacks standing because he fails to allege that he bought the machine in Florida. The FAC alleges that Reid "resides in Tampa, Florida," and purchased the machine "from a nearby Air Force base." FAC ¶¶ 38, 10. I take judicial notice that Tampa is 200 miles from the Georgia border and that there is an air force base four miles from Reid's home. Reading the Complaint in the light most favorable to the non-moving party, I will deny the motion to dismiss on this basis.

### b. Deceptive or unfair act

Defendants also contend that the FAC fails to allege that Defendants employed a deceptive or unfair act. Under the FDUTPA, a deceptive act is one that is "likely to mislead a consumer acting reasonably," *Zlotnick v. Premier Sales Grp.*, 480 F. 3d 1281, 1284 (11th Cir. 2007), and an unfair practice is one that "offends established public policy" or is otherwise "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (citation and internal quotations omitted).

A deceptive act occurs when "there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1302 (S.D. Fla. 2011) (quoting *PNR, Inc.*, 842 So. 2d at 777). Accordingly, the statute "focuses on whether an act is deceptive, not whether a defendant knew that the allegedly violative conduct was occurring." *Id.*

For the reasons amply set forth above, the mislabeling of the washers would be likely to mislead a reasonable consumer about the energy efficiency of

the washers. *See Zlotnick v. Premier Sales Grp.*, 480 F. 3d 1281, 1284 (11th Cir. 2007). The FAC adequately alleges a deceptive act.[27]

>    c. Actual damages

Defendants argue that Plaintiffs fail to allege actual damages. As discussed above in the context of other claims, the FAC adequately alleges that plaintiffs paid a price premium for an Energy Star certified washer, and paid higher energy bills because the machine did not in fact comply with efficiency standards. That is enough.

The motion to dismiss the FDUTPA claims is denied.

> 5. Ohio Consumer Sales Practices Act[28]

Plaintiff Parsons brings a claim under the Ohio Consumer Sales Practices Act ("OCSPA"), which prohibits suppliers from committing "an unfair or deceptive act or practice in connection with a consumer transaction." Ohio Rev. Code Ann. § 1345.02. That statute requires a showing of a material representation, deceptive act, or omission that affected a plaintiff's decision to purchase an item. *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 265 (6th Cir. 2005).[29] Parsons asserts both a class claim and an individual claim under the OCSPA.

The viability of the class claim is better addressed at the class certification stage. The parties will then be asked to address, *inter alia,* the

---

[27]     Plaintiffs also allege that Defendants violated "the EPCA, NECPA, NAECA, and regulations promulgated thereunder . . . ." FAC ¶¶ 25, 108. Defendants argue that Plaintiffs do not state a claim because these statutes do not impose an obligation on Defendants regarding the use of the Energy Star logo. I do not reach this issue, as I find that Plaintiffs have sufficiently alleged a deceptive act under the FDUPTA.

[28]     Parsons, on Ohio purchaser, may properly bring this claim against Whirlpool and ARCA. As noted above, however, it does not appear that ARCA has been properly served. In any event, ARCA has not moved to dismiss the claims brought against it.

[29]     Defendants also move to dismiss an Ohio Deceptive Trade Practices Act claim because it does not apply to consumer transactions. Plaintiff has conceded the point and withdrawn this claim. Docket No. 47 at 26 n.9. Accordingly, the Ohio Deceptive Trade Practices Act is dismissed.

effect of OCSPA's limitations on class actions in federal court under *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). *See McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 743 (N.D. Ohio 2010) (discussing *Shady Grove* issue with respect to OCSPA). I here discuss only whether the FAC adequately pleads an individual violation of OCSPA.[30]

Defendants, here as elsewhere, contend that the Energy Star logo makes no specific representation to energy efficiency and that the FAC does not identify specific, relevant marketing statements. They cite *Savett v. Whirlpool Corp.*, which held that the Energy Star logo was not specific enough to constitute an express warranty under Ohio law: "[T]he logo itself contains no assertion of fact or promise. Unlike traditional express warranties where unambiguous promises or factual assertions are made, which are clearly understood on their own footing, any meaning conveyed by the logo requires independent knowledge." *Savett*, 12 CV 310, 2012 WL 3780451, at *9. And in any event, "plaintiff [did] not allege that he saw or understood any purported meaning of the logo." *Id.* n.8. I repeat, however, that this reasoning explicitly applied only to an express warranty claim.

