James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO**
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Scott A. Bursor
Joseph I. Marchese
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, New York  10019
(212) 989-9113

Antonio Vozzolo
Andrea Clisura
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, New York  10017
(212) 983-9330

*Interim Class Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLENE DZIELAK, SHELLEY BAKER, FRANCIS ANGELONE, BRIAN MAXWELL, JEFFERY MCLENNA, JEFFERY REID, KARI PARSONS, CHARLES BEYER, JONATHAN COHEN, JENNIFER SCHRAMM, and ASPASIA CHRISTY on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WHIRLPOOL CORPORATION, LOWE'S HOME CENTER, SEARS HOLDINGS CORPORATION, THE HOME DEPOT, INC., FRY'S ELECTRONICS, INC., and APPLIANCE RECYCLING CENTERS OF AMERICA, INC.,<br><br>Defendants. | Civil Action No. 12-cv-0089 (KM)(MCA)<br><br><br>**SECOND AMENDED CONSOLIDATED COMPLAINT and<br><u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery McLenna, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy (collectively, "Plaintiffs") by way of Complaint against Defendants, say:

## NATURE OF THE ACTION

1.     This is a class action against defendants Whirlpool Corporation ("Whirlpool"), Lowe's Home Center[1] ("Lowe's"), Sears Holdings Corporation ("Sears"), The Home Depot, Inc. ("The Home Depot"), Fry's Electronics, Inc. ("Fry's Electronics"), and Appliance Recycling Centers of America, Inc. ("ARCA") (collectively, "Defendants") for misrepresenting the water and energy efficiency of Maytag Centennial washing machines, model numbers MVWC6ESWW0, MVWC6ESWW1, and MVWC7ESWW0 (the "Mislabeled Washing Machines"), by promoting them as ENERGY STAR®-qualified and labeling them with the ENERGY STAR® logo.[2]  In fact, the Mislabeled Washing Machines do *not* meet the ENERGY STAR® efficiency standards, and consume significantly more water and energy than their labels state.

2.     ENERGY STAR®-qualified washing machines are required by the U.S. Department of Energy ("DOE") to exceed minimum standards for water and energy efficiency. Qualified washing machine models use approximately 50% less water and 37% less energy than

---

[1] Via stipulation, Plaintiffs voluntarily dismissed Lowe's Companies, Inc., a party named in the First Amended Consolidated Complaint.  [Dkt. 63].  Lowe's Home Center, a wholly owned subsidiary of Lowe's Companies, Inc., agreed to be substituted as a named defendant in the case, as it is responsible for the sale of the appliances at issue in this action.  *Id.*
[2] The MVWC6ESWW1 is the basic model.  The MVWC6ESWW0 adds an EMI/RFI filter to reduce electrical and radio interference.  It shares the same ENERGYGUIDE label as the MVWC6ESWW1.  The MVWC7ESWW0 adds a glass top for cosmetic purposes.  Otherwise, the interior and exterior parts are virtually identical.  These three models share, among other parts, the same motor, cabinet, electric wiring, control knobs, timer knobs, wash basket, agitator, drive tube, pump, and clutch.  Furthermore, they have identical energy usage, water usage, and load capacity.

standard models.   According to Whirlpool's own 2010 Product Catalogue, the ENERGY STAR® program "mean[s] the appliance exceeds the federal minimum efficiency standards as set forth by the Environmental Protection Agency and the U.S. Department of Energy, helping to save money on utility bills."  *See* Exhibit A.  ENERGY STAR®-qualified appliances are more expensive than standard models, but they come with the promise of reduced water and energy bills that, over time, will generate enough savings to recoup the higher price.   This is the fundamental bargain the ENERGY STAR® program offers: consumers pay a higher up-front purchase price but save more on water and energy bills ("Utility Bills") over time using the product.

3.     As a result, there is tremendous demand by consumers for ENERGY STAR®-qualified appliances and products that bear the distinctive ENERGY STAR® mark.   "The ENERGY STAR® label is a critical tool for consumers looking to save energy and money with their appliances."  Scott Blake Harris, DOE, General Counsel.  In fact, "[t]he ENERGY STAR mark ranks among the highest level of influence on product purchase among all consumer emblems, similar in ranking to the Good Housekeeping Seal."

4.     An independent study commissioned by Whirlpool confirms that the "majority of consumers look for [the] ENERGY STAR label when making purchase decisions."   A 2012 National Association of Home Builders ("NAHB") Home Trends & Buyer Preferences survey also acknowledged that ENERGY STAR® appliances were the feature most desired by homebuyers, picked by 94% of respondents.

5.     To capitalize on this demand, Whirlpool engaged in a long-term advertising campaign in which Whirlpool utilized various forms of media to consistently and uniformly promote the Mislabeled Washing Machines as ENERGY STAR®-qualified.   For example,

Whirlpool's national print media campaign featured the ENERGY STAR® mark, along with energy efficiency messaging, and reached over 550 million consumers in 2009 alone.

6.    Defendants' promotion and sale of the Mislabeled Washing Machines as ENERGY STAR®-qualified, when in fact they are not, is false and misleading, rendering the promised benefits of efficiency and Utility Bill savings illusory.  For Class members who purchased the Mislabeled Washing Machines, the promised savings from reduced Utility Bills never came.  Instead, Class members were hit with a costly double-whammy:  a higher up-front price due to the substantial price premium that ENERGY STAR® washing machines command in the marketplace, followed by higher Utility Bills over the washing machines' useful life, since its actual energy consumption and water usage is substantially higher than what was promised. Each class member paid a higher initial price for their washing machine and will pay higher Utility Bills every month – month after month and year after year – for as long as the washing machine remains in use.

7.    Plaintiffs seek relief in this action individually, and as a class action on behalf of similarly situated purchasers of the Mislabeled Washing Machines, for violation of the Magnuson-Moss Warranty Act; breach of express warranty; breach of the implied warranty of merchantability; unjust enrichment; violation of the New Jersey Consumer Fraud Act; violation of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J. Stat. Ann. §§ 56:12-14 to 56:12-18, *et seq.*; violation of the California Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*; violation of the California Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*; violation of the California False Advertising Law ("FAL"), Business & Professions Code §§ 17500, *et seq.*; violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901, *et seq.*; violation of Florida's Deceptive and

4

Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*; violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.*; violation of Indiana's Deceptive Consumer Sales Act, Ind. Code. Ann. § 24-5-0.5-1, *et seq.*; and violation of the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41, *et seq.*

## **THE PARTIES**

8.   Plaintiff Charlene Dzielak is a citizen of New Jersey, residing in Middlesex County, New Jersey.

9.   Plaintiff Shelley Baker is a citizen of California, residing in Rancho Cucamonga, California.

10.   Plaintiff Francis Angelone is a citizen of New Jersey, residing in Cinnaminson, New Jersey.

11.   Plaintiff Brian Maxwell is a citizen of California, residing in Roseville, California.

12.   Plaintiff Jeffery McLenna is a citizen of Michigan, residing in Metamora, Michigan.

13.   Plaintiff Jeffery Reid is a citizen of Florida, residing in Tampa, Florida.

14.   Plaintiff Kari Parsons is a citizen of Ohio, residing in Dublin, Ohio.

15.   Plaintiff Charles Beyer is a citizen of Indiana, residing in Martinsville, Indiana.

16.   Plaintiff Jonathan Cohen is a citizen of Texas, residing in Houston, Texas.

17.   Plaintiff Jennifer Schramm is a citizen of Virginia, residing in Springfield, Virginia.

18.   Plaintiff Aspasia Christy is a citizen of California, residing in Turlock, California.

19.    Defendant Whirlpool is a Delaware corporation with its principal place of business in Benton Harbor, Michigan.  Whirlpool is one of the world's leading manufacturers of home appliances, with annual revenues of approximately $18.8 billion in 2013.   Whirlpool represents that it "is an industry leader in developing high-performance appliances that help conserve the earth's resources and allow homeowners to use resources more efficiently." Whirlpool's Chairman and CEO, Jeff M. Fettig, boasts on Whirlpool's corporate website, "At Whirlpool Corporation, we take our environmental responsibilities very seriously.  Just as we have taken a global approach to our home appliance business, we believe our world's environmental issues, such as climate change, must be addressed in a similarly comprehensive way.  This is why we continue to develop innovative products that minimize their impact on the environment while making our consumers' lives easier."  Since 1975, Whirlpool has played a leadership role in crafting every major appliance efficiency regulation, "including a leading role in setting the ENERGY STAR program standards."

20.    Defendant Lowe's is a North Carolina corporation with its principal place of business in Mooresville, North Carolina.  Lowe's is the second largest home improvement retailer in the world and has approximately 1,725 home improvement stores in the United States, Canada, and Mexico.  Lowe's is a seven-time recipient of the ENERGY STAR® Partner of the Year Award in the Partner Retailer Category.

21.    Defendant Sears is a Delaware corporation with its principal place of business in Hoffman Estates, Illinois.  Sears is the parent company of Sears, Roebuck and Co., the nation's fourth largest broadline retailer with approximately 3,900 full-line and specialty retail stores in the United States and Canada, and claims to be "the leading home appliance retailer."  Sears has

made public statements claiming it sells more ENERGY STAR® rated appliances than any other retailer.

22.    Defendant The Home Depot is a Delaware corporation with its principal place of business in Atlanta, Georgia. The Home Depot is the world's largest home improvement specialty retailer and the fourth largest retailer in the United States. It has more than 2,200 retail stores in the United States, Canada, Mexico and China. The Home Depot represents, "For a typical home, appliances account for about 20% of the energy bills. That's up to $380 per year. ENERGY STAR® qualified appliances use 10-50% less energy and water than standard models… By replacing your 10 year old refrigerator, dishwasher, room air conditioner and clothes washer with ENERGY STAR® labeled equipment, you could save about $180 a year." The Home Depot's website boasts that it has sold 389,194,856 ENERGY STAR® products, resulting in an estimated energy savings of $1,334,690,630.

23.    Defendant Fry's Electronics is a California corporation with its principal place of business in San Jose, California. Fry's Electronics is a major retailer of computers, consumer electronics, and appliances, with roughly 35 stores in 10 states. The chain's extensive inventory includes computer software and components, industry magazines, movies, music, refrigerators, washers and dryers, small appliances, stereo equipment, and televisions.

24.    Defendant ARCA is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. The company's retail business operates about 20 ApplianceSmart Factory Outlet stores in Minnesota, Georgia, Ohio, and Texas that sell new, reconditioned, and "special-buy" appliances from manufacturers such as Electrolux, GE, and Whirlpool.

25.    At all times relevant to the allegations in this matter, Defendants Whirlpool, Lowe's, Sears, The Home Depot, Fry's Electronics, and ARCA (the "Retailer Defendants")

acted in concert, with the knowledge and approval of the other defendants and/or as the agent of the other defendants within the course and scope of the agency, regarding the acts and omissions alleged.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

27.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendants.

28.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants Whirlpool, Lowe's, Sears, and The Home Depot do business throughout this district, and a substantial part of the events giving rise to Ms. Dzielak's claims took place within this judicial district.

## FACTS COMMON TO ALL CLAIMS

### A.    The ENERGY STAR® Promise And Its Significant Effect On Consumers

29.    The Energy Policy and Conservation Act of 1975 ("EPCA"), 42 U.S.C. §§ 6291, *et seq.*, established an energy conservation program for major household appliances.  EPCA was amended by the National Energy Conservation Policy Act of 1978 ("NECPA"), Pub. L. 95-619, to, among other things, give the DOE authority to regulate the minimum water and energy efficiency of several products, including residential clothes washers.  Further amendments to EPCA in the National Appliance Energy Conservation Act of 1987 ("NAECA"), Pub. L. 100-12, established minimum water and energy efficiency standards for clothes washers.  In totality, the

ECPA, NAECPA, and NAECA give the DOE authority to establish water and energy efficiency standards for clothes washers, "promote Energy Star compliant technologies," and "preserve the integrity of the Energy Star label."  42 U.S.C. § 6294a.

30.    ENERGY STAR® is a government-backed voluntary program, designed to "identify and promote energy-efficient products in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards."  *See* 42 U.S.C. § 6294a.  The program is jointly administered by the DOE and the Environmental Protection Agency ("EPA").

31.    The ENERGY STAR® program is not a regulatory program;[3] rather, it consists of voluntary partnerships (with licensing agreements) between the DOE/EPA and industry participants that commit to manufacture products that meet the very highest standards of water and energy efficiency.   This licensing agreement, embodied in the standard partnership agreement ("Partnership Agreement") provides that both "parties concur that this agreement is wholly voluntary and may be terminated by either party at any time, and for any reason, with no penalty."  Furthermore, the Partnership Agreement states that the signatory or "partner will not construe, claim, or imply that its participation in the ENERGY STAR program constitutes federal government approval, acceptance, or endorsement of anything other than Partner's commitment to the program.  Partner understands its participation in the ENERGY STAR program does not constitute federal government endorsement of Partner or its buildings, homes, products, services, or industrial facilities."

---

[3] This is in stark contrast to the ECPA, which imposes ***mandatory*** minimum energy-efficiency standards on certain products.

32.     To qualify for the ENERGY STAR® program, residential washing machines, including the Mislabeled Washing Machines, must be at least 37% more energy efficient than the minimum energy efficiency standard mandated by federal law, plus they must meet stringent energy and water efficiency criteria including specified Modified Energy Factor ("MEF") and Water Factor ("WF") levels.   MEF is a comprehensive measure of energy efficiency that considers the energy used for washing, including the energy used to operate the washing machine and to heat the water.   The higher the MEF, the more efficient the product.   WF is a measure of water efficiency and is calculated as gallons of water used per cubic foot of capacity. The lower the WF, the more efficient the clothes washer.   On March 7, 2008, the DOE released updated criteria (effective July 1, 2009) increasing efficiency criteria by five percent (5%) over the prior level.   Under the updated criteria, ENERGY STAR®-qualified clothes washers must have an MEF of 1.8 or greater (MEF ≥ 1.8) and a WF of 7.5 or lower (WF ≤ 7.5).   The ENERGY STAR® website's "for consumers" page provided this same specification information to consumers.[4]

33.     Since ENERGY STAR® is widely recognized as the preeminent brand for energy efficient products, participation in the ENERGY STAR® program has a significant impact on the marketability of products.

34.     The most significant tool used in the ENERGY STAR® program is the ENERGY STAR® label that incorporates the ENERGY STAR® certification mark.   All appliances with the ENERGY STAR® label are required to meet the strict energy efficiency guidelines set by the EPA and the DOE, which require the Mislabeled Washing Machines to use at least 37% less

---

[4] *See*
http://www.energystar.gov/products/specs/system/files/Clothes_Washers_Program_Requirements.pdf

10

energy than the maximum permitted under the NAECA, as well as up to 50% less water than non-certified models.

35.    The message and promise conveyed by the ENERGY STAR® logo is that the appliance is ENERGY STAR®-qualified and thus complies with the strict water and energy efficiency level required by the ENERGY STAR® program.  Because the product is ENERGY STAR® qualified, it will enable consumers to maximize their water and energy savings while helping to protect the environment.  The national retailers that dominate the appliance market rely extensively on ENERGY STAR®-related promotions, as well as the distinctive logo, to sell appliances and bring consumers to their stores.



36.    The campaign to promote ENERGY STAR® has continued for well over a decade.  To promote the message of water and energy efficiency and savings, the EPA launched a broad outreach campaign in 1997, encouraging consumers to look for the distinctive ENERGY STAR® label.   The campaign prominently mentioned the environmental benefits of the ENERGY STAR® program, but the focus was still on the financial savings that consumers could realize through superior energy efficiency.  According to the EPA, the first consumer campaign had three key messages:

**ENERGY STAR saves you money and protects the environment.**  Use of qualified products in your home can mean up to 30 percent savings.

**The second price tag.**  Products have two price tags: the purchase price plus the cost of electricity needed to use the product over its lifetime.

