## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**CHARLENE DZIELAK, et al.,**

        **Plaintiffs,**

  v.

**WHIRLPOOL CORPORATION, et al.,**

        **Defendants.**

Civ. No. 2:12-0089 (KM)(JBC)

**OPINION**

Has the EPA been wishy-washy about fishy washers? And if so, does its remedial inaction constitute a statement of federal law that preempts the plaintiffs' state law causes of action against a manufacturer and sellers of washing machines?

The defendants in this case manufactured and sold washing machines that bore the federal Energy Star insignia, an assurance of energy efficiency. After the Environmental Protection Agency ("EPA") found that the relevant washer models did not qualify for the Energy Star program, the plaintiffs brought suit. In the Second Amended Complaint, they assert state law breach of warranty and consumer fraud claims, as well as a claim under the federal Magnuson-Moss Warranty Act.

The defendants have moved to dismiss the state law claims, asserting that they are preempted by federal law. The federal EPA, they say, could have ordered compensation but did not do so, so any state claim for compensation is preempted. EPA's inaction, however, does not create the kind of stark conflict that requires state law to yield. I hold that the state law claims are not preempted. I do, however, grant defendants' motion to dismiss the Magnuson-Moss claim. The claim of unjust enrichment is likewise dismissed, though only as to defendant Whirlpool.

## Background[1]

The clothes washers at issue were manufactured by defendant Whirlpool. The plaintiffs purchased them from the defendant retailers. (Opinion,[2] 1) All of these washing machines bore the logo of a federal program called Energy Star. *Id.* at 2. Energy Star is designed to promote the development and use of energy efficient products and buildings. *See* 42 U.S.C. § 6294a(a). It permits an appliance manufacturer to affix the Energy Star logo to a product if it meets certain efficiency standards. (Opinion, 2) Energy Star products often cost more than non-Energy Star products. *Id.* at 3. On the other hand, their efficiency may result in savings in the long run. (Compl. ¶ 6)

According to the Complaint, in May 2012 the Department of Energy[3] determined that the washer models purchased by the plaintiffs did not comply

---

[1]    A more thorough summary of the facts is contained in my opinion (Dkt. No. 78) on the defendants' previous motion to dismiss the First Amended Complaint. For purposes of this motion to dismiss only, the allegations of the Second Amended Complaint are taken as true.

[2]    Citations to the record will be abbreviated as follows:

"Compl." – Second Amended Complaint, Dkt. No. 86.

"Disqualification Procedures" – Disqualification Procedures, Energy Star Products, Dkt. No. 89-3, Exh. 6.

"Integrity Update" – Energy Star Program Integrity Update: Verification Testing & Product Disqualifications, Dkt. No. 89-3, Exh. 1.

"Mot." – Brief in Support of Defendants…Motion to Dismiss the Second Amended Consolidated Complaint, Dkt. No. 89-2.

"Opinion" – Opinion, Defendants' first motion to Dismiss, Dkt. No. 78.

"Opp." – The plaintiffs' Memorandum of Law in Opposition to Defendants' Motin to Dismiss, Dkt. No. 93.

"Pilot Program" – FAQ for Energy Star Verification Testing Pilot Program, Dkt. No. 89-3, Exh. 5.

"Sample Prtshp. Agrmt." – Partnershp Agreement between Energy Star and {Organization Name}, Dkt. No. 89-3, Exh. 7.

[3]    The Energy Star program is jointly administered by the Department of Energy and the Environmental Protection Agency. *See* 42 U.S.C. § 6294a(a). Generally, once a participating appliance has failed a test of its efficiency by either the DOE or a third party tester, the failure is reported to the EPA. (Disqualification Procedures, 1) The EPA then determines whether the product will be disqualified from the Energy Star

with Energy Star requirements. Those models were therefore disqualified from the Energy Star program. (Opinion, 2; Compl., ¶¶ 106, 108)

The plaintiffs brought this action, alleging that they had purchased washing machines that were supposed to be compliant with Energy Star requirements, but in fact were not. (Compl. ¶ 1) They alleged various theories, including breach of warranty and violation of state consumer fraud statutes. On June 16, 2014, I filed an Opinion granting in part the defendants' motion to dismiss the First Amended Complaint. (Dkt. No. 78)  Familiarity with that earlier, comprehensive opinion is assumed.

