## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CHARLENE DZIELAK, et al.,

       Plaintiffs,

    v.

WHIRLPOOL CORPORATION, et al.,

       Defendants.

Civ. No. 2:12-0089
(KM)(JBC)

OPINION

__KEVIN MCNULTY, U.S.D.J.:__

    This putative class action arises from the sale of Maytag washing machine models that bore ENERGY STAR® labels signifying that they met federal standards of water and electrical efficiency.[1] In May 2012, the U.S. Department of Energy determined that these particular models did not actually meet Energy Star efficiency standards, and thus disqualified them from the program. The plaintiffs, including named plaintiff Charlene Dzielak, are purchasers of Maytag Centennial models MVWC6ESWW0, MVWC6ESWW1, and MVWC7ESWW0[2] (the "Washers"). They claim that they and a putative class suffered uniform harm because they all purchased Washers improperly labeled with the Energy Star logo. The price of the Washers was inflated, they claim, because consumers will pay a premium for Energy Star-qualified washing machines, "due to their . . . supposed water usage, energy efficiency,

---

[1]    Familiarity with my earlier opinions (ECF No. 78, 127) is assumed. Herein, I will render ENERGY STAR® as "Energy Star".

[2]    Models MVWC6ESWW0 and MVWC6ESWW1 are hereinafter referred to as the C6 models and MVWC7ESWW0 is referred to as the C7 model.

and ENERGY STAR® qualification." (Second Amended Consolidated Complaint, ECF No. 86, ¶ 118) Additionally, they claim that each purchaser "paid more money in additional water and energy costs to operate his or her Mislabeled Washing Machine than they would have had the appliance actually met the ENERGY STAR® qualification as represented and promised by Whirlpool." (*Id.*)

This opinion addresses four motions *in limine*—three filed by the defendants and one by the plaintiffs—seeking to strike proffered expert testimony concerning class-wide damages. For the most part, the motions are denied. For the reasons discussed below, I will deny the defendants' motions to strike the expert opinions of Dr. Ramamirtham Sukumar and Dr. Michael J. Dennis (ECF nos. 198, 199). I will grant in part the defendants' motion to strike the expert opinion of Mr. Colin Weir (ECF No. 200), insofar as it is based on data presented in an anonymous Whirlpool document. Finally, I will deny the plaintiffs' cross-motion to strike Dr. Carol A. Scott's rebuttal and supplemental expert opinions as a discovery sanction under Federal Rule of Civil Procedure 37 (ECF No. 221).

## I.    FACTS & PROCEDURAL HISTORY

The defendants are Whirlpool, which manufactured the plaintiffs' Washers, and several retailers who sold them: Lowe's Home Centers, LLC ("Lowe's"), Sears Holdings Corporation ("Sears"), The Home Depot, Inc. ("Home Depot"), Fry's Electronics, Inc. ("Fry's") and Appliance Recycling Centers of America, Inc. ("ARC"). In my July 31, 2015 opinion on the defendants' motion to dismiss the plaintiffs' second amended complaint, I dismissed plaintiffs' Magnuson-Moss Warranty Act and unjust enrichment claims against Whirlpool. What remain are state law claims of breach of express warranty and the implied warranty of merchantability; unjust enrichment as to the defendants other than Whirlpool; and violation of consumer protection statutes, including the New Jersey Consumer Fraud Act ("NJCFA"). (*See* ECF No. 127)

2

As relevant here, the plaintiffs have proffered the opinions of three experts:

(a) Ramamirtham Sukumar, PhD, who means to isolate the portion of the purchase price of the Washers that is attributable to the Energy Star "price premium";

(b) Michael J. Dennis, PhD, who conducted a contingent valuation survey meant to isolate the portion of the purchase price that is attributable solely to the Energy Star label; and

(c) Colin Weir, who proposes a model for calculating class-wide "price premium" and "energy expense" damages.

Each of these three has submitted a declaration and expert report in support of the plaintiffs' motion for class certification. (ECF nos. 171–173). In response to the defendants' opposing expert reports, each of the three has submitted a rebuttal report. (ECF nos. 184–186).[3] Pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702, Whirlpool, Lowe's, Sears, and Fry's (for purposes of this motion,

---

[3]      The plaintiffs previously filed with this Court a motion for class certification. By order dated July 25, 2016 (ECF No. 203), I responded to the parties' request that that motion be considered in conjunction with the four motions *in limine* addressed in this opinion. I administratively terminated the class certification motion and instructed the plaintiffs to renew that motion, supplementing as appropriate, following my decision on the four motions now before me. This is consistent with the Third Circuit's recent directive that "a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015). Thus, although the expert and class certification issues are intertwined, it seemed best to sort out the *Daubert* issues first.

In connection with class certification, the plaintiffs intend to show that the requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. By that they mean that "questions of law or fact common to class members predominate over any questions affecting only individual members," based in part on the opinions of their damages expert, Mr. Weir. Weir calculates "energy expense damages" and "price premium damages," which plaintiffs argue can be calculated on a classwide basis, and thus are provable by common evidence. (ECF No. 163 (sealed) at 17, 27)

the "defendants") have moved to preclude these three experts from testifying. (ECF nos. 198–200)

Whirlpool, for its part, has proffered an initial report, as well as a rebuttal report and a supplemental report, authored by Carol A. Scott, PhD. Dr. Scott is offered as an opinion witness critical of Dr. Sukumar's and Dr. Dennis's price premium estimates, as well as Mr. Weir's damages model. The plaintiffs assert that Scott's rebuttal and supplemental reports were untimely filed under Federal Rule of Civil Procedure 26 ("Rule 26") and this Court's January 6, 2015 Scheduling Order (ECF No. 103), as modified by the February 8, 2016 Order Extending Deadlines (ECF No. 174, hereinafter, the "Scheduling Order"). The plaintiffs have therefore filed a cross-motion (ECF No. 221) to exclude Dr. Scott's rebuttal and supplemental reports as a sanction under Federal Rule of Civil Procedure 37 ("Rule 37").

## II.   DEFENDANTS' MOTIONS *IN LIMINE*

### A.   Legal Standards: Admissibility Under Rules 702 and 703

Federal Rule of Evidence 702 ("Rule 702") states certain prerequisites to the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The case law has extracted from Rule 702 three essential requirements: "qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*,

320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993))).

"Qualification refers to the requirement that the witness possess specialized expertise." *Schneider*, 320 F.3d at 404. This is interpreted liberally: "a broad range of knowledge, skills, and training qualify an expert." *Paoli*, 35 F.3d at 741.

"Reliability" requires that the opinion be "based on 'the methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Paoli*, 35 F.3d at 742 (citing *Daubert*, 509 U.S. at 590). Reliability is a "flexible" test. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal citation omitted). The Third Circuit has explained that factors "deemed important" for determining reliability include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 791 n.8. These factors are not exclusive, nor must they all be applied in every case. *Kumho Tire Co.*, 526 U.S. at 141; *Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3d Cir. 2000). Rather, whether "specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co.*, 526 U.S. at 153.

"Fit" requires that the expert opinion correspond to the issues in the case, *i.e.*, that it be relevant and "assist the trier of fact." *Paoli*, 35 F.3d at 742-43. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quoting 3 Weinstein

& Berger ¶ 702[02], p. 702–18). Therefore, "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." *Id.* at 743.

The burden of demonstrating admissibility under Rule 702 falls on the proponent: "The party offering the proposed expert testimony bear[] the burden of establishing the admissibility of the testimony by a preponderance of the evidence." *In re Human Tissue Products Liab. Litig.*, 582 F. Supp. 2d 644, 655 (D.N.J. 2008) (citing *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417-18 (3d Cir. 1999); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593 n.10). That inquiry requires the court to "examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).

The District Court, exercising its sound discretion, serves as a gatekeeper to prevent expert testimony that falls short of these requirements from reaching the jury. *Daubert*, 509 U.S. at 592-95. Nevertheless, "[t]he Rule's basic standard of relevance . . . is a liberal one." *Id.* at 587. Within the principles outlined above, a judge has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (internal citation omitted) (emphasis in original).

Federal Rule of Evidence 703 ("Rule 703") sets forth the requirements relating to the underlying facts or data on which an expert may base his or her opinion. It provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury

> evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

The Third Circuit announced in *In re Paoli* that "when a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." 35 F.3d at 749. In making that assessment, *Paoli* held, a trial judge has considerable latitude. The judge can "take into account the particular expert's opinion that experts reasonably rely on that type of data, as well as the opinions of other experts as to its reliability, but the judge can also take into account other factors he or she deems relevant." *Id.* at 748.

### B.   Defendants' Motion to Strike the Opinions of Dr. Sukumar

The defendants' first motion attacks the opinions of the plaintiffs' "price premium" expert, Dr. Sukumar, under *Daubert*'s reliability and fit requirements. (Defendants do not question Dr. Sukumar's qualifications.)

The defendants first challenge Dr. Sukumar's proprietary method of conjoint analysis, called "ASEMAP". Second, they challenge Dr. Sukumar's conclusions and opinions, which they contend are inconsistent with market reality. Third, the defendants object to the composition of Dr. Sukumar's surveyed population and his exclusion of certain data when arriving at his conclusions. Finally, the defendants argue that, under *Daubert* and *Comcast Corp. v. Behrend*, __ U.S. __, 133 S. Ct. 1426, 1433 (2013), Dr. Sukumar's opinion must be excluded because his conjoint analysis does not "fit" the plaintiffs' theory of liability.

#### 1. Overview of Dr. Sukumar's Analysis

The plaintiffs asked Dr. Sukumar to "estimate the price premium, if any, attributable to the Energy Star logo" on the Washers "through the use of a

conjoint analysis." (Sukumar Br. 1 (quoting Sukumar Report 4))[4] Conjoint analysis involves a survey in which respondents are asked "to make a series of trade-offs between different product features and prices." The object and result of conjoint analysis is to "determine the aggregated values customers attach to different features of a product." (Sukumar Br. 4 (quoting Sukumar Report 4–5)); Sukumar Opp. 4)

Dr. Sukumar holds an MBA and PhD in marketing and statistics. He identifies conjoint analysis, and in particular ASEMAP, as the appropriate tool to isolate the price premium solely attributable to the Energy Star logo. Conjoint analysis, he says, "is designed to value a specific product feature, even in circumstances where the feature's price is not expressly set by the manufacturer or retailer." (Sukumar Opp. 3; *see also* Sukumar Report 4–5) Here, the Washers possess many features of potential value to consumers; he identified 19 such features through a series of consumer focus groups. (Sukumar Opp. 5) Thus he settled on a specific form of conjoint analysis called Adaptive Self-Explication of Multi-Attribute Preferences ("ASEMAP"), because it is "specifically designed to be capable of handling surveys that incorporate a number of product features." Other forms of conjoint analysis, he reasoned, were inferior in this case because they performed less accurately than ASEMAP

---

[4]     The following abbreviations will be used to cite Dr. Sukumar's submissions and the briefing on the defendants' motion to strike his opinion testimony:

- "Sukumar Report" = Declaration and Expert Report of Dr. R. Sukumar, Dec. 28, 2015, Deckant Decl. Ex. R, ECF No. 215-18
- "Sukumar Rebuttal" = Rebuttal Expert Report of Ramamirtham Sukumar, Ph.D., Deckant Decl. Ex. S, ECF No. 215-19
- "Sukumar Br." = Brief in Support of Motion to Strike the Opinions of Dr. Sukumar by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 198
- "Sukumar Opp." = Plaintiffs' Opposition to Motion to Strike the Opinions of Dr. Sukumar by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 214
- "Sukumar Reply" = Reply Brief in Support of Motion to Strike the Opinions of Dr. Sukumar by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 228

in the literature, had not been subject to peer review, or are better suited to products with a smaller number of features than those identified here. (*Id.* 4–5; Sukumar Report 8–9)

Dr. Sukumar's analysis drew on an online survey of a random sample of 564 purchasers of washing machines. He compared the values for the Washers (represented as costing being $300 and $500) with and without the Energy Star logo to calculate, via ASEMAP, the value attributable to the logo alone. His analysis concluded that the logo had a value of $180.39, or "44.3% of the average clothes washing machine price of $406.99." (Sukumar Opp. 7; Sukumar Report 14–17). This result represented an average across the respondent sample and also takes into account differences in how individual respondents value a dollar. (Sukumar Opp. 6; Sukumar Report 14–16)

### 1) Objection to ASEMAP

The defendants specifically argue that ASEMAP is not a reliable methodology capable of satisfying *Daubert* because it is "a little-known proprietary method that is rarely used—if at all—outside [Dr. Sukumar's] own [consulting] firm." (Sukumar Br. 11) Additionally, the defendants argue, ASEMAP has been peer-reviewed in only one article, authored by its inventor. And even that article never specifically discusses the use of the ASEMAP methodology for determining "price premiums" (*Id.* 16). Defendants add that Dr. Sukumar's conjoint analysis cannot be replicated because ASEMAP is a proprietary methodology that employs an undisclosed algorithm. (*Id.* 14)

The plaintiffs respond generally that methodological criticisms of consumer surveys go to the weight of the evidence, not to its admissibility. (Sukumar Opp. 8–9). More specifically, they say that conjoint analysis is a "widely-accepted survey research method for measuring consumer preferences," as numerous courts have acknowledged. (*Id.* 9–10). The defendants' challenge to ASEMAP, they argue, is based only on the unsupported opinion of the defendants' expert Dr. Peter E. Rossi. (*Id.* 11) To

exclude Dr. Sukumar's testimony, then, would usurp the jury's prerogative to find one expert more persuasive than another. (*Id.* 11)

The plaintiffs point to other federal courts' acceptance of conjoint analysis, if not ASEMAP specifically, "as a valid method of estimating changes in market value for purposes of performing damage calculations in litigation." (*Id.* 12 (citing *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 (N.D. Cal. 2013) (defendant's challenge to conjoint surveys as fundamentally flawed and unreliable go to the weight of the survey rather than admissibility); *Microsoft Corp. v. Motorola Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) (conjoint analysis critiques went "to issues of methodology, survey design, reliability, and critique of conclusions, and therefore go to the weight of the survey rather than admissibility")).

The plaintiffs seemingly concede that that the only peer-reviewed journal article evaluating ASEMAP is one written by its inventor, Professor Srinivasan. That circumstance does not, however, detract from the article's validity in the plaintiffs' view. Professor Srinivasan is said to be "an undisputed expert in the conjoint analysis technique." (Sukumar Br. 15) Plaintiffs also seem to acknowledge that the article does not specifically discuss ASEMAP in relation to the calculation of price premiums. Nevertheless, they say, the article more generally demonstrates the ASEMAP method's external and predictive validity.