*Savett* itself appears to have at least tacitly acknowledged the limits of that rationale when it turned to an individual plaintiff's rescission claim under the OCSPA. *Savett* dismissed that OCSPA claim, not because the Energy Star logo is not a representation, but on the following basis: "[P]laintiff fails to allege that he saw the ENERGY STAR logo or any advertisement at any point. Nor does he allege that he had any understanding of the meaning of the ENERGY STAR logo. Absent such allegations, the Court finds that plaintiff fails to state an individual claim for rescission under the OCSPA." *Id.* at *6

*Savett* is not persuasive here, because the allegations "absent" in that case are present here. The FAC alleges that each Plaintiff, including Parsons, saw the Energy Star label around the time of purchase. FAC ¶¶ 29–38. Each understood the logo "as a representation and warranty . . . that the machine met the standards of energy efficiency established by the Energy Star program, and that the machine would help him maximize his energy savings while helping to protect the environment." *Id.* Each is alleged to have relied on those representations when purchasing the machines. *Id.* Unlike the *Savett* plaintiff,

---

[30]   Defendants acknowledge that there is a split of authority as to whether Rule 9(b) or ordinary Rule 8 pleading standards apply to these claims. My decision does not turn on the distinction, as it would be the same under either standard.

Cohen allegedly "saw" and "understood" the "purported meaning" of the logo. *Savett*, 12 CV 310, 2012 WL 3780451, at *9, n.8.

Plaintiff Cohen's allegations sufficiently make a "showing of a material representation . . . that impacted" his "decision to purchase the item at issue." *See Temple*, 133 Fed. App'x at 265. I therefore find that Plaintiffs have sufficiently pleaded a material misrepresentation under OCSPA and deny the motion to dismiss Parson's claim under OCSPA.

### 6. Indiana Deceptive Consumer Sales Act[31]

Plaintiff Beyer asserts a claim under the Indiana Deceptive Consumer Sales Act ("IDCSA"),[32] which prohibits "incurable" and "uncured" deceptive acts. An "incurable" act is one committed with intent to defraud or mislead, whereas an "uncured" deceptive act is one the supplier failed to "cure" after receiving notice. *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 647 (Ind. Ct. App. 2004). There is no catchall fraud category under the IDSCA; a plaintiff's allegations must fit into one of the enumerated acts proscribed under the statute. *Lawson v. Hale*, 902 N.E.2d 267, 274 (Ind. App. 2009).

The FAC alleges that Defendants violated the statute by nondisclosure and active concealment of the washers' failure to meet Energy Star standards. Accordingly, it alleges, "Defendants engaged in unlawful trade practices," including representations that the machines have qualities that they do not have. FAC at 39.

#### a. Failure to Plead with Particularity.

First, Defendants submit that Plaintiffs have failed to plead any misconduct with the requisite particularity under Fed. R. Civ. P. 9(b). Relatedly, they contend that the statute requires an oral or written act or representation, and that the FAC alleges only non-disclosures, which are not actionable. *See Lawson*, 902 N.E.2d at 274.

---

[31]     Beyer, an Indiana purchaser, may properly bring this claim against Whirlpool and Sears.

[32]     Various sections of the IDCSA were recently amended by the Indiana Legislature. These amendments are effective as of July 1, 2014. Therefore, the previous version of the statute is applicable here.

Plaintiffs respond that the allegations of the FAC fall within the following portions of Indiana Code subsection 24–5–0.5–3:

(a) The following acts or representations as to the subject matter of a consumer transaction, made either orally or in writing by a supplier, are deceptive acts:

    (1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.

    (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

    . . .

    (7) That the supplier has a sponsorship, approval, or affiliation in such consumer transaction the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have.

    . . .

b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such representation thereon or therein, or who authored such materials, and such other suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false.

Ind. Code Ann. § 24-5-0.5-3.

Beyer contends that he relied on alleged affirmative misrepresentations as to the energy efficiency and Energy Star compliance of the machines; non-disclosures of certain information are not essential to his claims. In short, he does not allege an omission, but instead alleges an affirmative

misrepresentation. As discussed above, *see* Section IV.E.1.a, I find that such allegations are sufficient and I will not dismiss on this ground.

*b.* An "incurable" or "uncured" deceptive act

Defendants argue that Plaintiffs have failed to plead an "incurable" or "uncured" deceptive act as required under the statute.