**An easy choice.**  Either the product is energy efficient because it displays the ENERGY STAR label, or it isn't.

37.    To facilitate the guiding principle of easily identifying efficient appliances that offer savings on utility bills, the EPA set up specific promotional and labeling guidelines for ENERGY STAR®-qualified appliances and the use of its distinctive ENERGY STAR® mark as a label.  Specifically, the publication titled "Using the Energy Star Identity to Maintain and Build Value" provides examples, guidelines and recommendations by the EPA "on how to get the greatest value of the Certification Mark," *available at* http://www.energystar.gov/ia/partners/logos/downloads/BrandBook508r.pdf.  For one, the mark "may never be associated with products … that do not qualify as ENERGY STAR." *Id.* at 4.0.

38.    These marketing and educational efforts have culminated in one of the most recognizable, global symbols for energy efficiency.  Scott Blake Harris, General Counsel for the DOE, has stated that "[t]he ENERGY STAR® label is a critical tool for consumers looking to save energy and money with their appliances."

39.    In fact, the ENERGY STAR® label was *specifically engineered* to convey a simple message to consumers:  that a given appliance meets rigorous energy efficiency standards.  A product either meets ENERGY STAR® criteria, or it does not.  In the words of Whirlpool's Vice President of Government Relations, Tom Catania, "ENERGY STAR Makes it Simple" – it is "[a]warded to products that ***meet [] strict efficiency criteria set by the U.S. Department of Energy and the U.S. Environmental Protection Agency***" (emphasis added).

40.  Maura Beard, a former director of strategic communication at the EPA for the ENERGY STAR® Program, stated that:[5]

> The value of Energy Star for consumers is the fact that it's binary – that yes/no part of Energy Star, I think is a really important … attribute of the brand.  So, when a consumer's picking a dishwasher, they're not looking at a sticker trying to decide, "Ok, this is a C on an ABCDEF … and trying to decide whether that's how that value of a C might relate to all the other attributes of, of the appliance… ***[W]ith Energy Star, it's a yes/no, it has it or it doesn't, and when it has it, it means one thing*** … and I think that has tremendous value for the mainstream marketplace. (emphasis added).

41.  For instance, in a January 2006 letter to the Federal Trade Commission ("FTC"), Whirlpool wrote that "Whirlpool and the Association of Home Appliance Manufacturers (AHAM) conducted a consumer research study where a nationally representative sample of 1,000 respondents compared the current [ENERGYGUIDE] label with three alternatives…  The purpose of the study was to … determine which label design which, with an ENERGY STAR® logo added, ***most clearly conveyed high efficiency of that appliance***.  The goal was to determine which label provided the consumer with the best information on the relative and absolute energy consumption of a particular model appliance.  It was equally important that the label not create the impression that it included information on anything other than energy consumption; that is, that it not imply anything about product quality, product performance or any other non-energy characteristic." (bold and italicized emphasis added, underline in original).

42.  The ENERGY STAR® label is more than a symbol.  It is "extremely successful as an informational device."  Declaration of Catherine Zoi, Assistant Secretary, Office of Energy Efficiency and Renewable Energy, *LG Electronics U.S.A., Inc. v. DOE, et al.*, No. 09-2297-JDB (D.C. Dec. 23, 2009), Dkt. No. 10-7, at ¶ 19.  It sends an unequivocal message to consumers:

---

[5] Pew Center on Global Climate Change Best Practices Conference, April 7, 2010.

the labeled product is ENERGY STAR® qualified – it meets the mandatory minimum efficiency standard required by the ENERGY STAR® program.

43.    The DOE and EPA have found that "[s]ubstantial portions of U.S. households in the surveyed population recognize, understand, and are influenced by the ENERGY STAR label."  This is supported by a prominent national survey conducted in 2011, which found that 85% of households had at least a general understanding of the label's purpose, including 75% that had a "high understanding."

44.    That same survey found the ENERGY STAR® logo material, influencing the purchasing decisions of 88% of households that recognized it, including 76% whose purchase decisions were influenced "very much" or "somewhat."

45.    In September 2010, the EPA prepared a PowerPoint presentation entitled "Energy Star® Sales Associate Training – Clothes Washers."  The EPA's PowerPoint presentation emphasizes that the ENERGY STAR® logo helps consumers easily identify energy-efficient products and that "[t]he ENERGY STAR mark ranks among the highest level of influence on product purchase among all consumer emblems, similar in ranking to the *Good Housekeeping Seal*."  The PowerPoint presentation also included the following slide showing that the ENERGY STAR® label has an influence on 91% of consumers:



46.    Moreover, Whirlpool's own internal survey data supports a similar finding of materiality.  On March 14, 2011, Whirlpool issued a press release stating: "According to a Whirlpool Corporation survey … energy efficiency is more important than ever in the purchase decision of consumers shopping for major appliances.  The majority of U.S. consumers (72%) said they actively look for the ENERGY STAR® label when making purchase decisions." Similarly, on November 5, 2004, Whirlpool submitted a position paper to the DOE stating that "consumers recognize the ENERGY STAR mark as an indication that they will incur lower operating costs with these products."

47.    Earlier this year, on the 20th anniversary of the ENERGY STAR® program, the EPA issued a book entitled "Energy Star® Products – 20 Years of Helping America Save Energy, Save Money and Protect the Environment."  In the book, the EPA stated:

Twenty years later, ENERGY STAR is a ***global symbol for energy efficiency***. EPA recognizes ENERGY STAR products in more than 60 categories. More than 80 percent of U.S. consumers recognize and understand the label, collectively buying an estimated 300 million ENERGY STAR qualified products every year. (emphasis added)

48.    In that book, Whirlpool's Government Relations Senior Specialist Nick Gillespie stated:

Throughout the last 20 years, ENERGY STAR has been the market transformation program catalyzing manufacturers to introduce eco-efficient appliances into the market place that significantly benefit the consumer and the environment. Although ENERGY STAR is a voluntary program, it did not take long for Whirlpool Corporation to see the potential in and help formulate what has been ***one of the most recognizable brands of its kind***....   Our ongoing commitment to the growth, success and integrity of the ENERGY STAR partnership has been a strong source of pride for Whirlpool Corporation for the last 20 years. (emphasis added)

49.    In that same publication, Marc Hoffman, Executive Director of the Consortium for Energy Efficiency ("CEE"),  stated:

When the federal government came up with the concept for ENERGY STAR and then extended it to appliances, CEE carefully deliberated before incorporating the brand into its own plans for advancing efficiency.  Over time the decision of CEE members to adopt ENERGY STAR as their marketing platform for energy efficiency has proven to be a great one.  Surveys show that ENERGY STAR is an important endorsement label for consumers and that it plays an equally important role as a marketing platform for myriad energy efficiency programs.

***

EPA maintains a brand that simply and credibly identifies cost-effective-energy-saving opportunities that do not compromise amenity or reliability.  In turn, CEE members actively promote the ENERGY STAR in their energy-savings programs, thereby simplifying energy efficiency decision-making for their customers and helping to grow the brand.  ENERGY STAR also presents an excellent rallying point for energy efficiency organization and industry to work cooperatively.  We consider ENERGY STAR to be America's most trusted and recognized brand for energy efficiency.

50.    A 2012 NAHB Home Trends & Buyer Preferences survey[6] acknowledged that ENERGY STAR® appliances were the feature most desired by homebuyers, picked by 94% of respondents.

51.    There is no doubt that appliance manufacturers such as Whirlpool consider the ENERGY STAR® label to be a "promise" of "savings" and "energy efficiency."

52.    For example, on September 5, 2008, Whirlpool issued a press release titled "Whirlpool Corporation Leads Industry in Energy Efficiency; Company's ENERGY STAR(R) Qualified Appliances Deliver Promised Savings."  The article, released in response to reports of competitors exceeding reported energy ratings, was released to "reassure consumers that all of its French Door Bottom-Mount refrigerators – sold under the Whirlpool, Maytag, KitchenAid and Amana brands – have legitimately earned the ENERGY STAR credential by rigorously following the required energy testing procedures."  Furthermore, Phil Pejovich, vice president of refrigeration, Whirlpool North America, stated:  "We want consumers to know that when they purchase French Door Bottom-Mount refrigerators – and all ENERGY STAR qualified appliances by Whirlpool – they can do so with the confidence that they will deliver energy savings as communicated in-store, on the product and in the product literature."  Mr. Pejovich further added:

> Consumers who proactively seek ENERGY STAR qualified products are being deprived of the opportunity to effectively comparison shop based on energy consumption, not because of a problem with the test procedure, but by the failure of some manufacturers to follow it.

> We also are concerned for companies that purchase products from these manufacturers and re-sell them under their own brand names. They may be unwittingly depriving consumers of the energy savings and environmental benefits they expect of genuine ENERGY STAR qualified refrigerators.

---

[6] According to the NAHB, these results were obtained by surveys performed by NAHB and Better Homes and Gardens.

53.      That same day, Michael A. Todman, President of Whirlpool North America, participated in a Morgan Keegan Equity Conference and stated: "***ENERGY STAR qualifications essentially say that there are significant savings from a consumer perspective***.  So against the conventional appliances for electricity, okay, with an appliance that's ENERGY STAR qualified is on average about a 31% savings." (emphasis added).  He further declared: "If you put it into real terms, there is a slight premium that consumers will pay for [ENERGY STAR®] appliances.  But they're looking for pay back and right now on average the pay back period for [ENERGY STAR®] qualified appliances is around three, a little over three years, 3.4 years."

54.      Similarly, on March 9, 2009, Jeff M. Fettig, Chairman and Chief Executive Officer of Whirlpool, attended a Raymond James Institutional Investors Conference and boasted:

> We've been really championing the ENERGY STAR program and fundamentally reducing the energy efficiency in appliances.    We think it's also a compelling value story, and you'll see a lot of this at our point of sale, in stores on our products about the value opportunity for consumers.
>
> This is just an example of a typical product today in the marketplace.  You can see the conventional appliance, which is what I would call a non-ENERGY STAR appliance.  Although the initial purchase price is less, the cost of ownership over a 10-year cycle is higher.  The product on the right is a comparable product with energy efficiency ratings.  You pay a little bit more on the front end, but you save about 20% over the life of the product.  And if you compare that to an existing product that's over 10 years old, then it's more than 50%.  It's a dramatic opportunity for consumers to save and we're seeing very strong interest in our energy offerings in the marketplace today.

55.      In his presentation, Mr. Fettig showed several slides regarding Whirlpool's participation in the ENERGY STAR® program and the savings consumers could expect from purchasing ENERGY STAR®-qualified products in comparison to conventional appliances.  Mr. Fettig's slides included the ENERGY STAR® logo ***to represent ENERGY STAR® qualified appliances***:



56.    On April 7, 2010, Tom Catania, Whirlpool's Vice President for Government Relations, participated in the Pew Center on Global Climate Change Best Practices Conference. Mr. Catania made a presentation entitled "Increasing the Value of Energy Efficiency to the Consumer: The Case of Major Home Appliances."  In the presentation, Mr. Catania extolled the virtues of the ENERGY STAR® program and its distinctive and easily recognizable mark.  For example, Mr. Catania presented a slide titled "ENERGY STAR Makes it Simple."  The "Confidential" slide, reproduced below, included the ENERGY STAR® logo and touts the importance of the logo as the "National symbol for energy efficiency."



# ENERGY STAR Makes it Simple



• National symbol for energy efficiency

• Awarded to products that meet of strict efficiency criteria set by the U.S. Department of Energy and the U.S. Environmental Protection Agency





WWW.ENERGYSTAR.GOV

WHIRLPOOL CORPORATION ▪ CONFIDENTIAL

57.    The "Confidential" slide further states that the ENERGY STAR® mark is "[a]warded to products that meet [] strict efficiency criteria set by the U.S. Department of Energy and the U.S. Environmental Protection Agency."

58.    Mr. Catania also acknowledged that 84% of consumers "trust" the ENERGY STAR® program and its distinctive symbol. Another "Confidential" slide accompanying Mr. Catania's presentation is reproduced below:



59.    Participation in the ENERGY STAR® program has a significant impact on the marketability of products.  The message conveyed by the ENERGY STAR® logo is that the consumer can maximize his or her savings while helping to protect the environment.  The national retailers that dominate the appliance market rely extensively on ENERGY STAR®-related promotions to bring consumers to the store and sell washing machines.

**B.    Whirlpool's Reliance On The ENERGY STAR® Logo In The Marketing And Sale Of The Mislabeled Washing Machines**

60.    Whirlpool sought to capitalize on this tremendous demand for ENERGY STAR® products by conducting a long-term campaign over several years, in several forms of media, in which Whirlpool consistently and uniformly promoted its products, including the Mislabeled

Washing Machines, as ENERGY STAR®-qualified.  Whirlpool advertised and identified these models as ENERGY STAR® qualified products by prominently displaying the ENERGY STAR® symbol in promotional materials, including print, internet, and other media; product literature including spec sheets; and by attaching the ENERGY STAR® logo on the Mislabeled Washing Machines themselves.

61.    Whirlpool's Chairman and CEO, Jeff M. Fettig has boasted "[w]e've been really championing the ENERGY STAR program and fundamentally reducing energy efficiency in appliances.  We think it's a compelling value story, and you'll see a lot of this at our point of sale, in stores on our products about the value opportunity for consumers."

62.    In fact, Whirlpool has received numerous awards from the EPA in connection with its marketing and promotion of ENERGY STAR®-qualified products, including seven consecutive ENERGY STAR® awards for "Sustained Excellence."  For example, in 2008 Whirlpool announced that it had received the ENERGY STAR® Award for "Sustained Excellence" for certain key accomplishments, including "integrat[ing] its ENERGY STAR commitment throughout operation by continuously promoting the benefits of ENERGY STAR to its trade partners, employees, and consumers."  Key achievements include, among others:

- Offering a full line of appliances to meet ENERGY STAR® criteria, and that are sold across the nation under high-profile brand names, including Whirlpool, Maytag, Kenmore, and KitchenAid.

- Demonstrating exceptional leadership with regard to ENERGY STAR® training efforts.

- Emphasizing ENERGY STAR® in all internal training materials.

- Making ENERGY STAR® a major focus of external trainings, including outreach to Whirlpool's national retail partners.

63.    In 2009, Whirlpool announced that it had received the Sustained Excellence award for the fourth year in a row for "continuously promot[ing] the benefits of ENERGY STAR

to its trade partners, employees, and consumers." As an active ENERGY STAR® partner since 1998, Whirlpool received the award for the following key accomplishments:

- Developing ENERGY STAR®-themed national promotions, which were featured in Whirlpool's Resource Innovations newsletter and on the ENERGY STAR® Special Deals Finder.

- Offering a full line of appliances that meet ENERGY STAR® criteria and are sold across the nation under various high-profile brand names including Whirlpool, Maytag, Kenmore, KitchenAid, Amana, Gladiator, and others.

64.     In 2010, Whirlpool announced that the "Company [was] being recognized for its exceptional efforts to manufacture, market, and promote ENERGY STAR qualified products." Whirlpool noted that it received the ENERGY STAR® Award for "Sustained Excellence" for certain key accomplishments, including:

- Delivering ENERGY STAR® training and marketing to retailers, housing industry representatives, utility companies, and consumers. Whirlpool's 2009 national print media featured creative executions that included the ENERGY STAR® mark, along with energy and water efficiency messaging that reached over 550 million consumers.

- Educating and training more than 61,000 national retailer sales associates on the benefits of ENERGY STAR®-qualified products.

65.     In 2011, Whirlpool announced that it was again awarded the ENERGY STAR® Sustained Excellence recognition for "its outstanding efforts to design, produce, and market ENERGY STAR qualified appliances." Additional key accomplishments include:

- Providing a hands-on training and learning experience for retail associates in fall 2010. During a 7-week tour in more than 70 cities across the country, associates learned the latest product innovations and key selling points for ENERGY STAR qualified appliances.