On July 28, 2014, the plaintiffs filed a Second Amended Complaint.[4] In this revised complaint, they accuse the defendants of violating the Magnuson-Moss Warranty Act ("MMWA"), a federal statute dealing with warranties in consumer products (Count I); they bring state law claims for breach of express warranty (Count II) and the implied warranty of merchantability (Count III); they bring a state law claim of unjust enrichment (Count IV); and they assert claims for violation of the consumer protection statutes of their home states (Counts V through XIV). The defendants are Whirlpool, the manufacturer of the washing machines, as well as several retailers who sold the machines to the plaintiffs.[5]

Whirlpool, joined by the other defendants, has brought a motion (Dkt. Nos. 89, 90) to dismiss the Complaint. First, Whirlpool argues that the federal law and regulations governing the Energy Star program preempt all of the state law claims. (Mot., 14-31) Second, Whirlpool argues that the plaintiffs' claim under the Magnuson-Moss Warranty Act must be dismissed because MMWA

---

program, and what remedial actions will be proposed. *Id.* I will refer to the DOE and EPA interchangeably in describing the Energy Star program itself, but will generally refer to the EPA when discussing disqualification practices.

[4]     References to the "Complaint," unless otherwise specified, mean the currently operative Second Amended Complaint.

[5]     For simplicity, I will refer to the movant as Whirlpool, although all defendants have now joined Whirlpool's motion. References to Dzielak may likewise be taken to apply to the plaintiffs collectively.

does not apply to warranties that are governed by other federal laws. *Id.* at 33-34. Third, Whirlpool argues that the claim of unjust enrichment must be dismissed pursuant to my earlier opinion in this case, in which I found that the plaintiffs had not shown that they conferred a sufficiently direct benefit on Whirlpool. *Id.* at 34.

**Discussion**

I find that the state law claims are not preempted by federal law (Part I). I find, however, that the MMWA claim must be dismissed for failure to state a claim (Part II), and that the claim of unjust enrichment must be dismissed as to Whirlpool only (Part III).

**I.     Preemption**

The Constitution provides that federal law will be supreme over state law. U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof…shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby.") Where a state law interferes with or is contrary to a federal law, the federal law will preempt the state law. *Free v. Bland*, 369 U.S. 663, 666 (1962). In general, preemption takes three forms:

> (1) "express" preemption, applicable when Congress expressly states its intent to preempt state law; (2) "field" preemption, applicable when "Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;" and (3) "conflict" preemption, applicable when "state law is nullified to the extent that it actually conflicts with federal law," even though Congress has not displaced all state law in a given area.

*Fellner v. Tri–Union Seafoods, L.L.C.*, 539 F.3d 237, 242-43 (3d Cir. 2008) (quoting *Colacicco v. Apotex Inc.*, 521 F.3d 253, 261 (3d Cir. 2008) (quoting

*Hillsborough County v. Automated Med. Labs.*, 471 U.S. 707, 713, 105 S. Ct. 2371 (1985)).

Whirlpool argues that the federal EPA's failure to require manufacturers to pay compensation to purchasers of the disqualified washers preempts any state-law requirement that such compensation will be paid. It invokes both field and conflict preemption.[6] To resolve that preemption issue, I will consider four questions:

a)      Whether this agency action is the kind of federal "law" that has preemptive effect.

b)      Whether these are claims traditionally reserved to the states that give rise to a presumption against preemption.

c)      Whether federal law so occupies this particular field that there is no room for state law involvement (*i.e.,* "field preemption"). *See Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010).

d)      Whether state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*i.e.,* "obstacle preemption," a form of conflict preemption). *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012).

### a. Is this agency action a federal "law" for preemption purposes?

The threshold question is whether the agency's action is a federal "law" that will be given preemptive effect. I find that this case does not involve the sort of formalized agency action that is capable of preempting a state law.

Congress may enact a statute which, as an authoritative statement of federal law, may have preemptive effect. Federal agencies, too, can take actions or promulgate regulations that preempt state law. *Wyeth v. Levine*, 555 U.S. 555, 576 (2009); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-54 (1982). Not every agency action, however, has the power to preempt

---

[6]      Express preemption, where a statute or regulation explicitly expresses an intent to displace state law, is not at issue here.

state law. *See Fellner v. Tri–Union Seafoods, L.L.C.*, 539 F.3d 237, 245 (3d Cir. 2008) ("This does not mean, however, that federal law capable of preempting state law is created every time someone acting on behalf of an agency makes a statement or takes an action within the agency's jurisdiction.") But where, for example, an agency engages in formal notice-and-comment rulemaking, the resulting regulation can preempt state law. *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 331 (3d Cir.2009); *Fellner*, 539 F.3d at 243. Likewise, an agency adjudication may have preemptive effect because, through such adjudications, agencies can create binding rules. *Holk*, 575 F.3d at 340.