Plaintiffs also note that *Daubert* cites publication as a factor, but does not require or unduly stress it: "Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, . . . and in some instances well-grounded but innovative theories will not have been published . . . ." 509 U.S. at 593–94. Peer review aside, Dr. Sukumar states that he himself has employed ASEMAP extensively, both in and outside the context of litigation. Whether or not its accuracy has been established "exclusively through academic journals," ASEMAP has withstood the test of time without revealing significant flaws. (*Id.* 12)

As for replicability, the plaintiffs point out that although ASEMAP is proprietary, it is available to anyone who purchases a software license. Therefore, they say, the defendants could have independently verified or challenged Dr. Sukumar's opinions, but did not do so. If skeptical of the software itself, defendants could have moved to compel Dr. Sukumar to produce ASEMAP's confidential source code, but again they did not. The discovery they did request, they got: Dr. Sukumar directed defendants to a peer-reviewed publication that guides readers through ASEMAP, produced his complete worksheets and datasheets, and detailed the design and implementation of his survey methods in his expert report. (*Id.* 12–13)

I find the plaintiffs' arguments persuasive. Dr. Sukumar's reports are well-reasoned, and there is ample evidence that his methods are sufficiently testable and accepted in the relevant scientific community, as well as the legal community. Conjoint analysis has won acceptance from courts and legal commentators. *See, e.g., ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) (acknowledging that "marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences," and holding that conjoint analysis is sufficiently reliable to be used to calculate class-wide damages); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013) (in product mislabeling class action, determining that conjoint analysis is accepted in the relevant community and acknowledging "a handful of cases to demonstrate that conjoint analysis is increasingly used in litigation"); Sukumar Opp. 10–11 (collecting cases where experts' conjoint analysis was accepted).

ASEMAP, the proprietary form of conjoint analysis that Dr. Sukumar employs, is not specifically discussed in the case law, and according to the defendants, it boasts just one inventor-authored peer-reviewed article. (Dr. Sukumar's rebuttal report adds citations to two peer-reviewed articles in support of the claim that ASEMAP has "external and predictive validity."

11

(Sukumar Rebuttal 9))[5] In the case of a technique that is a variant of a known technique, however, "the relationship of the technique to methods which have been established to be reliable"—here, conjoint analysis—may be considered. *In re Paoli*, 35 F.3d at 791 n.8. *Daubert* itself recognized that "[s]ome propositions . . . are too particular, too new, or of too limited interest to be published." 509 U.S. at 593. Dr. Sukumar states, without effective rebuttal, that ASEMAP is simply a variant or an elaboration of the widely accepted conjoint analysis methodology. That proposition is corroborated by the fact that ASEMAP's inventor is Professor Srinivasan, who would know. Srinivasan has been recognized by federal courts as "coin[ing] the term 'conjoint analysis'," *TV Interactive Data Corp.*, 929 F. Supp.2d at 1020, and as the "father of conjoint analysis." *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-CV-10578, 2016 WL 5956325, at *2 (E.D. Mich. Oct. 14, 2016). According to plaintiffs, he has "authored 24 peer-reviewed research papers on the topic." (Sukumar Br. 15)

Dr. Sukumar states that ASEMAP has proven reliable outside of the context of litigation. It has been used in over 100 commercial studies and he has personally employed ASEMAP in "several commercial studies over the last 8 years" (Sukumar Report 6, 9). ASEMAP has also been acknowledged as reliable in legal scholarship, if not in the case law. *See* David Franklyn & Adam Kuhn, *The Problem of Mop Heads in the Era of Apps: Toward More Rigorous Standards of Value Apportionment in Contemporary Patent Law*, 98 J. Pat. & Trademark Off. Soc'y 182, 218–19 (2016) ("[A]dvances in research software, such . . . *Asemap, have made it much easier to design reliable indirect elicitation*

---

[5]    To the extent the defendants disagree that these articles validate ASEMAP, *see, e.g.*, Sukumar Br. 17 n.13 (arguing that one of the articles Dr. Sukumar cites in his rebuttal report never mentions ASEMAP), they are free to pursue this on cross-examination as a weakness impacting the weight of Dr. Sukumar's opinion. And, to the extent the defendants take issue with the fact that Dr. Srinivasan's peer-reviewed article does not specifically advocate ASEMAP as "a valid methodology for isolating a historic price premium," that too goes to weight, not admissibility. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) ("Rule 702 does not incorporate the common law *Frye* rule in which expert testimony is admissible only insofar as it is based on a technique generally accepted in the scientific community.").

*surveys.* These programs can present a series of 'bundled' features comprising a product and ask the respondent to choose the one they would be most likely to purchase. . . . *Reliable, objective data then coalesces around individual product feature valuations.*" (emphases added)).[6]

As for the defendants' ability to replicate Dr. Sukumar's ASEMAP analysis, *Daubert* explains that "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." 509 U.S. at 593. The Third Circuit refers to this consideration as requiring that an expert present a "testable hypothesis." *In re Paoli*, 35 F.3d at 791 n.8.

As defendants view this requirement, it seems to hinge on whether the opposing party has successfully replicated the proffered expert's results. (*See* Sukumar Br. 14–15) Surely that goes too far. Courts have interpreted *Daubert's* testing factor as one of replicability, not replication. *See, e.g., Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result."). To the extent defendants are arguing that they hold the keys to admissibility—*i.e.,* that this evidence cannot be admitted unless *they* have reproduced Dr. Sukumar's testing—I cannot accept their analysis. And at any rate, the defendants have never purchased a license, sought discovery of the source code, or shown any inclination to reproduce Dr. Sukumar's analysis. The mere possibility that they could do so, or that they believe their efforts to do so, if undertaken, would have been thwarted, does not detract from the testability or validity of Dr. Sukumar's conclusions.

---

[6]     Franklin and Kuhn discuss Professor Srinivasan's conjoint analysis in *TVI Data Corp.* at length. Their discussion indicates that Professor Srinivasan in fact used ASEMAP in that case, although the Court's opinion does not specifically identify that ASEMAP was used. *See* Franklin & Kuhn, *supra*, at 208 (citing Declaration of Dr. V. Srinivasan, *TVI Data Corp. v. Sony Corp.*, 2013 WL 496310 (N.D. Cal., Jan. 18, 2013)).

I am thus enjoined to consider whether Dr. Sukumar's methodology involves testing of a hypothesis that is testable. The Advisory Committee notes to Federal Rule of Evidence 702, for example, describe *Daubert*'s testing factor as asking "whether the expert's theory *can be* challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that *cannot reasonably be assessed* for reliability." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (emphasis added). To vary the terminology, ""Testability" has also been described as "falsifiability." A proposition is "falsifiable" if it is "capable of being proved false; defeasible."" *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citations omitted)).[7]

Of course a competing expert's performance of the same test under the same conditions would be highly probative. But we do not have that here. Rather we have contending results that are the product of contending methodologies.

At the *Daubert* stage, I am to assess the scientific *nature* of the challenged theory or technique, not to take a side in a debate among experts about the results. Here, I have already concluded that ASEMAP has a sufficient pedigree— *i.e.,* that it passes muster under the *Daubert* considerations of peer review, standardization, judicial and non-judicial acceptance, and its relationship to other established reliable techniques (particularly, the conjoint analysis technique of which it is a part). *See Paoli*, 35 F.3d at 791 n.8. I think these considerations, in addition to supporting the reliability of the method, tend to establish that ASEMAP is testable, in the sense of producing results susceptible of an objective challenge.

Dr. Sukumar's conclusion is that consumers attach a value, in the form of a price premium, to the Energy Star logo on the Washers. (*See* Sukumar

---

[7]    "Falsifiability," as a basis to distinguish science from non-science, is a term that has passed into general usage. It has its origin, so far as I am aware, in Karl Popper's philosophy of science. *See* Stanford Encyclopedia of Philosophy, "Karl Popper" § 7, https://plato.stanford.edu/entries/popper/#ScieKnowHistPred; *id.* "Scientific Method" § 3.3, https://plato.stanford.edu/entries/scientific-method/#PopFal.

Report 4) Defendants may attack that conclusion, employing ASEMAP or some alternative form of analysis. My point here is that it is *capable* of being tested.

Although the point is not critical to my analysis, Judge Brown's decision in *United States v. Ewell* suggests that defendants are making a category mistake in arguing that everything about Dr. Sukumar's software, as opposed to the ASEMAP methodology itself, must pass the *Daubert* test. 252 F. Supp. 2d 104 (D.N.J. 2003), *aff'd sub nom. United States v. Adams,* 189 F. App'x 120 (3d Cir. 2006). In *Ewell,* a criminal defendant challenged the government's use of specific materials kits for performing "PCR/STS typing" DNA analysis to identify the defendant. In an opinion admitting the evidence, Judge Brown explained:

> The hypothesis of PCR/STR DNA typing is that with proper procedures an expert can determine the allelic types of given DNA samples at the thirteen core STR loci. . . . The Court is not persuaded that the claimed lack of validation of the efficacy of the kits has any effect on whether PCR/STR typing has a testable hypothesis. Contrary to defendant's assertions, the . . . kits merely provide the materials necessary to perform the PCR amplification process, and thus, the kits need not independently meet the *Daubert* standard of admissibility. Accordingly, challenges as to the efficacy and reliability of the materials kits go to the weight of the evidence and not to admissibility.

252 F. Supp. 2d at 111.

But the government in *Ewell,* like the plaintiffs here, had a backup argument. It also offered a peer reviewed article attesting to the validity of the challenged kits. Judge Brown dealt with that backup argument as well:

> Moreover, even if the kits were independently subject to *Daubert,* defendant's argument is not well-founded. The Government produced as exhibit 7 a peer reviewed article reporting a study of various commercially available amplification kits. The article concludes, inter alia, that Profiler Plus and COfiler kits "can be used to amplify and type STR loci successfully from DNA derived from human biological specimens. The current study demonstrates that the procedures used

to type STR loci using these commercial kits are robust and valid."

*Id.*

Of course, the defendants *might have* attempted to dissect the ASEMAP source code as part of an attack on plaintiffs' case, but they have not done so. I do not think the results of such a dissection are a prerequisite to my ruling on admissibility. Dr. Sukumar's analysis remains falsifiable. Defendants may test his conclusions by comparing them to the choice-based conjoint method that their own expert, Dr. Peter Rossi, endorses in his critique of Dr. Sukumar's report, or by some other means. (*See* Rossi Report 34–35) I may even assume the validity of applying *Daubert* to the details of the ASEMAP methodology. For the reasons expressed above, that methodology, like the kits in *Ewell,* has sufficient support in scientific literature and practice, and it has not been effectively challenged.

In short, even assuming ASEMAP is as tethered to Dr. Sukumar's consulting business as the defendants allege, the plaintiffs have presented sufficient indicia of reliability to assure me that ASEMAP—both generally and as Dr. Sukumar applies it—is not so substantively flawed as to render Dr. Sukumar's opinions inadmissible. *See Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.,* No. CV113684SRCCLW, 2016 WL 3545529, at *5 (D.N.J. June 29, 2016) ("In the context of survey evidence, 'mere technical flaws' in methodology go to 'the weight accorded a survey, not its admissibility.'" (quoting *Fancaster,* 832 F. Supp. 2d at 402)). ASEMAP's shortcomings, whatever they may be, are fodder for cross-examination.

### 2) Criticisms of Survey Methodology, Population, and Results

Defendants' main contention is that Dr. Sukumar's conclusions flunk the reality test. According to the defendants, most washers, whether they boasted an Energy Star logo or not, cost more than $400 during the relevant time period. Subtracting Dr. Sukumar's calculated $180 Energy Star price premium from the prevailing price of a washing machine, however, yields an

16

unrealistically low price in the range of $120 to $227. (Sukumar Br. 17–21; Sukumar Reply 6) Thus, say the defendants, Dr. Sukumar's analysis cannot be correct, and must be the product of an unreliable methodology. (*Id.*)

One cause, or perhaps a symptom, of that unreliability is said to be Dr. Sukumar's exclusion of more than 70% of his survey respondents (in particular, "Price Reversal" respondents[8]) from his sample. Were those responses considered, say defendants, Dr. Sukumar's estimated price premium would have been even more absurdly high. They point out that the plaintiffs have failed to "cite a single case in which a court admitted a survey despite the expert's exclusion of the majority of data." (Sukumar Br. 21–22; Sukumar Reply 7) The defendants also object to Dr. Sukumar's choice to survey consumers who had recently purchased high-efficiency ("HE") washing machines, which allegedly cost hundreds of dollars more than the Washers at issue. (Sukumar Report 22–25)

Responding to the defendants' claims that the $180 price premium defies market reality, the plaintiffs explain that conjoint analysis often assigns values to individual attributes which, if added together, would exceed the value of the product. Dr. Sukumar's exclusion of Price Reversal data, they say, is a technique that the defendants' own expert, Dr. Rossi, supports. It also results in a more conservative price premium estimate, draws from a higher quality respondent pool, and has been used in prior cases. (*Id.* 18–19 (citing Sukumar Rebuttal at 12–13))

For Dr. Sukumar's selection of his survey population, the plaintiffs offer a laundry list of explanations: Dr. Sukumar employed a widely-used online marketing tool; screened respondents to ensure representativeness of the putative class (i.e., household decision-makers who purchased washing machines); conducted the type of survey routinely used and accepted in

---

[8]    Dr. Sukumar excluded from his data set the answers of respondents who seemingly preferred higher prices to lower prices.

litigation; and the defendants' technical criticisms go only to the weight of Dr. Sukumar's testimony. (Sukumar Opp. 18–22)

Here, I am guided by the principle that *Daubert* is essentially results-agnostic. "[I]n deciding whether an expert's report meets the reliability factor of a *Daubert* and Rule 702 analysis, [this] Court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein." *Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002). In most respects, the defendants' contentions amount to attacks on the expert's conclusions. They cannot be refashioned into *Daubert* attacks by the facile method of saying that such unlikely results could only have been the product of unscientific methods. Such arguments go to the weight of the expert's testimony, not to its admissibility.

The thrust of the challenge here is that Dr. Sukumar excluded from his data set the answers of respondents who seemingly preferred higher prices to lower prices. This is asserted as a challenge to the reliability of ASEMAP. (*See* Rossi Report 30 ("Dr. Sukumar excludes more than 70 perfect of his respondents from his WTP computations. It seems that the ASEMAP procedure and the survey designed by Dr. Sukumar cannot produce data that accord with the common sense notion that people prefer lower prices to high prices. In my opinion, this casts grave doubt on the reliability and usefulness of Dr. Sukumar's survey data.")) Ironically, defendants attack the exclusion of responses on the grounds that including them would result in a *higher* price premium—indeed, one that would be self-evidently too high, and call the whole enterprise into question.