As to an "incurable" act, the FAC bases its claim of "intent to deceive" on the following allegations: "Defendants were first notified on September 20, 2010 that the Mislabeled Washing Machines failed to meet Energy Star standards." Docket No. 47 at 27 (citing FAC ¶ 40). Despite this notification, "Defendants did not recall the Mislabeled Washing Machines." And Defendants thereafter "knowingly sold the Washing Machine to Plaintiff Baker with intent to defraud after receiving notice of the noncompliance." *Id.* Baker, however, is not Beyer; Baker is the California plaintiff who did indeed buy the washer after September 20, 2010. Beyer, in Indiana, bought his washer at a Sears retail store on March 18, 2010, long *before* the September 20, 2010 notification. *Id.* ¶ 36. Any intent to deceive with respect to Beyer's purchase cannot rest on the September 20, 2010 notification, which occurred afterward. The FAC does not otherwise specifically allege that the relevant Defendants knew or should have known of the defect at the time of Beyer's purchase. It fails to allege the required intent to deceive, and therefore fails to allege a deceptive incurable act as defined under the Indiana statute.

As to the "uncured" deceptive act claim, the FAC alleges that Defendants failed to correct the defect after receiving notification in September 2010, but instead "reached an informal agreement with the EPA." Plaintiffs were not given notice of this agreement or of the noncompliance. Docket No. 47 at 27 (citing FAC ¶ 45).

Here, Beyer's failure to allege that he provided notice to Defendants is fatal to his claim. An "uncured deceptive act" under the statute is specifically defined as a deceptive act

(A) with respect to which a consumer who has been damaged by such act has given notice to the supplier under section 5(a) of this chapter; and

(B) either:

46

(i) no offer to cure has been made to such consumer within thirty (30) days after such notice; or

(ii) the act has not been cured as to such consumer within a reasonable time after the consumer's acceptance of the offer to cure.

Ind. Code Ann. § 24-5-0.5-2. Furthermore, Section 5(a) states that:

No action may be brought under this chapter . . . unless (1) the deceptive act is incurable or (2) the consumer bringing the action shall have given notice in writing to the supplier within the sooner of (i) six (6) months after the initial discovery of the deceptive act, (ii) one (1) year following such consumer transaction, or (iii) any time limitation, not less than thirty (30) days, of any period of warranty applicable to the transaction, which notice shall state fully the nature of the alleged deceptive act and the actual damage suffered therefrom, and unless such deceptive act shall have become an uncured deceptive act.

Ind. Code Ann. § 24-5-0.5-5.

The FAC does not allege that Plaintiff Beyer complied with the statutorily-mandated notice provision. *See Jasper v. Abbott Labs., Inc.*, 834 F. Supp. 2d 766, 773 (N.D. Ill. 2011) (finding that, to state an uncured deceptive act claim, "notice must come from the consumer bringing the action" and that constructive notice is insufficient to state a claim). The uncured deceptive act claim is defective and must be dismissed.

The motion to dismiss the IDCSA claims for failure to state a legal cause of action is granted.

### 7. Texas Deceptive Trade Practices Act[33]

The Texas Deceptive Trade Practices Act ("TDTPA"), Tex. Bus. & Com. Code § 17.41–17.63, has three essential elements: (1) the plaintiff is a consumer; (2) the defendant violated a specific provision of the TDTPA; and (3) the defendant's violation caused damages to the plaintiff. The statute specifically allows a plaintiff to pursue a claim under the TDTPA for a breach of

---

[33]    Cohen, a Texas purchaser, may properly bring this claim against Whirlpool and Home Depot.

an express or implied warranty, as well as for an "unconscionable act." *See Brittan Communications Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 907 (5th Cir. 2002).

The FAC alleges that "Defendants engaged in false, misleading, and deceptive practices," in violation of TDTPA. FAC ¶ 174. Cohen, individually and on behalf of the putative Texas subclass, alleges that Defendants made misrepresentations as to the Energy Star compliance of the washing machine purchased. He also alleges that Defendants breached express and implied warranties to Cohen and the subclass, and are therefore liable under Sections 17.50(a)(2) and 17.50(b) of the TDTPA. Finally, he alleges that Defendants violated the TDTPA because their actions constitute "an unconscionable action or course of action" under § 17.50(a)(3) of the TDTPA. FAC ¶ 179.

*a.* Statute of limitations

Defendants argue that these claims are barred by the applicable statute of limitations. A TDTPA claim must be brought within two years from the date of the false, misleading, or deceptive act "or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." Tex. Bus. & Com. Code Ann. § 17.565. Cohen purchased the machine from Home Depot on November 28, 2009. FAC ¶ 31. This action was filed more than two years later, on January 5, 2012. The parties therefore agree that the claim is time-barred unless the "discovery rule" exception applies.