66.     In 2012, Whirlpool announced that it was again awarded the ENERGY STAR® Sustained Excellence award. According to the EPA, in "2011, Whirlpool stepped up its longstanding commitment to design, produce, and market ENERGY STAR qualified appliances"

and was recognized for "its outstanding efforts to design, produce, and market ENERGY STAR qualified appliances."   Additionally, Whirlpool secured over one billion ENERGY STAR® impressions in a wide variety of media including point-of-purchase education and advertising. Specifically, key accomplishments include:

- Offering training and continued education on ENERGY STAR® and energy efficiency for trade customers, designers, key influencers, and sales associates at its innovative World of Whirlpool experience center.

- Promoting ENERGY STAR® through public relations outreach efforts – including press release distribution, targeted media outreach, experimental events, and point-of-purchase education and advertising – achieving more than 1.3 billion impressions in 2011.

67.    Moreover, in September 2008, after news broke that appliance made by a competing manufacturer had been found to consume far more energy than their reported energy ratings, Whirlpool issued a press release assuring consumers that all of its refrigerators "have legitimately earned the ENERGY STAR credential by rigorously following the required energy testing procedures."   The press release further stated that "Whirlpool Corporation asserts that all of its ENERGY STAR qualified products are in full compliance with ENERGY STAR requirements."                                                                                  *See* http://investors.whirlpoolcorp.com/common/mobile/iphone/releasedetail.cfm?ReleaseID=531663 &CompanyID=ABEA-5DXEK8&mobileid=# (last visited July 28, 2014).

68.    Similarly, Whirlpool aggressively marketed the Mislabeled Washing Machines based on their ENERGY STAR® qualification.   Whirlpool conducted a systematic, broadly disseminated, sustained, widespread, multi-year advertising campaign, misrepresenting that the Mislabeled Washing Machines were ENERGY STAR® qualified.   Whirlpool advertised and identified these models as ENERGY STAR®-qualified products by prominently displaying the ENERGY STAR® symbol in promotional materials and product literature, including print,

24

internet, and other media, and by attaching or affixing the ENERGY STAR® logo on each and every Mislabeled Washing Machine.

69.     For example, in Whirlpool's "Know Before You Go" buying guide for washers and dryers, Whirlpool emphasizes the materiality of the energy and water usage of a washer in the decision making of consumers.  Moreover, Whirlpool represents that products which are ENERGY STAR®-qualified save consumers money through lower usage costs.



http://www.hustedmaytagappliance.com/WashDrybuyguide.pdf

70.     Moreover, in promotional brochures or print ads for the MVWC6ESWW printed in the spring of 2009, reproduced below, "NEW! ENERGY STAR® Qualification" is listed as the first feature of the product, along with an oversized image of the distinctive ENERGY STAR® logo alongside a photo of the model.  According to the promotional brochure, "[t]his 4.0 Cu. Ft. I.E.C. capacity washer pays for itself in just over 6 years" and "[s]ave[s] money on utility bills while getting excellent cleaning results…."



**NEW!**
**ENERGY STAR® Qualification**
This 4.0 cu. ft. I.E.C. capacity washer pays for itself in just over 6 years.* Save money on utility bills while getting excellent cleaning results, even in large loads.

*Compared to pre-2004 conventional washers, based on a 10-year life.




**Maytag® Commercial Technology (MCT)**
Centennial® laundry pairs bring long-lasting, commercial-grade components to your home. With MCT, the washer transmission features parts that have been tested to twice the life.**

**Components tested to 20 years include drive shaft, spin gear and synthetic oil.



**3x3 Spray System**
New spray technology with Auto Load Sensing gives exceptional cleaning performance from every angle. 3x3 uses 3 spray jets to wash, rinse and repeat to fight tough stains using less water.



# Centennial® Laundry Pair

**MVWC6ESWW WASHER**

**MEDC700V (Electric) MGDC700V (Gas) DRYER**

Spring 2009

http://insideadvantage.com/assets/pdfs/cms/MVWC6ESWW.pdf

71.     Similarly, a print ad for the MVWC6ESWW displayed in the April 13, 2010 issue of *Broadcaster Press* by retailer Larry's Appliance, reproduced below, prominently displays the ENERGY STAR® logo to tout energy and water savings.  The ad, which includes an oversized image of the distinctive ENERGY STAR® logo superimposed on the Mislabeled Washing Machine, states the washer "Pays For Itself In Just Over 6 Years!":



72.    Additionally, the 2009 Maytag Laundry or product catalogue (2009 Product Catalogue) is replete with references to and images of the distinctive ENERGY STAR® logo. For example, an introductory page at the beginning of the 2009 Product Catalogue, titled "Pick the pair that meets your needs," prominently displays the following representation:



73.    Further, the 2009 Product Catalogue repeatedly touts that the Mislabeled Washing Machines are ENERGY STAR® qualified, which results in substantial energy and water saving benefits.  For example, under the heading "Is This Product Right for You", Whirlpool claims the Mislabeled Washing Machines use "65% less water and 49% less energy."

**Is this product right for you?**

| Was your previous top load laundry pair built to last with commercial-grade parts? | Would you like to have a more efficient washer without giving up your preference for top load style? | Does your dryer tend to overdry your clothes with high heat? |
|---|---|---|
| Centennial® laundry pairs feature Maytag® Commercial Technology (MCT), which is a series of long-lasting, commercial-grade components for your home. This includes the washer's transmission, steel-reinforced baseframe and leveling legs, plus the dryer's belt, drum rollers, steel-reinforced baseframe and 1/3-HP motor. | The new Centennial® washer (model MVWC6ESW) is ENERGY STAR® qualified, using 65% less water and 49% less energy* in a configuration you've come to know. Plus, it features 3x3 Surround Spray, which uses three spray jets to wash, rinse and repeat for a better cleaning wash system that also saves water. | Thanks to the GentleBreeze™ drying system, you'll no longer have to worry. It quickly and efficiently dries clothes for more consistent results. Plus, the IntelliDry® sensor measures moisture to stop the cycle when complete. This prevents overdrying, and could save you up to $140 over the life of the dryer.** |

74.    In fact, in the 2009 Product Catalogue Whirlpool touts ENERGY STAR® qualification as one of the "Key Product Features" of the Mislabeled Washing Machines, once again prominently displaying an oversized image of the distinctive ENERGY STAR® logo

superimposed on alongside a photo of the Mislabeled Washing Machine.  A copy of the Key

Product Features page is reproduced below:



75.    Whirlpool also displays an oversized image of the distinctive ENERGY STAR®

logo superimposed on the Mislabeled Washing Machines alongside a photos of other, non-

ENERGY STAR® clothes washers, to distinguish the Mislabeled Washing Machines:



76.     Additionally, the product "Spec Sheet" for the Mislabeled Washing Machine maintained on Whirlpool's website, notes that "ENERGY STAR® Qualification" of the Mislabeled Washing Machine will result in savings on "utility bills":



http://insideadvantage.com/assets/pdfs/cms/MMLL172.pdf

77.     If there were any ambiguities on the part of consumers over the meaning of ENERGY STAR®, Whirlpool also included a glossary of terms in the 2009 Product Catalogue, titled "Feature Definitions" in which Whirlpool explains that ENERGY STAR®-qualified appliances "help lower utility bills." A copy of the definition is reproduced below:

> **ENERGY STAR® Qualified**
> Select Maytag® washers are ENERGY STAR®
> qualified to help lower utility bills while
> delivering excellent cleaning performance.

78.     As with the 2009 Product Catalogue, the 2010 Maytag Laundry or product catalogue (2010 Product Catalogue), is replete with references to and images of the distinctive

ENERGY STAR® logo.  Similarly, in the 2010 Product Catalogue, Whirlpool touts ENERGY STAR®-qualification of the Mislabeled Washing Machines, prominently displaying an oversized image of the distinctive ENERGY STAR® logo superimposed on alongside a photo of the Mislabeled Washing Machines.  According to the 2010 Product Catalogue, the ENERGY STAR® qualification of the Mislabeled Washing Machines, including model numbers MVWC6ESW and MVWC7ESW, "means you'll save money on monthly utility bill …":



79.    Again to erase any ambiguities on the part of consumers over the meaning of ENERGY STAR®, Whirlpool also included a glossary of terms in the 2010 Product Catalogue, titled "Feature Definitions" in which Whirlpool explains that ENERGY STAR®-qualification "mean the appliance exceeds the federal minimum efficiency standards as set forth by the Environmental Protection Agency and the U.S. Department of Energy, helping to save money on utility bills."

80.    Furthermore, Whirlpool's website, www.whirlpool.com, explains the meaning of "ENERGY STAR® Qualified" and directs consumers to "look for the ENERGY STAR mark" when shopping for appliances.  A screenshot of the image on Whirlpool's website is reproduced below:

### Q. What does ENERGY STAR® qualified mean?

A. ENERGY STAR® qualified appliances incorporate advanced technologies that use at least 10-50% less energy and water than standard models — and many Whirlpool® ENERGY STAR® appliances offer even greater efficiency. The money you save on your utility bills can more than make up for the cost of a more expensive but more efficient ENERGY STAR® model. When shopping, look for the ENERGY STAR® mark on the EnergyGuide label of the appliance — that's how to tell if it's ENERGY STAR® qualified.



Source: energystar.gov

http://schedule.whirlpool.com/content.jsp?sectionId=1338#faq&wtpc=&wtcgn=CashForApplian ces&wtcgs=CFA_Home&wtti=FaqCFA (last visited Apr. 17, 2013).

81.    Whirlpool also maintains a list of its ENERGY STAR®-qualified clothes washers on its website, further emphasizing the misrepresented energy and water savings of the Mislabeled Washing Machines, which are listed as models MVWC6ESW*+ and MVWC7ESW#** (as noted on the EnergyStar.gov website,[7] "Model numbers often contain wildcard characters, such as *, #, and X, that are placeholders for non-energy attributes, such as color.").  In fact, Whirlpool's list mirrors the list of purportedly ENERGY STAR®-compliant appliances found on the EnergyStar.gov website.

---

[7] http://www.energystar.gov/index.cfm?fuseaction=clotheswash.display_column_definitions

Last Modified: 06/16/2010
Definitions of Terms Used in Column Headers

| Brand | Model | Product Name | Volume (cubic feet) | kWh/ year | Modified Energy Factor (MEF) | Federal Standard (MEF) | Percent Better | Water Factor | Annual Water Use (gallons/ year) | Active | Active Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **AMANA** | | | | | | | | | | | |
| Amana | NFW7200TW | | 3.11 | 216 | 1.93 | 1.26 | 53% | 4.5 | 5,486 | Yes | 9/22/08 |
| Amana | NFW7300W*+ | | 3.46 | 162 | 2.39 | 1.26 | 90% | 3.9 | 5,263 | Yes | 3/16/10 |
| Amana | NFW7500V*+ | | 3.51 | 187 | 2.22 | 1.26 | 76% | 4.2 | 5,751 | Yes | 1/27/09 |
| Amana | NFW7600X*+ | | 3.86 | 177 | 2.35 | 1.26 | 87% | 4.1 | 6,143 | Yes | 4/30/10 |
| **MAYTAG** | | | | | | | | | | | |
| Maytag | MHWE250X*+ | | 3.46 | 161 | 2.35 | 1.26 | 87% | 3.8 | 5,154 | Yes | 4/30/10 |
| Maytag | MHWE300*+ | | 3.47 | 160 | 2.18 | 1.26 | 73% | 4.3 | 5,822 | Yes | 8/12/08 |
| Maytag | MHWE300W#* | | 3.51 | 161 | 2.31 | 1.26 | 83% | 4.1 | 5,696 | Yes | 7/20/09 |
| Maytag | MHWE400W#* | | 3.86 | 165 | 2.59 | 1.26 | 106% | 3.8 | 5,765 | Yes | 7/20/09 |
| Maytag | MHWE450W#* | | 3.86 | 165 | 2.59 | 1.26 | 106% | 3.8 | 5,765 | Yes | 7/20/09 |
| Maytag | MHWE500V*+ | | 3.47 | 138 | 2.35 | 1.26 | 87% | 3.8 | 5,210 | Yes | 8/12/08 |
| Maytag | MHWE550W#* | | 3.86 | 147 | 2.66 | 1.26 | 111% | 3.6 | 5,462 | Yes | 7/20/09 |
| Maytag | MHWE900V*+ | | 3.79 | 141 | 2.58 | 1.26 | 105% | 3.6 | 5,274 | Yes | 1/27/09 |
| Maytag | MHWE960W#* | | 3.86 | 141 | 2.58 | 1.26 | 105% | 3.5 | 5,251 | Yes | 7/20/09 |
| Maytag | MHWE950W*+ | | 3.86 | 136 | 2.63 | 1.26 | 109% | 3.4 | 5,190 | Yes | 12/9/09 |
| Maytag | MHWZ400T*+ | | 3.46 | 139 | 2.45 | 1.26 | 94% | 3.9 | 5,222 | Yes | 8/21/07 |
| Maytag | MHWZ600T*+ | | 3.46 | 139 | 2.45 | 1.26 | 94% | 3.9 | 5,222 | Yes | 8/21/07 |
| Maytag | MHWZ600W*+ | | 3.46 | 139 | 2.45 | 1.26 | 94% | 3.9 | 5,222 | Yes | 12/9/09 |
| Maytag | MVWB300W#* | | 4.08 | 264 | 2.22 | 1.26 | 76% | 4.3 | 6,861 | Yes | 7/20/09 |
| Maytag | MVWB450W#* | | 4.31 | 282 | 2.21 | 1.26 | 75% | 4.2 | 7,062 | Yes | 7/1/09 |
| Maytag | MVWB700V*+ | | 4.08 | 252 | 2.23 | 1.26 | 77% | 4.4 | 7,101 | Yes | 7/16/08 |
| Maytag | MVWB750W#* | | 4.31 | 282 | 2.21 | 1.26 | 75% | 4.2 | 7,062 | Yes | 7/1/09 |
| Maytag | MVWB800V*+ | | 4.08 | 249 | 2.25 | 1.26 | 79% | 4.5 | 7,117 | Yes | 7/16/08 |
| Maytag | MVWB850W#* | | 4.34 | 277 | 2.25 | 1.26 | 79% | 4.3 | 7,384 | Yes | 7/1/09 |
| Maytag | MVWC5E8X#* | | 3.47 | 207 | 1.89 | 1.26 | 50% | 7.1 | 9,671 | Yes | 6/16/10 |
| Maytag | MVWC6E5W*+ | | 3.43 | 211 | 1.85 | 1.26 | 47% | 7.1 | 9,506 | Yes | 3/5/09 |
| Maytag | MVWC7E5WW#* | | 3.43 | 212 | 1.85 | 1.26 | 47% | 7.1 | 9,506 | Yes | 7/20/09 |
| Maytag | MD 1720 | | 1.9 | 141 | 1.89 | 1.26 | 50% | 7.1 | 5,288 | Yes | 2/1/08 |
| Maytag | MD 3720 | | 1.9 | 141 | 1.89 | 1.26 | 50% | 7.1 | 5,288 | Yes | 2/1/08 |

http://insideadvantage.com/assets/pdfs/cms/WP_EStarWashers.pdf

82.    Besides promoting the Mislabeled Washing Machines on its own website, Whirlpool provided retailers with promotional materials that reinforced its misleading marketing campaign.  For example, a listing for the model MVWC6ESWW on the website of online retail giant Amazon.com highlighted the model's purported ENERGY STAR® qualification at the very top of the product feature list:[8]

> This 4.0 cu. ft. I.E.C. energy star qualified washer pays for itself in just over six years compared to pre-2004 conventional washers, based on lifetime water and energy savings.