Many agency actions do not fit the mold of either notice-and-comment rulemaking or adjudication. Whether such less formal actions are capable of preempting state law requires case-by-case analysis. A court should look to whether the agency's action attained a level of fairness and deliberation that suggests Congress intended it to constitute a pronouncement of federal law:

> In determining whether an agency action is entitled to deference, we will be guided by the Supreme Court's pronouncement that it is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force. Accordingly, we declined in *Fellner* to afford preemptive effect to less formal measures lacking the fairness and deliberation which would suggest that Congress intended the agency's action to be a binding and exclusive application of federal law.

*Holk*, 575 F.3d at 340 (internal quotations and citations omitted). Contrariwise, a court should not give preemptive effect to the results of informal agency proceedings that lack such "fairness and deliberation":

> We decline to afford preemptive effect to less formal measures lacking the "fairness and deliberation" which would suggest that Congress intended the agency's action to be a binding and exclusive application of federal law. Courts with good reason are wary of affording preemptive force to actions taken under more informal circumstances. Regularity of procedure—whether it be the rulemaking and adjudicatory procedures of the APA or others

6

> which Congress may provide for a particular purpose—not only
> ensures that state law will be preempted only by federal "law," as
> the Supremacy Clause provides, but also imposes a degree of
> accountability on decisions which will have the profound effect of
> displacing state laws, and affords some protection to the states
> that will have their laws displaced and to citizens who may hold
> rights or expectations under those laws.

*Fellner*, 539 F.3d at 245 (internal citations omitted).

Applying those principles, the Third Circuit has twice considered whether an agency action was deliberative enough to have preemptive effect: Once where the FDA had issued a policy statement, then issued several letters to effectuate that policy statement, and once where the Commissioner of the FDA sent a letter to the Attorney General of California stating that a state lawsuit was preempted. *See Holk*, 575 F.3d at 339, 341; *Fellner*, 539 F.3d at 241. Both times, the Third Circuit held that the agency action was not a federal "law" capable of preemptive effect.

In *Holk, supra,* the FDA had issued a policy statement adopting an informal definition of the term "natural" on food and beverage labels. 575 F.3d at 339. The agency later invoked that policy statement in several letters that directed food and beverage producers to remove the word "natural" from product labels. *Id.* at 341. The question before the Third Circuit was whether that agency action preempted a state-law cause of action alleging that the word "natural" on the defendant's beverage label was deceptive. *Id.* at 332, 340. The court held that the agency's actions were not federal laws capable of preemptive effect. The FDA had not adopted any formal policy as to labeling a food "natural"; that is, it had not solicited public comment and issued an authoritative regulatory definition. *Id.* at 340-41. Indeed, the FDA had acknowledged that there were "many facets of the issue that the agency will have to carefully consider if it undertakes rulemaking to define the term 'natural.'" *Id.* at 341. All in all, the Court found, the FDA's pronouncements regarding the term "natural" were preliminary and informal; they lacked procedural regularity and "the kind of fairness and deliberation" required for an

agency action to attain the status of a federal "law." Hence, they would not be given preemptive effect. *Id.*

The Third Circuit reached a similar conclusion in *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237 (3d Cir. 2008). There, the plaintiff brought a state-law products liability action, alleging that Tri-Union failed to warn her about dangerously high levels of mercury in their tuna fish. *Id.* at 241. Tri-Union, having removed the action to federal court, obtained a dismissal on the grounds that Fellner's claims were preempted by FDA action. The State of California had earlier sued Tri-Union, seeking to force it to warn consumers about mercury levels. In response, the Commissioner of the FDA sent a letter to the California Attorney General stating that the state action was preempted, because it would frustrate the FDA's (conservative) approach to regulation of mercury levels in fish. The FDA had not adopted rules requiring warning, but instead had adopted a program of targeted advisories.

The Third Circuit held that the Commissioner's letters and other communications were not the sort of agency action that gives rise to preemption. True, the FDA had outlined a regulatory approach—one which embodied, to some degree, a decision *not* to regulate. But overall, the FDA's actions lacked the kind of formality, fairness and deliberation required to elevate an agency's action to the status of a federal "law" that could displace state law *via* preemption.

Here, Dzielak alleges that defendants' improper use of the Energy Star label constituted a state law breach of warranty. She seeks monetary damages because she paid a premium for what she believed was an Energy Star appliance. Such a state law cause of action, in Whirlpool's view, is preempted by EPA's regulatory decisions. Once EPA disqualified the washers, says Whirlpool, it had the discretion to fashion an appropriate remedy. (Mot., 9-10) EPA could have ordered the defendants to compensate consumers who had overpaid, *id.*, but it never did so. That decision by EPA, says Whirlpool, is an

expression of federal law that preempts a state law action seeking such compensation.