As defendants see it, this would be a case of what statistical wags have called "torturing the data until it confesses."[9] It may alternatively be viewed,

---

[9]     Some version of the expression has been credited to economist Ronald Coase, and to Darrell Huff's classic *How to Lie With Statistics* (1954). If one posits a hypothesis, gathers data, discards all data that does not comply with the hypothesis, then QED, the hypothesis will be proven. That abusive practice, however, must be distinguished from the common and valid practice of eliminating junk from the data set.

however, as the implementation of a methodological assumption—one that surely may be challenged on cross-examination, but not an unreasonable one. As I understand Dr. Sukumar's selection process, it presupposes that what we are measuring are consumer choices rationally based on price. If that assumption is accepted, then his claim (I exaggerate to illustrate a point) is that he has done the equivalent of throwing out ballots voting for both candidates, or recording a vote for Mickey Mouse. Looking at it from another perspective, we might say that scientific methods are being applied to the expressed preferences of consumers who are not always entirely rational or analytic about their choices (or their responses to surveys). In short, we are building with crooked timber, but build we must. Whether the resulting structure is too rickety to withstand the wrecking ball of cross-examination is a separate question.[10]

I agree with plaintiffs that the defendants' arguments here largely depend on disagreement with Dr. Sukumar's conclusions. Such substantive disagreement is not the correct focus of a *Daubert* motion. *Jama v. Esmor Corr. Servs., Inc.*, No. 97-3093 DRD, 2007 WL 1847385, at *27 (D.N.J. June 25, 2007) ("The Supreme Court in *Daubert* has stated that the focus of the inquiry should be solely on principles and methodology, not on the conclusions that they generate." (citing *Daubert,* 509 U.S. at 596)).[11]

---

[10]     For example, plaintiffs' statement that conjoint analysis often assigns values to individual attributes which, if added together, would exceed the value of the product, seems to be more of a restatement of the defendants' criticism than an answer to it. That consumers' valuations of the product's features add up to more than 100% may be a fertile area for cross-examination or rebuttal. But the fact that not all consumers do the necessary math does not mean that their expressed preferences have no validity; I take it as a given that their preferences, ill-considered or not, are what we are measuring when we do conjoint analysis. Thus these are not grounds for *Daubert* exclusion, in my view.

[11]     For the proposition that courts will exclude a survey where the majority of data has been excluded, defendants cite *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 517 n.14 (3d Cir. 1998). There, however, the Third Circuit merely discussed in dicta why it believed the district court had been wrong to admit a survey under Fed. R. Evid. 803(24) (now Fed. R. Evid. 807(a)), which permits hearsay where there are "circumstantial guarantees of trustworthiness" based on "accordance with

The defendants remain free to argue that Dr. Sukumar manipulated his data to produce a more plausible result, inappropriately excluded data from respondents who "prefer higher prices to lower prices and [therefore] don't value the Energy Star logo at all," or drew from a minority population not representative of the putative class.[12] The issue now, however, is not one of the opinion's ultimate persuasiveness, but of its admissibility. "The judge should only exclude evidence if the flaw is large enough that the expert lacks good grounds for his conclusion." *Jama*, 2007 WL 1847385, at \*27 (citation and internal quotation marks omitted). *See also Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) (declining to exclude Dr. Sukumar's opinion based on claims that his survey was unreliable and used a non-representative sample because "[t]echnical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." (quoting *Fortune Dynamic v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1038 (9th Cir.2010)); *Hartle v. FirstEnergy Generation Corp.*, No. CIV.A. 08-

---

generally accepted . . . principles." This standard is not identical to the *Daubert* standard. Regardless, the *Brokerage Concepts* court explained that the challenged survey in that case involved calling and posing questions to just 20 people, used improper framing of questions, and excluded data without any statistical basis for doing so. The entire survey in that case suffered from significantly more egregious flaws than those the defendants claim here.

[12]    Defendants cite cases finding surveys inadmissible, but those surveys had significantly greater, and less debatable, flaws. *See Pittsburgh Press Club v. United States*, 579 F.2d 751, 759 (3d Cir. 1978) (survey excluded as hearsay because it "was not scientifically designed," respondents were all interested in the litigation and "told the precise nature of the litigation and the purpose of the survey," and therefore the survey "suffer[ed] from a severe dearth of any circumstantial guarantees of trustworthiness."); *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 372 (D.N.J. 2002) (survey to determine whether trademark was descriptive excluded, in part, because it was directed to consumers at a shopping mall even though the product was sold only to commercial distributors in the market); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) (survey held unreliable where, among other flaws, the "'universe' of potential respondents consisted entirely of individuals and companies that [the expert] knew through his work as a journalist," and the expert "did not make any attempt to select a sample to approximate the relevant characteristics of the target population.").

1019, 2014 WL 1317702, at *6 (W.D. Pa. Mar. 31, 2014) (excluding a "fundamentally flawed" survey that "would not give the jury a proper basis for determining damages," but declining to exclude a survey suffering only from "errors of a technical nature that go to the weight of the survey").

Dr. Sukumar proffers what he plausibly characterizes as "good grounds" for his population and sample selection.[13] (Sukumar Opp. 18–22; Sukumar Rebuttal Report 7–8, 12–15) To the extent defendants do not accept his contentions, I direct them to "the traditional and appropriate means of attacking shaky but admissible evidence": "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. If Dr. Sukumar could be shown to have selected a misleading sample, to have achieved results that add up to more than 100%, or to have implied a counterintuitively low price for a non-Energy Star washer, that might prove harmful to the plaintiffs' case. Such issues, however, are for the finder of fact.

### 3) *Whether Dr. Sukumar's Price Premium Analysis Fits the Facts of the Case and Plaintiffs' Theory of Liability*

The final error the defendants assign to Dr. Sukumar's opinions is that his results do not "fit" the facts of the case or the putative class's particular theory of liability. Therefore, the defendants urge, Dr. Sukumar's opinions are inadmissible under *Daubert* and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013). (Sukumar Br. 25–28)

Specifically, the defendants argue that Dr. Sukumar's price premium only measures respondents' subjective "willingness to pay" for the Energy Star logo, and not "what retailers actually charged putative class members in 2009

---

[13]   *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.").

and 2010 for the logo on the Washers in this case." (Sukumar Br. 26) Framed differently, the defendants' argument is that the plaintiffs' theory of liability properly rests on "the amount that Defendants actually charged purchasers when they bought their Washers in 2009 and 2010, while Dr. Sukumar's 'price premium' focuses on the 'value' that respondents placed on the logo in 2015." (Sukumar Reply 9) Those values, say the defendants, are not at all the same thing.

The defendants also protest Dr. Sukumar's failure to subtract from his price premium any offsetting benefits, such as rebates or utility savings (even if those benefits were not as great as a fully Energy Star-qualified washing machine would have yielded). (Sukumar Br. 29) The defendants point to deposition testimony in which Dr. Sukumar admitted that the Energy Star logo is a reflection of efficiency. If Dr. Sukumar's price premium encompasses both the value of the logo and the value of the utility savings from greater efficiency, the defendants argue, then he should have offset those efficiency-based benefits. Citing *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 579 (C.D. Cal. 2014), and *In re POM Wonderful LLC*, No. ML 10-02199 DDP (RZx), 2014 WL 1225184, at *5 & n.7 (C.D. Cal. Mar. 25, 2014), the defendants conclude that the "price premium" is not merely what the Energy Star logo promised, but rather what the Energy Star logo promised *and* did not deliver. Otherwise, they say, the price premium as calculated by Dr. Sukumar would not meet *Daubert*'s "fit" requirement. (Sukumar Reply 11–12)

The plaintiffs respond, first, that Dr. Sukumar's opinion meets defendants' objection by incorporating "supply side" factors (here, retail market prices) into his analysis. Those supply-side factors include "actual sales data and advertising circulars from retailers who sold the Maytag Centennial clothes washing machines to determine the price paid by actual purchasers." (Sukumar Opp. 23 (quoting Sukumar Report at 6)). Thus, say plaintiffs, Sukumar did consider what retailers actually charged putative class members. (*Id.*)

Second, the plaintiffs respond that Dr. Sukumar did not need to subtract benefits received from his price premium, because such benefits were baked into the survey questions. Dr. Sukumar's survey asked respondents to compare Maytag washing machines with and without an Energy Star logo, with all other factors held constant. (*Id.* 25) Thus the survey was designed to isolate the value consumers attached *solely* to the Energy Star logo. (*Id.*)

The plaintiffs' explanations are not entirely persuasive, but there is a more fundamental issue. The parties are talking past each other. Essentially, the plaintiffs are talking about *Daubert* "fit"; the defendants, about *Comcast* "fit." At this early stage of the case, *Comcast* "fit" is a premature consideration.

> a) *Comcast* versus *Daubert*

In *Comcast*, the Supreme Court held that a putative class failed to satisfy Rule 23(b)(3)'s predominance requirement, which requires that the putative class's damages can be calculated on a class-wide basis. The Court found that the model proposed by plaintiffs' expert "failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised." *Comcast Corp.*, 133 S. Ct. at 1433. That damages model was built on the expert's assumption that the defendants' antitrust violations had distorted the market and impacted prices in four different ways. By the time the trial court ruled on certification, however, only one theory of antitrust impact had survived. *Id.* at 1434. The district court set that aside: it "saw no need for respondents to 'tie each theory of antitrust impact to a calculation of damages,'" *id.* at 1433 (internal quotation marks omitted). The Court of Appeals, affirming, "concluded that respondents 'provided a method to measure and quantify damages on a classwide basis,' finding it unnecessary to decide 'whether the methodology [was] a just and reasonable inference or speculative.'" *Id.*

The Supreme Court reversed, explaining that "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event.*" *Id.* at 1435 (quoting Federal

23

Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011) (emphasis added)). The Supreme Court held that the District Court and the Court of Appeals had bypassed that mandatory first step. *Id.*

*Daubert*'s "fit" test for admissibility, however, is not so stringent, and it precedes the "first step" [*sic*] discussed in *Comcast. Daubert* instructs that for expert testimony to "fit" the case, it simply must bear enough of a relation to the facts and issues of the case to be of aid to the jury in resolving a dispute of fact. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S. Ct. 2786, 2795–96 (1993). As the Third Circuit has explained:

> In assessing whether an expert's proposed testimony "fits," we are asking " 'whether [the] expert testimony proffered ... is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Id.* (*quoting United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). Put another way, this is a question of relevance, and "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility" if it has the "potential for assisting the trier of fact." *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir.1997) (*citing Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777, 780 (3d Cir.1996)); *see also In re TMI Litig.,* 193 F.3d 613, 670 (3d Cir.1999) ("expert evidence which does not relate to an issue in the case is not helpful"). The "standard is not that high," but "is higher than bare relevance." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir.1994).

*United States v. Schiff,* 602 F.3d 152, 173 (3d Cir. 2010).

The defendants would have me conclude that *Comcast* adds a layer of complexity to the *Daubert* admissibility determination.[14] Neither the Third Circuit nor courts within this district have read *Comcast* that way. Rather, they have distinguished the manner in which the court *admits* opinion evidence under *Daubert* and the manner in which the court *weighs* such evidence when

---

[14]    *See* Sukumar Br. 26–27 & n.20 (arguing that Dr. Sukumar's price premium cannot establish "an absolute valuation to be awarded as damages" because it does not incorporate market supply and that this argument is "relevant to both the Rule 23 inquiry and to whether Dr. Sukumar's testimony meets *Daubert*'s "fit" requirement).

assessing predominance under *Comcast. See, e.g., In re Urethane Antitrust Litig.,* 166 F. Supp. 3d 501, 510 (D.N.J. 2016) ("*Comcast* is of dubious relevance because it involves predominance issues arising in the Rule 23 context, whereas the instant matter concerns whether expert testimony is reliable and relevant under Rule 702.").[15]

In *In re Blood Reagents Antitrust Litigation,* the Third Circuit joined other Courts of Appeals in holding that "a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert.*" 783 F.3d 183, 187 (3d Cir. 2015). That language necessarily implies that the *Daubert* issue is prior, and that class certification is separate and distinct. *See id.* at 184 (presenting as separate issues on appeal (1) whether Rule 23 requires that challenged expert testimony be scrutinized under *Daubert* and (2) whether class certification was proper in light of *Comcast*). Of course, if the expert opinion is inadmissible under *Daubert,* it will not be considered in the *Comcast* analysis. *See id.* at 187 ("Expert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied.").[16] The clear takeaway from *In re Blood Reagents* is that

---

[15]    In fact, The Third Circuit has explained that *Comcast* turned on "a straightforward application of class-certification principles," *Neale v. Volvo Cars of N. Am., LLC,* 794 F.3d 353, 374 (3d Cir. 2015) (quoting *Comcast,* 133 S.Ct. at 1433), and does not change the "well nigh universal" recognition "that individual damages calculations do not preclude class certification under Rule 23(b)(3)." *Id.* (quoting *Comcast,* 133 S.Ct. at 1437 (Ginsburg, J. & Breyer, J., dissenting)) (collecting Court of Appeals cases reading *Comcast* similarly). *See also City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.,* No. CIV.A. 12-5275, 2015 WL 5097883, at *7 (D.N.J. Aug. 31, 2015) ("[C]lass treatment would still be appropriate here even if damages were required to be calculated on an individual basis."). The Third Circuit also explicitly cautioned that *Comcast*'s "predominance analysis was specific to the antitrust claim at issue." *Neale,* 794 F.3d at 374.

[16]    Indeed, *In re Blood Reagents* remanded for the trial court to consider the Supreme Court's then-recent decision in *Comcast.*

25

*Comcast* presents questions for the class certification stage that are distinct from, and logically posterior to, the *Daubert* analysis.

    b)  Defendants' reliance on *Comcast* is premature, if not entirely misplaced

On this motion, I am still at the *Daubert* gatekeeping step. I am deciding what opinion evidence is admissible for purposes of, *inter alia,* the class certification inquiry. It follows that questions of "fit" under *Comcast* are premature. Now, I must consider the reliability of an expert's opinion or whether it sufficiently relates to the facts and issues of the case (*Daubert* "fit"). Only later do I consider whether the expert's damages model comports with the plaintiffs' theory of liability, or with the type of damages legally available (*i.e.,* *Comcast* "fit," assuming it applies at all outside of the antitrust context).

That two-step approach is illustrated by the first of the two cases upon which defendants chiefly rely, *In re ConAgra Foods, Inc.,* 90 F. Supp. 3d 919 (C.D. Cal. 2015), *aff'd,* 844 F.3d 1121 (9th Cir. 2017), and No. 15-55727, 2017 WL 53421 (9th Cir. Jan. 3, 2017). There, the United States District Court for the Central District of California considered a price premium damages methodology proposed by the plaintiffs' expert (Colin B. Weir, as it happens). The court had little trouble finding Mr. Weir's methodology admissible under *Daubert*: "Admissibility turns on whether Weir's methodology is sufficiently reliable," the court wrote, and it found that the price premium methodology passed that test. *Id.* at 946. But, the court cautioned, "whether [the price premium methodology] satisfies *Comcast* and shows that a class should be certified is another question altogether—one which the court will address *infra*

---

*See also City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.,* No. CIV.A. 12-5275, 2015 WL 5097883, at *3 (D.N.J. Aug. 31, 2015) ("Courts are also frequently called upon to consider expert opinion offered to support or oppose class certification. Where an expert opinion is critical to class certification and a party challenges the reliability of that opinion, the reviewing court must engage in a two-step analysis before analyzing whether Rule 23's requirements have been met: (1) whether the party's challenges bear upon 'those aspects of [the] expert testimony offered to satisfy Rule 23' and (2) if so, whether the opinion is admissible as to those aspects under Federal Rule of Evidence 702 and *Daubert*." (citations omitted)).

in conducting a Rule 23(b)(3) predominance analysis." *Id.* Later in its opinion, the court performed that *Comcast* "fit" analysis. It held that Weir's methodology was not sufficient, on its own, to define classwide damages under Rule 23(b)(3) because it did not "isolate[] and quantif[y] damages associated with plaintiffs' specific theory of liability." 90 F. Supp. 3d at 1024. What *ConAgra* did *not* hold is that an expert opinion should be held to flunk *Daubert* because it flunks *Comcast*—quite the opposite, in fact.