The discovery rule acts to defer "accrual of certain causes of action until the plaintiff knew or exercising reasonable diligence should have known of the wrongful act causing injury." *Salinas v. Gary Pools, Inc.*, 31 S.W.3d 333, 336 (Tex. Comm'n App. 200). Under Texas practice, a party seeking to avail itself of the discovery rule must plead the rule, either in its original complaint or amended complaint. *See Taha v. William Marsh Rice Univ.*, No. 11-CV-2060, 2011 WL 6057846, at *6 (S.D. Tex. Dec. 6, 2011) (quoting *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988)) ("Under Texas law, a 'party seeking to avail itself of the discovery rule must . . . plead the rule, either in its original petition or in an amended or supplemental petition in response to defendant's assertion of the defense as a matter of avoidance.'"). In *Taha*, the plaintiff failed to plead the rule and "merely mentioned the discovery rule at the end of his response" to a motion to dismiss. *Id.* The court found that the

plaintiff had "therefore waived his ability to use the rule to avoid the statute of limitations." *Id.*

The Fifth Circuit has made it clear, however, that in federal court the discovery rule need not be specifically pleaded. As long as the facts that are pleaded put the defendant on sufficient notice that the plaintiff may assert the discovery rule, it is not waived. *Brandau v. Howmedica Osteonics Corp.*, 439 Fed. App'x 317, 320 (5th Cir. 2011) (citing *TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008)).

Plaintiffs respond first that the discovery rule— not a common law doctrine but an explicit element of the Texas statute—always applies to TDTPA claims. *See Salinas v. Gary Pools, Inc.*, 31 S.W.3d 333, 336 (Tex. App. 2000) (citing Tex. Bus. & Com. Code Ann. § 17.565) (noting that the discovery rule "always applies to DTPA claims, which, according to the statute, accrue on the date on which the false, misleading or deceptive act or practice occurred, or when the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading or deceptive act or practice.").

That is true as far as it goes, but I think a complaint must still put the defendant on notice that the accrual of the cause of action is potentially delayed under the circumstances of the particular case. Plaintiff Cohen replies that the FAC does just that. It alleges that Whirlpool learned of the DOE's determination of noncompliance on September 20, 2010, but provided consumers with "no notice of . . . the Mislabeled Washing Machines' noncompliance with the Energy Star standard." FAC ¶¶ 40, 45. The allegation is that Defendants gave no actual notice, and the facts pleaded do not suggest that Plaintiffs, through the exercise of reasonable diligence, should have discovered on their own that the washers were not Energy Star-compliant.

I therefore agree with Plaintiffs that the discovery rule should apply to this TDTPA claim, and that the TDTPA claims cannot be dismissed on statute of limitations grounds based on the face of the FAC.

### b. Adequacy of the Breach of Warranty and Unconscionable Action Allegations

Under the TDPTA, Tex. Bus. & Com. Code Ann. § 17.50(a)(2), a plaintiff may pursue a claim under the TDTPA for breach of an express or implied

warranty. Defendants argue that the TDTPA claim must be dismissed because the underlying breach of express and implied warranty claims must be dismissed. I have already found that the FAC adequately plead express and implied warranty claims, *see* Sections IV.A & B, *supra*, so the premise of this argument fails.[34]

> *c.* Failure to provide pre-litigation notice

At least 60 days before filing a suit for damages under the TDTPA, a consumer provide a putative defendant with written notice advising the defendant of the nature of the suit and the amount of any damages and expenses. *See* Tex. Bus & Com. Code Ann. § 17.505(a).[35] Because Cohen failed to fulfill this prerequisite, Home Depot contends, his TDPTA claim must be dismissed.

The Fifth Circuit has held that a plaintiff "has the burden to plead and prove compliance with this notice requirement . . . ." *Keith v. Stoelting, Inc.*, 915 F.2d 996, 998 (5th Cir. 1990) (citing *How Insurance Company v. Patriot Financial Services of Texas, Inc.*, 786 S.W.2d 533, 537 (Tex. App. 1990)) (holding that plaintiff's failure to allege compliance with the notice requirement

---

[34]    A TDPTA claim may also be sustained by a showing on an "unconscionable action," which is defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code Ann. § 17.45(5). Having determined that the breach of express and breach of implied warranty claims are sufficient to sustain this claim, I do not reach the issues as to an unconscionable act.

[35]    Specifically, this provision provides that:

> (a) As a prerequisite to filing a suit seeking damages under Subdivision (1) of Subsection (b) of Section 17.50 of this subchapter against any person, a consumer shall give written notice to the person at least 60 days before filing the suit advising the person in reasonable detail of the consumer's specific complaint and the amount of economic damages, damages for mental anguish, and expenses, including attorneys' fees, if any, reasonably incurred by the consumer in asserting the claim against the defendant. During the 60-day period a written request to inspect, in a reasonable manner and at a reasonable time and place, the goods that are the subject of the consumer's action or claim may be presented to the consumer.