83.    Moreover, Lowe's marketed, for example, the Maytag Centennial model number MVWC7ESWW on its website alongside an oversized ENERGY STAR® logo displayed next to a photograph of the Mislabeled Washing Machine:

---

[8] Previously available at http://www.amazon.com/Maytag-Centennial-MVWC6ESWW-Top-Load-Washer/dp/B002ACHJF0/ref=cm_cr_pr_product_top/185-2908430-1600761 (accessed Jan. 4, 2012).



http://www.lowes.com/pd_142514-46-MVWC7ESWW_4294857976_?productId=3123237

84.    In addition to a comprehensive internet campaign, Whirlpool voluntarily posted the ENERGY STAR® logo on the EnergyGuide label, which was packaged with each of the Mislabeled Washing Machines.  These EnergyGuide labels have been routinely displayed on Internet retailers' product websites for the Mislabeled Washing Machines and in or on the display models placed in retail showrooms.[9]

---

[9] *See, e.g.*, http://www.ajmadison.com/ajmadison/itemdocs/MVWC7ESWW_energy_guide.pdf (last visited July 11, 2014), *see also* http://www.ajmadison.com/ajmadison/itemdocs/MVWC6ESWW_Energy_Guide.pdf (last visited July 11, 2014).

85.    The FTC maintains a website titled "Energy Guidance:  Appliance Shopping With the Energy Guide Label."[10]  The site informs consumers about the significance of the ENERGY STAR® logo when it appears on a product's EnergyGuide label.  The website states: "If you've shopped for appliances, you've seen the bright yellow Energy Guide label. …  The more energy efficient an appliance is, the less it costs to run," and "If you see the ENERGY STAR® logo, it means the product is better for the environment because it uses less energy than standard models."



86.    Each of the Mislabeled Washing Machines included one of the following EnergyGuide labels bearing the basic model number of the Mislabeled Washing Machine and the ENERGY STAR® logo:

---

[10] *Available at* http://www.ftc.gov/bcp/edu/ pubs/consumer/homes/rea14.shtm (last visited Sept. 21, 2012).




87.     Besides including the ENERGY STAR® logo on the EnergyGuide label, which is packaged with each of the Mislabeled Washing Machines, Whirlpool also affixed the distinctive logo to the front of the washing machine.

88.     In addition to these various promotional venues, Whirlpool issued press releases reaffirming its commitment and promise of water and energy savings.  For example, on September 5, 2008, Whirlpool issued a press release titled "Whirlpool Corporation Leads Industry in Energy Efficiency; Company's ENERGY STAR® Qualified Appliances Deliver Promised Savings."  The article, released in response to reports of competitors exceeding reported energy ratings, was released to "reassure consumers that all of its French Door Bottom-Mount refrigerators – sold under the Whirlpool, Maytag, KitchenAid and Amana brands –  have legitimately earned the ENERGY STAR credential by rigorously following the required energy testing procedures."  Furthermore, Phil Pejovich, vice president refrigeration, Whirlpool North

America, stated: "We want consumers to know that when they purchase French Door Bottom-Mount refrigerators – and all ENERGY STAR qualified appliances by Whirlpool – they can do so with the confidence that they will deliver energy savings as communicated in-store, on the product and in the product literature."

89.     On October 23, 2009, Whirlpool once again took the opportunity to reaffirm its compliance with the ENERGY STAR® program and promise of energy savings. Specifically, on October 23, 2009, in an article titled "Whirlpool Corporation Applauds U.S. Department of Energy's Steps to Enforce Energy Efficiency Standards," the company stated: "'We're pleased that DOE is stepping up [ENERGY STAR®] enforcement as these actions are important for several reasons,' said Katrina Helmkamp, senior vice president, product business teams, Whirlpool Corporation. 'They will help ensure manufacturers of appliances are held accountable to deliver *the energy savings they promise.* In turn, consumers will be able to confidently use the Energy Guide label to make energy performance comparisons among brands while shopping, and to attain in real world use *the energy efficiency promised when they purchased the appliance.*'" (emphasis added).

### C.    Plaintiffs' Experiences

90.     On November 27, 2009, Plaintiff Francis Angelone purchased a Maytag Centennial MVWC6ESWW1 washing machine at The Home Depot retail store in Delran, New Jersey. He paid $299.00 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification. The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine. He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which

created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his water and energy savings while helping to protect the environment. He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW1 if he had known that it was not, in fact, ENERGY STAR® compliant. He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool. He also understood that the purchase involved a direct transaction between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

91.    On November 27, 2009, Plaintiff Brian Maxwell purchased a Maytag Centennial MVWC6ESWW1 washing machine at a Fry's Electronics retail store in Roseville, California. He paid $399.00 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification. The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine. He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that

the machine would help him maximize his water and energy savings while helping to protect the environment.  He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW1 if he had known that it was not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  He also understood that the purchase involved a direct transaction between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

92.    On November 28, 2009, Plaintiff Jonathan Cohen purchased a Maytag Centennial MVWC6ESWW1 washing machine at The Home Depot retail store in Houston, Texas.  He paid $299.00 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his water and energy savings while helping to protect the environment.  He relied on these representations and warranties in deciding to purchase the

washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW1 if he had known that it was not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  He also understood that the purchase involved a direct transaction between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

93.    On November 30, 2009, Plaintiff Charlene Dzielak purchased a Maytag Centennial MVWC6ESWW1 washing machine at a Lowe's retail store near her home in Middlesex County.  She paid $409.00 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her water and energy savings while helping to protect the environment.  She relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW1 if she had known

that it was not, in fact, ENERGY STAR® compliant.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  She also understood that the purchase involved a direct transaction between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

94.    In January 2010, Plaintiff Jennifer Schramm purchased a Maytag Centennial MVWC6ESWW1 washing machine at a Lowe's retail store in Alexandria, Virginia.  She paid $490.20 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her water and energy savings while helping to protect the environment.  She relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW1 if she had known that it was not, in fact, ENERGY STAR® compliant.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of

Whirlpool.  She also understood that the purchase involved a direct transaction between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

95.     On February 27, 2010, Plaintiff Jeffery McLenna purchased a Maytag Centennial MVWC6ESWW1 washing machine at The Home Depot retail store in Lapeer, Michigan.  He paid $476.10 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his water and energy savings while helping to protect the environment.  He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW1 if he had known that it was not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  He also understood that the purchase involved a direct transaction between himself and Whirlpool, because the machine came with packaging and other materials prepared by

42

Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

96.    On March 27, 2010, Plaintiff Kari Parsons purchased a Maytag Centennial MVWC6ESWW1 washing machine at an ApplianceSmart Factory Outlet retail store in Columbus, Ohio.  She paid $492.99 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her water and energy savings while helping to protect the environment.  She relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW1 if she had known that it was not, in fact, ENERGY STAR® compliant.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  She also understood that the purchase involved a direct transaction between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly

to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

97.    On March 18, 2010, Plaintiff Charles Beyer purchased a Maytag Centennial MVWC6ESWW1 washing machine at a Sears retail store in Martinsville, Indiana.  He paid $457.49 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his water and energy savings while helping to protect the environment.  He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW1 if he had known that it was not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  He also understood that the purchase involved a direct transaction between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

98.    On December 1, 2010, Plaintiff Shelley Baker purchased a Maytag Centennial MVWC6ESWW1 washing machine at a Sears retail store in Ontario, California.  She paid $439.93 plus tax and delivery, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her water and energy savings while helping to protect the environment.  She relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW1 if she had known that it was not, in fact, ENERGY STAR® compliant.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  She also understood that the purchase involved a direct transaction between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

99.    In 2010, Plaintiff Jeffery Reid purchased a Maytag Centennial MVWC6ESWW1 washing machine from a nearby Air Force base in Florida.  He paid for the machine with cash,

which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit he purchased was marked with the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  He saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help him maximize his water and energy savings while helping to protect the environment.  He relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Maytag Centennial MVWC6ESWW1 if he had known that it was not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  He also understood that the purchase involved a direct transaction between himself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

100.    On September 15, 2010, Plaintiff Apasia Christy purchased a Maytag Centennial MVWC6ESWW1 washing machine at The Home Depot retail store in Turlock, California.  She paid $464.09 plus tax, which included a substantial price premium due to its supposed water and energy efficiency and ENERGY STAR® qualification.  The unit she purchased was marked with

the ENERGY STAR® logo in two places, on the lower right-hand corner of the EnergyGuide label affixed to the washing machine, and also directly affixed to the front of the washing machine.  She saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program, and that the machine would help her maximize her water and energy savings while helping to protect the environment.  She relied on these representations and warranties in deciding to purchase the washing machine, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Maytag Centennial MVWC6ESWW1 if she had known that it was not, in fact, ENERGY STAR® compliant.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Whirlpool and/or as the agent of Whirlpool.  She also understood that the purchase involved a direct transaction between herself and Whirlpool, because the machine came with packaging and other materials prepared by Whirlpool, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Whirlpool as part of the transaction with the retailer.

   **D.    DOE Testing And Revocation Of The Mislabeled Washing Machines' ENERGY STAR® Qualification**

   101.    The success of the ENERGY STAR® program depends on the accuracy and reliability of the ENERGY STAR® logo as an indicator of highly efficient products.  To protect the integrity of the ENERGY STAR® label and certification mark, the DOE has evaluated and verified performance test results to ensure that ENERGY STAR®-certified appliances correspond to actual savings for consumers.

102.    On September 8, 2010, Springboard Engineering (a division of Underwriters Laboratories Verification Services) laboratories in Newton, Iowa completed DOE efficiency testing of a Maytag Centennial MVWC6ESWW1.  The results showed the unit did not meet ENERGY STAR® standards.

103.    On September 20, 2010, the DOE notified Whirlpool that DOE-initiated testing revealed that Whirlpool's model MVWC6ESWW1 did not meet the applicable ENERGY STAR® energy efficiency requirements.

104.    After consulting with Whirlpool, the DOE proceeded with testing of additional units.

105.    From January 3 through January 12, 2011, Springboard Engineering laboratories conducted DOE efficiency testing of four additional units of the Maytag Centennial MVWC6ESWW1.  The results showed again that these units did not meet ENERGY STAR® standards.

106.    On January 19, 2011, the DOE notified Whirlpool that the second round of testing confirmed that model MVWC6ESWW1 does not meet ENERGY STAR® requirements.

107.    On March 16, 2011, the DOE referred the matter to the EPA, the brand manager for ENERGY STAR®, for appropriate action.

108.    On May 7, 2012, the DOE and/or EPA Disqualified model MVWC6ESWW1.

109.    In accordance with guidelines and the EPA's disqualification procedures, these models were then posted on the EPA's list of disqualified models.

110.    Moreover, as a result of the disqualification by the EPA (after consulting with the DOE), Whirlpool was required to immediately cease labeling and shipping the appliance with the ENERGY STAR® logo, remove ENERGY STAR® references from related marketing

materials, spec sheets and websites, and cover or remove labels on units within the manufacturer's control.

111.    The Maytag models disqualified by the EPA and/or DOE include the models purchased by Plaintiffs Dzielak, Baker, Angelone, Maxwell, McLenna, Reid, Parsons, Beyer, Cohen, Schramm, and Christy.   The disqualification was not limited to base model number MVWC6ESWW1.     Rather, it applied to all Maytag models MVWC6ESW*+ and MVWC7ESW#**, including Plaintiffs' Mislabeled Washing Machines.

112.    Defendant Whirlpool did not modify the design or manufacture of the Mislabeled Washing Machines in any way that would affect the water or energy efficiency of the appliances. Indeed, the available parts lists for all Whirlpool's Maytag models MVWC6ESW*+ and MVWC7ESW#** show they are substantially similar, with the majority of parts, including the parts which affect energy usage, being the same.   Charts of the parts list comparing the part numbers of the Mislabeled Washing Machines is attached hereto as Exhibit B.

113.    Illustrative of this fact, the EnergyGuide Labels affixed to the Mislabeled Washing Machines were identical or substantially identical for all models, including the MVWC6ESWW0, MVWC6ESWW1, and MVWC7ESWW0.   In fact, the MVWC6ESWW0 and the MVWC6ESWW1 share the same EnergyGuide label, which states that it applies to the MVWC6ESW* family of models.   *See* ¶ 86.   Furthermore, Defendants in their own promotional brochures and print ads refer to the specific models MVWC6ESWW0, MVWC6ESWW1, and MVWC7ESWW0 simply as the "MVWC6ESW," "MVWC6ESWW," and "MVWC7ESW," and leave off the last two characters, as they identify non-energy attributes, such as color.   *See* ¶¶ 70, 71, 78, 81, 82.

114.    Furthermore, when a basic model is disqualified by the EPA and/or DOE, the disqualification order includes "all units of a given type of covered product (or class thereof) manufactured by one manufacturer, having the same primary energy source, and which have essentially identical electrical, physical, and functional (or hydraulic) characteristics that affect energy consumption, energy efficiency, water consumption, or water efficiency..."  10 C.F.R. § 430.2.    All units of Maytag models MVWC6ESW*+ and MVWC7ESW#** were manufactured by one manufacturer and have the same primary energy source, and have essentially identical electrical, physical, and functional (or hydraulic) characteristics that affect energy consumption, energy efficiency, water consumption, or water efficiency.    Thus, the washing machines purchased by Plaintiffs Dzielak, Baker, Angelone, Maxwell, McLenna, Reid, Parsons, Beyer, Cohen, Schramm, and Christy were equally affected by the EPA/DOE noncompliance and disqualification determinations.

115.    Whirlpool is one of the world's leading manufacturers of home appliances, maintaining 65 manufacturing and technology research centers around the world.  Besides playing a leadership role in crafting every major appliance efficiency regulation, "including a leading role in setting the ENERGY STAR program standards," the company purports to maintain rigorous testing procedures.  Whirlpool's laboratories are certified annually by the Canadian Standards Association, and "work closely with them in rigorously demonstrating that the appropriate principles outlined by ISO/IEC 17025 are within [Whirlpool's] process for ENERGY STAR® product qualification."  Moreover, Whirlpool touts that "the technical sophistication of our laboratories and the highly advanced skill sets of our engineers are among the best in the world.  Our lab personnel also have expansive job scopes, which include more responsibility than just testing product for energy performance."  *Id.*  According to Whirlpool,

the "Whirlpool process includes rigorous equipment maintenance and calibration, detailed lab procedures and comprehensive record keeping on both equipment and test results."  May 27, 2010 Letter from Nick Gillespie (Government Relations Senior Specialist) to EPA concerning ENERGY STAR® Draft Lab Requirements.  As such, Whirlpool either (a) tested the Mislabeled Washing Machines before marketing them and, at all times relevant hereto, knew that the models were non-compliant with the requirements of the ENERGY STAR® program or, in the alternative (b) affixed ENERGY STAR® labels to the Mislabeled Washing Machines without testing them, and thus knew the representation concerning their energy efficiency was baseless. This information is solely within Whirlpool's possession.

116.    The Mislabeled Washing Machines have never, at any point, been properly labeled with the ENERGY STAR® logo.  This is analogous to the unauthorized practice of medicine.  Suppose a fraudster misrepresents himself as a board-certified physician and opens a medical clinic, only to be exposed years later.  This does not mean that the fraudster was properly licensed to practice medicine prior to his exposure.  To the contrary, the fraudster was never licensed, and any statements to the contrary were false.  Here, Whirlpool made misrepresentations about the ENERGY STAR® status of the Mislabeled Washing Machines. Just because the DOE disqualified the units in 2012 does not mean they were compliant in 2009. To the contrary, the DOE's determination means the Mislabeled Washing Machines were *never* properly labeled.  Any representation to the contrary was false when it was made.  The Mislabeled Washing Machines failed to work properly from the outset.

117.    The failure of the Mislabeled Washing Machines to comply with ENERGY STAR® standards is a latent defect.  If this defect were known, the Mislabeled Washing Machines would not have been saleable as described, and they would not measure up to the

description given to the purchaser.  Furthermore, this defect is hidden from purchasers. Reasonable consumers do not have the knowledge or equipment to assess whether their appliances are ENERGY STAR® compliant.  This information is solely within Whirlpool's possession.