In my view, EPA's action (or rather inaction) does not rise to the level of a federal "law" that can be given preemptive effect. EPA has never issued a formal policy regarding the remedies or punishments a manufacturer will face when its product is found to be non-compliant with Energy Star. By contrast, EPA and DOE have promulgated extensive regulations defining Energy Star efficiency standards and testing procedures. (*See, e.g.*, 10 C.F.R. § 430, Subpart B, Appendix J1, detailing testing procedures for clothes washers). There is little specificity, however, as to procedures once a given appliance is found non-compliant.

The process for disqualifying a product and imposing corrective measures is not formalized. As in *Fellner,* the agency has issued only informal guidance. In 2011, EPA issued a document called "Disqualification Procedures," describing its process for disqualifying products from the Energy Star program. In 2014, EPA issued an "Integrity Update," also explaining the procedures it uses to disqualify a product. The Integrity Update includes a list of factors EPA considers in deciding what corrective action it might direct the manufacturer to undertake. (*See* Integrity Update) The Integrity Update does allude, at least generally, to the possibility of ordering manufacturers to reimburse consumers. (Integrity Update, 3) (noting that EPA "may require, where market feasible, that manufacturing partners remain available to compensate consumers in a commensurate and appropriate manner."). But it does no more than identify compensation as an option.

Neither of these documents is a formal regulation. Neither approaches the level of formality expected of rulemaking or adjudication. There is no indication that either was issued after notice and comment. As a result, EPA's failure to act cannot be treated as an authoritative statement of federal law. There are no indicia of the kind of "fairness and deliberation" that are required

before an agency action will be given preemptive effect.[7] In short, EPA's action here is most akin to the informal actions found to lack preemptive effect in *Holk* and *Fellner, supra.*

EPA's failure to order manufacturers to compensate consumers is not a federal law capable of preempting a state-law cause of action. For that threshold reason, I would deny preemption.

In the following sections, I nevertheless will assume *arguendo* that EPA's actions constitute federal law, and consider whether preemption would be appropriate. Analyzing those alternative grounds, I find that Dzielak's claims would not be subject to field preemption or conflict preemption.

### b. Presumption against preemption

Where a state law concerns an area that is traditionally governed by the states, courts may be particularly reluctant to find that it is preempted. This principle is sometimes stated as a presumption against preemption. *Farina v. Nokia Inc.*, 625 F.3d 97, 116 (3d Cir. 2010) ("The presumption applies with particular force in fields within the police power of the state."). *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest.") (internal quotation marks omitted).

State law has historically governed the field of actions for breach of warranty or false advertising. That consideration, standing alone, does not

---

[7]     I note in addition that the Energy Star program is not a regulatory regime in the usual sense, but a voluntary contractual arrangement. *See* 42 U.S.C. § 6294a(a) (Energy Star is "a voluntary program ...."). It governs the conditions under which a manufacturer may use EPA's Energy Star logo. Disqualification and or corrective action are options within the contractual relationship between EPA and the manufacturer. Disqualification of an appliance is thus more like termination of an agreement than imposition of a regulatory sanction. *See* Sample Prtshp. Agrmt., 2 (providing DOE/EPA with the option to terminate the agreement "at any time, and for any reason, with no penalty"); 2007 Report, 22 ("If a company refuses to comply after several attempts to resolve a situation and EPA's Office of General Counsel has reviewed the matter, EPA or DOE can notify a company that its partnership has been terminated.")

decide the preemption issue. My analysis, however, will be shaped by a presumption that a consumer action for breach of warranty is within the states' traditional sphere.

### c. Field Preemption

Field preemption applies where the federal government has so thoroughly occupied a particular field as to leave no room for state involvement. *Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010) ("[F]ield preemption applies where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation or where the field is one in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."). The principal inquiry is whether the regulatory scheme is so "pervasive," or the federal interest so "dominant," that Congress (directly or *via* agency action) must have intended to occupy the entire field and displace state law. *Lozano v. City of Hazleton*, 724 F.3d 297, 303 (3d Cir. 2013).

Of course, whether federal law thoroughly occupies a field depends a great deal on how we define the field. If the "field" is defined broadly to encompass the entire subject area of a federal program, preemption might easily be found. Courts are more careful, however, to delimit a federal law's reach. Indeed, even where there is an *express* preemption clause, a court will diligently determine the "substance and scope of Congress' displacement of state law." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76-77 (1996) So it is not enough simply to say that federal law concerns itself with a particular field. A court must look to the scope of that occupation and define the borders beyond which federal law ceases to operate exclusively.