The second of the two cases upon which defendants chiefly rely is *In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014). There, the court applied *Comcast* to find that an expert's price premium model could not satisfy Rule 23(b)(3), explaining: "Rather than draw any link between Pom's actions and the price difference between the four-juice average benchmark price and average Pom prices, the Price Premium model simply calculates what the price difference was. This damages 'model' does not comport with *Comcast*'s requirement that class-wide damages be tied to a legal theory . . . ." Again, however, the essence of the holding is not a *Daubert* admissibility analysis, but a *Comcast* "fit" analysis.[17]

---

[17]     It must be said, however, that *POM Wonderful* did not so clearly distinguish between the standards and purposes of *Daubert* and *Comcast*. It analyzed and rejected class certification, but also stated, in a footnote: "For these *and related reasons*, [the expert's] report and testimony are not admissible under *Daubert* . . . ." 2014 WL 1225184, at *6 (emphasis added). The opinion rested on the complete disconnect between the proffered damages model and the facts of the case. *See id.* at *5 (noting that the damages expert presented no "survey or other evidence of what consumers' behavior might otherwise have been," and "made no attempt, let alone an attempt based upon a sound methodology, to explain how Defendant's alleged misrepresentations caused any amount of damages."). In such a clear case, it was perhaps less critical to distinguish between the two, accounting for the throwaway *Daubert* analysis in a footnote.

*See also In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119–1122 (C.D. Cal. 2015) (on class certification motion, expert's analysis did not satisfy *Comcast* and Rule 23(b)(3) because they "provide[d] only a model for testing what a consumer is willing to pay, without considering other factors in a functioning marketplace," whereas only restitution damages (the difference between the product as labeled and the product as received) were recoverable under statute); *In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-428-JFW (JEMX), 2016 WL 787415, at *9 (C.D. Cal. Feb. 2, 2016) (declining to strike, under *Daubert*, plaintiffs' expert's opinions

Here, whether the plaintiffs' proposed damages model and its underlying methodologies (such as Dr. Sukumar's price premium) fit the plaintiffs' theory of liability will depend on as-yet-undetermined issues. Among these are likely to be a determination of the type of damages recoverable for breach of express warranty and the implied warranty of merchantability, unjust enrichment, and violation of consumer protection statutes under the laws of various states. For these and other reasons, a final *Comcast* determination of "fit" for purposes of class certification would be premature. What I have decided here is that Dr. Sukumar's opinion is admissible under *Daubert* and therefore will go into the mix when I do decide the class certification issues.

To summarize, Rule 702 permits a wide range of testimony as long as the expert is qualified and the testimony is reliable and relevant. Dr. Sukumar's opinion testimony, and its supporting methodologies, are sufficiently reliable and relevant to be admitted into evidence for consideration at the next stage of this case—a motion for class certification under Rule 23. Thereafter, the defendants will have the opportunity to address their concerns with Dr. Sukumar's opinions through traditional methods of presentation of their case, including cross-examination and rebuttal evidence. Accordingly, the defendants' motion to exclude Dr. Sukumar's opinions will be denied.

## C.   Defendants' Motion to Strike the Opinions of Dr. Dennis

The defendants argue that the plaintiffs' other price premium expert, Dr. Dennis, also used methods that flunk the *Daubert* test. The defendants raise three broad arguments and several sub-arguments as to why I should strike Dr. Dennis's opinions for lack of "fit." I first describe Dr. Dennis's method of analysis, and then address defendants' arguments.

---

on the basis of alleged flaws in conjoint analysis and regression analysis, but concluding, under *Comcast* that Rule 23(b)(3) could not be satisfied because "Plaintiffs have not proffered a model capable of calculating damages on a classwide basis . . . ."); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2014 WL 976898, at *13 (N.D. Cal. Mar. 6, 2014) ("Here, of course, the Court is not addressing a *Daubert* challenge.").

*1) Dr. Dennis's Analysis*

Dr. Dennis surveyed 1,122 people who had purchased top-loading washing machines in the United States since 2009. (Dennis Opp. 1; *see generally* Dennis Report.)[18] The method employed by Dr. Dennis is called contingent valuation, an "approach based on the direct elicitation of [] values from individuals through the use of carefully designed and administered sample surveys." (*Id.* (quoting Kenneth Arrow, *et al.*, *Report of the NOAA Panel on Contingent Valuation* (Jan. 11, 1993) ("NOAA Report"), Deckant Decl. Ex. I, ECF No. 215-9)). Dr. Dennis's surveys purportedly measured "respondents' valuations of products that are identical in all respects except for the presence of absence of the Energy Star® logo," and "controlled for all other variables to isolate the price premium solely attributable to the Energy Star® logo." (Dennis Opp. 1) Dr. Dennis's initial report discusses his contingent valuation and its results. His initial report also summarizes the results of Whirlpool's own consumer research on the Energy Star logo. (*See* Dennis Report ¶¶ 44–49) Dr. Dennis also submitted a rebuttal report defending his contingent valuation

---

[18]    The following abbreviations will be used to cite Dr. Dennis's submissions and the briefing on the defendants' motion to strike his opinion testimony:

- "Dennis Report" = Declaration and Expert Report of J. Michael Dennis, Ph.D, Deckant Decl. Ex. F, ECF No. 215-6
- "Dennis Rebuttal" = Rebuttal Expert Report of J. Michael Dennis, Ph.D., Deckant Decl. P, ECF No. 215-16
- "Dennis Br." = Brief in Support of Motion to Strike the Opinions of Dr. J. Michael Dennis, Ph.D. by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 199
- "Dennis Opp." = Plaintiffs' Opposition to Motion to Strike the Opinions of Dr. J. Michael Dennis, Ph.D. by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 213
- "Dennis Reply" = Reply in Support of Motion to Strike the Opinions of Dr. J. Michael Dennis, Ph.D. by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 229

methodology against the criticisms of defense expert Dr. Carol A. Scott. (*See* Dennis Rebuttal.)

The defendants do not dispute that Dr. Dennis is appropriately qualified and credentialed. He is currently a Senior Vice President of the National Opinion Research Center at the University of Chicago. He has "been personally involved in the design and conduct of over a hundred statistical surveys using the internet mode of data collection," including for several United States federal agencies and in at least six prior litigations. (Dennis Opp. 3–4 (citing Dennis Report ¶¶ 4, 6–7))

### 2) Objection to selection of contingent valuation method

First, the defendants argue that Dr. Dennis's opinions should be excluded because he should not have opted for this contingent valuation methodology at all. Contingent valuation, say the defendants, is a second-best method that should be used only when objective indicia of market value, such as prices actually paid for "market goods," are not available. Dr. Dennis himself, they say, generally agrees with this principle. (Dennis Reply 3)

Here, the defendants say, objective market data are available: The "C500" model Maytag washing machine (which retailed at a higher price, on average, than the Washers) was a comparable washing machine that did not bear the Energy Star logo. (Dennis Br. 10–12; Dennis Reply 6). Therefore, in lieu of theorizing, Dr. Dennis should have simply analyzed the comparable C500 sales data, which show what consumers *actually* paid during the relevant time period for a similar washing machine without the Energy Star label.

The plaintiffs respond that the C500 machine is not comparable. In their brief, they say that there are many differences between the Washers and the C500, and that those differences would confound the price premium analysis. (Dennis Opp. 10) All very well, say defendants, but Dr. Dennis did not himself perform such an analysis, did not determine whether the non-Energy Star washer was a comparable "market good," and therefore did not choose the

contingent valuation methodology "based on his reasoned determination that the [C500] was not sufficiently similar." (Reply 5)

I recognize the origin and purposes of the contingent valuation method. It was developed as a means of assigning a dollar value to what are obviously non-market goods, *i.e.*, things that are not bought and sold, such as the preservation of a wilderness area. In lieu of consumers' "revealed" preferences (*i.e.*, what they actually pay for a market good), contingent valuation relies on consumers' "stated" preferences (*i.e.*, what they say a good is worth to them). Saying is not paying, and that suggests some of the possible shortcomings of the stated-preference approach. It costs a survey respondent nothing to say $0 or $1 billion, to ignore tradeoffs or income constraints, to register a protest ("bankruptcy is too good for any company that put the wrong label on my purchase"), and so on. The potential pitfalls, and techniques for minimizing or avoiding them, are discussed more formally in the seminal NOAA Report, Sections II & III. (A copy is attached to defendants' papers. (ECF no. 215-9))

My task here, however, is not to identify the best methodology and exclude all others, but rather to determine whether contingent valuation is a reasonable, reliable methodology. *See Lentz v. Mason*, 32 F. Supp. 2d 733, 746 (D.N.J. 1999). The facts and case law before me establish that it is.

Dr. Dennis's report bespeaks a thorough familiarity with the contingent valuation method and its limitations. Asked if contingent valuation would be an appropriate approach even if he knew that the C500 model was comparable, Dr. Dennis opined that the "contingent valuation approach would still be a reliable tool . . . .because . . . .[it] . . . has a powerful ability to isolate the value that consumers and purchasers place on particular attributes . . . ." (Dennis Dep. 67:12–68:3)[19] Contingent valuation is a tool long used by the federal

---

[19]   Defendants dispute that the distinctions between the C500 and the Washers would bear on the price comparison in any relevant way. (*Id.*) For the reasons expressed in text, this is not critical to the *Daubert* analysis, but I do find the defendants' attempt to minimize the distinctions between the C500 and the Washers to be unclear and undeveloped.

government. (*See* Dennis Opp. 2–3) Courts have accepted it as a sufficiently reliable basis to estimate the economic impact of alleged product defects or labeling misrepresentations in consumer class actions. *See, e.g., Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) (stating "numerous courts, including this one, have accepted both [Choice-Based Conjoint Analysis] and [Contingent Valuation Method] as reliable methodologies for calculating price premiums on a classwide basis in consumer class actions," and collecting cases); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prod. Liab. Litig.*, No. MDL 10-02172-CJC, 2012 WL 4904412, at *4 (C.D. Cal. Sept. 20, 2012) (finding contingent valuation admissible to estimate damages arising from an anti-lock braking system defect, and explaining that the "proposed methods of analysis, *i.e.* hedonic regression, contingent valuation, and discrete choice, are generally accepted, have been tested, and are part of peer-reviewed studies.").[20]

---

For example, citing no case law or expert testimony, the defendants assert that whether a washing machine features an "end of a cycle signal" is a "distinction[] without a difference." (Dennis Reply 5) They also argue that certain distinguishing features the plaintiffs identify "would have resulted in the C500 costing <u>less</u> than the labeled version of the Washer, not more, meaning that the market prices charged for the two machines should have shown an even larger price premium than Dr. Dennis's methodology predicted." (Dennis Reply 5) (emphasis in original) But as an example of this argument, they state that "the larger capacity of the C500 is a desirable feature that should have resulted in a <u>higher</u> price." (*Id.*) (emphasis added).

[20]    The defendants argue that in the few cases in which courts have accepted contingent valuation, the product in question contained an undisclosed defect. On that basis, the proponent of contingent valuation argued that the subject of the survey was actually a "nonmarket good" in the sense that no market existed in which consumers had purchased the product without the defect. (Dennis Br. 12–13). The plaintiffs' argument here is more debatable; they must acknowledge that there is a market for non-Energy Star washers, but they contend that none of them are truly comparable to the Washers at issue. (Dennis Opp. 10–11) Defendants' counterargument is based on the opinion of their own expert, Dr. Carol Scott. (*See, e.g.*, Expert Report of Carol A. Scott, Ph.D., April 26, 2016, Deckant Decl. Ex. L ¶¶ 53, 71–74) The dispute raises a factual question going to weight, not admissibility. *See Hartle*, 2014 WL 1317702, at *7 (W.D. Pa. Mar. 31, 2014) ("A factual disagreement between experts is a matter for the jury to resolve." (citing *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1216 (3d Cir. 1993)).

Granted, some courts have rejected contingent valuation studies where they cannot be used to reliably measure damages, or where the study proposed is too vague. In *Miller v. Fuhu Inc., supra*, for example, a contingent valuation study (Dr. Dennis's, as it happened) proposed for the purpose of quantifying the economic impact of handheld tablets' defective charging systems, was excluded under both *Daubert* and Rule 23. There, the court found, Dr. Dennis had done nothing but sketch out a plan for conducting a contingent valuation survey to measure the hypothetical sale price of a product if it had not been defective. 2015 WL 7776794, at *21. But the *Miller* court did not rule out a properly conducted contingent valuation survey. Rather, it stated that, on a renewed motion to certify, the "proposed methodology could, in theory, provide a legally justifiable measurement for classwide damages," if the plaintiffs "provided more concrete details regarding [Dr. Dennis's] proposed survey." *Id.* at 22.

Here, in contrast, Dr. Dennis is not merely proposing to do a vaguely described survey. His opinions are based on a fully completed contingent valuation survey and data analysis, both of which are described in detail in his expert report. The concerns raised in *Miller* are not present in our case.

As with Dr. Sukumar, the defendants have stated a disagreement with the results of Dr. Dennis's analysis, and tried to work back from there to a *Daubert*-based exclusion of his opinion. As I see it, their argument relies on disputed facts and differences of opinion bearing primarily on the persuasive weight a jury might assign to Dr. Dennis's analysis. *See, e.g., Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 391 (3d Cir. 2016) *appeal docketed*, No. 16-928 (U.S. Jan. 26, 2017) ("disagreement with the calculation methodology and the underlying assumptions . . . goes to the weight given to [an expert's] testimony, rather than admissibility."); *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138–39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."); *Lentz*, 32 F. Supp. 2d at 746 (for

33

"testimony to be reliable, and, thus, admissible under *Daubert,* [the expert] need not have used the best method available, only a reasonable one. Moreover, the Defendants are free to challenge [the expert's] methodology on cross-examination and in their closing arguments.").

Contingent valuation is a reasonable methodology. I decline to exclude Dr. Dennis's opinions on the basis of his having used it.