Tex. Bus. & Com. Code Ann. § 17.505.

is grounds for a determination that plaintiff failed to state action under the DTPA). Cohen does not really deny that he failed to serve notice. He contends instead that a plaintiff may provide written notice of suit within a grace period of sixty days *after* the filing of a complaint if "written notice is rendered impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations." Tex. Bus. & Com. Code § 17.505(b).[36] He further maintains that, because he filed suit on behalf of a class, he could not wait 60 days, lest the class members' claims be barred by the statute of limitations in the interim.

The parties dispute whether Cohen's claims were already barred by the statute of limitations when he filed the complaint (rendering the 60-day grace period moot). Cohen purchased his washer on November 28, 2009. He filed his complaint against Home Depot on February 16, 2012, more than two years later. But he maintains that the statute of limitations did not being to run until May 7, 2012, the date the washing machines were formally disqualified.

The dispute is not consequential. Cohen does not assert that pre-suit notice was *ever* tendered, whether sixty days before or sixty days after the Plaintiffs filed suit.

The question of a remedy remains. The Supreme Court of Texas confirms that, under the TDTPA, pre-suit notification is a prerequisite to a DTPA action for damages. *Hines*, 843 S.W.2d at 468. But that is not the end of the story. "The notice requirement of the DTPA is clearly mandatory, but that feature alone does not determine the consequences for failure to comply with it." *Id.*

Serious consequences, it turns out, may be easily averted. As Cohen points out, the TDTPA states that failure to provide pre-suit notice is grounds for abatement, not for automatic dismissal. *See id.* § 17.505(d). In *Hines, supra,* the Supreme Court of Texas held that "[w]hen a plaintiff fails to comply with the requirement, abatement of the action for the statutory notice period is

---

36    In full, the provision provides:

(b) If the giving of 60 days' written notice is rendered impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations or if the consumer's claim is asserted by way of counterclaim, the notice provided for in Subsection (a) of this section is not required, but the tender provided for by Subsection (d), Section 17.506 of this subchapter may be made within 60 days after service of the suit or counterclaim.

more consistent with the purpose of notice," which is to encourage settlement and discourage litigation. 843 S.W.2d at 469. So the appropriate sanction is not dismissal but a 60-day delay.

I find, moreover, that Defendants have waived their objection to the lack of notice by failing to make a "timely request for abatement." *Soto v. Vanderbilt Mortgage*, CIV.A. C-10-66, 2010 WL 2598374, at *2 (S.D. Tex. June 24, 2010).

> If a plaintiff files an action for damages under the DTPA without first giving the required notice and a defendant timely requests an abatement, the trial court must abate the proceedings if it determines that notice was not provided as required. [Tex. Bus. & Com. Code] § 17.505(c), (d) (Vernon 2002). To be timely, the request for an abatement must be filed not later than the 30th day after the date the person files an original answer. *Id.* § 17.505(c). A defendant who fails to make a timely request for abatement waives his objection to the lack of notice. *Hines v. Hash*, 843 S.W.2d 464, 469 (Tex. 1992).

*Y2K Enterprises, Inc. v. Carriere*, 01-06-00476-CV, 2007 WL 1844427, at *2 (Tex. App. June 28, 2007). *See also Hines*, 843 S.W.2d 464 at 469 ("To be timely, the request for abatement must be made while the purpose of notice—settlement and avoidance of litigation expense—remains viable. Thus, defendant must request an abatement with the filing of an answer or very soon thereafter. If the trial court determines that plaintiff has failed to give notice as required by the statute, the action must be abated.").

Accordingly, for all of these reasons, I will deny the motion to dismiss the TDTPA claim on the basis of failure to provide pre-suit notification.

## CONCLUSION

For the reasons stated above, Defendants' Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**. Because the Court cannot conclude at this stage that amendment would be futile, such dismissals are without prejudice, and Plaintiffs are **GRANTED** leave to amend their First Amended Consolidated Complaint. Plaintiffs shall have 40 days from the filing of this Opinion and accompanying Order to file an amended pleading, which should be deemed the Second Amended Complaint. Defendants will have 30

days thereafter to respond via answer or dispositive motion. An appropriate order follows.

**KEVIN MCNULTY**
**United States District Judge**

Dated: June 16, 2014