118.    Plaintiffs and Class members who purchased Mislabeled Washing Machines paid a price premium due to their Mislabeled Washing Machine's supposed superior water usage, energy efficiency, and ENERGY STAR® qualification, and paid more money in additional water and energy costs to operate his or her Mislabeled Washing Machine than they would have had the appliance actually met the ENERGY STAR® qualification as represented and promised by Whirlpool.  The additional Utility Bills can be reasonably quantified by an appropriate study, and through objective mathematical processes, based on the data from the DOE-initiated testing described herein.

119.    Plaintiffs and the Class members could not have discovered that their washing machines were not ENERGY STAR® compliant until the EPA and/or DOE's disqualification order was issued on May 7, 2012.  No reasonable consumer has the knowledge or equipment to test appliances for ENERGY STAR® compliance.

120.    Plaintiffs Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery McLenna, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, Aspasia Christy, and each purchaser of the Mislabeled Washing Machines paid a price premium due to their Mislabeled Washing Machine's supposed water and energy efficiency and ENERGY STAR® qualification.  The amount of the price premium can be reasonably quantified by an appropriate market study of the prices for comparable washing machines sold with and

without the ENERGY STAR® logo, or through a contingent valuation study, or through other means regularly employed by economic and valuation experts.

121.    Plaintiffs Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery McLenna, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, Aspasia Christy, and each purchaser of the Mislabeled Washing Machines paid more money in additional Utility Bills to operate the Mislabeled Washing Machines than each would have paid if the washing machines had actually met the ENERGY STAR® standards as promised.  The additional Utility Bills can be reasonably quantified by an appropriate study, and through objective mathematical processes, based on the data from the DOE-initiated testing described herein.

## CLASS ACTION ALLEGATIONS

122.    Plaintiffs seek to represent a class defined as all persons in the United States who purchased a Mislabeled Washing Machine (hereafter, the "Class").

123.    Plaintiffs Dzielak and Angelone also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of New Jersey (hereafter, the "New Jersey Subclass").

124.    Plaintiffs Baker, Maxwell, and Christy also seek to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of California (hereafter, the "California Subclasses").

125.    Plaintiff McLenna also seeks to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Michigan (hereafter, the "Michigan Subclass").

126.    Plaintiff Reid also seeks to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Florida (hereafter, the "Florida Subclass").

127.    Plaintiff Parsons also seeks to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Ohio (hereafter, the "Ohio Subclass").

128.    Plaintiff Beyer also seeks to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Indiana (hereafter, the "Indiana Subclass").

129.    Plaintiff Cohen also seeks to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the State of Texas (hereafter, the "Texas Subclass").

130.    Plaintiff Schramm also seeks to represent a subclass of all Class members who purchased a Mislabeled Washing Machine in the Commonwealth of Virginia (hereafter, the "Virginia Subclass").

131.    Members of the Class and Subclasses are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclasses number in the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

132.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

(a)    whether the Mislabeled Washing Machines were sold bearing false labels misrepresenting them as ENERGY STAR® compliant;

(b)    whether Class members suffered an ascertainable loss as a result of the Defendants' misrepresentations; and

(c)    whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution, injunctive, and/or monetary relief and, if so, the amount and nature of such relief.

133.    Plaintiffs' claims are typical of the claims of Class and Subclass members because Plaintiffs and all Class members purchased a Mislabeled Washing Machine bearing a false label misrepresenting it as ENERGY STAR® compliant, when in fact it was not.

134.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

135.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.)

136.  Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

137.  Plaintiffs bring this Count I individually and on behalf of the members of the Class and Subclasses against all Defendants.

138.  The Mislabeled Washing Machines are consumer products as defined in 15 U.S.C. § 2301(1).

139.  Plaintiffs and Class members are consumers as defined in 15 U.S.C. § 2301(3).

140.  Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

141.  In connection with the sale of the Mislabeled Washing Machines, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the products met the water and energy efficiency requirements of the ENERGY STAR® program.

142.  In fact, the Mislabeled Washing Machines did not meet the water and energy efficiency requirements of the ENERGY STAR® program.

143.  By reason of Defendants' breach of warranties stating that the Mislabeled Washing Machines met the water and energy efficiency requirements of the ENERGY STAR® program, Defendants violated the statutory rights due Plaintiffs and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiffs and Class members.

144.    Plaintiffs and Class members were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency and water usage had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher Utility Bills for as long as they continue to use the Mislabeled Washing Machines.

## COUNT II
### (Breach of Express Warranty)

145.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

146.    Plaintiffs Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy bring this Count II individually and on behalf of the members of the Class and the New Jersey, California, Florida, Ohio, Indiana, Texas, and Virginia Subclasses against all Defendants.

147.    Plaintiff Jeffery McLenna also brings this Count II individually and on behalf of the members of the Michigan Subclass against The Home Depot.

148.    Defendants, as the designer, manufacturer, marketers, distributors, or sellers expressly warranted that the Mislabeled Washing Machines were fit for their intended purpose in that they would function properly as water and energy-efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.

149.    In fact, the Mislabeled Washing Machines were not fit for such purposes because they do not function properly as water and energy-efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.

150.     Plaintiffs and Class members were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency and water usage had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher Utility Bills as long as they continue to use the Mislabeled Washing Machines.

### COUNT III
**(Breach of Implied Warranty of Merchantability**)

151.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

152.     Plaintiffs Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery Reid, Kari Parsons, Jeffery McLenna, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy bring this Count III individually and on behalf of the members of the Class and the New Jersey, California, Michigan, Florida, Ohio, Indiana, Texas, and Virginia Subclasses against the Retailer Defendants.

153.     Additionally, Plaintiffs Charlene Dzielak, Francis Angelone, Jeffery McLenna, Charles Beyer, Jonathan Cohen, and Jennifer Schramm bring this Count III individually and on behalf of the members of the Class and the New Jersey, Michigan, Indiana, Texas, and Virginia Subclasses against Whirlpool.

154.     Defendants as the designer, manufacturer, marketers, distributors, and/or sellers impliedly warranted that the Mislabeled Washing Machines were fit for their intended purpose in that they would function properly as water and energy-efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.

155.    Defendants breached the warranty implied in the contract for the sale of the Mislabeled Washing Machines in that the Mislabeled Washing Machines could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose in that they did not function properly as water and energy-efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.  As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendants to be merchantable.

156.    Plaintiffs and Class members are the intended beneficiaries of Defendants' implied warranties.

157.    In reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose, Plaintiffs and Class members purchased the Mislabeled Washing Machines for use as water and energy-efficient washing machines within the parameters established by federal law and the ENERGY STAR® program.

158.    The Mislabeled Washing Machines were not altered by Plaintiffs and Class members.  The Mislabeled Washing Machines were defective when they left the exclusive control of Defendants.

159.    Defendants knew the Mislabeled Washing Machines would be purchased and used without additional testing for water and energy efficiency by Plaintiffs and Class members. The Mislabeled Washing Machines were defectively designed and unfit for their intended purpose, and Plaintiffs and Class members did not receive the goods as warranted.

160.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have

purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency and water usage had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher Utility Bills for as long as they continue to use the Mislabeled Washing Machines.

## COUNT IV
### (Unjust Enrichment)

161.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

162.    Plaintiffs bring this Count IV individually and on behalf of the members of the Class and Subclasses against all Defendants.

163.    "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences.  In all states, the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched.  At the core of each state's law are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff.  The focus of the inquiry is the same in each state."  *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007)).

164.    "Since there is no material conflict relating to the elements of unjust enrichment between the different jurisdictions from which class members will be drawn," *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. at 58, New Jersey law applies to those claims.

165.    Plaintiffs and Class members conferred a benefit on Whirlpool, Lowe's, and Sears by purchasing the Mislabeled Washing Machines.

166.    Whirlpool misrepresented that the Mislabeled Washing Machines complied with ENERGY STAR® standards, and misrepresented the water usage and energy efficiency of the Mislabeled Washing Machines, for the purpose of generating retail sales which could and did increase the amount of wholesale sales to Whirlpool.

167.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' purchases of the Mislabeled Washing Machines. Retention under these circumstances is unjust and inequitable because Whirlpool, Lowe's, Sears, The Home Depot, and ARCA misrepresented that the Mislabeled Washing Machines complied with ENERGY STAR® standards, when in fact they did not, and misrepresented the water and energy efficiency of the Mislabeled Washing Machines, which caused injuries to Plaintiffs and Class members because (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency and water usage had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher Utility Bills for as long as they continue to use the Mislabeled Washing Machines.

168.    Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

## COUNT V
### (Violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*)

169.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

170.    Plaintiffs Dzielak and Angelone bring this Count V individually and on behalf of the members of the New Jersey Subclass against defendants Whirlpool, Lowe's, and The Home Depot.

171.    Defendants misrepresented that the Mislabeled Washing Machines complied with ENERGY STAR® standards when in fact they did not, and misrepresented the energy efficiency and water usage of the Mislabeled Washing Machines.

172.    Plaintiffs Dzielak, Angelone, and New Jersey Subclass members suffered an ascertainable loss caused by Defendants' misrepresentations because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency and water usage had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) they have paid and will continue to pay higher Utility Bills for as long as they continue to use the Mislabeled Washing Machines.

## COUNT VI
### (Violations of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act "TCCWNA," New Jersey Stat. §§ 56:12-14 to 56:12-18)

173.    Plaintiffs repeat the allegations contained in the above paragraphs as if fully set forth herein.

174.    Plaintiffs Dzielak and Angelone bring this Count VI individually and on behalf of the members of the New Jersey Subclass against defendants Whirlpool, Lowe's, and The Home Depot.

175.    The TCCWNA provides:

> No seller … shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign … which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

176.    The ENERGY STAR® labels, advertising, and marketing materials for the Mislabeled Washing Machines are written consumer warranties, notices, and/or signs offered, given, and/or displayed to consumers and prospective consumers subject to the TCCWNA.

177.    Plaintiffs Dzielak and Angelone, and members of the New Jersey Subclass are "consumer[s] or prospective consumer[s]" within the meaning of N.J.S.A. § 56:12-15.

178.    Defendants are "sellers" within the meaning of N.J.S.A. § 56:12-15.

179.    The rights of consumers to truthful and accurate statements on the labels and marketing materials for the Mislabeled Washing Machines, as well as the right to avoid deception caused by false and misleading statements on such labels and marketing materials, are "clearly established legal rights" under N.J.S.A. § 56:8-2.

180.    The responsibility of a seller to refrain from the employment of any unconscionable commercial practice, deception, fraud, false pretense, or misrepresentation, and to refrain from the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of merchandise, and to refrain from selling products with labels that make false statements about the products, are clearly established under N.J.S.A. § 56:8-2.

181.    Defendants violated the TCCWNA by misrepresenting that the Mislabeled Washing Machines Defendants complied with ENERGY STAR® standards when in fact they

did not, and misrepresented the energy efficiency and water usage of the Mislabeled Washing Machines.

182.    Pursuant to N.J.S.A. § 56:12-17, Defendants are liable to Plaintiffs Dzielak, Angelone, and the New Jersey Subclass for civil penalties or for actual damages, or both, at the election of the consumer.    In addition, Plaintiffs Dzielak and Angelone are entitled to reimbursement for all reasonable attorneys' fees and court costs incurred as a result of bringing this action.

**COUNT VII**

**(Violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*)**

183.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

184.    Plaintiffs Baker, Maxwell, and Christy bring this Count VII individually and on behalf of the California Subclass under California law against defendants Whirlpool, Sears, Fry's Electronics, and The Home Depot.

185.    CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Defendants violated this provision by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency and water usage of the Mislabeled Washing Machines.

186.    CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."   Defendants violated this provision by representing the Mislabeled Washing

Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency and water usage of the Mislabeled Washing Machines.

187.    CLRA § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."   Defendants violated this provision by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency and water usage of the Mislabeled Washing Machines.

188.    At the time they made these representations and made sales to Plaintiffs and class members, Defendants were aware of the defect because they were aware that DOE-initiated testing had shown the Mislabeled Washing Machines did not comply with ENERGY STAR® standards.

189.    Plaintiffs Baker, Maxwell, and Christy and the California Subclass members suffered injuries caused by Defendants' misrepresentations because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency and water usage had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) Plaintiffs and the California Subclass members have paid and will continue to pay higher Utility Bills for as long as they continue to use the Mislabeled Washing Machines.

190.    On November 11, 2011, prior to the filing of this Complaint, a CLRA notice letter was served on Defendants Whirlpool and Sears which complies in all respects with California Civil Code § 1782(a).  Plaintiff Baker sent Defendants a letter *via* certified mail, return receipt requested, advising Defendants that they are in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.  Defendants were

further advised that in the event that the relief requested has not been provided within thirty (30) days, Baker would file this Complaint.  A true and correct copy of Plaintiff Baker's CLRA letter is attached hereto as Exhibit C.

191.    On November 16, 2011, prior to the filing of this Complaint, a CLRA notice letter was served on Defendant Whirlpool which complies in all respects with California Civil Code § 1782(a).  Plaintiff Brian Maxwell sent Whirlpool a letter *via* certified mail, return receipt requested, advising Whirlpool it was in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.  Whirlpool was further advised that in the event that the relief requested has not been provided within thirty (30) days, Maxwell would file this Complaint.  A true and correct copy of Plaintiff Maxwell's CLRA letter is attached hereto as Exhibit D.

192.    Wherefore, Plaintiffs Baker, Maxwell, and Christy seek damages, restitution, and injunctive relief for this violation of the CLRA.

## COUNT VIII
### (Violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*)

193.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

194.    Plaintiffs Baker, Maxwell, and Christy bring this Count VIII individually and on behalf of the California Subclass under California law against defendants Whirlpool, Sears, Fry's Electronics, and The Home Depot.

195.    Defendants are subject to the Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200 *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

196.    Defendants' conduct, described herein, violated the "unlawful" prong of the UCL by violating the EPCA, NECPA, NAECA, and regulations promulgated thereunder, governing the water and energy efficiency of washing machines.

197.    Defendants' conduct, described herein, violated the "unfair" prong of the UCL by violating the policy or spirit of the EPCA, NECPA, NAECA, and regulations promulgated thereunder, governing the water and energy efficiency of washing machines.

198.    Defendants' conduct, described herein, violated the "fraudulent" prong of the UCL by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency and water usage of the Mislabeled Washing Machines.

199.    Plaintiffs Baker, Maxwell, and Christy and California Subclass members suffered lost money or property as a result of Defendants' UCL violations because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency and water usage had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) they have paid and will continue to pay higher Utility Bills for as long as they continue to use the Mislabeled Washing Machines.

**COUNT IX**
**(False Advertising)**
**(False Advertising Law, Business & Professions Code § 17500 *et seq.*)**

200.    Plaintiffs repeat the allegations contained in the above paragraphs as if fully set forth herein.

201.    Plaintiffs Baker, Maxwell, and Christy bring this Count IX individually and on behalf of the California Subclass under California law against defendants Whirlpool, Sears, Fry's Electronics, and The Home Depot.

202.    California's False Advertising Law (*Bus. & Prof. Code* § 17500, *et seq.*) makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

203.    Defendants committed acts of false advertising, as defined by §17500, by using false and misleading statements to promote the sale of Mislabeled Washing Machines, as described above.

204.    Defendants knew or should have known, through the exercise of reasonable care that the statements were untrue and misleading.

205.    Defendants' actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

206.    Plaintiffs Baker, Maxwell, and Christy and California Subclass members suffered lost money or property as a result of Defendants' FAL violations because: (a) they would not have purchased the Mislabeled Washing Machines on the same terms if the true facts concerning their energy efficiency and water usage had been known; (b) they paid a price premium due to the mislabeling of the washing machines as ENERGY STAR®-qualified; (c) the Mislabeled Washing Machines did not perform as promised; and (d) they have paid and will continue to pay higher Utility Bills for as long as they continue to use the Mislabeled Washing Machines.