In defining the field, Whirlpool focuses exclusively on the Energy Star program itself. The federal government invented the program, owns the Energy Star mark, and "comprehensively manages every aspect of the program in order to promote critical federal goals." (Mot., 28) The states, they argue, have no

11

regulatory role in the program. Rather, the federal government fully occupies the field of administration of the Energy Star program. The plaintiffs, on the other hand, say that the relevant field here is not the Energy Star program, but rather the laws governing breach of warranty law or false advertising. (Opp., 15) That field, the plaintiffs argue, is one in which the states have traditionally played a substantial or even dominant role. *Id.* [8]

Is this case more about federal energy efficiency requirements, or more about warranties made to consumers? I find that Dzielak's causes of action do not significantly impinge on the federal government's definition or enforcement of Energy Star standards. The plaintiffs are not alleging, for example, that an appliance runs afoul of state law despite its compliance with the Energy Star program. They are merely alleging that that the defendants said their product was Energy-Star-qualified, when in fact it was not. That is a garden variety breach of warranty claim. True, the seller's allegedly incorrect representation relates to the requirements of a federal program. But evaluating the plaintiffs' claims does not require any interference with the federal program itself. The gist of the plaintiffs' cause of action is the falsity of the seller's representations

---

[8]    Actually, even if the "field" is defined as the Energy Star program itself, there is reason to believe that the federal government is inclined to defer to the states in this area. In July of 2009, the DOE began a program called State Energy-Efficient Appliance Rebate Program, whereby the federal government provided money to states so the states could offer rebates to consumers who purchased energy efficient products. www1.eere.energy.gov/recovery/appliance_rebate_program.html (accessed July 24, 2015). While that program was in effect, states were not required to remove disqualified products from their rebate lists. (Pilot Program, 6) In addition, once a product was disqualified, states could decide for themselves whether to notify consumers who already had been issued rebates. *Id.* In addition, according to DOE, states could decide for themselves how to handle two additional issues: "Will the resident have the ability to return the product and secure an alternative that does meet the requirements?" and "If so, who is responsible for making this exchange? Who bears the cost?" *Id.* The federal agencies, then, have hardly rushed in to occupy the field of remedies for consumers who have purchased disqualified products. *See generally R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 149 (1986) ("With respect to agency regulations, we must consider whether the regulations evidence a desire to occupy a field completely."); *Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010) ("Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive.").

to the buyer, not the administration of energy efficiency standards. The relevant "field" for purposes of preemption, then, is best viewed as warranty law.[9]

The case law, although it does not invoke the Energy Star program specifically, suggests strongly that this analysis is correct.

A good starting point is *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237 (3d Cir. 2008), cited above. Those plaintiffs alleged that a tuna fish producer should have warned consumers about mercury levels in their fish. The company argued that this state law claim was preempted by the federal government's failure to definitively require such a disclosure. *Id.* at 248. The Third Circuit held, however, that this was an ordinary action for failure to warn, a traditional subject of regulation by the states. *Id.* at 248-49. Nor was state law repugnant to federal food and drug law: "[S]tate tort law and other similar state remedial actions are often deemed complementary to federal regulatory regimes, and this appears to be such a case. Federal regulatory programs frequently do not include a compensatory apparatus, and the Supreme Court has recognized that state tort law can also play an important information-gathering role not easily replicated by federal agencies." *Id.* at 249.

As in *Fellner*, the underlying claim here is breach of warranty, a traditional state law cause of action. For sure, the *subject* of the seller's representation was the appliances' eligibility for a federal program. The state action, however, asserts a claim that does not conflict with the goals or impinge on the scope of the Energy Star program.

On point in every way that matters is the Sixth Circuit case of *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 282 (6th Cir. 2010). The National Highway Traffic Safety Authority requires that motorcycle helmets pass certain safety

---

[9]     Consider, for example, a solicitor for a charity who falsely claimed that the beneficiaries were veterans. A donor, discovering the truth, might rightly sue for fraud. The fraud action would not involve adjudication or adjustment of the beneficiaries' status; the primary issue would be whether the solicitor *lied* about their status. We would not deny a state law cause of action, saying that this is a matter for the military authorities.

tests. *Id.* at 279. Manufacturers so signify by affixing a "DOT" sticker to their helmets. *Id.* at 282. Fulmer sold helmets that carried the DOT sticker, but were later shown to flunk the applicable safety tests. *Id.* at 279. Fabian alleged that he had purchased Fulmer's helmet in reliance on the (false) assurances implied by the DOT sticker. He brought a state law action for misrepresentation and breach of warranty. The Sixth Circuit held that Fabian's state causes of action were not preempted. The state law suit, said the Court, would not "stand as an obstacle" to federal law. *Id.* at 282. Fabian's claim turned on what Fulmer knew about its products' compliance with federal standards; it did not imply, for example, that the helmets should have met some higher standard. Fabian's claims did not seek to add to or subtract from anything the federal regulations required. "All that the claims do is potentially impose liability based on representations about whether the Department of Transportation has approved the helmets, even after a failed government-sponsored test." *Id.* at 278.