### 3) Criticisms of Survey Methodology, Population, and Results

The defendants also assign a number of errors to Dr. Dennis's application of the contingent valuation method, and to his analysis of data. They aver that Dr. Dennis's contingent valuation measures only consumers' stated "willingness to pay" a premium for the Energy Star logo—a concept not equivalent to what the putative class members actually paid. Relatedly, they argue that Dr. Dennis failed to subtract offsetting actual benefits or to account for supply-side factors that affected what putative class members actually paid for their Washers. The defendants add that Dr. Dennis surveyed consumers in 2015, but the putative class members purchased their Washers under the different economic and competitive conditions that prevailed in 2009 and 2010.

The plaintiffs deny that what Dr. Dennis has offered is merely a "willingness-to-pay" calculation. Willingness to pay, they say, is a theoretical concept untethered to marketplace data. A survey based on this concept might simply consist of asking respondents, "How much are you willing to pay for X?" Such an informal, qualitative, and unanchored survey might raise reliability concerns. But here, the plaintiffs emphasize, Dr. Dennis's survey presented respondents with the actual prevailing $400 market price for the Washers, a real-world price that necessarily incorporated supply and demand factors. (Dennis Op. 7, 12–13) The plaintiffs add that Dr. Dennis "worked closely with an expert economist" to ensure that his survey design took into account both supply-side and demand-side factors. (Dennis Opp. 1)

The defendants reply, in effect, that Dennis is attempting the impossible: a one-sided comparison. A valid contingent valuation, they say, would have to

"account for the impact of supply-side factors . . . . on the price of the Washer <u>relative to the price of the unlabeled version of the Washer</u>, and [Dr. Dennis] [would] need[] an accurate measure of the price of both to identify any alleged price premium." (Dennis Reply 8) (emphasis in original). In reality, they say, "intense market competition for similarly-priced Energy Star top-loaders drove down prices for that category of machines and eliminated any potential price premium for the Washers as compared to the unlabeled C500 version." (*Id.*)

As for the timing issue, the plaintiffs point out that Dr. Dennis testified that his 2015 survey is a reliable and valid measurement for washing machine purchases for the entire 2005–2015 time frame. The Energy Star label, he stated, has had "such a remarkable hold on the consumer mind–and it's been that way for a significant period of time . . . ." (*Id.* (quoting Dennis Dep., Deckant Decl. Ex. O, 123:13–25)) This is thin stuff, say the defendants; there is "too great an analytical gap" between Dr. Dennis's 2015 survey results and the conclusions he draws about 2009–2010 purchases. (*Id.* (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997)))

For the reasons discussed Section III.A.3., *supra*, with respect to the defendants' similar criticisms of Dr. Sukumar's analysis, I find that Dr. Dennis's methodology is reasonable and reliable overall. Defendants' challenges to the "willingness to pay" and survey population components go to weight, not admissibility. The defendants' criticisms are far from frivolous. Those criticisms, however, do not so undermine the reliability of Dr. Dennis's methods or their application to the case as to warrant exclusion.

### 4) Whether Dr. Dennis's Price Premium Analysis Fits the Facts of the Case and Plaintiffs' Theory of Liability

Finally, the defendants argue that Dr. Dennis's opinions are misaligned with the facts of the case and the plaintiffs' theory of the case. (Dennis Br. 18)

First, the defendants attribute to Dr. Dennis the incorrect "binary" assumption that the Washers either (a) were Energy Star qualified, and therefore delivered a host of efficiency and rebate benefits, or else (b) were not Energy Star qualified, and therefore delivered no benefits. In reality, the

35

defendants claim, the purchasers of the Washers received tax rebates and incentives, and also enjoyed water and energy efficiencies which, even if they did not meet Energy Star standards, nevertheless exceeded those of other, non-Energy Star washers. (*Id.* 19–21) The defendants argue that Dr. Dennis failed to account for these benefits when he treated the Energy Star logo in binary, black-or-white fashion. His opinions therefore would not align with the plaintiffs' "real theory of liability," which the defendants frame as follows: "consumers who purchased a Washer in 2009 and 2010 paid a price premium in exchange for improved water and energy efficiency."  (Dennis Reply 10–11 (emphasis in original))

The plaintiffs confirm that Dr. Dennis considers the Energy Star "promise" to be a binary one. But this, they say, is not an error. Rather, they explain, the promise *is* binary because "Plaintiffs' theory of liability is not based on the price premium for the relative efficiency of the washers at issue, but rather the price premium solely attributable to the presence or absence of the Energy Star® logo." (*Id.* at 14) Plaintiffs' damages expert, Mr. Weir, accounted for energy expense losses in his "energy expense damages model." (*see* Declaration of Colin B. Weir, Dec. 28, 2015, Deckant Decl. Ex. C, ¶¶ 9–23)) Weir's energy expense model, however, is distinct from his "price premium model," which comes at the same issue from the perspective of consumer preferences, and is based on Dr. Dennis's results. (*Id.* at 15) Dr. Dennis did not need to consider rebates, the plaintiffs say, because "price premium damages . . . occurred at the time of purchase and rebates, if any, were only paid out later." (*Id.*) Even if he did need to account for rebates, they say, Dr. Dennis has stated that his survey respondents surely "were thinking about [publicly known] rebate programs" (*Id.* (quoting Dennis Dep., Deckant Decl. Ex. O, 165:18–21)) when they responded. Therefore, the impact of rebates was "prebaked into the survey results." (*Id.*) Moreover, the plaintiffs explain, the defendants' own expert did not adjust for rebates. (*Id.*)

This first debate revolves primarily around the *Comcast* question of whether Dr. Dennis's model fits the plaintiffs' theory of the case. For the reasons stated above, consideration of that *Comcast* issue is premature at this, the *Daubert* stage. The defendants also state that "the fact that Dr. Dennis failed to account for the substantial evidence showing that most, if not all, of the benefits of Energy Star were delivered [] renders his opinions inadmissible under Rule 702." (Dennis Br. 20) But this alleged deficiency depends on questions of fact that go to weight of the evidence (and also directly to the merits, it would seem), not its admissibility. These flaws, if that is what they are, does not rise to the level of requiring me to exclude Dr. Dennis's opinion from evidence.

I note, by the way, that the plaintiffs' endorsement of the "binary" approach here is seemingly at odds with their position in relation to alleged "double counting" in Mr. Weir's opinion, discussed in Section II.D.4, *infra*. There, they wriggle free of defendants' criticism by acknowledging that the value of the Energy Star logo and the value of the promised energy savings may well overlap. Here, however, they place consumer preferences in a black box and accept that consumers want what they want. That, too, however, is an issue that may be refined in the course of class certification or the calculation of damages, and may ultimately be placed before the jury for decision.

Second, the defendants claim that Dr. Dennis's contingent valuation model cannot reliably be applied in this case because "real world" market data shows that non-Energy Star washing machines sold for just as much as Energy Star washing machines. On that view, Dr. Dennis's price premium would fail to correspond to market reality.

The plaintiffs respond that defendants' preferred "actual market data" approach, whatever its validity, actually proves plaintiffs' case. Data from the time that the Washers at issue and the non-Energy Star C500 model were both were on the market, they say, shows that the C500 washers were 48% cheaper than the C6 Washers. (*Id.* 16 (citing Rebuttal Declaration of Colin B. Weir,

Deckant Decl. Ex. E, ¶ 8)) That 48% price differential, they say, is roughly consistent with Dr. Dennis' 48.5% price premium and with Dr. Sukumar's 44.3% price premium (*see* Sukumar Report ¶ 14–17), as well as the view expressed by "Whirlpool's own executives." (*Id.*)

Third, the defendants say Dr. Dennis's contingent valuation study does not fit the facts of the case because his survey focused on retail prices and retail consumers, ignoring the fact that the C7ES model of the Washers was sold primarily to rental companies. (Dennis Br. 22) The plaintiffs dismiss this third argument as lacking evidentiary or case law support. (Dennis Opp. 16–17).

The defendants' second and third points do not raise significant *Daubert* problems. They merely take issue with Dr. Dennis's interpretation of facts, with specific methodological choices he made in his survey design, and with his conclusions. As noted above, the focus of Rule 702 "must be solely on principles and methodology, not on the conclusions that they generate," Daubert, 509 U.S. at 595.

In sum, the plaintiffs have demonstrated that Dr. Dennis employed reasonable methodologies and that his conclusions rest on valid grounds. As before, defendants have identified significant vulnerabilities, which they no doubt will exploit at trial. But viewed as a question of *Daubert* admissibility, defendants' motion to strike Dr. Dennis's opinions must be denied.

D.    The Defendants' Motion to Exclude the Opinions of Mr. Weir

Finally, the defendants move, pursuant to *Daubert* and Federal Rules of Evidence 702 and 703, to strike the opinions of the plaintiffs' class-wide damages expert, Colin B. Weir. As discussed below, the defendants contend that Mr. Weir's model is generally unreliable; is based on unreliable data, false assumptions, and miscalculations; and is inconsistent with the facts of the case and with the plaintiffs' theory of liability.

## 1) *Mr. Weir's Damages Model*

Mr. Weir holds an MBA from Northeastern University, a Bachelor of Arts in Business Economics from The College of Wooster, has testified in numerous cases and government hearings on damages calculations, and has co-authored several articles in the field of economics. Although the defendants describe Mr. Weir as "a professional plaintiffs' expert who invariably opines that damages are capable of measurement on a classwide basis," they do not formally challenge his qualifications as an expert opinion witness. I find that Mr. Weir is sufficiently qualified; it appears that his education and experience have given him a specialized knowledge in damages calculations that may help a jury understand the evidence or make a determination. *See* Fed. R. Evid. 702.

Mr. Weir proposes a hybrid damages model addressing two categories of damages: (1) "price premium" damages representing the portion of the retail price attributable solely to the Energy Star label; and (2) "energy expense" damages stemming from utility bills the putative class members paid, which were allegedly higher than they would have been if the Washers truly had met Energy Star standards. (S*ee generally* Weir Report)[21]

For the price premium component of his damages model, Mr. Weir relies (a) on the price premiums calculated by Drs. Sukumar and Dennis, and (b) on

---

[21] The following abbreviations will be used to cite Mr. Weir's submissions and the briefing on the defendants' motion to strike his opinion testimony:

- "Weir Report" = Declaration of Colin B. Weir, Dec. 28, 2015, Deckant Decl. Ex. C, ECF No. 215-3
- "Weir Rebuttal" = Rebuttal Declaration of Colin B. Weir, June 10, 2016, Deckant Decl. E, ECF No. 215-5
- "Weir Br." = Brief in Support of Motion to Strike the Opinions of Mr. Colin Weir, Ph.D by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 200
- "Weir Opp." = Plaintiffs' Opposition to Motion to Strike the Opinions of Mr. Colin Weir by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 212
- "Weir Reply" = Reply Brief in Support of Motion to Strike the Opinions of Mr. Colin Weir by Defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 230

a 2006 Whirlpool document comparing sales data between Energy Star certified and non-certified washing machines. (Id. ¶¶ 32–33)

For the energy expense component of his damages model, Mr. Weir compares the energy and water consumption allegedly promised by Energy Star-qualified washing machines to the results of laboratory audit tests that the DOE performed on the Washers in 2009 and 2010. (Weir Br. 4–6; see Weir Report ¶¶ 9–15)

### 2) *Mr. Weir's Price Premium Analysis*

#### a) *Mr. Weir's conception of price premium damages*

The defendants first argue that Mr. Weir's calculations of price premium damages "conflict[] with Plaintiffs' allegations and do not fit the evidence in this case." (Weir Br. 7) In his deposition, Mr. Weir testified that consumers paid a 55.7% price premium for the Energy Star logo on the Washers, but declined to say "what consumers would have paid had the logo not been there." (Weir Br. 8 (quoting Weir Dep. 193:13–194:6, 195:9–18)). That, from defendants' point of view, constitutes an admission that Weir's damages model is not "tied to the presence or the absence of the Energy Star logo on the Washers," and therefore "is not designed to measure damages that flow from Plaintiffs' theory of liability in the case." (Weir Br. 9).

The plaintiffs answer, and I agree, that the defendants' argument is based on a selective quotation of Mr. Weir's deposition testimony and on distinguishable[22] or otherwise inapt Rule 23-focused case law. (*See* Weir Br. 9;

---

[22]    While precedent is of course relevant, I do not agree that rejection of an particular expert's opinion in a prior case forever taints that expert's future opinions. Each opinion must be measured against the requirements of Rules 702 and 703.

The defendants cite *In re ConAgra Foods Inc.,* 302 F.R.D. 537, 552 (C.D. Cal. 2014), where a court struck Mr. Weir's declaration for failure to satisfy Rule 702. There, Mr. Weir testified that classwide "price premium" damages could be calculated for consumers of mislabeled cooking oil provided necessary data is obtained. He generally described the method of analysis he proposed using in his expert reports and testified that the necessary data could be easily obtained from business records or market research data, but did not identify any variables he intended to build into his models or identify data in his possession that could be applied to models. Therefore,

Weir Opp. 9–14). Having reviewed the deposition, I am not convinced overall that there is no "connection between [Dr. Weir's] . . . test result to be presented and particular disputed factual issues in the case." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 743. To the contrary, Mr. Weir's price premium damages analysis aims to "calculate the portion of the retail price attributable to the Energy Star label, and/or to estimate the portion of the revenues and profits gleaned by Whirlpool," which fits several of the plaintiffs' theories of harm. (Weir Report ¶¶ 6, 24; *see also, e.g.*, Compl. ¶160 (alleging plaintiffs were harmed by defendants' breach of the implied warranty of merchantability by paying a price premium for the Energy Star logo); *id.* ¶ 167 (alleging defendants were unjustly enriched and plaintiffs were injured by paying a price premium for the logo)) That is a close enough "fit" to satisfy *Daubert*.

To the extent the defendants seek to challenge the damages component of Mr. Weir's model as inconsistent with the types of damages legally available by statute, they raise *Comcast*-style Rule 23 arguments, to be decided at the class certification stage.

---

the court concluded that Mr. Weir had provided "no damages model at all," and thus his declaration was "so incomplete as to be inadmissible as irrelevant." 302 F.R.D. at 552 (internal quotation marks omitted). This is not the case here, where Mr. Weir possesses what he considers the necessary data and uses that data to calculate actual proposed damages figures.