<u>**COUNT X**</u>

**(Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*)**

207.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

208.    Plaintiff McLenna brings this claim on behalf of the members of the Michigan Subclass against defendants Whirlpool and Home Depot.

209.    Mich. Comp. Laws § 445.903(c) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Defendants violated this provision by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency and water usage of the Mislabeled Washing Machines.

210.    Mich. Comp. Laws § 445.903(e) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Defendants violated this provision by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency and water usage of the Mislabeled Washing Machines.

211.    Mich. Comp. Laws § 445.903(g) prohibits "[a]dvertising goods or services with intent not to dispose of those goods or services as advertised or represented."   Defendants violated this provision by representing the Mislabeled Washing Machines as ENERGY STAR®-qualified and by misrepresenting the energy efficiency and water usage of the Mislabeled Washing Machines.

212.    Defendants misrepresented the energy efficiency and water usage of the Mislabeled Washing Machines after learning of their defects with the intent that Plaintiffs relied

on such representations in their decision regarding the purchase, lease and/or use of the Mislabeled Washing Machines.

213.    Plaintiff McLenna and the Michigan Subclass did, in fact, rely on such representations in their decision regarding the purchase, lease and/or use of the Mislabeled Washing Machines, which were primarily used for "personal, family and household services."

214.    Through those misleading and deceptive statements and false promises, Defendants violated the Michigan Consumer Protection Act.

215.    The Michigan Consumer Protection Act applies to Defendants' transactions with Plaintiff McLenna and the Michigan Subclass because Defendant Whirlpool has its principal place of business in Michigan, and Defendants' deceptive scheme was carried out in Michigan and affected Plaintiff McLenna.

216.    Plaintiff McLenna and the Michigan Subclass relied on Defendants' silence as to known defects in connection with their decision regarding the purchase, lease, servicing and/or use of the Mislabeled Washing Machines.

217.    As a direct and proximate result of Defendants' deceptive conduct and violation of the Michigan Consumer Protection Act, Plaintiff McLenna and the Michigan Subclass have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT XI
### (Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*)

218.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

219.    Plaintiff Jeffery Reid brings this claim on behalf of the members of the Florida Subclass against defendant Whirlpool.

220.    The purpose of the FDUTPA is to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce.

221.    The sale of Mislabeled Washing Machines to Plaintiff Reid and the Florida Subclass as described herein constitutes the "conduct of any trade or commerce" within the meaning of FDUTPA, Fla. Stat. §§ 501.201, *et seq*.

222.    Whirlpool's misrepresentations and material omissions in its labeling, marketing, and advertising of the Mislabeled Washing Machines as described herein constitute false, deceptive, misleading, and unconscionable practices in violation of the FDUTPA.

223.    Plaintiff Reid and the Florida Subclass have suffered damages by virtue of buying Mislabeled Washing Machines that they would not have purchased but for Whirlpool's unfair marketing, advertising, packaging, and labeling. Plaintiff Reid and the Florida Subclass did not receive the benefit of their bargain in that the Mislabeled Washing Machines are not water or energy efficient and are not ENERGY STAR® compliant, and their Mislabeled Washing Machines have suffered a diminution in value.

224.    Whirlpool's conduct proximately caused the injuries to Plaintiff Reid and the Florida Subclass.

225.    Whirlpool's misrepresentations and material omissions impact the public interest because Plaintiff Reid and the Florida Subclass were injured in exactly the same way as thousands of others purchasing and/or leasing Mislabeled Washing Machines as a result of Defendants' generalized course of deception.

226.    Given the vast numbers of consumers who have purchased Mislabeled Washing Machines, Plaintiff Reid and the Florida Subclass have been damaged and will continue to be damaged by the false, deceptive, misleading, and unconscionable labeling, advertising, and marketing of the Mislabeled Washing Machines.

227.    Pursuant to Fla. Stat. Ann. § 501.201, Plaintiffs will serve the Florida Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

### COUNT XII
**(Violation of the Ohio Consumer Sales Practices Act,
Ohio Rev. Code Ann. § 1345.01, *et seq.*)**

228.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

229.    Plaintiff Kari Parsons brings this claim on behalf of the members of the Ohio Subclass against defendants Whirlpool and ARCA.

230.    Plaintiff Parsons and members of the Ohio Subclass are persons who purchased Mislabeled Washing Machines primarily for personal, family, and/or household use.  Therefore, the purchases of Mislabeled Washing Machines by Plaintiff Parsons and members of the Ohio Subclass are "consumer transactions" as that term is defined in O. R. C. § 1345.01(A).

231.    Defendants routinely engage in the business of effecting and/or soliciting consumer transactions on a nationwide basis.  As described herein, Defendants purposefully solicited consumer transactions for those products on a nationwide basis.  As a result, Defendants are "suppliers" covered by the Ohio Consumer Sales Practices Act which applies to all persons "engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer."  O.R.C. § 1345.01(C).

232.    By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices both before and during consumer transactions with Plaintiff and members of

the Class in violation of O. R. C. § 1345.02 by falsely representing that the Mislabeled Washing Machines were ENERGY STAR® compliant and failing to disclose that the Mislabeled Washing Machines did not meet ENERGY STAR® standards.

233.    By the acts and conduct alleged herein, Defendants committed unconscionable acts and practices acts both before and during consumer transactions with Plaintiff Parsons and members of the Ohio Subclass in violation of O. R. C. § 1345.03 by falsely representing that the Mislabeled Washing Machines were ENERGY STAR® compliant and failing to disclose that the Mislabeled Washing Machines did not meet ENERGY STAR® standards.

234.    Defendants committed the unfair, deceptive, and/or unconscionable acts and practices in Ohio, targeting both Ohio consumers and consumers nationwide.

235.    Defendants' false, unfair, deceptive, and unconscionable acts have previously been declared to be false, unfair, deceptive, or unconscionable.  The Ohio Attorney General has made the following materials, among others, publicly available for inspection, which materials declare similar actions unfair, deceptive, and unconscionable:

- Judgment Entry in *State ex rel. Brown v. Lyons, Rogers v. Airborne Health, Inc.*, No. A742156, Court of Common Pleas, Franklin County, Public Inspection File No. 1000304;

- Judgment Entry in *State ex rel. Cordray v. The Dannon Company, Inc.*, No. 10 CVH-12-18225, Court of Common Pleas, Franklin County, Public Inspection File No. 10002917;

- Judgment Entry in *State ex rel. Dewine v. GlaxoSmithKline, LLC*, No. CI-2011-3928, Court of Common Pleas, Franklin County, Public Inspection File No. 10002956.

236.    Plaintiff Parsons and members of the Ohio Subclass relied to their detriment on Defendants' false, deceptive, misleading, and unconscionable claims about the energy efficiency and water usage of the Mislabeled Washing Machines and purchased said products at a materially higher price than they would have otherwise paid for them or other comparable

products in the absence of Defendants' unlawful promotional activity.  As a direct and proximate result of Defendants' unfair, deceptive, and/or unconscionable acts and practices, Plaintiff Parsons and members of the Ohio Subclass suffered actual injury.

237.    Plaintiff Parsons and members of the Ohio Subclass have been damaged in an amount to be determined at trial.

238.    On behalf of herself and other Ohio Subclass members, Plaintiff Parsons seeks damages and/or rescission, equitable and/or injunctive relief, and also seeks equitable and declaratory relief, together with a reasonable counsel or attorneys' fees, and such other relief as the Court may deem necessary or appropriate to remedy these violations.

239.    Pursuant to O.R.C. §1345.09(E), this Complaint will be served upon the Ohio Attorney General.

**COUNT XIII**
**(Violation of Indiana's Deceptive Consumer Sales Act,**
**Ind. Code. Ann. § 24-5-0.5-1, *et seq.*)**

240.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

241.    Plaintiff Charles Beyer brings this claim on behalf of the members of the Indiana Subclass against defendants Whirlpool and Sears.

242.    Indiana's Deceptive Consumer Sales Act prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such

consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." IND. CODE § 24-5-0.5-3.

243.    Defendants are persons within the meaning of IND. CODE § 24-5-0.5-2(2).  In the course of Defendants' business, they willfully failed to disclose and actively concealed the Mislabeled Washing Machines' failure to meet ENERGY STAR® standards for water or energy efficiency.  Accordingly, Defendants engaged in unlawful trade practices, including representing that the Mislabeled Washing Machines have characteristics, uses, benefits, and qualities which they do not have, representing that the Mislabeled Washing Machines are of a particular standard and quality when they are not, and otherwise engaging in conduct likely to deceive.

244.    Moreover, Defendants' deceptive acts are incurable within the meaning of IND. CODE § 24-5-0.5-2(8).  Defendants either (a) tested the Mislabeled Washing Machines before marketing them and, at all times relevant hereto, knew that the models were non-compliant with the requirements of the ENERGY STAR® program or, in the alternative (b) affixed ENERGY STAR® labels to the Mislabeled Washing Machines without testing them, and thus knew the representation concerning their water usage and energy efficiency was baseless.  Thus, Defendants knowingly sold the Mislabeled Washing Machines to Plaintiff Beyer and the Indiana Subclass with intent to defraud or mislead.

245.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

246.    Defendants' conduct proximately caused injuries to Plaintiff Beyer and the Indiana Subclass.

247.    Plaintiff Beyer and the Indiana Subclass were injured as a result of Defendants' conduct in that they did not receive the benefit of their bargain in that the Mislabeled Washing Machines are not water or energy efficient and are not ENERGY STAR® compliant, and their Mislabeled Washing Machines have suffered a diminution in value.  These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

248.    Plaintiff Beyer and the Indiana Subclass seek injunctive relief and, if awarded damages under Indiana Deceptive Consumer Protection Act, treble damages pursuant to IND. CODE § 24-5- 0.5-4(a)(1).

249.    Plaintiff Beyer and the Indiana Subclass also seek punitive damages based on the outrageousness and recklessness of Defendants' conduct and their high net worth.

### COUNT XIV
**(Violation of the Texas Deceptive Trade Practices Act,**
**Tex. Bus. & Com. Code §§ 17.41, *et seq.*)**

250.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

251.    Plaintiff Jonathan Cohen brings this claim on behalf of the members of the Texas Subclass against defendants Whirlpool and Home Depot.

252.    Defendants engaged in false, misleading, and deceptive practices in violation of the DTPA, which Plaintiff Cohen and other Texas Subclass members relied on to their detriment.

253.    By failing to disclose and actively concealing the Mislabeled Washing Machines' noncompliance with ENERGY STAR® standards, Defendants engaged in deceptive business

practices prohibited by the Texas DTPA, including (1) representing that Mislabeled Washing Machines have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Mislabeled Washing Machines are of a particular standard, quality, and grade when they are not, and (3) failing to disclose information concerning the Mislabeled Washing Machines with the intent to induce consumers to purchase or lease the appliances.

254.    As alleged above, Defendants made numerous statements about the energy efficiency and water usage of the Mislabeled Washing Machines.  Each of these statements contributed to the deceptive context of Defendants' unlawful representations as a whole.

255.    Defendants' unfair or deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Cohen, about the true energy efficiency and water usage of the Mislabeled Washing Machines.

256.    In purchasing the Mislabeled Washing Machines, Plaintiff Cohen and the Texas Subclass relied on the misrepresentations and/or omissions of Defendants with respect to the appliances' energy efficiency and water usage.  Defendants' representations turned out not to be true because the Mislabeled Washing Machines were not, in fact, ENERGY STAR® compliant. Had Plaintiff Cohen and members of the Texas Subclass known this they would not have purchased or leased the Mislabeled Washing Machines and/or paid as much for them.

257.    Defendants also breached express and implied warranties to Plaintiff Cohen and the Texas Subclass, as set out above, and are, therefore liable to Plaintiff Cohen and the Texas Subclass for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA.  Defendants' actions also constitute an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

258.    Plaintiff Cohen and the Texas Subclass sustained damages as a result of Defendants' unlawful acts and are, therefore, entitled to damages and other relief provided for under § 17.50(b) of the Texas DTPA.  Because Defendants' conduct was committed knowingly and/or intentionally, the Plaintiffs and the class are entitled to treble damages.

259.    For Texas Subclass members who wish to rescind their purchases, they are entitled under § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

260.    Pursuant to DTPA § 17.50(b)(2), Plaintiff Cohen seeks an order enjoining Defendants' acts or failures to act that violate the DTPA.  Pursuant to DTPA § 17.50(b)(3), Plaintiff Cohen and the Texas Subclass seek orders necessary to restore to them all money acquired from them by Defendants in violation of the DTPA.  They also seek orders necessary to restore to class members whose identities are known to or ascertainable by Defendants all money acquired from them by Defendants in violation of the DTPA.  Plaintiff Cohen and the class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

261.    Pursuant to DTPA § 17.50(b)(4), Plaintiff Cohen and the Texas Subclass seek all other relief which the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.    For an order certifying the nationwide Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclasses and Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass members;

b.    For an order declaring the Defendants' conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiffs, the nationwide Class, and the Subclasses on all counts asserted herein;

d.      For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For injunctive relief as pleaded or as the Court may deem proper; and

h.      For an order awarding Plaintiffs and the Class and Subclasses their reasonable attorneys' fees and expenses and costs of suit.

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO**
Attorneys for Plaintiffs

Dated: July 28, 2014                    By:_____/s/ James E. Cecchi_____
                                                    JAMES E. CECCHI

Antonio Vozzolo
Andrea Clisura
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

Scott A. Bursor
Joseph I. Marchese
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO**
Attorneys for Plaintiffs

Dated: July 28, 2014                    By:_____/s/ James E. Cecchi_____
                                             JAMES E. CECCHI

Antonio Vozzolo
Andrea Clisura
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, New York  10017
(212) 983-9330

Scott A. Bursor
Joseph I. Marchese
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, New York  10019
(212) 989-9113

**EXHIBIT A**



# LAUNDRY
## Spring 2010

**1/2-HP Drain Pump**
This pump is constructed of durable polypropylene and features lubricated, sealed bearings. A heavy-duty rubber impeller protects the powerful drain pump against loose change and other debris.

**100° Arc of Agitation**
The agitator produces a sweeping arc motion that gently rolls clothes through the wash water.

**3x3 Surround Spray**
Three spray jets and load-sensing technology wash, rinse and repeat for a better cleaning wash system that saves water and energy.

**360° Front and Rear Heat Seal**
This triple-layered seal keeps heat inside the dryer drum for dependable performance.



**4-Tray Dispenser Drawer**
The self-cleaning dispenser drawer is easy to open and replenish with detergent, bleach and fabric softener. Plus there's an additional place for oxygenated stain-fighting liquid or powder pre-treater.

**Advanced Vibration Control**
Select Performance Series washers feature gap dampers and springs to minimize movement of the wash drum during spin cycle. Additional padding muffles washer noise and also cushions vibration. Plus, enhanced software adjusts load distribution reducing vibration and noise.

**Allergen Removal Cycles**
Select Performance Series and Bravos® washers feature cycles that eliminate at least 95% of common allergens from fabrics. Allergens tested were dust mites and pet dander.

**Automatic Temperature Control**
Promotes dependable cleaning performance by ensuring correct water temperatures.

**CEE Tier Ratings**
Although all models on the Consortium for Energy Efficiency (CEE) list are efficient, the more efficient products are listed in the highest tier (3). Select markets qualify for CEE Tier Rating rebates. Consult your local utility company for any available rebates.

**Clean Boost Option**
By selecting this option, the internal water heater on select Bravos® washers maintains water temperature throughout the entire wash cycle. The need for pretreating is reduced and cleaning performance is enhanced.

**Clean Washer Cycle**
This special cycle helps rid the wash basket of odor-causing buildup. Add Affresh® washer cleaner to enhance results.