As in *Fabian,* Dzielak's case has more to do with warranty law than with federal standards. Actions for breach of warranty, while not wholly a matter of state law, are traditionally so. At any rate, such causes of action are not dominated by federal law.

Field preemption is not appropriate here.

### d. Conflict Preemption/Obstacle Preemption

Where a state law and federal law conflict, the federal law may preempt the state law. *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) As noted above, one form of conflict preemption is "obstacle preemption," which occurs where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*[10] Whirlpool

---

10     As noted above, another form of conflict preemption is "impossibility preemption," which may apply where "compliance with both federal and state regulations is a physical impossibility." *Arizona*, 132 S. Ct. at 2501. Whirlpool has made no argument that impossibility preemption applies here, and I agree that it does not. Indeed, Dzielak seeks damages based on the very failure to meet Energy Star

urges that obstacle preemption may arise where a federal law or agency carefully balances conflicting factors, while the state action focuses on only one. Such "tunnel vision" may upset a carefully designed federal scheme. If find, however, that Dzielak's state law causes of action would not tend to disrupt the policy balancing inherent in the Energy Star program.

Two Supreme Court cases illustrate Whirlpool's legal point.

In *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), for example, the plaintiffs brought a state-law fraud claim, saying that the defendants had improperly obtained FDA approval for the use of a medical device. *Id.* at 343. The Court held that the claim was preempted. *Id.* at 348. The agency, it said, was attempting to "achieve a somewhat delicate balance of statutory objectives." *Id.* The FDA must conduct a thorough review; on the other hand, it must allow medical innovations to come to market within a reasonable period of time. *Id.* at 349-50. The FDA must ensure that a device is safe for a particular use; on the other hand, it must also preserve doctors' professional discretion to prescribe devices for legitimate "off-label" uses. *Id.* at 350 (citing 21 U.S.C. § 396). Subjecting that regulatory process to the tort law of 50 states, the Court said, would interfere with a delicate and complex administrative process. *Id.* at 350.

Likewise, in *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), the plaintiffs brought suit against a car manufacturer, essentially claiming that the manufacturer was negligent because it sold a car that lacked an airbag. *Id.* at 874. Federal regulations, though, did not limit manufacturers' options to airbags, but permitted other kinds of "passive restraints" as well. *Id.* at 875. The Court held that the state law suit was preempted. *Id.* at 874. The agency, it said, considered many conflicting factors in deciding not to mandate airbags. Those factors included consumer resistance, expense, the discouragingly high cost of replacing airbags once deployed, and dangers to certain out-of-position

---

standards found by EPA. A finding of liability would require, not prevent, compliance with the standards of the Energy Star program.

passengers such as children. *Id.* at 877-78. The agency determined that a gradual phase-in of airbag requirements would reduce the possibility of a backlash and would give the industry time to develop alternatives. *Id.* at 879. To impose, through tort litigation, what amounted to a state-law requirement of airbags "would have stood as an obstacle to the accomplishment and execution of the important means-related federal objectives" that led the agency to opt for a gradual phase-in. *Id.* There was, then, an "actual conflict" between federal regulations and state law. *Id.* at 884. *See also City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 625 (1973) (finding obstacle preemption where the Federal Aviation Administration had needed to balance safety and efficiency).

The *Buckman/Geier* principle has its limits, however. Where there is no showing that the federal government has in fact balanced competing objectives, the case for obstacle preemption is weak. *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010). Because there is no showing that EPA struck any kind of balance when it disqualified Whirlpool's washing machines, obstacle preemption is not appropriate.

In *Wyeth v. Levine*, 555 U.S. 555 (2009), for example, the plaintiff brought a state law action against a drug manufacturer, alleging (among other things) that the warnings on the drug's label were insufficient. The defendants argued that allowing a state law suit would interfere with federal labeling requirements in which Congress and the FDA attempted to "strike a balance between competing objectives." *Id.* at 573, 575. The court, though, found that there was not sufficient evidence of any such balancing. To begin with, Congress had not enacted a preemption provision for drugs, despite having enacted one for medical devices. *Id.* at 575. Nor had Congress given the FDA the explicit power to preempt state drug law, despite again having done so for medical devices. *Id.* at 576. Further, FDA had merely posited that its regulations preempted state law; it had not explained specifically how state laws would disrupt its regulatory scheme. *Id.* at 576-77. And the FDA's statements in support of preemption came not in the form of regulations, but