The plaintiffs point to a case in which Mr. Weir's opinions fared better—*Dei Rossi v. Whirlpool*, 2015 WL 1932484 (E.D. Cal. Apr. 28, 2015) (*see* Weir Opp. 1–3)—but it, too, is distinguishable. *Dei Rossi* is another consumer class action based on allegations of mislabeling. There, the court granted class certification and denied Whirlpool's motion to strike a declaration by Mr. Weir that calculated proposed price premium and energy expense damages. *Id.* at *1 n.1; (Weir Opp. 1) The court concluded that Mr. Weir's proposed price premium and energy savings methods were sufficient at the class certification stage of the case because even after *Comcast,* Ninth Circuit precedent directs that "plaintiffs need only propose a valid method for calculating class wide damages, not an actual calculation of damages." *Dei Rossi,* 2015 WL 1932484 at *1 n.1 (citing *Leyva v. Medline Indus., Inc.,* 716 F.3d 510, 514 (9th Cir. 2013)). But the *Dei Rossi* court did not evaluate Mr. Weir's methodology for admissibility under Rule 702 and *Daubert*.

b)  *Harnish v. Widener*

As to Mr. Weir's price premium opinions, both parties cite the Third Circuit's decision in *Harnish v. Widener University School of Law*, 833 F.3d 298 (3d Cir. 2016). There, law school graduates claimed they had been induced to pay inflated tuition based on the school's overstatement of post-graduation employment statistics. *Id.* at 303. Those plaintiffs sued solely under the New Jersey Consumer Fraud Act ("NJCFA") and Delaware Fraud Claims Act ("DCFA"). Neither state's Supreme Court, however, had recognized price-inflation as a theory of damages under those two statutes. The Third Circuit therefore held that the plaintiffs had failed to propose a theory of damages supportable by class-wide evidence and affirmed the district court's decision to deny class certification under Fed. R. Civ. P. 23(b)(3). *Id.* at 309–313.

The defendants argue that, under *Harnish*, I should strike Mr. Weir's price premium damages model because the plaintiffs' fifth count in its amended complaint in this case is a NJCFA claim. (Weir Reply 8–9; *See* ECF No. 86) But *Harnish* concerns Rule 23(b)(3)'s predominance requirement, not *Daubert* admissibility. It is possible that *Harnish* will be a hurdle for Mr. Weir's price-premium damages model with respect to the plaintiffs' NJCFA claims at the class certification stage. I will not decide class certification (or even a basis to dismiss a count on the merits), however, by the back-door method of deciding a *Daubert* motion.

To analyze defendants' contentions here, I must be in a position to "formulate some prediction as to how specific issues will play out" on the merits. *Harnish*, 833 F.3d at 304 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)). And those "specific issues" will, of course, include the plaintiffs' several non-NJCFA claims. It is premature to determine whether a price premium damages model must be excluded pursuant to Fed. R. Civ. P. 23 or *Comcast*. Suffice it to say that *Harnish* does not preclude Mr. Weir's price premium damages model at the *Daubert* stage.

   c) Mr. Weir's reliance on the Whirlpool document

   The Defendants next attack Mr. Weir's reliance on a Whirlpool document,
author unknown (the "Whirlpool document") to calculate a price premium. (A
copy of the Whirlpool document is at Bursor Decl. Ex. 1, ECF No. 164-1.) This
Whirlpool document includes a chart comparing pricing data for Energy Star
versus non-Energy Star washing machines. The chart does not indicate what
models or brands of washing machines are represented, and it appears to
depict data from 2006. (*Id.*) From the data in the chart, Mr. Weir calculates a
55.7% price premium, which he attributes to Whirlpool itself as a kind of
admission. (Weir Report ¶¶ 26, 32–33 ("Whirlpool determined that there was a
price premium of 55.7% attributable to the Energy Star."); *Id.* 3; *see also* Weir
Br. 10)

   Defendants contend that Mr. Weir's deposition testimony establishes that
he knows nothing about the date, author, content, basis, or reliability of the
Whirlpool document. (Weir Br. 10 (citing Weir deposition testimony, ECF No.
198-3) Defendants point also to the document's date of 2006, which precedes
by three years the relevant 2009-2010 time frame (by which point, the
defendants claim, competition drove down the price differential). (*Id.* 11–12)

   As further support for their position, the defendants have submitted a
declaration by Whirlpool's Global Sustainability Director, Ronald L. Voglewede.
(*See* Decl. of Ronald L. Voglewede ("Voglewede Decl."), ECF No. 178-9) Mr.
Voglewede states that the chart in the Whirlpool document "does *not* show the
existence of a 55.7% price premium attributable to the Energy Star logo for the
Maytag Centennial washers at issue here or any other washers. Rather, the
charts on page WDZ9999209 appear to show a comparison of the prices of
Whirlpool washers *that happen to be Energy Star* versus prices for washers that
happen to be non-Energy Star." (*Id.* ¶ 5) Whirlpool's Energy Star-certified
washers, he says, "were far more likely to have *several* premium features that
contributed to higher prices" in the 2006-2007 time frame. (*Id.* ¶ 6) By
contrast, "[t]he 2009-2010 timeframe saw particularly intense competition and

downward pressure on the prices of Energy Star top-loading washers." (*Id.* ¶ 7)

The plaintiffs respond first that criticisms of an expert's assumptions or the incompleteness of the expert's analysis, absent a severe methodological flaw, go to the weight of testimony only. (Weir Opp. 15). Even setting that aside, they say, "Mr. Weir did not analyze [the Whirlpool document] in a vacuum," but also considered "a plethora of additional internal documents" and corroborating admissions from Whirlpool executives. (*Id.* 16) For example, Weir's rebuttal report cites a presentation given by Whirlpool to its investors indicating "an expected up front price premium of $200 for clothes washers," as well as more general statements by Whirlpool indicating that Energy Star qualified products sell at higher prices. (Weir Rebuttal ¶ 67) Further, the plaintiffs continue, Mr. Weir concluded from internal documents that the price differential reported in the 2006 Whirlpool document was applicable to the 2009–2010 time frame. (*Id.* 16–17) And that differential, they say, survives a reality check: the 55.7% price differential in the Whirlpool document "is approximately within the range of Dr. Dennis's survey results (48.5%) and Dr. Sukumar's survey results (44.3%)." (*Id.* 16)

On reply, the defendants protest that the corroborating documents cited are no more specific than the Whirlpool document itself. (Weir Reply 4) For example, Mr. Voglewede states that the "2008 presentation given at an equity conference . . . . shows a supposed $200 initial price premium for an Energy Star washer, but it is unclear from the graph what 'price premium' should mean in this context, whether the price analysis involved comparable washers, and what year or years this data is supposed to cover . . . ." (Voglewede Decl. ¶ 8) He provides similar explanations for the other documents Mr. Weir cites.

Here is how I see it. The Whirlpool document is a Bates-stamped document produced by Whirlpool in discovery. It can fairly be read to support the generalized notion that unspecified (perhaps all?) Whirlpool Energy Star-qualified washing machines yielded higher revenues than non-qualified washing machines. It is not tied specifically to the C6 and C7 Washers at issue here. From the face of the document, one could reasonably glean—as Mr. Weir

does—that the data depicted in the document comes from a "Whirlpool Government Relations analysis of Energy Star qualified product sales versus non-qualified products." (Whirlpool document at WDZ0000208) Likewise, it would not be unreasonable to read the "plethora" of corroborating Whirlpool-produced documents reviewed by Mr. Weir relies as stating that Whirlpool executives placed some independent economic value on the Energy Star qualification. (*See, e.g.*, Weir Opp. 24 (citing documents relied on and cited in Weir Report at ¶¶ 24–31)) Therefore, I would not go so far as to say, as the defendants suggest, that Mr. Weir "knows nothing about the document or the data it summarizes." (Weir Br. 10) The results of Mr. Weir's independent inquiry seem to be far from definitive, but neither was that inquiry so completely lacking as those in the cases defendants cite.[23]

Still, to extract a 55.7% Energy Star price premium for the Washers based on this document, without any independent investigation into the *data* depicted in the document, is just too much. Here, Mr. Weir makes the kind of logical leap that other district courts in the Third Circuit have deemed unreliable and grounds for exclusion.[24] "[E]xperts who use data in their reports

---

[23] *E.g.*, *Legendary Art, LLC v. Godard*, No. CIV.A. 11-0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012) ("There is no evidence that [the plaintiff's expert] did anything to verify [the plaintiff's own] profit and loss projections. Indeed, his report states several times that his analysis assumed the validity of the projections. Moreover, there is no evidence that Mr. Slocumb had any familiarity with the methods or reasoning used by [the plaintiff] to arrive at the projections. Mr. Slocumb's reliance on projections supplied by [the plaintiff], without independent verification, renders his analysis unreliable." (internal quotation marks and citations omitted)).

[24] *See, e.g.*, *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 138 (M.D. Pa. 2015) ("Plaintiffs' experts were wholly unfamiliar with the methodology or purposes underlying the [internal documents]. They were not involved in data gathering or composition . . . ; they merely took what Defendant gave them. . . . Plaintiffs' experts sole connection with the composition of the [defendants' sales projection documents] came either from what Plaintiffs or their counsel chose to inform them of or what they remembered from certain discovery documents they were given to review—conduits that the evidence reveals were inadequate to furnish the experts with the requisite background information. The experts' memories as to whether a market study had been conducted, how many [sales projection documents] were generated, and which . . . was in fact the final one on which Defendant relied were largely incomplete and often contradicted by Defendant's own testimony and internal documentation."); *see also*

without independently verifying the accuracy or reliability of those figures fail to satisfy this Circuit's reliability requirement." *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 138 (M.D. Pa. 2015).

In short, it is not enough to simply seize on the figure because it appears in a document obtained from Whirlpool's files. And the "corroborating" documents, while a step in the right direction, do not sufficiently validate the Whirlpool document or pin down its meaning. I am confirmed in that conclusion by Mr. Voglewede's declaration. There are simply too many unknown variables that would affect the data in the anonymous Whirlpool document. Without more serious investigation of the basis for the figures, they cannot furnish a reasonable basis for an Energy Star logo price premium estimate. *Cf. Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 604 (D.N.J. 2002) (excluding expert's opinion as unreliable, noting "there is simply too great an analytical gap between the data purportedly relied on . . . and the opinion . . . proffered," in part because the expert "did not adequately explain his methods for assessing the internal validity of the studies that he relied upon in rendering his opinion." (internal quotation marks omitted)), *aff'd*, 68 F. App'x 356 (3d Cir. 2003).

Therefore, I will grant the defendants' motion to exclude Mr. Weir's opinions to the extent they rely on the data presented in the Whirlpool document as representing Whirlpool's own "price premium" projection for these Washers. I will strike the 55.7% price premium Mr. Weir derives from the anonymous Whirlpool document and the projected price premium damages of

---

*Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 449 (3d Cir. 2003) (district court did not abuse its discretion in excluding expert's testimony where expert had not independently investigated unreliable data underlying a party document and did not know, *inter alia*, how the document was created).

The cases that the plaintiffs cite for the proposition that an expert's failure to conduct further investigation is an issue of weight rather than admissibility do not concern an expert's reliance on unverified, unvalidated documents or data. Rather, those cases address criticisms of an expert's chosen methodology or reliance on another expert's sufficiently reliable data. (*See* Weir Opp. 15 (collecting cases))

$97,498,148 that he projects based on that figure. (*See, e.g.*, Weir Report ¶¶ 33–34, 53 ("Whirlpool Study" row in Table 4))

> d) Whether Mr. Weir should have considered conflicting market data from 2009–2010 or subtracted benefits received

The defendants next make arguments similar to those made against Drs. Sukumar and Dennis: first, that Mr. Weir did not examine actual, contradictory marketplace data from 2009 and 2010, and second, that Mr. Weir failed to subtract from his price premium damages the corresponding benefits that purchasers may have received. (Weir Br. 13–16).[25] The defendants themselves frame their second criticism as a *Comcast* problem (*see* Weir Br. 16–17), and on reviewing it, I agree. For the reasons expressed above, I do not address it on this *Daubert* motion. *See* Section III.A.4, *supra*.[26]

To the first criticism, the plaintiffs respond that consistency with other market data is a matter of weight, not admissibility. (Weir Opp. 17) Setting that aside, they point to available 2009 and 2010 market data concerning the C500

---

[25] The defendants also argue that Mr. Weir's price premium damages opinions must be excluded because they rely, in part, on the "unreliable and inadmissible" price premium opinions of Drs. Sukumar and Dennis. (Weir Br. 17–18) Because I find the Doctors' opinions admissible under Rule 702, there is no question that Mr. Weir is entitled to rely on those opinions without rendering his own opinions unreliable. *See* Fed. R. Evid. 703; *see also, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015) (explaining that an expert "need not be a survey expert to testify about the information compiled by third-party surveys, so long as the information is of a type reasonably relied upon by experts in the field to form opinions upon the subject.").

[26] Even if the defendants had framed their concern as a *Daubert* reliability or fit issue, the plaintiffs present good—if not overwhelmingly convincing—grounds as to why Mr. Weir chose not to subtract benefits received from his damages calculations: (1) the defendants' own expert, Dr. Scott, excluded rebates from her definition of market prices and made no adjustments for rebates or tax refunds in her analyses (*Id.* 22); and (2) realization of rebates and refunds is uncertain and occurs, if at all, after the time that the Washers were purchased, without any tie to the conduct of the defendants, whereas the plaintiffs' theory of price premium damages assumes they occur at the time of purchase. (*Id.*) "An expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury. It is also . . . a proper subject for cross-examination." *Walker v. Gordon*, 46 F. App'x 691, 695–96 (3d Cir. 2002) (affirming district court's decision to admit expert opinion over charge that expert had failed "to rely on all of the evidence in the case").

47

Maytag model. Mr. Weir explained in his rebuttal report, however, that his rejection of the C500 data had a reasonable basis: (a) the C500, which had different features from the Washers, was not comparable; and (b) nearly all of the C500 models had been sold by the time the C6 models, "designed and introduced as the successor to the C500," hit the market. (Weir Opp. 17–19 (citing Weir Rebuttal ¶¶ 5–31)) In short, the two did not compete for the consumer dollar. Even so, Mr. Weir calculated for purposes of argument that the C6 model carried a 48% price premium over the C500 model.

In response to Mr. Weir's 48% figure, the defendants' expert Dr. Scott submitted a rebuttal report (discussed further in Part III, below). Dr. Scott concluded that the average weighted price of the C6 Washers was actually lower than the non-Energy Star C500 models. (*Id.* 20–21 (citing Rebuttal Expert Report of Carol A. Scott, Ph.D., July 1, 2016, Deckant Decl. Ex. G, ECF No. 215-7) The plaintiffs rejoin that Dr. Scott cherry-picked data from inappropriate time periods. (*Id.*)

Enough. What is presented here is a classic battle of the experts over disputed facts, to be settled by the finder of fact; it does not affect admissibility. *See, e.g., In re Gabapentin Patent Litig.*, No. CIV.A. 00-2931, 2011 WL 12516763, at *10 (D.N.J. Apr. 8, 2011) (concluding that defendants' critiques of plaintiffs' experts' methodology and inconsistent conclusions presented "a battle of the experts, and both sides will be permitted to present expert testimony on these issues and to cross-examine the other side's expert witnesses."); *Walker*, 46 F. App'x at 695–96, *supra* 19; *Hartle*, 2014 WL 1317702, at *7, *supra* n.18.