**Commercial Capacity, Direct Drive Infinite Speed Motor**
Magnets propel the Bravos® washer motor assuring infinite wash, tumble and spin speeds of up to 1,100 RPM. Plus, the motor's 18-lb UL capacity rating is commercial grade.

**Commercial-Grade, 1/3-HP Motor**
Extra power makes it possible to tumble larger loads with less wear on the motor of Centennial® and Bravos® dryers.

**Commercial-Grade, 5-Rib Dryer Belt**
The industry's widest dryer belt stays strong to last long on Performance Series, Centennial® and Bravos® dryers.

**Commercial-Grade, 8-Rib Washer Belt**
Select Performance Series washers feature the industry's widest washer belt that stays strong to last long.

**Commercial-Grade Glass Window**
Strong scratch- and shatter-resistant glass on select lids and doors allows you to see your laundry as it washes and dries.

**Control Lockout**
A child safety door latch and locked controls keep little hands from running the washer.

**DependableClean™ Wash System**
Keeps clothes looking their best. The LoadFlex™ agitator produces a 100° arc wash motion that rolls clothes through the wash and rinse cycles to provide a reliable clean, wash after wash.

**Direct Y-Connector Water Hook-Up**
A solid brass Y-connector delivers water from the cold water inlet directly to the dryer. It eliminates the need to fill a reservoir in dryers that feature steam cycles. Included with all steam dryers.

**DuraCushion™ Dryer Drum**
Provides a smooth, scratch resistant surface for less friction and wear. Clothes gently glide off its surface without snagging or pilling.

**Dynamic Venting Technology™**
See *FreshHold™ Option.*

**End-of-Cycle Signal**
Signals the end of the cycle and is simple to turn on or off. The volume can be adjusted on select models.

**ENERGY STAR® Qualified**
An ENERGY STAR® qualification means the appliance exceeds the federal minimum efficiency standards as set forth by the Environmental Protection Agency and the U.S. Department of Energy, helping to save money on utility bills.

**Flat Back Construction**
Creates a shorter depth, making it easier to fit the dryer in locations where space is at a premium.

**Fresh Hold™ Option**
The industry's first built-in fan is part of Dynamic Venting Technology™ and helps keep clean laundry from smelling bad. The quiet, efficient fan and intermittent tumbling circulate fresh air and reduce moisture in clothes, so you can stop worrying about leaving them in the washer too long.



**Fresh Spin™ Option**
Clothes periodically tumble for up to 6 hours after cycle's end to remain fresh even if you don't move them to the dryer right away.

**Full-Width Lid Bumper**
Creates a seal between the lid and washer opening for quieter operation.

**GentleBreeze™ Drying System**
Quickly and efficiently dries clothing for more consistent results.

**Heavy-Duty Blower**
A 100-foot vent length for the Bravos® dryer's 1,950 RPM blower system offers the ultimate installation flexibility. Plus, increased blower speeds prevent lint from building up.

**Heavy-Duty, Die-Cast Door Hinge**
This durable door hinge provides structural strength for years of dependability.

**Heavy-Gauge Steel, Wide-Opening Lid**
Made of durable steel, it keeps the interior of the washer sealed off during use. Plus, the wide opening creates a larger target area for loading and unloading clothes.

**Hose Reversal Technology**
In the event of improper hose installation, front load washers self-correct so your clothes are never damaged due to incorrect water temperatures.

**IntelliClean™ Impeller**
A wash plate with fins continuously moves clothes through the water, effectively cleaning without the use of an agitator.

**IntelliDry® Sensor**
Measures moisture levels as clothes dry to minimize the risk of overdrying and shrinking. Clothes come out dry, yet cool to the touch.

**IntelliFill™ Automatic Water Level Sensor**
Built-in sensors match water usage to load size, saving both water and money.

**EXHIBIT B**

# TOP AND CABINET PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Literature Parts Installation Instructions: English/French | ✳ | W10200890 | W10200890 | W10200331 |
| Literature Parts Installation Instructions: Spanish | ✳ | W10200891 | W10200891 | W10200662 |
| Use & Care Guide: English/French | | W10092798 | W10092798 | W10092798 |
| Use & Care Guide: Spanish | | W10092799 | W10092799 | W10092799 |
| Feature Sheet: English/French | | W10092811 | W10092811 | W10092811 |
| Feature Sheet: Spanish | | W10092812 | W10092812 | W10092812 |
| Load Sense Info Sheet | | W10196538 | W10196538 | W10196538 |
| Energy Guide | | W10092828 | W10092834 | W10092813 |
| Wiring Diagram | ✳ | W10248232 | W10248232 | W10202237 |
| Lid | ✳ | W10093782 | W10164516 | W10093782 |
| Screw, Lid Hinge Mounting (4) | | W10119828 | W10119828 | W10119828 |
| Bearing, Lid Hinge (2) | | 8319539 | 8319539 | 8319539 |

## TOP AND CABINET PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Screw, Ground | | 3351614 | 3351614 | 3351614 |
| Switch, Lid | | 8318084 | 8318084 | 8318084 |
| Hinge, Lid (L.H.) | ✳ | W10225136 | 8559336 | W10225136 |
| Hinge, Lid (R.H.) | ✳ | 91770 | W10202542 | 91770 |
| Clip, Top & Cabinet & Rear Panel (2) | | 62780 | 62780 | 62780 |
| Dispenser, Bleach | | W10192089 | W10192089 | W10192089 |
| Top | ✳ | W10194868 | W10203530 | W10194868 |
| Spacer, Cabinet To Top (4) | | 62750 | 62750 | 62750 |
| Cabinet | | 63424 | 63424 | 63424 |
| Screw, 10-16 x 3/8 (4) | ✳ | W10165554 | 3390631 | W10165554 |
| Bumper, Lid (2) | ✳ | 9724509 | | 9724509 |
| Cabinet-Damper, Sound | | W10177046 | W10177046 | W10177046 |
| Spring-Extension, Glass Lid | | | W10208782 | |
| Clip, Retainer | | | 3350828 | |

| TOP AND CABINET PARTS | | | | |
|---|---|---|---|---|
| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
| | | | | |
| Filter, RFI | | | | 8540229 |
| Screw, 8-18 x 3/8 | | | | 90767 |
| Harness, Jumper | | | | W10177046 |

LEGEND:
Highlighted or shaded rows indicate parts with variation.
* indicates parts which only vary in one model.

## CONTROLS AND REAR PANEL PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Switch, Rotary | | 8578416 | 8578416 | 8578416 |
| Switch, Rotary | ✱ | 3949180 | 3949180 | 3949187 |
| Clip, Console (2) | | 8312709 | 8312709 | 8312709 |
| ATC-Auto Load Sensing Switch | ✱ | W10248240 | W10248240 | |
| Switch, Rotary | ✱ | 3949180 | 3949180 | |
| Shield, Suds | ✱ | W10245838 | W10245838 | W10188372 |
| Timer (Motor not a Service Part) | | W10243947 | W10243947 | W10243947 |
| Circuit Board, Agitation Delay | | W10104800 | W10104800 | W10104800 |
| Panel, Control (Includes Item 10) | ✱ | W10089738 | W10089738 | W10089729 |
| Badge Assembly | | W10101390 | W10101390 | W10101390 |
| Clip, Knob | | 8536939 | 8536939 | 8536939 |
| Knob, Control | | W10180218 | W10180218 | W10180218 |
| Knob, Timer | | W10180213 | W10180213 | W10180213 |
| Dial, Timer | | W10180214 | W10180214 | W10180214 |
| Strap, Console | | 8568314 | 8568314 | 8568314 |
| Cord, Power | | 8578842 | 8578842 | 8578842 |

| CONTROLS AND REAR PANEL PARTS | | | | |
|---|---|---|---|---|
| **Part Name** | | **Model: MVWC6ESWW1** | **Model: MVWC7ESWW0** | **Model: MVWC6ESWW0** |
| Strain Relief, Power Cord | | 3952821 | 3952821 | 3952821 |
| Screw, 8-18 x 1/2 | | 9740848 | 9740848 | 9740848 |
| Screw, Ground | | 3351614 | 3351614 | 3351614 |
| Cable Tie | | 3347868 | 3347868 | 3347868 |
| U-Bend, Drain Hose | | 8577378 | 8577378 | 8577378 |
| Drain Hose Assembly (Includes Item 28) | | W10189267 | W10189267 | W10189267 |
| Cap, End (L.H.) (Includes Item 3) | | W10193824 | W10193824 | W10193824 |
| Cap. End (R.H.) (Includes Item 3) | | W10193821 | W10193821 | W10193821 |
| Screw, 10-16 x 3/8 | | 62863 | 62863 | 62863 |
| Support, Rear Panel | | 8519200 | 8519200 | 8519200 |
| Screw, 8-18 x 1/2 | | 359625 | 359625 | 359625 |
| Clamp, Hose | | 8541668 | 8541668 | 8541668 |
| Clamp, Hose | | 8317496 | 8317496 | 8317496 |
| Clamp, Hose | | 3363366 | 3363366 | 3363366 |

## CONTROLS AND REAR PANEL PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Hose, Pump To Tub (Includes Item 30) | | 3951449 | 3951449 | 3951449 |
| Panel, Rear | | W10194451 | W10194451 | W10194451 |
| Pad, Rear Panel | | 62747 | 62747 | 62747 |
| Harness, Wiring | * | W10204122 | W10204122 | W10243952 |
| Clip, Harness & Pressure Hose | | 8055003 | 8055003 | 8055003 |
| Valve, Water Inlet | | W10175893 | W10175893 | W10175893 |
| Hose, Flowmeter to Tub Ring | | W10166732 | W10166732 | W10166732 |
| Clamp, Hose | | W10185367 | W10185367 | W10185367 |
| Clamp, Hose | | W10117298 | W10117298 | W10117298 |
| Flowmeter | | W10176591 | W10176591 | W10176591 |
| Screw, Ground | | 3400073 | 3400073 | 3400073 |
| Hose, Valve to Flowmeter | | W10166731 | W10166731 | W10166731 |
| Clip, Push-In Retainer | | | W10000080 | |
| Switch, Water Temperature (ATC) | | | | W10179666 |

## CONTROLS AND REAR PANEL PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| | | | | |
| Switch, Auto Load Sensing | | | | W10177795 |
| Retainer, Harness | | | | 8317975 |

**LEGEND:**

Highlighted or shaded rows indicate parts with variation.

* indicates parts which only vary in one model.

## AGITATOR, BASKET AND TUB PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Dispenser, Fabric Softener | | 8575076 | 8575076 | 8575076 |
| Cap, Barrier | | 3354733 | 3354733 | 3354733 |
| Seal, Inner Cap | | W10072840 | W10072840 | W10072840 |
| Screw & Washer (5/16-24 x 1) | | 358237 | 358237 | 358237 |
| Washer | | 3949550 | 3949550 | 3949550 |
| Agitator (Complete) | | W10093672 | W10093672 | W10093672 |
| Cam, Driven | | 3363663 | 3363663 | 3363663 |
| Dog, Agitator Clutch (4) | | 3366877 | 3366877 | 3366877 |
| Bearing, Driven Cam | | 3363661 | 3363661 | 3363661 |
| Clothes Mover | | 3349019 | 3349019 | 3349019 |
| Spacer, Thrust | | 3350389 | 3350389 | 3350389 |
| Agitator | | W10110020 | W10110020 | W10110020 |
| Tub Ring | | W10167984 | W10167984 | W10167984 |
| Gasket, Tub Ring | | 3359585 | 3359585 | 3359585 |
| Clip, Agitator | | 3354845 | 3354845 | 3354845 |
| Washer, Agitator | | 8543666 | 8543666 | 8543666 |
| Balance Ring | | W10006326 | W10006326 | W10006326 |
| Nut, Spanner | | W10116602 | W10116602 | W10116602 |
| Basket & Balance Ring | | W10006327 | W10006327 | W10006327 |
| Clip, Pressure Switch Hose | | 2219077 | 2219077 | 2219077 |

## AGITATOR, BASKET AND TUB PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Hose, Pressure Switch | * | W10240485 | W10240485 | W10211144 |
| Block, Basket Drive | | 389140 | 389140 | 389140 |
| Tub | | 63849 | 63849 | 63849 |
| Gasket, Centerpost | | 383727 | 383727 | 383727 |

LEGEND:
Highlighted or shaded rows indicate parts with variation.
* indicates parts which only vary in one model.

| **BRAKE, CLUTCH, GEARCASE, MOTOR AND PUMP PARTS** | | | |
|---|---|---|---|
| | | | |
| **Part Name** | | **Model: MVWC6ESWW1** | **Model: MVWC7ESWW0** | **Model: MVWC6ESWW0** |
| | | | |
| Brake & Drive Tube (Complete) | | 388952 | 388952 | 388952 |
| Washer, Spin Tube Thrust | | 63292 | 63292 | 63292 |
| Ring, Spin Tube Support | | 62697 | 62697 | 62697 |
| Ring, Retainer | | 63283 | 63283 | 63283 |
| Clutch (Complete) | | 8299642 | 8299642 | 8299642 |
| Band & Lining, Clutch | | 3951993 | 3951993 | 3951993 |
| Cap, Clutch Spring (2) | | 62646 | 62646 | 62646 |
| Spring, Clutch | | 8559387 | 8559387 | 8559387 |
| Gearcase (Complete) | ✱ | W10251783 | W10251783 | W10140301 |
| Screw, Gearcase to Base (3) | | 3357334 | 3357334 | 3357334 |
| Plate, Motor Mount to Gearcase | | 62611 | 62611 | 62611 |
| Grommet, Motor (4) | | 62691 | 62691 | 62691 |
| Coupling, Motor & Isolation | | 3978849 | 3978849 | 3978849 |
| Seal | | 8577374 | 8577374 | 8577374 |

## BRAKE, CLUTCH, GEARCASE, MOTOR AND PUMP PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| | | | | |
| Clip, Anti-Rattle | | 3355454 | 3355454 | 3355454 |
| Screw | | 3400516 | 3400516 | 3400516 |
| Retainer, Motor (2) | | W10086010 | W10086010 | W10086010 |
| Shield, Tub to Motor | | 3362089 | 3362089 | 3362089 |
| Motor, Main Drive | | 661600 | 661600 | 661600 |
| Switch, Main Drive Motor | | 62850 | 62850 | 62850 |
| Retainer, Pump (2) | | 8546127 | 8546127 | 8546127 |
| Pump (Complete) | | 3363394 | 3363394 | 3363394 |
| Screw, 10-16 x 5/8 | | 3387485 | 3387485 | 3387485 |
| Shield, Motor | | 3946532 | 3946532 | 3946532 |
| Washer, Thrust | | 8578981 | 8578981 | 8578981 |
| Screw, 10-16 x 3/8 | | 62863 | 62863 | 62863 |
| Capacitor | | 8572717 | 8572717 | 8572717 |
| Clamp, Capacitor | | 3949496 | 3949496 | 3949496 |