16

in the form of less formal pronouncements. *Id.* at 576. The Court explained that in contrast with *Geier*, where "the agency's "contemporaneous record…revealed the factors the agency had weighed and the balance it had struck," there was not sufficient evidence of any such balancing in the case of the FDA's approval of the drug label in question. *Id.* at 580. "[W]e have no occasion in this case to consider the pre-emptive effect of a specific agency regulation bearing the force of law. And the FDA's newfound opinion, expressed in its 2006 preamble, that state law frustrates the agency's implementation of its statutory mandate, does not merit deference." *Id.* at 580 (internal quotations omitted). *See also People of State of Cal. ex rel. State Air Res. Bd. v. Dep't of Navy*, 431 F. Supp. 1271, 1288 (N.D. Cal. 1977) aff'd sub nom. *People of State of Cal. v. Dep't of the Navy*, 624 F.2d 885 (9th Cir. 1980) (finding no preemption in part because there was not sufficient evidence that the regulation in question would disturb the "delicate balance between safety and efficiency and the protection of persons on the ground" that Congress and the Federal Aviation Administration had sought to achieve).

This case is at the *Levine* rather than the *Buckman/Geier* end of the spectrum. There are no sufficient indications that the EPA has struck any delicate regulatory balance as to the appropriateness of remedial measures after it disqualifies a product, or that it did so in this case. To outward appearances, the EPA was empowered to order compensation to Whirlpool buyers, but did not do so; it simply failed to act. Whirlpool argues, however, that what appears to be a non-decision really reflects EPA's balancing of three important objectives: keeping participation in Energy Star inexpensive, protecting the integrity of the Energy Star mark, and treating Energy Star partners equally. (Mot., 14-15) There is no particular evidence, however, that EPA's stasis actually represents that delicate equipoise.

It is true that, through informal guidance documents, EPA has listed numerous factors that bear on its selection of remedial measures when it

17

disqualifies a product.[11] (Integrity Update, 2) Deficiencies in performance, EPA explains, can occur for any number of reasons, including changes in supply chain, production malfunction, inconsistent quality of raw materials and components, and insufficient margins of error. *Id.* The agency might attempt to segregate compliant from noncompliant products by place of manufacture, time frame, or other factors. (Disqualification Procedures, 2; Integrity Update 3-4) Likewise, the agency might assess the severity of the product's noncompliance against the background of consumer expectations and investment. (Integrity Update, 2) Or it might defer to the manufacturer's own remedial measures. (Disqualification Procedures, 2)

There are two reasons, however, that EPA's articulation of those factors falls short of requiring obstacle preemption. First, as explained at Part I.a, *supra*, and as the Supreme Court held in *Levine*, such informal guidance documents lack the force of law. To the extent any balancing went on here, it did not lead to any binding result. Second, there is no indication that the agency undertook a balancing of these factors when it did not order Whirlpool or the retailers to compensate consumers. Such a decision could implicate complex regulatory deliberations, but there is no indication that it did. More to the point, there is no *requirement* that EPA engage in such balancing or render a formal decision as to the appropriate remedy.[12] Indeed, it could do nothing, without running afoul of any law or triggering any obligation to explain itself. That is a far cry from the kind of pervasive regulatory regime that would displace state law.

Whirlpool argues in addition that state tort liability might increase the costs of the Energy Star program. (Mot., 16-17) To a point, I agree with Dzielak

---

[11]     Whirlpool has asked me to take judicial notice of the official publications cited in this paragraph. (Dkt. No. 89-3)

[12]     These factors may again come into play at the class certification or merits stage. The identification of the subclass of washers that were Energy-Star-deficient, for example, may turn out to be an important issue. I decline, however, to deny a plaintiff the opportunity to make that showing simply because EPA might theoretically have considered similar factors in reaching its decision.

that this really represents a cost of non-compliance rather than a cost of compliance. (Opp., 21 n. 15) But a manufacturer might nevertheless be more reluctant to participate in the program if its participation carried a risk of liability. I will not, however, officiously posit an important federal policy that the federal government itself has not espoused. Presumably Congress could have enacted a preemption provision; it has not done so. It could have precluded liability for misuse of the Energy Star label; it has not done so. There is no such statute or regulation, and I have received no other evidence that preemption of state law—really, implied immunity in tort—is "the clear and manifest purpose" of the agency. *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012).

For all of the foregoing reasons, then, I hold that the state law claims are not subject to preemption.