### 3) Mr. Weir's Energy Expense Damages Model

The defendants next turn to the "energy expense damages" component of Mr. Weir's model. This component, they claim, should be excluded because it rests on false assumptions and miscalculations. (Weir Br. 18) The defendants especially take issue with the model's assumptions that: (a) the Washers consumed more energy than Energy Star regulations permit; and (b) the United

States Department of Energy ("DOE") tests for measuring energy consumption reliably represent real-world use. They argue that the Washers only failed to meet the DOE's Energy Star standards because the DOE changed its procedure for measuring washer capacity. The Washers themselves remained unchanged from the time when they did meet Energy Star standards. Because Mr. Weir did not account for this, the defendants say, his "energy expense calculations lack any factual foundation, and his methodology is designed to maximize the appearance of damages where there are none." (Weir Br. 19) Additionally, the defendants argue, Mr. Weir failed to account for how the putative class members actually used their washers, as opposed to the way the DOE tested the Washers in the laboratory. (*Id.* 21)

The defendants also submit that when Dr. Weir calculated the electrical use of the Washers, he "used a made-up drying energy input when he should have used the <u>actual</u> drying energy from the DOE's audit tests . . . ." (*Id.* 23) The defendants claim Dr. Weir's use of an unexplained, made-up number resulted in a $15 million error in the plaintiffs' favor. Such a basic mathematical miscalculation, the say, renders Dr. Weir's analysis unreliable and highlights Dr. Weir's misunderstanding of the DOE tests on which he relies. (*Id.* 24)

The plaintiffs respond that the defendants' arguments concerning the DOE's results go to the merits of the case and have no bearing on whether Mr. Weir has presented an adequate damages model. (Weir Opp. 25) And, they say, Mr. Weir chose to rely on DOE data because he reasonably understands the data to be representative of general consumer behavior—that is, it is relevant in practice, not just theory. (*Id.* 26–27 (citing Weir deposition testimony, Deckant Decl. Ex. D, ECF No. 215-4)) As for the miscalculations, the plaintiffs stress that a potentially incorrect *input*, the problem identified by the defendants' experts, does not render Mr. Weir's *methodology* unreliable. (*Id.* 27)

I agree with the plaintiffs that the defendants' criticisms go to weight, not admissibility. First, I do not think Mr. Weir's reliance on DOE results and

figures raises the same concerns as, say, his reliance on the Whirlpool document. Mr. Weir has researched and understands the source, context, and meaning of the DOE's data here, and the DOE's calculations have a direct factual connection to this case. Indeed, they are at the root of the plaintiffs' allegation that the Energy Star label was inappropriate.

As an opinion witness, Weir is entitled to rely on facts or data of the type reasonably relied upon by expert in the field. *Daubert*, 509 U.S. 579; Fed. R. Evid. 703. Here, I think Mr. Weir has good grounds to rely on the DOE data for purposes of calculating potential energy expense damages, and I see no reason that experts in the field of damages would not reasonably rely on data of this type. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994) ("[W]hen a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert. Whether experts in the field rely on this type of data will simply continue to be a part of the judge's analysis.) If the DOE data is truly flawed or inapt, the defendants should have no problem making that clear on cross examination.

Additionally, if it is the case that the Washers are just as efficient as Energy Star qualified washing machines, or as efficient as they are labeled—a theory directed to the merits of plaintiffs' allegations—then the defendants will have the opportunity to establish this by opposing evidence, as opposed to exclusion of the plaintiffs' evidence.

Finally, mathematical errors and flawed data can of course be significant in the *Daubert* calculus. *See, e.g., Dart v. Kitchens Bros. Mfg. Co.*, 253 F. App'x 395, 398 (5th Cir. 2007) (mathematical errors in another expert's underlying calculations on which expert relied was one of several flaws contributing to the unreliability of expert's methodology). Here, however, I am not convinced that Mr. Weir's alleged miscalculations render his energy damages model unreliable and inadmissible. In fact, the "miscalculation" the defendants allege is not really a matter of mathematics, as implied; rather, it is a factual dispute among experts regarding the value and source of an input that is fully disclosed and

can be disputed factually. (*See* Weir Report Ex. 3 ("Drying Factor" input))[27] The principle of GIGO (garbage in, garbage out) can be grasped by a jury.

Having reviewed Mr. Weir's initial and rebuttal reports, I agree that he could have provided a clearer explanation as to how he chose a drying energy input. (*See* Weir Report ¶ 10, Ex. 3; Weir Rebuttal ¶ 129) But the defendants' own expert, Dr. Fessler, achieves the opposite of the defendants' intended purpose on this *Daubert* motion; he figures out that Mr. Weir derived his drying energy input by "back-calculating" from figures displayed on the Washers' EnergyGuide label.[28] (*See* Fessler Report ¶¶ 56–62) Mr. Weir's back-calculation from official DOE test results is a sufficiently reliable methodology which rests on a sufficient foundation for *Daubert* purposes.[29] It can be tested on cross-

---

[27]    The defendants' arguments are inspired by the opinions of their own experts, Dr. M. Laurentius Marais (*see* Expert Report of M. Laurentius Marais, Ph.D., April 26, 2016, ECF No. 177-4 ("Marais Report")) and Dr. John R. Fessler (*see* Expert Report of John R. Fessler, Ph.D., P.E., ECF No. 177-6 ("Fessler Report")), who attack various aspects of Mr. Weir's methodology. Mr. Weir, in turn, rebuts the opinions of Drs. Marais and Fessler and presents reciprocal quibbles with Drs. Marais's and Fessler's methodologies. (*See* Weir Rebuttal ¶¶ 89–133)

[28]    According to the government-sponsored Energy Star website:

> All major home appliances must meet the Appliance Standards Program set by the US Department of Energy (DOE). Manufacturers must use standard test procedures developed by DOE to prove the energy use and efficiency of their products. ***Test results are printed on [a] yellow EnergyGuide label***, which manufacturers are required to display on many appliances. This label estimates how much energy the appliance uses, compares energy use of similar products, and lists approximate annual operating costs. Your exact costs will depend on local utility rates and the type and source of your energy.

https://www.energystar.gov/index.cfm?c=appliances.pr_energy_guide (emphasis added).

[29]    As the DOE's findings that the Washers do not meet Energy Star standards lie at the heart of plaintiffs' claims, I also find that there is a sufficient factual connection between the DOE's results and this case for purposes of *Daubert*'s fit requirement.

I reach these same conclusions with respect to the defendants' related argument, made in a footnote, that Mr. Weir made "several other significant calculation errors." (Weir Br. 23 n.13) Mr. Weir's reports identify reliable sources for

examination, for example by plugging in alternative, arguably better-chosen, inputs. (*See* Weir Rebuttal ¶¶ 129–131 (explaining that Drs. Marais and Fessler only take issue with his choice of inputs, not his basic framework, and accepting that other inputs can be tested in his model); Weir Report Ex. 3 (indicating that the drying energy input is adjustable))

Once again, I conclude that we are faced, not with an inadmissible expert opinion, but with a battle of the experts, suitable for sorting out in subsequent motion practice or at trial.

### 4)  *Whether Dr. Weir Double-Counts Damages*

Finally, the defendants argue that Dr. Weir's model double-counts damages: that is, it assumes invalidly that the putative class should be awarded both "price premium" and "energy expense" damages. This assumption, the defendants say, threatens to reimburse the plaintiffs for the Energy Star "price premium" (the price differential between an Energy Star and non-Energy Star washer, which is rationally based on the expectation of efficiency-based savings) *and also* to compensate them for not having received those very savings. (Weir Br. 23–24) In other words, "it would be as though Plaintiffs had bought a conventional washer . . . but realized the energy efficiency benefits of the Energy Star washer . . . ." (*Id.* 25)

The plaintiffs say that the defendants have simply misunderstood: "Mr. Weir is not proposing that his two damages models must be used in combination." (Weir Opp. 28) Although Mr. Weir testified that he believes both methods could be used concurrently, he also states that the models are independent. (*See* Weir Rebuttal ¶ 90 ("I believe the determination of which damage methodologies are selected in this litigation will be made by the Court or jury, and I offer no opinion as to whether Plaintiffs are legally entitled to one of both of these damage recoveries. I have simply offered multiple damage

---

his input data—mainly DOE results and Energy Star specifications set forth in the Code of Federal Regulations—and his input values are disclosed in his initial report and thus susceptible to challenge at trial.

methodologies that I believe comport with Plaintiffs' stated theories of liability .
. . .")) 

Thus, the plaintiffs take the position that either type of damages may be
awarded, depending on the merits of the case and the court's determination as
to which method or methods are appropriate for calculating class wide
damages through the use of common evidence, as Fed. R. Civ. P. 23 requires.
(*Id.* 28–29) Here, they seem to accept, at least in principle, that the two may
overlap. (*But see* Section II.C.4, pp. 35–38, *supra.*)

For now, I will permit the plaintiffs to explore what are potentially
alternative measures of damages. The plaintiffs' position is appropriate at this
stage of the case and raises no *Daubert* issue. To the extent the plaintiffs do
seek double recovery, the defendants may raise their argument at a later, more
appropriate stage of the case. *See, e.g., Dewey v. Volkswagen of Am.*, 728 F.
Supp. 2d 546, 596 (D.N.J. 2010) (rejecting proposed double counting of
damages on motion to approve settlement), *rev'd and remanded on other
grounds sub nom. Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170 (3d
Cir. 2012).

In sum, the defendants' motion to exclude the opinions of Mr. Weir is
granted as to the opinions of Mr. Weir's opinions that rely on the data
presented in the anonymous Whirlpool document as Whirlpool's own "price
premium" projection. The defendants' motion is otherwise denied.

### III.   PLAINTIFFS' MOTION TO STRIKE DR. SCOTT'S REPORTS

The plaintiffs' only motion *in limine* (ECF No. 221) seeks to strike the July 1, 2016 rebuttal and supplemental expert reports of Dr. Carol A. Scott,[30] a damages expert for the Whirlpool defendants. The plaintiffs raise no arguments under Rule 702 or 703, Fed. R. Evid. Rather, they say the rebuttal and supplemental reports should be stricken as a sanction under Rule 37, Fed. R. Civ. P., because they were submitted too late and without justification under this Court's Scheduling Order. (*See* Scott Br. 9–12) That Order sets April 26, 2016 as the deadline for "Defendants' class based expert reports in support of their opposition to class certification," and does not provide for submissions of additional expert reports. (*See* Scheduling Order).

A.   <u>Legal Standard: Exclusion of Expert Testimony Pursuant to Rule 37(c)(1)</u>

Rule 26(a)(2) provides that an expert witness retained to testify in a case must submit a report. Rule 26(e)(1) provides:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its

---

[30]   The following citations will be used for Dr. Scott's reports and the briefing on the plaintiffs' motion to strike them:

- "Scott Report" = Expert Report of Carol A. Scott, Ph.D., April 26, 2016, Deckant Decl. Ex. M, ECF No. 215-13

- "Scott Rebuttal" = Rebuttal Expert Report of Carol A. Scott, Ph.D., July 1, 2016, Deckant Decl. Ex. G, ECF No. 215-7

- "Scott Supplemental" = Supplemental Expert Report of Carol A. Scott, Ph.D., July 1, 2016, Deckant Ex. H, ECF No. 215-8

- "Scott Br." = Memorandum of Law in Support of Plaintiff's Motion to Strike Dr. Carol A. Scott's July 1, 2016 Rebuttal Expert Report and Supplemental Expert Report, ECF No. 224

- "Scott Opp." = Opposition to Plaintiffs' Motion to Strike Dr. Carol A. Scott's July 1, 2016 Rebuttal Expert Report and Supplemental Expert Report By Defendants Whirlpool Corporation, Lowe's Home Center, LLC, Sears Holdings Corporation, and Fry's Electronics, Inc., ECF No. 231

- Scott Reply" = Reply Memorandum of Law in Further Support of Plaintiff's Motion to Strike Dr. Carol A. Scott's July 1, 2016 Rebuttal Expert Report and Supplemental Expert Report, ECF No. 232

disclosure or response:

    (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

    (B) as ordered by the court.

Fed. R. Evid. 26(e)(1).

      Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). It follows that a court has the discretion to bar expert testimony that is not proffered in accordance with Rule 26, unless the noncompliance is excused. *See Geis v. Tricam Indus., Inc.*, No. CIV.A. 09-1396 MLC, 2010 WL 8591142, at *2 (D.N.J. Oct. 6, 2010). A sister court within this Circuit has usefully summarized the standards under Rule 37(c)(1) for excusing noncompliance as "substantially justified" or "harmless":

> The party against whom the sanction is sought has the "burden of proving substantial justification or that its failure to produce was harmless." *Tolerico v. Home Depot,* 205 F.R.D. 169, 175 (M.D. Pa. 2002). "'Substantial justification' for the failure to make a required disclosure has been regarded as 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.' " *Id.* (quoting *United States v. Dentsply Intern., Inc.,* No. Civ. A. 99–5, 2000 WL 654378, at *7 (D. Del. May 10, 2000). "The test of substantial justification is satisfied if 'there exists a genuine dispute concerning compliance.'" *Id.* at 175–76 (quoting *Henrietta D. v. Giuliani,* No. 95–CV–0641, 2001 WL 1602114, at *5 (E.D.N.Y. Dec. 11, 2001)).

*Vaskas v. Kenworth Truck Co.*, No. 3:10-CV-1024, 2013 WL 1207963, at *3 (M.D. Pa. Mar. 25, 2013).

55

The exclusion of critical evidence, however, "is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Meyers v. Pennypack Woods Home Ownership Ass'n.*, 559 F.2d 894, 904–905 (3d Cir. 1977) (citation omitted), *overruled on other grounds*, *Goodman v. Lukens Steel*, 777 F.2d 113 (3d Cir.1985), *aff'd* 482 U.S. 656, 107 S. Ct. 2617 (1987). The Third Circuit has set forth factors (the "*Pennypack* factors"), to be considered when determining whether "exclusion of evidence is an appropriate sanction for failure to comply with discovery duties":

> (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

*Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000); *see also Pennypack Woods*, 559 F.2d at 904–05. The Third Circuit has supplemented that *Pennypack* list, also considering (5) "the importance of the excluded testimony" and (6) the party's explanation for failing to disclose. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (quoting *Pennypack*, 559 F.2d at 905); *Vaskas v. Kenworth Truck Co.*, No. 3:10-CV-1024, 2013 WL 1207963, at *3 (M.D. Pa. Mar. 25, 2013).[31]

B.    Discussion

The plaintiffs argue that the six *Pennypack* factors weigh in favor of striking Dr. Scott's reports, for the following reasons: (1) the plaintiffs were prejudiced because Dr. Scott's supplemental and rebuttal reports were submitted just hours before the close of expert discovery, leaving the plaintiffs no time to depose Dr. Scott or submit a responsive expert report; (2) the plaintiffs cannot cure the prejudice, unless granted leave to file an expert

---

[31]    For simplicity, I will refer to all six as the "*Pennypack* factors".

56

report in response to Dr. Scott's additional reports, because expert discovery has closed;[32] (4) disclosure of the reports on the very day the plaintiffs were required to submit their reply brief in support of class certification indicates bad faith; (5) Dr. Scott's additional reports are important to the damages analysis because Dr. Scott opines that C6 washers do not carry a price premium over the C500 washers; and (6) the defendants cannot argue that Dr. Scott's additional reports were *not* untimely by virtue of their compliance with Rule 26.