**LEGEND:**
Highlighted or shaded rows indicate parts with variation.
* indicates parts which only vary in one model.

## MACHINE BASE PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Screw, Bracket Mounting (10-32 x 5/8) | | 3400076 | 3400076 | 3400076 |
| Bracket, Spring Outer (2) | | 64067 | 64067 | 64067 |
| Spring Suspension (3) | | 63907 | 63907 | 63907 |
| Support & Brake, Tub | | 8575214 | 8575214 | 8575214 |
| Bracket, Spring Outer (L.F.) | | 64065 | 64065 | 64065 |
| Link, Leveling Mechanism (2) | | 63466 | 63466 | 63466 |
| Spring, Leveling Mechanism | | 62597 | 62597 | 62597 |
| Pin, Knurled | | 62837 | 62837 | 62837 |
| Foot, Rear (2) | | 62596 | 62596 | 62596 |
| Bearing, Centerpost (2) | | 8546455 | 8546455 | 8546455 |
| Seal, Centerpost (3) | | 357409 | 357409 | 357409 |
| Spring, Counterweight | * | 388492 | W10250667 | 388492 |
| Pad, Plate | | 62568 | 62568 | 62568 |
| Plate, Suspension (includes item 13) | | 3946509 | 3946509 | 3946509 |
| Pad, Base | | 3363660 | 3363660 | 3363660 |

| **MACHINE BASE PARTS** | | | | |
|---|---|---|---|---|
| | | | | |
| **Part Name** | | **Model: MVWC6ESWW1** | **Model: MVWC7ESWW0** | **Model: MVWC6ESWW0** |
| Base Assembly (includes items 6, 7, 8, 9, 13, 14, 15 &22) | | 3946512 | 3946512 | 3946512 |
| Nut, Lock (2) (3/8 x 16) | | 3359452 | 3359452 | 3359452 |
| Foot, Front (2) | | W10001130 | W10001130 | W10001130 |
| Seal, Centerpost | | 8577376 | 8577376 | 8577376 |
| Centerpost Bearing Kit (includes items 10, 11 & 19) | | 285203 | 285203 | 285203 |
| Ring, Sound Deadening | | 63134 | 63134 | 63134 |
| Retainer, Suspension Spring | | W10145155 | W10145155 | W10145155 |

**LEGEND:**
Highlighted or shaded rows indicate parts with variation.
* indicates parts which only vary in one model.

## WIRING HARNESS PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Retainer, Harness | | 3349557 | 3349557 | 3349557 |
| Clip, Harness | | 388498 | 388498 | 388498 |
| Clip, Harness | | 3347812 | 3347812 | 3347812 |
| Clip, Harness (Push-In) | | 3352501 | 3352501 | 3352501 |
| Clip, Harness (Half-Harness) | | 90016 | 90016 | 90016 |
| Clip, Harness | | 3390496 | 3390496 | 3390496 |
| Retainer, Harness | | 389379 | 389379 | 389379 |
| Timer, Block Disconnect (Natural) | | 3948614 | 3948614 | 3948614 |
| Timer, Block Disconnect (Black) | | 352089 | 352089 | 352089 |
| Receptacle, Terminal (3-Way) | | 62889 | 62889 | 62889 |
| Plug, Terminal (3-Way) | | 353424 | 353424 | 353424 |
| Block, Disconnect (Motor 2 Speed) | | 62505 | 62505 | 62505 |
| Block, Disconnect | | 3347243 | 3347243 | 3347243 |
| Protector | | 63523 | 63523 | 63523 |
| Connector (2-Way) | | 717252 | 717252 | 717252 |
| Clip, Harness | | 3352944 | 3352944 | 3352944 |
| Block, Disconnect (12-Way) | | 3390423 | 3390423 | 3390423 |

## WIRING HARNESS PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Receptacle (6-Way) | | 3347730 | 3347730 | 3347730 |
| Connector (T.P.A.) (3-Circuit) | | 3948617 | 3948617 | 3948617 |
| Plug (T.P.A.) (3-Circuit) (Pressure Switch) | | 3360056 | 3360056 | 3360056 |
| Block, Connector (Natural) | | 3354925 | 3354925 | 3354925 |
| Block, Connector (Red) | | 3354926 | 3354926 | 3354926 |

**LEGEND:**
Highlighted or shaded rows indicate parts with variation.
* indicates parts which only vary in one model.

## BRAKE AND DRIVE TUBE PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Brake and Drive Tube (complete) | | 388952 | 388952 | 388952 |
| Ring, Thrust | | 62658 | 62658 | 62658 |
| Seal, Drive Tube | | 356427 | 356427 | 356427 |
| Tube, Basket Drive | | 64027 | 64027 | 64027 |
| Ring, Retaining | | 64035 | 64035 | 64035 |
| Shoe, Brake (2) | | 64232 | 64232 | 64232 |
| "T" Bearing, Spin Tube | | 62703 | 62703 | 62703 |
| Cap, Brake Spring (2) | | 3353956 | 3353956 | 3353956 |
| Spring, Brake | | 387806 | 387806 | 387806 |
| Sleeve, Brake Spring | | 3355360 | 3355360 | 3355360 |
| Cam, Brake Release | | 661516 | 661516 | 661516 |
| Sleeve, Cam | | 63022 | 63022 | 63022 |
| Driver, Brake Cam | | 64194 | 64194 | 64194 |
| Ring, Retaining | | 90368 | 90368 | 90368 |

**LEGEND:**
Highlighted or shaded rows indicate parts with variation.
* indicates parts which only vary in one model.

# GEARCASE PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Gearcase (complete) | * | W10251783 | W10251783 | W10140301 |
| Cover, Gearcase | | 285202 | 285202 | 285202 |
| Seal, Gearcase Cover | | 3349985 | 3349985 | 3349985 |
| Sealer, Gasket (.20 Fl. Oz.) (6 ml) | | 285195 | 285195 | 285195 |
| Screw, Gearcase Cover Mounting (8) (10-24 x 3/8) | | 3351614 | 3351614 | 3351614 |
| Spin Pinion & Gear Spin Kit | | W10172898 | W10172898 | W10172898 |
| Seal, Spin Pinion (part of item 6, not serviced separately) | | | | |
| Ring, Retaining (2) | | 90369 | 90369 | 90369 |
| Retainer, Spring (2) | | 62677 | 62677 | 62677 |
| Spring, Agitate | | 62676 | 62676 | 62676 |
| Gear, Agitate (includes items 15 and 17) | | W10110245 | W10110245 | W10110245 |
| Washer, Agitate Gear | | 62619 | 62619 | 62619 |

**GEARCASE PARTS**

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Cam Follower (includes item 14) | | 62580 | 62580 | 62580 |
| Cam, Agitate (includes item 13) | | 3976349 | 3976349 | 3976349 |
| Shaft, Agitator | | 389231 | 389231 | 389231 |
| Washer, Cam Thrust | | 62618 | 62618 | 62618 |
| Washer, Intermediate | | 388815 | 388815 | 388815 |
| Shaft, Agitator (Complete) | | 389387 | 389387 | 389387 |
| Bearing, Thrust (includes item 20) | | 16018 | 16018 | 16018 |
| Ball Bearing (includes item 19) | | 85529 | 85529 | 85529 |
| Seal, Thrust Plug | | W10111745 | W10111745 | W10111745 |
| Ring, Retaining | | 3362552 | 3362552 | 3362552 |
| Washer Kit, Thrust | | 285766 | 285766 | 285766 |
| Nuetral Assembly | | 388253 | 388253 | 388253 |
| Rack, Connecting | | 8546456 | 8546456 | 8546456 |
| Actuator, Shift | | 62621 | 62621 | 62621 |

## GEARCASE PARTS

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| | | | | |
| Gear, Main Drive (not serviced separately) | | | | |
| Bottom & Pinion Gearcase (not serviced separately) | | | | |

**LEGEND:**
Highlighted or shaded rows indicate parts with variation.
* indicates parts which only vary in one model.

| OPTIONAL PARTS (NOT INCLUDED) | | | |
|---|---|---|---|
| **Part Name** | | **Model: MVWC6ESWW1** | **Model: MVWC7ESWW0** | **Model: MVWC6ESWW0** |
| Paint, Touch-Up (1/2 Oz.) | | 72017 | 72017 | 72017 |
| Paint, Pressurized Spray (12 Oz.) (Primer, Gray) | | 350938 | 350938 | 350938 |
| Paint Pressurized Spray (12 Oz.) (White) | | 350930 | 350930 | 350930 |
| Paint, Bulk (1 qt.) (White - Uncut) | | 799344 | 799344 | 799344 |
| Oil, Gearcase (16 Oz.) | | 350572 | 350572 | 350572 |
| Lubricant (Use only in brake shoe assembly on roller and pin) | | 285208 | 285208 | 285208 |
| Sealer, Gasket (.20 Fl. Oz.) (6 ml) | | 285195 | 285195 | 285195 |
| Drain Protector | | 367031 | 367031 | 367031 |
| Siphon Break Kit | | 280129 | 280129 | 280129 |
| Drain Hose Adapter Kit | | 280130 | 280130 | 280130 |
| Drain Hose Extension Kit | | 280131 | 280131 | 280131 |

| **OPTIONAL PARTS (NOT INCLUDED)** | | | |
|---|---|---|---|
| **Part Name** | | **Model: MVWC6ESWW1** | **Model: MVWC7ESWW0** | **Model: MVWC6ESWW0** |
| Inlet Hoses, 4 Ft. (two black hoses with straight ends and 4 rubber washers) | | 8212546RP | 8212546RP | 8212546RP |
| Inlet Hoses, 5 ft. (two black hoses with straight ends and 4 rubber washers) | | 8212641RP | 8212641RP | 8212641RP |
| Inlet Hoses, 5 ft. (one red hose and one blue hose with straight ends and 4 rubber washers) | | 8212545RP | 8212545RP | 8212545RP |
| Inlet Hoses, 5 ft. (two braided hoses with straight ends and 4 rubber washers) | | 8212487RP | 8212487RP | 8212487RP |
| Inlet Hoses, 6 ft. (two black hoses with one straight end and one 90 degree end and 4 rubber washers) | | 8212637RP | 8212637RP | 8212637RP |

## **OPTIONAL PARTS (NOT INCLUDED)**

| Part Name | | Model: MVWC6ESWW1 | Model: MVWC7ESWW0 | Model: MVWC6ESWW0 |
|---|---|---|---|---|
| Inlet Hoses, 6 ft. (two braided hoses with one straight end and one 90 degree end and 4 rubber washers) | | 8212638RP | 8212638RP | 8212638RP |
| Hose Washers (package of 4) | | 285448A | 285448A | 285448A |
| Hose Screen (package of 2) | | 285452A | 285452A | 285452A |

**LEGEND:**
Highlighted or shaded rows indicate parts with variation.
* indicates parts which only vary in one model.

**EXHIBIT C**

# BURSOR & FISHER

P.A.

1990 NORTH CALIFORNIA BLVD.
SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

L. TIMOTHY FISHER
Tel: 925.300.4455
Fax: 925.407.2700
ltfisher@bursor.com

November 11, 2011

*Via Certified Mail - Return Receipt Requested*

Whirlpool Corporation
2000 N. M-63
Benton Harbor, MI 49022-2692

Sears Holdings Corporation
Legal Department
3333 Beverly Road
Hoffman Estates, IL 60179

Re:     *Demand Letter Pursuant to California Civil Code § 1782*

To Whom It May Concern:

      This letter serves as a preliminary notice and demand for corrective action by Whirlpool Corporation ("Whirlpool") and Sears Holdings Corporation ("Sears") pursuant to the provisions of California Civil Code § 1782, on behalf of our client, Shelley Baker, and all other persons similarly situated.

      This notice concerns Maytag brand washing machine model MVWC6ESWW1 (the "Mislabeled Washing Machine"). Whirlpool affixes ENERGY STAR® labels to the Mislabeled Washing Machine, but the appliance uses more energy than indicated.

      Ms. Baker purchased this washing machine on December 3, 2010 at a Sears store in Ontario, California. Ms. Baker paid $439.93, plus a non-refundable $69.99 delivery fee, a $10.00 Haul-Away Fee, and sales tax of $38.49, for a total of $558.41. When Ms. Baker purchased her Mislabeled Washing Machine from Sears, it was expressly represented that her washing machine was energy efficient and complied with ENERGY STAR® standards for energy efficiency. However, testing by the U.S. Department of Energy later showed this washing machine uses more energy than indicated, which exceeds allowable ENERGY STAR® energy efficiency requirements.

**BURSOR&FISHER**
P.A.

By misrepresenting, mislabeling and selling the Mislabeled Washing Machine, Whirlpool and Sears have violated numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(5), (7), and (9).

We hereby demand that Whirlpool and Sears immediately (1) cease and desist from further illegal sales of the Mislabeled Washing Machine, (2) issue an immediate recall of the Mislabeled Washing Machine; (3) make full restitution to all purchasers of the Mislabeled Washing Machine of all purchase money obtained from sales thereof; and (4) compensate all purchasers for the increased energy costs they have incurred as a result of the Mislabeled Washing Machine's failure to conform with the energy efficiency standards of the ENERGY STAR® program.

It is further demanded that Whirlpool and Sears preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.      All documents concerning tests of the energy efficiency of the Mislabeled Washing Machine;

2.      All communications with the DOE concerning the energy efficiency of this appliance;

3.      All documents concerning the advertisement, marketing and/or sale of the Mislabeled Washing Machine; and

4.      All communications with customers concerning complaints or comments concerning the Mislabeled Washing Machine.

Please comply with this demand within 30 days from receipt of this letter.

We are willing to negotiate with Whirlpool and Sears to attempt to resolve the demands asserted in this letter.  If Whirlpool and Sears wish to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that Whirlpool and Sears are not interested in resolving this dispute short of litigation.

If Whirlpool and Sears contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

L. Timothy Fisher
ltfisher@bursor.com

**EXHIBIT D**

# BURSOR & FISHER
P.A.

**1990 North California Blvd.**
**Suite 940**
**Walnut Creek, CA 94596**
**www.bursor.com**

**L. Timothy Fisher**
**Tel: 925.300.4455**
**Fax: 925.407.2700**
**ltfisher@bursor.com**

November 16, 2011

*Via Certified Mail - Return Receipt Requested*

Whirlpool Corporation
2000 N. M-63
Benton Harbor, MI  49022-2692

Re:    *Demand Letter Pursuant to California Civil Code § 1782*

To Whom It May Concern:

This letter serves as a preliminary notice and demand for corrective action by Whirlpool Corporation ("Whirlpool") pursuant to the provisions of California Civil Code § 1782, on behalf of our client, Brian Maxwell, and all other persons similarly situated.

This notice concerns Maytag brand washing machine model MVWC6ESWW1 (the "Mislabeled Washing Machine").  Whirlpool affixes ENERGY STAR® labels to the Mislabeled Washing Machine, but the appliance uses more energy than indicated.

Mr. Maxwell purchased this washing machine on November 27, 2009 at a Fry's Electronics store in Roseville, California.  Mr. Maxwell paid $399.99, plus a sales tax of $34.00, for a total of $433.99.  When Mr. Maxwell purchased his Mislabeled Washing Machine from Fry's, it was expressly represented that his washing machine was energy efficient and complied with ENERGY STAR® standards for energy efficiency.  However, testing by the U.S. Department of Energy later showed this washing machine uses more energy than indicated, which exceeds allowable ENERGY STAR® energy efficiency requirements.

By misrepresenting, mislabeling and selling the Mislabeled Washing Machine, Whirlpool has violated numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(5), (7), and (9).

We hereby demand that Whirlpool immediately (1) cease and desist from further illegal sales of the Mislabeled Washing Machine, (2) issue an immediate recall of the Mislabeled Washing Machine; (3) make full restitution to all purchasers of the Mislabeled Washing Machine of all purchase money obtained from sales thereof; and (4) compensate all purchasers for the

BURSOR&FISHER
P.A.

increased energy costs they have incurred as a result of the Mislabeled Washing Machine's failure to conform with the energy efficiency standards of the ENERGY STAR® program.

It is further demanded that Whirlpool preserves all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.      All documents concerning tests of the energy efficiency of the Mislabeled Washing Machine;

2.      All communications with the DOE concerning the energy efficiency of this appliance;

3.      All documents concerning the advertisement, marketing and/or sale of the Mislabeled Washing Machine; and

4.      All communications with customers concerning complaints or comments concerning the Mislabeled Washing Machine.

Please comply with this demand within 30 days from receipt of this letter.

We are willing to negotiate with Whirlpool to attempt to resolve the demands asserted in this letter.  If Whirlpool wishes to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that Whirlpool is not interested in resolving this dispute short of litigation.

If Whirlpool contends that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

L. Timothy Fisher
ltfisher@bursor.com