## II.     Magnuson-Moss Warranty Act claims

Count I of the Complaint asserts a a claim under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (Compl., Count I) Whirlpool moves to dismiss Count I because the MMWA does not apply to warranties that are governed by other federal laws. (Mot., 33) That contention has merit. The motion to dismiss Count I will be granted.[13]

> d) Other Federal warranty laws
>
> This chapter (other than section 2302(c) of this title) shall be inapplicable to any written warranty the making or content of which is otherwise governed by Federal law. If only a portion of a written warranty is so governed by Federal law, the remaining portion shall be subject to this chapter.

---

[13]     Whirlpool also argues that because state warranty claims are preempted, and an MMWA claim must be based on a valid state warranty claim, the MMWA claim must be dismissed. (Mot., 33) I have already held, *supra*, that the plaintiffs' state law claims are not preempted. The argument is therefore moot. Because I here dismiss Count I on separate grounds, I also set aside Whirlpool's argument that the Energy Star logo does not qualify as a "written warranty" for purposes of the MMWA.

15 U.S.C. § 2311(d).

At least three courts have found that a MMWA claim of deceptive labeling could not proceed because the Food, Drug, and Cosmetic Act ("FDCA") governed the contents of the labeling. *See Bates v. Gen. Nutrition Centers, Inc.*, 897 F. Supp. 2d 1000, 1002 (C.D. Cal. 2012) (labeling of a dietary supplement); *Hairston v. S. Beach Beverage Co.*, No. 12-cv-1429, 2012 WL 1893818, at *5 (C.D. Cal. May 18, 2012) (labeling of a beverage); *Kanter v. Warner-Lambert Co.*, 122 Cal. Rptr. 2d 72 (Cal. Ct. App. 2002) (labeling of a head lice drug). The Energy Star program is of course completely voluntary.[14] In that respect it differs from the mandatory regime of the FDCA. Nevertheless, federal law and regulations do specify the criteria that a product must meet to earn the Energy Star logo. *See, e.g.*, 42 U.S.C. § 6294a(4); 10 CFR 430, Subpart B, Appendix J1. To the extent that the Energy Star logo is considered a warranty, the "making" and "content" of that warranty are governed by federal law.

MMWA does contain a kind of saving provision for cases of partial overlap: "If only a portion of a written warranty is so governed by Federal law, the remaining portion shall be subject to this chapter." 15 U.S.C. § 2311(d). Energy Star's coverage could be regarded as only partial because it does not impose mandatory sanctions or remedies for misusing the logo. *See* Part I.a, *supra.* But MMWA's "Other Federal warranty laws" provision is not conditioned on the competing federal law's having sufficiently robust enforcement provisions. Nothing in the MMWA suggests that it is intended to override remedial policy choices in other statutes. Indeed, the opposite—MMWA, last in line, operates where no other federal warranty law applies.

Defendants' motion to dismiss Count I of the Complaint will therefore be granted.

---

[14]     *See* 42 U.S.C. § 6294a(a) (Energy Star is "a voluntary program to identify and promote energy-efficient products . . . in order to reduce energy consumption, improve energy security, and reduce pollution through *voluntary labeling* of, or other forms of communication about, products and buildings that meet the highest energy conservation standards."); *Avram v. Samsung Electronics Am., Inc.*, No. CIV. 2:11-6973 KM, 2013 WL 3654090, at *6 (D.N.J. July 11, 2013).

### III.   Unjust Enrichment

In a prior opinion, I dismissed the plaintiffs' unjust enrichment claims against Whirlpool only. (Dkt. No. 78, 26) I held that a claim of unjust enrichment requires that a plaintiff have conferred a direct benefit on the defendant. *Id.* Because the plaintiffs purchased their appliances from the retailer-defendants, not from Whirlpool, they did not confer a sufficiently direct benefit on Whirlpool. *Id.* They did, however, confer a sufficiently direct benefit on the retailer sellers. Consequently, I dismissed the unjust enrichment claim against Whirlpool, but permitted it as against the defendant retailers. *Id.*

The Second Amended Complaint continues to assert the unjust enrichment claim (Count IV) against Whirlpool. It adds no allegations that the plaintiffs conferred any direct benefit on Whirlpool. I will therefore again dismiss the unjust enrichment claim (Count IV) as against Whirlpool only, this time with prejudice.

### Conclusion

The defendants' motion to dismiss (Dkt. Nos. 89 and 90) will be granted in part and denied in part. Count I of the Complaint will be dismissed without prejudice to the filing of an amended complaint that remedies the defects in the plaintiffs' MMWA theory. As to defendant Whirlpool only, Count IV of the Complaint (alleging unjust enrichment) will be dismissed with prejudice. The motion will otherwise be denied.

July 31, 2015
Newark, New Jersey

Kevin McNulty
United States District Judge

21