The defendants respond that I should deny the plaintiffs' motion for three reasons.

1) *The Plaintiffs' Failure to Follow Local Rule 37.1*

First, the defendants say the plaintiffs themselves have failed to comply with this District's Local Civil Rule 37.1(a) and the initial scheduling order in this case. The Rule instructs parties to confer and attempt to resolve discovery disputes among themselves before seeking the court's intervention. (Scott Opp. 9–11) The initial scheduling order provides that "[n]o discovery . . . motions for sanctions for failure to provide discovery shall be made without prior leave of Court," and directs the parties to bring discovery disputes to the court that cannot be informally resolved within 14 days. (ECF No. 103 ¶ 8) By defendants' reckoning, the motion was brought tardily and without the required prior consultation.

The plaintiffs do not deny that they never sought to informally resolve the Scott-related issues with the defendants. They contend that they adequately disclosed their intentions, however, when they filed a letter with this Court requesting a unified briefing schedule for both sides' *Daubert* motions. (Scott Reply 10) The plaintiffs' motion to strike pursuant to Rule 37(c)(1), however, is not a *Daubert* motion. It is a discovery motion that should have been discussed if not resolved by the parties, with or without the help of the Magistrate Judge,

---

[32]    The plaintiffs do not make any argument as to the third factor.

months ago. Finding some procedural fault on both sides, however, I will excuse the plaintiffs' noncompliance and consider the merits of their motion.

2) *Whether the Reports Comply with Rule 26*

The defendants attack the very premise of the plaintiffs' motion. Dr. Scott's Rebuttal and Supplemental Reports, they say, were timely submitted under Rule 26.

a)  Dr. Scott's Rebuttal Report

The defendants argue that Dr. Scott's rebuttal expert report was intended solely to contradict or rebut a new opinion stated in Mr. Weir's rebuttal expert report. The Scheduling Order did not specifically address the timing of defendants' rebuttal reports. Therefore, they say, we fall back upon the default deadline in the Federal Rules: the defendants' rebuttal reports needed to be disclosed within 30 days after the plaintiffs' reports to which they responded. Fed. R. Civ. P. 26(a)(2)(D)(ii). (*Id.* 12–13). Mr. Weir's rebuttal report was dated June 10, 2016; Dr. Scott's Rebuttal Report in response was dated July 1, 2016, within the Rule's 30-day deadline.

Rule 26(a)(2)(D)(ii) provides: "*Absent a stipulation or a court order*, the disclosures must be made:  . . . (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). The highlighted language raises the question of whether the Scheduling Order in this case is a "court order" that overrides the deadline in the Rule. The Scheduling Order does, of course, set a deadline of April 26, 2016 for "Defendants' class based expert reports in support of their opposition to class certification" and a deadline of June 10, 2016 for "Plaintiffs' class based rebuttal expert reports."[33]

---

[33]     *See* Scheduling Order at 2 (also noting that "no further extensions will be granted).

The Scheduling Order, however, is "silent as to the submission by Defendants of rebuttal reports in the event that Plaintiffs' experts offer new opinions." (Scott Opp. 12) Several cases hold that where a scheduling order exists, but is silent on a particular point, then it does not constitute an overriding "court order" within the meaning of Rule 26(a)(2)(D)(ii).[34] I agree. Under the circumstances, I apply the default Rule 26 deadline of 30 days. Because Dr. Scott's rebuttal report was submitted within 30 days, it was timely.

To say that defendants met the deadline for a rebuttal report, however, begs the question of whether Dr. Scott's report is properly regarded as a rebuttal report at all. Plaintiffs, citing Rule 26(a)(2)(D)(ii), say no, for two reasons. First, they say, Mr. Weir's rebuttal report did not contain any "new opinion" requiring additional rebuttal, but only a brief concession *arguendo* that *if* Weir were to compare the C500 and C6 models (a comparison which he maintains is inappropriate), then he would find a positive price premium discount "of as much as 48% or $196.81." Second, they say that Dr. Scott's rebuttal adds nothing to the conclusions of her initial report. (Scott Reply 6)

I disagree. Mr. Weir's calculation of a price premium between the C500 and C6 models is new; it does not appear in his earlier report. (*See* Weir Rebuttal ¶ 24) That it is narrow, brief, or stated *arguendo* does not make it any less new. There is no room in the Rules for plausible deniability; plaintiffs are either offering Weir's new opinion for the fact finder's consideration, or they are not. If they are not, it should not be in the report; if they are, it is subject to

---

[34]   *See, e.g., Fulton Fin. Advisors v. Natcity Invs., Inc.*, Civil Action No. 09-4855, 2016 WL 5461897, at *2 (E.D. Pa. Sept. 28, 2016) ("Courts have held that where a [case management order] is silent as to rebuttal expert reports, the terms of Rule 26(a)(2)(D)(ii) permits them if they are timely disclosed."); *Teledyne Instruments, Inc. v. Cairns*, Civ. A. No. 12-854, 2013 WL 5781274, at * 17 (M.D. Fla. 2013) ("The [scheduling order's] failure to set a deadline for the disclosure of rebuttal expert witness reports does not mean that rebuttal expert witness reports are not permitted. It simply means that rebuttal expert witness reports must be submitted within the period set forth in Rule 26(a)(2)(D)(ii)." (also collecting cases and noting this is the majority view)).

rebuttal. Such rebuttal, of course, must be confined to the scope of the new opinion.[35] Dr. Scott's rebuttal report, I find, is confined to rebutting Mr. Weir's new "48% or $196.81" calculation. It does nothing more than describe Mr. Weir's new calculation (Scott Rebuttal Report ¶ 5); analyze the data he cited as the basis for that calculation (*id.* ¶¶ 7–8); and conclude that Mr. Weir did not provide sufficient information to permit verification of it (*id.* ¶¶ 3–4, 9).

Dr. Scott's report is properly considered a rebuttal report. As such, for the reasons expressed above, it is timely. (*See* Scott Reply 4–5)

### b) Dr. Scott's Supplemental Report

As for Dr. Scott's Supplemental Report, the defendants argue that disclosure was timely pursuant to Fed. R. Civ. P. 26(e). Rule 26(e) requires an expert to supplement or correct his or her disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). The deadline for such a supplemental expert report is "the time the party's pretrial disclosures . . . are due." Fed. R. Civ. P. 26(e)(2).[36]

Dr. Scott's Supplemental Report meets the Rule 26(e) requirements, say defendants, because it "solely concerns data that Dr. Scott did not have at the

---

[35]     *See, e.g., In re Asbestos Prod. Liab. Litig. (No. VI),* No. 09-CV-74351X, 2012 WL 661673, at *1 (E.D. Pa. Feb. 8, 2012), *report and recommendation adopted sub nom. In re Asbestos Prod. Liab. Litig. (No. IV),* No. 09-74410, 2012 WL 661660 (E.D. Pa. Feb. 29, 2012) ("It is well settled that evidence which properly belongs in the case-in-chief but is first introduced in rebuttal may be rejected so as to avoid prejudice to the defendant and to ensure the orderly presentation of proof." (quoting *Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984)); *Hans v. Tharaldson,* No. 3:05-CV-115, 2011 WL 6937598, at *10 (D.N.D. Dec. 23, 2011) ("The function of rebuttal evidence is 'to explain, repel, counteract or disprove evidence of the adverse party.' Experts are typically allowed to introduce new methods of analysis in a rebuttal report if they are offered to contradict or rebut another party's expert; however, a rebuttal report should not extend beyond the scope of the other party's expert reports." (quoting *United States v. Luschen,* 614 F.2d 1164, 1170 (8th Cir.1980) (additional citation omitted))).

[36]     The deadline for pretrial disclosures has not yet been scheduled in this case.

time of her original report." Specifically, it is based on sales data that defendant Home Depot produced for the first time on June 9, 2016. The Supplemental Report was therefore timely produced 21 days later, on July 1, 2016. (Scott Opp. 14–15) The plaintiffs reply that Rule 26(e)(1)(A) does not apply because the late-arriving data was not produced by them, but by one of Whirlpool's co-defendants, Home Depot. Data in the hands of Home Depot, they say, should have been obtained by Dr. Scott in time for her original report. (Scott Reply 2–3, 6)[37]

Rule 26(a)(1)(A) is not confined to information withheld by an adversary. Rather, it authorizes (indeed, requires) correction or supplementation where the person learns that an earlier response was "incomplete or incorrect," unless the corrected or supplemented facts have been disclosed by other means.

The defendants have not explained in detail why Dr. Scott did not possess Home Depot's data. (*See* Scott Reply 7) For these purposes, however, I think the explanation given—that Home Depot had not produced it—is sufficient. Absent any indication that defendants gained a procedural advantage by stringing out Dr. Scott's analysis, I accept that the information simply arrived late. Indeed, blank columns in the exhibits to Dr. Scott's initial expert report corroborate that impression: some data from Home Depot is analyzed, but the rest is missing. (*See* Scott Report Exs. 5A–5B (leaving blank columns for certain Fry's and Home Depot data)) This, I think, weighs against any inference that Dr. Scott is seeking to use Rule 26(e) as an "avenue to correct 'failures of omission because [she] did an inadequate or incomplete preparation.'" *In re Asbestos Prod. Liab. Litig. (No. VI)*, 289 F.R.D. at 425 (quoting (*Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002)).

---

[37]    For what it is worth, defendants do not stand united as to this issue. Dr. Scott's reports are submitted on behalf of Whirlpool only. (*See* Deckant Decl. Ex. G ¶ 2; Id. Ex. H ¶ 1 (supplementing original report); *id.* Ex. M ¶ 7 (ECF No. 215-7, 8, 13). Whirlpool, Lowe's, Sears, and Fry's oppose the plaintiffs' motion to strike Dr. Scott's reports. (*See* Scott Opp.). Home Depot takes no part.

Accordingly, I will accept Dr. Scott's Supplemental Report as a proper, timely supplement under Rule 26(e).

### 3) *Substantial Justification and the* Pennypack *Factors*

Even if Dr. Scott's rebuttal and supplemental reports were not timely under Rule 26, I would be reluctant to exclude critical evidence, an extreme sanction that should be avoided if the untimely disclosure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Under the *Pennypack* factors, which inform this standard, I would find the tardiness of Dr. Scott's additional reports both substantially justified and harmless.

First, the plaintiffs were neither surprised nor prejudiced. Dr. Scott's rebuttal report presents no new opinions, but is confined to disputing one new point that Mr. Weir made in his rebuttal declaration. Her supplemental report merely analyzes new Home Depot data, missing from the original report, in a way that confirms and elaborates on the initial report. (*See* Scott Opp. 16–17) Were the plaintiffs truly at risk of being prejudiced, they surely would have sought some sort of relief from the Magistrate Judge, rather than just bringing a retaliatory cross-motion.

Second, because I find no prejudice, there is no pressing need to consider whether prejudice can be cured. In an abundance of caution, however, I have afforded plaintiffs the option of submitting a 5-page supplemental report discussing the Home Depot data.

Third, at this very early, pre-class-certification stage, consideration of Dr. Scott's additional reports does not threaten to disrupt the orderly and efficient trial of this case.

Fourth, because I find that the defendants submitted Dr. Scott's additional reports under color of Rule 26(a)(2)(D) and 26(a)(1)(A), and at worst were reasonably mistaken in their interpretation of the Rule, I cannot find bad faith.[38]

---

[38]   The plaintiffs stress that the defendants submitted Dr. Scott's additional reports "literally *hours* before the close of expert discovery, and the deadline for

62

Fifth, because Dr. Scott's additional reports respond to a new opinion of Weir and fill a prior hole in Dr. Scott's data analysis, I think the information is "important" to the defendants' case.

Sixth, for the reasons already expressed, I find the defendants have provided adequate explanations for failing to turn over Dr. Scott's additional reports sooner. The reports came within a few weeks after disclosure of the information to which they responded; there are no indications that defendants held back the reports for tactical advantage.

Taking these factors into consideration, I find that exclusion under Rule 37 is not warranted. Even assuming *arguendo* that Dr. Scott's additional reports did not comply with the procedures of Rule 26, I would still find that the defendants have shown "a genuine dispute concerning compliance," and could "satisfy a reasonable person that parties could differ as to whether the [defendants were] required to comply with" the deadlines in the Scheduling Order. *Vaskas*, 2013 WL 1207963, at *3 (internal quotation marks and citations omitted). *See also Rojas v. Acuity Brands Lighting, Inc.*, No. CIV.A. 12-2220 DMC, 2014 WL 794364, at *1 (D.N.J. Feb. 27, 2014).

I find the defendants had substantial justification for acting as they did, and that the plaintiffs suffered no harm as a result. Accordingly, the plaintiffs' motion to strike Dr. Scott's Rebuttal and Supplemental Reports is denied.

### 4) *Plaintiffs' Request for Leave to Submit a Supplemental Expert Report*

Plaintiffs request that in the alternative, I grant leave for Mr. Weir to submit a supplemental expert report in response to Dr. Scott's additional reports. (Scott Reply 11) This request should have been made pursuant to Rule 37.1 at the time Dr. Scott's Rebuttal and Supplemental reports were first

---

Plaintiffs to submit their reply brief in further support of class certification." (Scott Reply 9) I think the defendants' eleventh-hour filing bespeaks a rush to meet the discovery deadline, rather than a desire to interfere with plaintiffs' (also last-minute) drafting. If the plaintiffs truly felt the need to address the additional reports, presumably they would have sought additional briefing or leave to file supplemental expert responses of their own. They did not.

disclosed. Made now, in the plaintiffs' briefs in support of their belated motion, it seems more like tit-for-tat than a serious request. Someone's report has to be last, and any issues left hanging in Dr. Scott's reports appear to be minor.

I will, however, permit the following, and only the following. Within 14 days, the plaintiffs may—if they truly believe it necessary—submit a supplemental expert report, not to exceed five pages, confined to a discussion of the Home Depot data in Dr. Scott's Supplemental Report. A further response to Dr. Scott's Rebuttal Report is *not* authorized.

## IV.   CONCLUSION

For the reasons stated above, the defendants' motions to strike Dr. Sukumar's and Dr. Dennis's opinions are denied. The defendants' motion to strike Mr. Weir's opinions is granted as to the portions of Mr. Weir's opinions that rely on the anonymous Whirlpool document as representative of Whirlpool's own price premium, and denied as to the remainder of Mr. Weir's opinions. Finally, the plaintiffs' motion to strike the rebuttal and supplemental reports of Dr. Scott is denied. Plaintiffs may, at their option, submit a supplemental report, not to exceed 5 pages, confined to the issue of the additional Home Depot data discussed in Dr. Scott's Supplemental Report.

A separate order will issue.

Dated: March 17, 2017

KEVIN MCNULTY
United States District Judge