## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**CHARLENE DZIELAK, SHELLEY BAKER, FRANCIS ANGELONE, BRIAN MAXWELL, JEFFERY REID, KARI PARSONS, CHARLES BEYER, JONATHAN COHEN, JENNIFER SCHRAMM, and ASPASIA CHRISTY on behalf of themselves and all others similarly situated,**

Civ. No. 2:12-89 (KM)(JBC)

OPINION

**Plaintiffs,**

**v.**

**WHIRLPOOL CORPORATION, SEARS HOLDINGS CORPORATION, THE HOME DEPOT, INC., FRY'S ELECTRONICS, INC., APPLIANCE RECYCLING CENTERS OF AMERICA, INC., and LOWE'S HOME CENTER, LLC,**

**Defendants.**

**KEVIN MCNULTY, U.S.D.J.:**

    This motion for class certification arises from the sale of Maytag washing machines that bore ENERGY STAR® ("Energy Star") labels signifying that they met federal standards of water and electrical efficiency. Defendants had already been selling Maytag washing machines with the Energy Star label when, in May 2012, the U.S. Department of Energy determined that those particular models did not actually meet the Energy Star efficiency standards. Plaintiffs seek to represent a putative class whose members allegedly suffered uniform harm because they all purchased washers improperly labeled with the Energy Star logo. They claim two harms: (1) that the price of the washers was inflated

1

because consumers pay a premium for Energy Star qualified machines and (2) that each purchaser "paid more money in additional water and energy costs to operate his or her Mislabeled Washing machine" than he or she would have if the washers had actually met the Energy Star standards. (2AC ¶ 118).[1]

This opinion addresses plaintiffs' renewed motion for class certification.

---

[1]   Citations to the record will be abbreviated as follows:

"MTD Op." = Opinion on Defendant's Motion to Dismiss the First Amended Consolidated Complaint (ECF no. 78)

"2AC" = Second Amended Consolidated Complaint (ECF no. 86)

"Preemption Op." = Opinion on Motion to Dismiss State Law Claims in 2AC (ECF no. 127)

"Bursor Decl." = Declaration of Scott A. Bursor Regarding the Motion to Certify Class (ECF no. 164)

"Weir Decl." = Declaration of Colin B. Weir Regarding the Motion to Certify Class (ECF no. 167)

"Weir Rebuttal" = Rebuttal Declaration of Colin B. Weir (ECF no. 184)

"*Daubert* Op." = *Daubert* Opinion (ECF no. 236)

"Pl. Br." = Memorandum of Law in Support of Plaintiff's Renewed Motion for Class Certification (ECF no. 241-1)

"Home Depot Br." = Defendant Home Depot USA, Inc.'s Opposition to Plaintiff's Renewed Motion for Class Certification (ECF no. 251)

"Def. Br." = Defendant's Brief in Opposition to Plaintiff's Renewed Motion for Class Certification (Whirlpool et al.) (ECF no. 254)

"Pl. Reply to Whirlpool" = Reply Memorandum of Law in Support of Plaintiffs' Renewed Motion for Class Certification (Response to Whirlpool, Lowe's Fry's, and Sears' Opposition Brief) (ECF no. 256)

"Pl. Reply to Home Depot" = Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (Response to Home Depot's Opposition Brief) (ECF no. 257)

## I.    BACKGROUND

Familiarity with my earlier opinions (MTD Op.; *Daubert* Op.; Preemption Op.) is assumed. I canvass here only the facts and procedural history pertinent to my decision on class certification.

The named plaintiffs, purchasers of Maytag washing machines, are Charlene Dzielak, Francis Angelone, Shelley Baker, Brian Maxwell, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Apasia Christy. (MTD Op. 1; 2AC ¶¶ 8-18). Defendant Whirlpool Corporation ("Whirlpool") manufactured the relevant washers. (MTD Op. 1). The remaining defendants are retailers from whom the plaintiffs purchased the machines: Lowe's Home Center, LLC ("Lowe's"), Sears Holding Corporation ("Sears"), The Home Depot, Inc. ("Home Depot"), Fry's Electronics, Inc. ("Fry's"), and Appliance Recycling Centers of America, Inc. ("ARCA"). (*Id.* at 1-2; 2AC ¶¶ 19-24).

Each Maytag washing machine at issue in this case bore an Energy Star label at the time of purchase. (*Id.* at 2). Energy Star machines must use approximately 37% less energy and 50% less water than standard models. (*Id.* at 4). Thereafter, however, the Department of Energy determined that the washers at issue did not comply with Energy Star requirements, and the EPA then disqualified them from the program. (*Id.* at 2).

The putative class comprises seven subclasses of purchasers in all states where named plaintiffs bought washers—New Jersey, California, Florida, Ohio, Indiana, Texas, and Virginia. (Pl. Br. 4); (Pl. Reply to Whirlpool 13). Plaintiffs allege two harms: (1) a price premium they attribute to the Energy Star label and (2) higher water and energy costs than they would have paid had the washers actually met the Energy Star standards. (Weir Decl. ¶¶ 14-53).

The claims that remain at this stage are as follows:

Count II:    Breach of Express Warranty

Count III:   Breach of Implied Warranty of Merchantability (for NJ, IN, TX, and VA plaintiffs only)

Count IV:     Unjust Enrichment (asserted against retailers only; not against Whirlpool)

Count V:      New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJCFA")

Count VI:     New Jersey Truth-in-Consumer Contract, Warranty, and Notice Act, N.J. Stat. Ann. § 56:12-14, *et seq.* ("TCCWNA")

Count VII:    California's Consumer Legal Remedies Act, Cal. Civil Code § 1750, *et seq.* ("CLRA")

Count VIII:   California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")

Count IX:     California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL")

Count XI:     Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA")

Count XII:    Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.* ("OCSPA")

Count XIII:   Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.* ("IDCSA")

Count XIV:    Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41, *et seq.* ("DTPA").[2]

(2AC); (MTD Op.). Plaintiffs now move for class certification under Rule 23(b)(3). Defendants argue that plaintiffs have not satisfied the requirements for class certification.

---

[2]     In prior opinions (MTD Op.; Preemption Op.), I dismissed Count I (violation of the Magnuson-Moss Warranty Act) in its entirety, Count III (implied warranty of merchantability) under California, Florida, and Ohio law, and Count IV (unjust enrichment) as against Whirlpool. These claims were not reasserted. Plaintiff Jeffery McLenna, the sole named plaintiff from Michigan, voluntarily dismissed his claims in this action, effectively eliminating Count X, under the Michigan Consumer Protection Act. (ECF no. 112).

## II.    JURISDICTION

The Court has jurisdiction over this motion for class certification under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453, 1711-15. CAFA confers jurisdiction on federal courts over certain class actions in which the matter in controversy exceeds $5 million, exclusive of interest and costs, and minimal diversity is present, *i.e.,* any defendant's citizenship is diverse from that of any plaintiff. *Id.* § 1332(d)(2).

## III.    LEGAL STANDARD

The class action is "an exception to the usual rule that litigation is usually conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citing *Califano v. Yamaski*, 442 U.S. 682, 700-01 (1979)). Accordingly, a plaintiff bears the burden of affirmatively demonstrating by a preponderance of evidence that her putative class satisfies the class-certification requirements in Federal Rule of Civil Procedure 23. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). Importantly, Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Rather, the plaintiff must prove that the Rule 23(a) requirements are met. *Comcast*, 569 U.S. at 33.

First, to qualify for class certification, a party must demonstrate that the putative class meets the four requirements set forth in Rule 23(a):

(1)  the class is so numerous that joinder of all members is impracticable;

(2)  there are questions of law or fact common to the class;

(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see Dukes*, 564 U.S. at 345. The Rule 23(a) factors are referred to as numerosity, commonality, typicality, and adequacy of representation.

The Supreme Court has emphasized that it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" and that certification is proper only if "the trial court is satisfied, after a rigorous analysis" that Rule 23(a)'s prerequisites have been met. *Comcast*, 569 U.S. at 33 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982)). Such an analysis will "entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351.

Second, a plaintiff must satisfy at least one of the three requirements listed in Rule 23(b). *Id.* at 345-46. In this action, plaintiffs seek to certify the class under Rule 23(b)(3), which permits certification when (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) analysis of predominance and superiority is more demanding than the Rule 23(a) analysis. *Comcast*, 569 U.S. at 34 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). In particular, courts have a duty to take a close look at whether common questions predominate over individual ones. *Dukes*, 564 U.S. at 362.

In the Third Circuit, Rule 23(b)(3) certification also involves an independent ascertainability inquiry, which requires a plaintiff to show that (1) the class is "defined with reference to objective criteria" and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (citing *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). The parties do not seem to dispute this issue, however.

## IV.    RULE 23(A) REQUIREMENTS

As stated above, a plaintiff seeking to certify a class first must satisfy Rule 23(a)'s four requirements: numerosity, commonality, typicality, and adequacy of representation. All must be proven by a preponderance of the evidence. *Hydrogen Peroxide*, 552 F.3d 305, 307 (3d Cir. 2008). Defendants

claim that plaintiffs have not met their burden regarding commonality, typicality, and adequacy. (Def. Br. 11 n.8).[3]

### A. Numerosity

Rule 23(a)(1) requires a finding that "the class is so numerous that joinder of all members is impracticable." That requirement promotes judicial economy by avoiding onerous (anti-)joinder rules and eliminating the need to adjudicate numerous similar actions separately. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594-95 (3d Cir. 2012). Furthermore, it enhances access to judicial relief, particularly when individual claims would be uneconomical to litigate individually, and, where joinder can be easily accomplished, prevents putative class representatives and counsel from denying members of a small class from adjudicating their claims individually. *Id.*

As a general rule, a potential class with as few as forty members may meet the numerosity requirement. *Id.* at 595 (citing *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)). Nonetheless, Rule 23(a)(1) "requires examination of the specific facts of each case." *Gen. Tel. Co. of Northwest v. EEOC*, 446 U.S. 318, 330 (1980). Additionally, numerosity is not inferred for state-specific subclasses simply because there is a nationwide or larger class; there needs to be state-specific evidence for each subclass. *Marcus*, 687 F.3d at 585.

Plaintiff has satisfied the numerosity requirement by providing documentation that approximately 174,974 units of allegedly mislabeled washers were sold in the seven states during the class period. (Weir Decl. ¶ 49); (Bursor Decl. Ex. 18). Plaintiffs provide data for each individual state, which allows me to determine that the numerosity requirement is met for each state-

---

[3]     Defendants did not fully brief the Rule 23(a) requirements. Defendants state, in a footnote, that they dispute commonality, typicality, and adequacy but "have not challenged Plaintiffs['] ability to meet those requirements here but reserve the right to do so in the future." (Def. Br. 11 n.8). Their brief focused almost exclusively on disputing predominance and superiority.

specific subclass as well. Therefore, plaintiffs have proven Rule 23(a)'s numerosity requirement. (Bursor Decl. Exs. 17, 18).[4]

### B. Commonality

Rule 23(a)(2) requires a showing of "questions of law or fact common to the class." "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (citing *Falcon*, 457 U.S. at 157). The claims must rest upon a "common contention" that is capable of classwide resolution:

> What matters to class certification ... is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* at 350 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Importantly, the commonality requirement does not require that class members share identical claims. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 310 (3d Cir. 1998). "[F]actual differences among the claims of the putative class members do not defeat certification." *Id.* (citing *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Commonality is addressed at a fairly high level of generality and is less stringent than the Rule 23(b)(3) predominance requirement. *See Amchem Prods, Inc.*, 521 U.S. at 609.

What is required is that the named plaintiffs share at least one question of fact or law with the prospective class. *See Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013). In fact, "the focus of the commonality inquiry is

---

[4]     Each of the Rule 23(a) requirements, including numerosity, must be met for each subclass. *See Marcus*, 687 F.3d at 595. As it happens, plaintiffs have not in all cases proven that any retailer-specific sub-subclasses, *see infra* subsections V.A.iii–iv, would have met Rule 23(a)'s numerosity requirement. For example, plaintiffs have not demonstrated that the putative class members who purchased a "mislabeled" washing machine from ARCA in Ohio are "so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1).

not on the strength of each plaintiff's claim, but instead is 'on whether the defendant's conduct was common as to all of the class members.'" *Id.* (citing *In re Prudential*, 148 F.3d at 311).[5]

In this case, there are common questions whose resolution would drive the resolution of this litigation. Such common questions include whether the Energy Star mark and advertising material were material to class members' decisions to purchase the machines; whether the class members paid a price premium because of the Energy Star label; and whether class members paid more in energy and water bills because the washers were mislabeled. Therefore, this putative class satisfies Rule 23(a)'s commonality requirement.

### C. Typicality

The Rule 23(a)(3) test for typicality requires that the claims or defenses of the named plaintiffs are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Prudential*, 148 F.3d at 311; *see also Rodriguez*, 726 F.3d at 376 n.4 (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)). Typicality does not require that the putative class members all share identical claims. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3d Cir. 2004). Rather, the typicality requirement, which tends to overlap with the adequacy and commonality determinations, seeks to assure that absent class members will be adequately represented. *Rodriguez*, 726 F.3d at 376 n.4; *Eisenberg*, 766 F.2d at 786.

In this case, the claims of the representative plaintiffs all arise from the same allegedly wrongful conduct—the alleged misrepresentation that the

---

[5] Plaintiffs have made only conclusory allegations against the retailers (MTD Op. 32), and have not affirmatively demonstrated that they engaged in a common course of conduct toward the class. This weighs against a finding of commonality regarding the retailer defendants. I will address these issues thoroughly during the Rule 23(b)(3) analysis. *See infra* subsections V.A–B.

washers were Energy Star qualified.[6] The claims arise under the same general legal theories. Overall, while there are some factual differences between the named plaintiffs' claims and those of other class members, the named plaintiffs have claims that are sufficiently typical of the putative class. Therefore, I find that the putative class satisfies Rule 23(a)(3) typicality.

### D. Adequacy of Representation

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." The adequacy inquiry has two components designed to ensure that absent class members' interests are fully pursued: (1) whether counsel is qualified to represent the class and (2) whether there are conflicts of interest between named parties and the putative class they seek to represent. *In re Warfarin*, 391 F.3d 516 (citing *In re Prudential*, 148 F.3d at 313).

First, the putative class counsel includes qualified and experienced class action attorneys who have been involved in similar litigation around the country. Putative class counsel have pursued this litigation vigorously for several years. Second, there are no apparent conflicts of interest between the named plaintiffs and the classes they seek to represent. The named plaintiffs bought the same washer models as the other class members, and they claim the same relief that the putative class would receive. As a result, I find that the class counsel and named plaintiffs will fairly and adequately represent the interests of the class.

In sum, I find that the putative class satisfies the four threshold Rule 23(a) class-certification requirements of numerosity, commonality, typicality, and adequacy of representation—at least against Whirlpool. (More about the retailers later.) I will now evaluate whether plaintiffs satisfy the requirements of Rule 23(b)(3).

---

6      I will address the retailers' conduct in subsections V.A–B, *infra*.

## V.    RULE 23(B)(3) REQUIREMENTS

In addition to satisfying the four Rule 23(a) requirements, a plaintiff seeking class certification must satisfy at least one of the three requirements listed in Rule 23(b). In this action, plaintiffs seek Rule 23(b)(3) certification, which requires (A) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (B) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).[7] Although the requirements are distinct, many considerations are relevant to both, so some overlap in the discussion is unavoidable.

### A. Predominance

To be certified as a Rule 23(b)(3) class action, a putative class must demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The putative class bears the burden of demonstrating predominance. *Comcast*, 569 U.S. at 33-34. "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). Since Rule 23(b)(3) is an "adventuresome innovation," designed for situations in which "class-action treatment is not clearly called for," courts have a duty to take a "close look" at whether common questions predominate over individual ones. *Id.* (citing *Dukes*, 564 U.S. at 362).

The predominance analysis may overlap with or resemble a merits inquiry. *Comcast*, 569 U.S. at 33-34; *Dukes*, 564 U.S. at 351. "The predominance inquiry is especially dependent upon the merits of a plaintiff's

---

[7]    This Circuit has given particular prominence to a third element: (C) an independent "ascertainability" inquiry to determine if the class can be defined and determined for the purposes of class litigation. *Byrd*, 784 F.3d at 163. Defendants challenge the putative class on predominance and superiority, but do not challenge ascertainability, perhaps because the identities of customers and the washer models they purchased are available from sales and warranty records.

claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009) (quotation marks omitted); *see Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). The Third Circuit recently explained:

> In determining whether issues that are "susceptible to generalized, class-wide proof" are "more prevalent or important," a district court is called to "formulate some prediction as to how specific issues will play out ... in a given case[.]" The court cannot rely on a mere "threshold showing" that a proposed class-wide method of proof is "plausible in theory." Rather, the court's Rule 23(b)(3) finding necessarily entails some analysis of whether the proposed class-wide evidence will actually be sufficient for the class to prevail on the predominant issues in the case. If class-wide evidence is lacking, the court cannot be adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication. This analysis will often resemble a merits determination, in that it relates to plaintiffs' ability to prove the elements of their claims.

*Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304-05 (3d Cir. 2016) (internal citations omitted).

Rule 23(b)(3) sets out a list of four non-exhaustive favors to consider during the predominance and superiority inquiries:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). I apply those factors to this case.

First, each class member has little interest in "individually controlling" an action because each claim is small in relation to the cost of prosecuting a lawsuit. A class action allows claims such as these to proceed when each claimant's alleged loss is too small to be economically litigated individually. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d

768, 783-84 (3d Cir. 1995). In such a case, a class action is the "only rational avenue of redress for many class members." *In re Prudential,* 148 F.3d at 316; *see also Amchem Prods.,* 521 U.S. at 617.

Second, the parties have not identified other litigation by the class members. There is pending litigation against Whirlpool in the Southern District of New York, filed nearly four years after this action was instituted. *Famular v. Whirlpool Corp.,* No. 16-cv-944, 2017 WL 2470844, at *2 (S.D.N.Y. June 7, 2017). Although the claims are related, the classes do not overlap and they seek relief under different states' laws.[8]

There are several challenges, however, related to predominance, the desirability of concentrating the litigation in this forum, and the likely difficulties of managing a class action. In that context, defendants raise several issues: (i) whether plaintiffs pose a cognizable theory of injury that is supported by class-wide evidence; (ii) whether plaintiffs' damages models are tied to their theory of liability and can measure damages on a class-wide basis; (iii) whether key differences in state law overwhelm common issues and thus render class treatment unmanageable; and (iv) whether individualized facts predominate over common facts.

In this section, I will discuss each of these predominance/superiority issues. The first two relate to all claims, but especially the central claims against Whirlpool. The third and fourth, however, prominently implicate the claims against retailers in the several states, and suggest that such claims against retailers are not sustainable on a class basis.

---

[8]     The plaintiffs in the *Famular* case were members of this putative class until plaintiffs' counsel voluntarily narrowed the proposed class by seeking certification in only seven states. 2017 WL 2470844, at *2. Plaintiffs from New York, Tennessee, Maryland, South Dakota, South Carolina, Illinois, Pennsylvania, Kentucky, and Oklahoma then brought a putative class action on the same grounds against Whirlpool, Lowe's, Home Depot, and Sears. *Id.* at *1-2. Defendants' motion to dismiss was granted in part. *Id.* at *10. Lowe's, Home Depot, and Sears were all terminated from the *Famular* case; only claims against Whirlpool remain. *Id.*

### i.   Cognizable Theory of Injury

Defendants argue that neither of the plaintiffs' theories of injury is cognizable. In particular, they contend that (a) plaintiffs' price-premium theory is not cognizable under the laws of several states, and (b) plaintiffs' energy-expense theory of injury is not susceptible of proof with common, class-wide evidence.

### a.   Price-Premium Theory

Defendants' attack on plaintiffs' price-premium theory centers on a comparison of this case with *Harnish v. Widener University School of Law*, 833 F.3d 298 (3d Cir. 2016), and *Dugan v. TGI Fridays, Inc.*, __ A.3d __, 2017 WL 4399352 (N.J. Oct. 4, 2017). *Harnish* and *Dugan*, applying New Jersey law, both denied class certification on price-inflation theories.

In *Harnish*, a putative class alleged that Widener University School of Law published misleading statistics about its graduates' employment. 833 F.3d at 301. Widener, the putative class argued, was able to charge "inflated" tuition because those misleading statistics enhanced its position within the tuition market. *Id.* at 302-03. The Third Circuit affirmed the district court's denial of class certification because a price-inflation suit pursuing out-of-pocket damages is not a cognizable theory under New Jersey or Delaware law. *Id.* at 309-13. *Harnish* does not, however, wholly foreclose class actions based on price-premium damages theories.

*Harnish* distinguished between two kinds of price-premium theories: price-inflation and benefit-of-the-bargain. The price-inflation theory is an extension of the fraud-on-the-market theory familiar from the securities context. *Id.* at 312. A fraud-on-the-market theory permits individuals to sue for fraud without individualized proof of reliance. The theory incorporates three presumptions: First, the relevant market must be an efficient one, where "information important to reasonable investors ... is immediately incorporated into stock prices." *Id.* at 310 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)). Second, the court presumes that a purchaser

14

"did in fact rely on the price of the stock as indicative of its value." *Id.* (citing *Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 822 (3d Cir. 1988)). Third, a court satisfied as to presumptions 1 and 2 will then presume that such reliance is reasonable. Essentially, the fraud-on-the-market theory is "based on the hypothesis that, in an open and developed securities market," misleading statements will affect the share price in a predictable way and therefore "defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir. 1986))).

The plaintiffs in *Harnish* introduced expert testimony that the market was efficient, in that tuition at Widener and elsewhere responds to public information such as employment statistics. *Id.* at 311-12. The *Harnish* plaintiffs argued that Widener published misleading employment statistics, that an efficient law-school-tuition market incorporated this information, and that Widener was thereby empowered to charge more. *Id.* The problem for the *Harnish* plaintiffs was that state courts have held that the ascertainable-loss and causal-relationship elements of the New Jersey Consumer Fraud Act ("NJCFA") cannot be met by this kind of price-inflation theory. *Id.*; *see, e.g.*, *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076 (N.J. 2007) (per curiam); *N.J. Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 178-79 (N.J. Super. Ct. App. Div. 2003).

In *Dugan v. TGI Fridays, Inc.*, the New Jersey Supreme Court held that class certification was not appropriate based on a price-inflation theory. __ A.3d __, 2017 WL 4399352 (N.J. Oct. 4, 2017). The *Dugan* plaintiffs argued that TGI Fridays, the restaurant chain, violated the NJCFA by failing to disclose the prices charged for beverages. *Id.* at *4. They claimed that TGI Fridays was able to charge each member of the class, across the board, $1.72 more than the "fair" or "reasonable" prices that the market would bear if the prices had been disclosed on the menu. *Id.* The New Jersey Supreme Court

recognized this as a price-inflation theory of damages, cited *Harnish*, and held that class certification was not appropriate. *Id.* at *18.

But if price-inflation or fraud-on-the-market class actions are foreclosed under New Jersey law, benefit-of-the-bargain class actions nevertheless remain viable. *See Harnish*, 833 F.3d at 308-309 & n.5.

> A benefit-of-the-bargain claim, by contrast [with fraud on the market], is contract-like. We look to the injuries that resulted from the defendant's having not lived up to the misrepresentation, and the goal is to place the plaintiffs in the position that they would occupy if the misrepresentation were true…. A benefit-of-the-bargain class action logically does not entail proving that all class members were induced to pay extra (a reliance-based theory) or even that the defendant was empowered to charge them all extra (the price-inflation theory ….). Instead, it entails proving that class members all reasonably expected more from the bargain than what they received.

*Id.* (internal citations omitted). In *Harnish,* the Third Circuit itself contrasted its holding with that of *Smajlaj v. Campbell Soup Co.*, which approved a benefit-of-the-bargain theory.

In *Smajlaj,* a putative class action survived a motion to dismiss on a benefit-of-the-bargain theory under the NJCFA. 782 F. Supp. 2d 84, 97-103 (D.N.J. 2011). In that case, plaintiffs alleged that they were misled into thinking that more expensive "less-sodium" soups contained significantly less sodium than the cheaper regular tomato soup. As a result, consumers allegedly were willing to pay more for the "less-sodium" soups. *Id.* at 100. In fact, however, Campbell's "25% Less Sodium Tomato Soup" allegedly contained the same amount of sodium per serving as its regular tomato soup. *Id.* at 90.

As noted in *Smajlaj,* the New Jersey Supreme Court has repeatedly and explicitly endorsed the benefit-of-the-bargain theory under the NJCFA. *Id.* at 99; *see, e.g., Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783 (N.J. 2005); *Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435 (N.J. 2004). Under that theory, the NJCFA's ascertainable-loss element "requires nothing more than

16

that the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised." *Smajlaj*, 782 F. Supp. 2d at 99.

The plaintiffs have made a viable *Smajlaj*-style benefit-of-the-bargain case in their second amended complaint. Each plaintiff allegedly "saw the ENERGY STAR® labels prior to and at the time of purchase, and understood them as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the machine met the standards of water and energy efficiency established by the ENERGY STAR® program ...." (2AC ¶ 100). Each plaintiff "relied on the representations and warranties in deciding to purchase the washing machine, and *these representations and warranties were part of the basis of the bargain, in that she would not have purchased the [washing machine] if she had known that it was not, in fact, ENERGY STAR® compliant.*" (2AC ¶ 100) (emphasis added).

In short, there is a distinction to be drawn between the fraud-on-the-market theory rejected by *Harnish* and the benefit-of-the-bargain theory endorsed by *Smajlaj*. The *Smajlaj* plaintiffs contended that they paid more for "25% Less Sodium Tomato Soup"—but received soup that did not in fact have reduced levels of sodium. By analogy, the plaintiffs in this action contend that they paid more for a washing machine that met the Energy Star criteria (*i.e.*, used at least 37% less energy and 50% less water than standard models), but received a machine that did not meet those Energy Star criteria. That is not a *Harnish* fraud-on-the-market theory, but a *Smajlaj* benefit-of-the-bargain theory. Therefore, the plaintiffs can pursue their claims on such a theory, which is not foreclosed by *Harnish*.[9]

---

[9]    Defendants cite to California and Indiana cases that reject fraud-on-the-market and "hypothetical market price damages," and further assert that no cases from Ohio, Texas, or Virginia recognize that theory. (Def. Br. 13-14 & n.10). However, as explained above, plaintiffs do not seek to certify a class based on a fraud-on-the-market or "hypothetical market price damages" theory. Rather, plaintiffs rest their

Plaintiffs may, without running afoul of that case law, pursue benefit-of-the-bargain claims for the alleged price premium.

### b. Energy-Expense Theory

Defendants also argue that plaintiffs' energy-expense theory is not susceptible of proof with common, class-wide evidence, and therefore is not a cognizable theory of injury. Defendants make three arguments here: (1) DOE tests do not reflect real-world conditions "and so do not establish that any Washer will use more waste or energy than the Energy Star logo implied under real-world conditions"; (2) a determination of energy and water usage requires evidence of "individual usage habits" such as loads washed per week, temperature and cycle settings, and local utility rates, all of which are not common to the class; and (3) permitting both price-premium and energy-expense theories would result in double counting of damages. (Def. Br. 14; Weir Br. 23-25).[10] Another, more general potential issue is (4) whether energy-expense damages are common to all class members. I discuss those four arguments in order.

**(1)** Defendants' argument that the Energy Star label does not reflect real-world costs is unavailing. The Energy Star label signifies that the machine operates with lower utility costs. That is the representation that Whirlpool (and, allegedly, the retailers, *see infra*) made, presumably with the expectation that it would have some meaning to consumers.

The DOE's tests approximate the difference in energy usage between different machines. An analogy to miles per gallon ("mpg") is helpful: Drivers may drive fast, brake quickly, or frequently idle in traffic; all of these factors

---

case on a cognizable benefit-of-the-bargain theory of injury. Defendants' citations to fraud-on-the-market cases in other states are therefore inapplicable, for the same reasons that the New Jersey *Harnish* and *Dugan* cases are inapplicable.

[10]     I also addressed the "double counting" issue at the *Daubert* stage: "For now, I will permit the plaintiffs to explore what are potentially alternative measures of damages. The plaintiffs' position is appropriate at this stage of the case and raises no *Daubert* issue. To the extent the plaintiffs do seek double recovery, the defendants may raise their argument at a later, more appropriate stage of the case." (*Daubert* Op. 53).

will affect the actual mpg of a car. Therefore, the car manufacturer cannot be held to the representation that an "eco-friendly" car with "50 mpg efficiency" will achieve *exactly* 50 mpg for each driver. Still, standardized efficiency tests are useful in comparing models, even if an individual's results will vary. Irrespective of individual driving habits, a car manufacturer might be guilty of a misrepresentation if it said the car achieved 50 mpg *on efficiency tests* while knowing that it would achieve only 25 mpg *on efficiency tests*. It could not excuse its misrepresentation by saying that individual mpg results may vary.

In a similar way, Energy Star machines are represented to use 50% less water and 37% less energy than standard models. (MTD Op. 4). While individual water and energy uses will vary depending on individual circumstances (settings, temperature, utility companies, etc.), Whirlpool represents that a customer with the "eco-friendly" Energy Star machine will use less water and energy in comparison to a standard model. Whirlpool cannot excuse such a misrepresentation by noting that individual water and energy usage rates vary.

**(2)** However, the different "individual usage habits" suggests that common facts may not predominate over individual ones. Many factors determine the energy and water costs for each putative plaintiff. Plaintiffs used different temperature and cycle settings, fill levels, and utility companies. The number of cycles per week varies greatly. For instance, named plaintiff Mr. Reid used the machine for one load of laundry per week, Ms. Parsons did two to three loads per week, and Mr. Maxwell did seven to fourteen loads per week. (ECF no. 279). Plaintiffs have not adequately addressed the numerous factors that affect each putative plaintiff's energy and water costs.

One cannot isolate the amount of energy and water each class member used for his or her washing machine. Consider the "eco-friendly car" analogy: If customers were over-promised a car that would achieve 50 mpg, each plaintiff could use the car's odometer to establish the number of miles driven. Although different driving styles would affect mpg, the court could determine how many

19

miles each plaintiff drove and thus allocate damages to a reasonable degree of accuracy. In this case, however, there is no feasible way to approximate, let alone calculate, individual energy and water usage. Utility bills do not break out costs by appliance, the washing machines do not have anything analogous to an odometer that tracks usage history, and the number of cycles per week varies widely. Fairly apportioning damages in this case would appear to be an impossible task. The individual facts involved would predominate over the common issues affecting the class.

Plaintiffs propose "rough justice": a damages approach that reflects the average value of the plaintiffs' claims. That proposal conflicts with the Rules Enabling Act and Supreme Court precedent. Cases that accept the use of representative evidence in class actions do not support the use of representative evidence here. *Tyson Foods, Inc. v. Bouaphakeo* exemplifies the proper use of representative evidence to establish class-wide liability. 136 S. Ct. 1036 (2016). There, an employer did not pay hourly employees for time spent donning and doffing protective gear. *Id.* at 1042. The employees sought to certify a class action under both Rule 23 and the Fair Labor Standards Act ("FLSA"),[11] arguing that they were entitled to be compensated for this time. *Id.* Since the employer did not keep records of donning and doffing time, the class used representative evidence—*i.e.*, the average time an employee took to don

---

[11] The *Tyson Foods* plaintiffs sought certification under both Rule 23 and 29 U.S.C. § 216, a provision of the FLSA that permits employees so sue on behalf of "themselves and other employees similarly situated." 29 U.S.C. § 216; *see Tyson Foods*, 136 S. Ct. at 1042.

The putative classes started on different dates. The Rule 23 class was also larger (3,344 members to 444 members) because § 216 requires class members to opt-in. *Tyson Foods*, 136 S. Ct. at 1043 (citing *Genesis Healthcare Cor. v. Symczyk*, 133 S. Ct. 1523, 1530 (2013)).

The parties did not dispute that the standard for certifying a collective action under the FLSA was "no more stringent" than the standard for certifying a Rule 23 class. *Id.* at 1045. The Supreme Court assumed, without deciding, that this is correct. *Id.* The Court then analyzed class certification under Rule 23, stating that satisfying Rule 23's requirements would satisfy § 216's requirements. *Id.* With that understanding, *Tyson Foods'* analysis of Rule 23's requirements is applicable here.

and doff safety equipment. *Id.* at 1043-44. The Court of Appeals found that the jury could nevertheless have drawn "a 'reasonable inference' of class-wide liability." *Id.* at 1044-45 (citations omitted). The Supreme Court affirmed. *Id.*

The dispute in *Tyson Foods* centered on whether it is permissible to infer that the representative evidence (taken from 744 observations) was actually representative of *each* plaintiff's claim, as opposed to some kind of extremes-masking average. *Id.* at 1043, 1046. *Tyson* held that it was. The class was permitted to use representative evidence because an individual class member would have been able to use that same statistical or representative evidence in an individual action. (Recall that under the Rules Enabling Act, the Federal Rules, including Rule 23, may not abridge or modify substantive rights.) *Id.* at 1046; *see Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407-08 (2010). The permissibility of including such representative evidence "turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Tyson Foods*, 136 S. Ct. at 1046. In that case, the average of 744 observations (for 3,344 members of the Rule 23 class) was representative of each plaintiff's claim. *Id.* at 1043, 1046. Indeed, the representative evidence resulted in the exclusion of 212 employees from the class, because they did not possess individual claims under the FLSA. *Id.* at 1044.[12]

While representative evidence was appropriate in *Tyson Foods*, representative evidence is inappropriate in many circumstances. In the earlier case of *Wal-Mart v. Dukes*, for example, a putative class was not certified because the class failed to meet the commonality requirement. 564 U.S. 338 (2011). The *Dukes* plaintiffs proposed using a "sample set of the class members" to determine liability, aggregating the damages award based on the "percent of claims to be valid" from this sample, applying this to the rest of the

---

[12]    As discussed in subsection V(A)(i)(b)(4), plaintiffs cannot identify which class members suffered energy-expense damages.

class, and then multiplying the "number of (presumptively) valid claims" by "the average backpay award in the sample set." *Id.* at 355-56, 367. The Supreme Court rejected this method, finding that the plaintiffs did not provide significant proof of a common policy of discrimination to which each employee was subjected. *Id.* at 355-56.

*Tyson Foods* itself clarified why the representative evidence in *Wal-Mart v. Dukes* was not conducive to class litigation:

> The underlying question in *Wal–Mart*, as here, was whether the sample at issue could have been used to establish liability in an individual action. Since the Court held that the employees were not similarly situated, none of them could have prevailed in an individual suit by relying on depositions detailing the ways in which other employees were discriminated against by their particular store managers.

136 S. Ct. at 1048. In this case, the plaintiffs' energy-expense evidence has a similar flaw: the plaintiffs use estimates of energy expense (*i.e.*, representative data) and attempt to apply it to the entire class—regardless of each individual's energy usage and regardless of whether the class member suffered any energy-expense injury at all. *See infra* subsection V(A)(i)(b)(4).

True, this may be a question of degree. We are not at the absurd end of the spectrum where a class member is saying, in effect, that "a lot of employees possess a cause of action, so there's a good chance that I do, too." But common sense suggests that individual variability in the time it takes to change clothing, as in *Tyson,* is dwarfed by individual variability in the energy use by owners of washers, rendering the use of representative evidence in this case more problematic than it was in *Tyson.*

The "representative" evidence proffered in this case thus presents two major problems: (a) the evidence is not representative of the class members and (b) it could not be used if one of the class members brought an individual action. As stated in *Tyson Foods*, "Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate ...." 136 S. Ct. at 1048-49. Even a quick glance at the named

22

plaintiffs suggests that the average usage estimates are not a close approximation of each of the putative class members' usage.[13] Furthermore, an individual plaintiff from the class would not be able to use the statistical evidence to prove a case. If Mr. Reid brought an action against Whirlpool, it is unlikely that he would be permitted to use the average energy expenditures of someone who does 392 cycles per year as a proxy for his own energy use (he does approximately 52 washes per year). He would have to submit his own evidence. Permitting a class to use representative data to prove a claim when an individual class member could not use that data to prove the same claim is to modify substantive rights under the Federal Rules of Civil Procedure—which is not permissible under the Rules Enabling Act. *See* 28 U.S.C. § 2072(b); *Dukes*, 564 U.S. at 367; *Sibbach v. Wilson & Co.*, 312 U.S. 1, 7-8 (1941).

**(3)** Defendants' third argument is that permitting both price-premium and energy-expense damages would lead to "double counting" of damages for many plaintiffs.[14] I take plaintiffs to have implicitly acknowledged this

---

[13]    Plaintiffs seek to apply to the class an "average" washing machine usage of 392 cycles per year. Compare the actual data for the named plaintiffs: Mr. Reid performed approximately 52 cycles per year (1 cycle per week x 52 weeks per year) and Ms. Parson performed approximately 130 cycles per year (2.5 cycles per week x 52 weeks per year). On the other hand, Mr. Maxwell completed about 546 cycles per year. (He performed 7 to 14 cycles per week, approximately 10.5 cycles per week, for 52 weeks). (ECF No. 279). As explained in *Tyson Foods*, the district court could have denied class certification on the ground that the representative evidence was improper if "no reasonable juror could have believed that the employees spent roughly equal time donning and doffing." 136 S. Ct. at 1049 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986)). In this case, no reasonable juror could find that the average of 392 cycles per year approximated individual usage.

[14]    Plaintiffs have acknowledged that their two damages models do not have to be, and perhaps should not be, aggregated. (*Daubert* Op. 52-53). Dr. Weir, plaintiffs' exert, reported as follows:

> I believe the determination of which damage methodologies are selected in this litigation will be made by the Court or jury, and I offer no opinion as to whether Plaintiffs are legally entitled to one or both of these damage recoveries. I have simply offered multiple damage methodologies that I believe comport with Plaintiffs' stated theories of liability, namely that Plaintiffs allege that the class has paid a price premium solely attributable to the presence of the Energy Star logo on these Maytag Washing Machines, and that on an ongoing basis the class pays

possibility, though only in part. They state in their brief that "Whirlpool and its customers understand that Energy Star labeled machines command an initial price premium, but come with the promise of reduced energy and water bills that, over time, will generate enough savings to recoup the higher purchase price." (Pl. Br. 7-9 & n.6). Plaintiffs claim that the price premium for an Energy Star machine is $200 and that an Energy Star customer will "recover" this price premium in 3.4 years because of lower bills. (Pl. Br. 1, 7-9). *After* the price premium is "recovered," however, an Energy Star customer continues to save money compared to a non-Energy Star customer for the rest of the (assumed) 11-year ownership term. (Pl. Br. 9; Weir Decl. ¶ 15).[15]

The energy-expense theory thus should be analyzed separately for two time periods: First, for the initial 3.4 years of ownership, the Energy-Star purchaser is "recovering" or amortizing the price premium. Second, from 3.4 years to 11 years of ownership, the Energy Star purchaser is continuing to save money (compared to a non-Energy Star purchaser). There is clear double counting in the first time period. Plaintiffs cannot receive damages for the price premium *and* the difference in energy expense that offsets the price premium. *See generally Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 596 (D.N.J. 2010) (rejecting proposed double counting of damages on motion to approve settlement), *rev'd and remanded on other grounds*, 681 F.3d 170 (3d Cir. 2012). The second time period, however, does not involve double counting. From plaintiffs' perspective, Energy Star customers are supposed to continue saving

---

additional amounts for energy as a result of the lowered efficiency of these Maytag Washing Machines.

(Weir Rebuttal ¶ 90).

[15]    If consumers possessed perfect information, if they were perfectly rational, and if the market were perfectly efficient (three very big "ifs," as I observed at oral argument), the two measures of damages might be equivalent. That is, consumers would calculate the future energy savings and discount it to a present value, and that figure would place a cap on the premium they were willing to pay. There is no evidence that this represents a real-world scenario. Still, there is something to it; consumers do not prize the Energy Star logo in the same way they prize a celebrity's name on a pair of basketball sneakers or a designer label on a fashion item. However imprecisely, they value the Energy Star logo for the savings it represents.

money (compared to non-Energy Star customers) until the end of the machine's lifetime. (Of course, the calculations for that second time period are complicated by the fact that individual usage habits vary widely and class members do not keep their machines for uniform periods of time).

(4) Finally, and perhaps most problematically, a closer look at the energy-expense theory suggests that not all members of the putative class suffered energy-expense damages (defined, remember, as additional damages that accrue in the second time period, after the initial price-premium is amortized). Mr. Weir, plaintiffs' expert, proposed an energy-expense calculation based on an estimated 392 cycles per year. (Weir Decl. ¶¶ 10-11). Since it takes 3.4 years (on average) to "recover" the Energy Star price premium, a member of the putative class would need to complete 1,332.8 cycles (3.4 years x 392 cycles) to "recover" the price premium.

But some of the plaintiffs, based on their rate of usage, might *never* amortize their price premium and enter the second, energy-expense zone. For example, named plaintiff Mr. Reid does one load of laundry per week. Over the (presumed) 11 year life of the machine, he would complete 572 cycles (11 years x 52 cycles per year); 572 cycles does not approach the 1,332.8 cycles needed to offset the price premium. And if he never recovers his price premium before disposing of the washer, Mr. Reid will never suffer any energy-expense damages, as we have defined them.

Other plaintiffs would recover their price premiums, but not for many years. For instance, Ms. Parsons does two to three loads per week. Assuming she does 2.5 cycles per week, it would take her over 10 years to offset the price premium she paid (2.5 cycles per week x 52 weeks per year x 10 years = 1300 cycles). If she uses the machine for less than 10 years (for any reason), she would not recover her price premium and therefore would not suffer any energy-expense damages.

It is likely, then, that many class members, like the named plaintiffs discussed above, will not exhaust their price premium and therefore will not

incur supplemental energy-expense damages. Furthermore, since proving individual usage appears impossible, there is no way to tell which plaintiffs are which. The energy-expense damages thus present significant individual issues that do not predominate over common questions.[16] As the Supreme Court held in *Dukes*, a court cannot just aggregate plaintiffs who suffered damages with plaintiffs who did not suffer damages and then disburse "average" damages. 564 U.S. at 367.

I find that plaintiffs' energy-expense theory is not a cognizable one, and that it does not lend itself to class treatment. As to this theory, then, the class will not be certified.

### ii.   Damages Models

Defendants argue that under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the putative class has not provided damages models that are adequately tied to their theory of liability. (Def. Br. 15-26). Defendants interpret *Comcast* to require that plaintiffs must "proffer a 'sound' class damages model

---

[16]   In certain circumstances "there would be problems involved in proving damages which would outweigh the advantages of class certification," and in such a case, a district court might "give appropriate consideration to certification of a class limited to the determination of liability." *Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004) (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977), *abrog. on other grounds by In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 n.18 (3d Cir. 2008)); *see* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

The interaction between the requirements of Rule 23(a)–(b) and the ability to maintain a class action "with respect to particular issues," permitted by Rule 23(c)(4), has generated divergent interpretations among the courts. *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200 n.25 (3d Cir. 2009) (comparing the approaches of different courts). In any case, however, I decline to exercise discretion under Rule 23(c)(4) given the multiple problems with the energy-expense damages. *See id.* Including an energy-expense theory in the class certification would not promote efficiency. It would complicate the case and would likely never be resolved satisfactorily. The energy-expense data will not be amenable to class treatment at a later time. Additionally, including this theory would alter the substantive rights of plaintiffs. Plaintiffs who did not suffer energy-expense damages would be compensated for them, while other plaintiffs would be under-compensated. *See id. See generally Principles of the Law of Aggregate Litigation* ch. 2 (Am. Law Inst. 2009).

that measures 'only those damages attributable' to one of th[eir] two theories."
(Def. Br. 15).

In *Comcast*, the plaintiffs alleged four different theories of antitrust
impact against a cable television provider. 569 U.S. at 36-38. The trial court
found that three of the four theories were not suited to class resolution, but it
did certified the remaining theory. *Id.* A problem arose, however, because the
plaintiffs' damages expert did not segregate damages attributable to any one
theory; rather, the expert calculated aggregate damages from all four. *Id.* The
Supreme Court reversed, finding that the plaintiffs had not established that the
single, certified damages theory was capable of measurement on a class-wide
basis. *Id.* at 34-36. Because plaintiffs' showing was not tailored to the damages
theory the court had found valid, it did not satisfy Rule 23(b)(3)'s predominance
requirement. *Id.*

*Comcast* did not signal a revolution in the scrutiny of damages
measurements in Rule 23(b)(3) class actions. It rests on the uncontroversial
principle that plaintiffs "must be able to show that their damages stemmed
from the defendant's actions that created the legal liability." *Leyva v. Medline
Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 569 U.S. at 38);
*see Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 & n.10 (3d Cir. 2015)
(citing *Leyva*, 716 F.3d at 514). "[T]he Supreme Court specifically noted that it
was not breaking new ground [in *Comcast*] by stating at the beginning of its
opinion: 'This case turns on the straightforward application of class-
certification principles.'" *Neale*, 794 F.3d at 374 (citing *Comcast*, 569 U.S. at
34).

Here, plaintiffs have presented two damages models—one for the price-
premium theory of liability, and another for the energy-expense theory. For the
reasons expressed above, the first liability theory is appropriate for class
treatment, but the second is not. Unlike the damages models in *Comcast*,
however, the damages models here do not combine or conflate the valid and
invalid theories. Rather, the plaintiffs have presented *separate* damages models

corresponding to the price-premium and energy-expense theories. A class action can therefore segregate the damages that correspond to the valid, price-premium theory. No *Comcast* issue arises.

### iii.    Differences in State Law

Defendants claim that differences in state law make class treatment of state law claims unworkable, even as to Whirlpool alone. (Def. Br. 26-33). And applying multiple states' laws could become even more challenging if the jury needs to consider the liability of Whirlpool together with that of the five retailer defendants. (Home Depot Br.).

When a multi-state class is sought, a choice-of-law determination is required at the certification stage. "A necessary precondition to deciding Rule 23 issues is a determination of the state whose law will apply." *Powers v. Lycoming Engines*, 328 F. App'x 121, 124 (3d Cir. 2009); *see Huber v. Taylor*, 469 F.3d 67, 82-83 (3d Cir. 2006). Indeed, attempts to structure and certify a multi-state class may turn on the question of whether the court must apply the law of a single state or multiple states. *Cf. Powers*, 328 F. App'x at 124. A comprehensive choice-of-law analysis is also necessary because a class action, a procedural device, may not alter the substantive legal rights of the plaintiffs. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985); *see also Dukes*, 564 U.S. at 367; *Sibbach*, 312 U.S. at 7-8. Therefore, the putative class must credibly demonstrate "that class certification does not present insuperable obstacles" in terms of choice of law. *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986).

The predominance requirement of Rule 23(b)(3) may be defeated when class claims must be decided on the basis of multiple state laws. Wright & Miller explain:

> As a matter of general principle, the predominance requirement of Rule 23(b)(3) will not be satisfied if the trial court determines that the class claims must be decided on the basis of the laws of multiple states and the appellate court will reverse an order granting certification if the lower court has failed to consider

28

> carefully whether or how multiple state laws will apply. The
> application of multiple state laws to the action works to defeat
> predominance because the legal issues no longer pose a common
> question.

Wright & Miller, Federal Practice & Procedure § 1780.1 (3d ed. 2005) (footnotes
omitted). Courts in this district have agreed. *See Powers*, 328 F. App'x at 127
("Attempting to apply the law of a multiplicity of jurisdictions can present
problems of manageability for class certification under Rule 23(b)(3)."); *Gray v.
Bayer Corp.*, No. 8-4716, 2011 WL 2975768 (D.N.J. July 21, 2011) (finding that
plaintiff did not meet the burden to "credibly demonstrate, through an
extensive analysis of state law variances, that class certification does not
present insuperable obstacles"); *see also Chin v. Chrysler Corp.*, 182 F.R.D.
448, 453 (D.N.J. 1998) ("[W]here the applicable law derives from the law of the
50 states, as opposed to a unitary federal cause of action, differences in state
law will 'compound the [ ] disparities' among class members from the different
states." (quoting *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 624 (1997))).

Plaintiffs respond that choice-of-law problems can be minimized through
the certification of seven subclasses. (Pl. Br. 4; Pl. Reply to Whirlpool 12-13).
Under that proposal, there would be independent subclasses for each state
(New Jersey, California, Florida, Ohio, Indiana, Texas, and Virginia). Each
state's law would determine a defendant's liability for washer purchases that
occurred in that state. As to Counts II, III, and IV, moreover, plaintiffs point out
that the states' substantive laws do not vary appreciably, so the claims can be
adjudicated using common standars. (*See* MTD Op. 13-27); *see also* 2 William
B. Rubenstein, Newberg on Class Actions § 4:61 (5th ed. 2013); *In re Prudential
Ins. Co. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998)
("Courts have expressed a willingness to certify nationwide classes on the
ground that relatively minor differences in state law could be overcome at trial
by grouping similar state laws together and applying them as a unit."); *In re
Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (certifying nationwide
class with subgroups based on variations in state law).

In an action against Whirlpool, I agree that the difficulties are not insuperable. Plaintiffs could present common issues of fact. And by dividing the action into seven state-specific subclasses, the court could minimize complicated choice-of-law issues and ensure that the substantive rights of plaintiffs are not altered.

Addition of the claims against the five retailers, however, would complicate the issues to an impermissible degree. The named plaintiffs only have standing to sue the retailers from which they purchased the washer, in the state where they purchased the washer.[17] The action involves seven states; some retailers are sued in only one state, and others in more than one. Therefore, sub-subclasses would need to be created. And those sub-subclasses require that the seven subclasses be divided in confusing, criss-crossing, and overlapping ways.

Take New Jersey as an example. The named New Jersey plaintiffs bought their washers from Lowe's and Home Depot. The New Jersey subclass, then, consists of all who purchased the relevant Whirlpool-manufactured washers in the relevant period. The two New Jersey sub-subclasses, however, consist of those who purchased their washers from Lowe's and Home Depot. Thus, in practice, the New Jersey subclass would have three subclasses: (1) New Jersey purchasers who sue only Whirlpool; (2) New Jersey purchasers who sue Whirlpool and Lowe's; and (3) New Jersey purchasers who sue Whirlpool and Home Depot. New Jerseyans who purchased their washers from retailers *other than* Lowe's and Home Depot—from Sears, say— would not be represented as against any retailer.

Take California as a second example. The California subclass would have four sub-subclasses: (1) California purchasers who sue only Whirlpool; (2) California purchasers who sue Whirlpool and Sears; (3) California

---

[17]    As I have already noted in this case, a plaintiff may bring state law claims only under the law of the state where he or she lived and the alleged injury occurred. (MTD Op. 29 & n.18); *see also Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 255 (3d Cir. 2010).

purchasers who sue Whirlpool and Fry's; and (4) California purchasers who sue Whirlpool and Home Depot. Californians who purchased their washers from retailers other than those just named—from Lowes, say— would not be represented as against any retailer at all.

Comparing the two, we see that New Jersey class members (if any) who purchased from, *e.g.*, Sears would not be represented as against Sears. But California class members who purchased from Sears would be represented against Sears. Conversely, California plaintiffs who purchased from Lowe's (if any) would not be represented against Lowe's. But New Jersey class members who purchased from Lowe's would be represented against Lowe's.

The Ohio, Indiana, Texas, and Virginia classes would all have analogous subclasses and sub-subclasses. (The Florida subclass sues only Whirlpool, not any retailers.) So multiply this tripartite or quadripartite scheme by six and imagine a jury's being called upon to deal with all of those overlapping categories. Two charts are attached to this opinion to demonstrate the complexity of the subclass proposal.

The manageability problems are obvious. Consider the claims against Home Depot. The jury would have to determine Home Depot's liability under the laws of New Jersey, California, and Texas; consider Home Depot's liability separately from the liability of other retailers (Sears, ARCA, Lowe's, and Fry's); and consider Home Depot's liability separately from that of Whirlpool. Home Depot alone is subject to three separate sub-subclasses applying the laws of three different states. The situation of the other retailers is analogous.

These manageability problems are compounded by factual differences regarding each retailer's purported representations. Those problems will be discussed further in the next subsection and in relation to Rule 23(b)(3)'s superiority requirement.

### iv.   Individualized Facts

Defendants suggest that individualized facts predominate over common facts for four reasons: (1) whether a warranty was breached or a fact

misrepresented will raise individualized questions; (2) several claims require individual proof of reliance or state of mind; (3) plaintiffs' warranty claims require individual proof of pre-suit notice; and (4) plaintiffs' unjust enrichment claims are inappropriate for class certification. (Def. Br. 33-38). I discuss those four reasons in turn. Ultimately, I conclude that individualized facts do not predominate in claims against Whirlpool, but do predominate in claims against the retailers.

**(1)** First, as to defendant Whirlpool, whether a warranty was breached or a fact was misrepresented does not raise predominant, individualized questions of fact. Defendants argue that a jury may find that a breach or misrepresentation occurred only after a certain date (such as July 6, 2010, when the DOE reinterpreted the term "clothes container"—or January 19, 2011, when the DOE concluded that the washers did not meet the revised Energy Star criteria). The existence of such different circumstances, a "safe harbor" defense, or other defenses that may affect class members differently does not compel a finding that individual questions predominate over common ones. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (finding that individualized defenses against certain policyholders does not defeat commonality); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) ("[W]here common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses."). It may be an issue of fact for the jury whether claims are viable depending on, *e.g.,* date of purchase. Once that issue of fact is decided, it should be feasible to segregate the claims that survive from those that do not.

As to the retailer defendants, however, the picture is different. Whether a warranty was breached or a fact was misrepresented raises factual questions that may differ, not only among plaintiffs, but among the retailers themselves. As noted previously, class certification depends on "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the

litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011) (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rev. 97, 132 (2009)).

Plaintiffs here do not allege or even preliminarily demonstrate factually that the retailers engaged in a common course of conduct. They allege that Home Depot, for example, encouraged the sale of Energy Star products at its corporate level. (2AC ¶ 22) They provide no specifics as to what warranties Home Depot or other retailers offered, what representations they made, or what fraudulent activity they may have engaged in. (Home Depot Br. 9-18). As to common action, plaintiffs assert generally that the retailers "acted in concert, with the knowledge and approval of the other defendants and/or as the agent of the other defendants within the course and scope of the agency, regarding the acts and omissions alleged." (2AC ¶ 25). In response to Home Depot's arguments, plaintiffs stress that the retailer acted as "an agent" of Whirlpool. (Pl. Reply to Home Depot 8). This is thin and conclusory stuff—sufficient, perhaps, to get past a motion to dismiss—but the inquiry at the certification stage must be more searching.[18]

The issues of whether each retailer made representations, adopted Whirlpool's representations, had knowledge of Whirlpool's allegedly fraudulent conduct, or acted as an agent of Whirlpool, present significant and discrete questions. The resolution of those questions depends on each retailer's acts or omissions. As discussed more fully in the preceding section, the plaintiffs suggest the creation of seven subclasses, one for each state, divided into subclasses, by retailer, within that state. The resolution of any question as to

---

[18]    I addressed these allegations in a previous opinion on the motion to dismiss the first amended complaint: "I note for future reference, however, that the allegations that the retailer Defendants acted as agents of Whirlpool have a conclusory quality, especially when measured against the pleading standard of Fed. R. Civ. P 9(b)." (MTD Op. 32). The second amended complaint is the currently operative pleading.

any particular multistate retailer, moreover, may or may not cut across state lines, creating yet another confusing latticework of categories.

Each sub-subclass would have to deal with significant, individualized questions regarding retailer liability. For instance, if the putative class is certified against the retailers, the jury will need to determine if each retailer made representations or adopted representations that formed the basis of the bargain. (And the difficulty of determining each retailer's liability will be compounded by the applicability of several states' laws.) This will lead to individual questions about each retailer, for example, whether that retailer had knowledge of Whirlpool's allegedly fraudulent labeling and whether the retailer made any additional representations or warranties.

In this context, it becomes increasingly apparent that individualized questions "impede the generation of common answers" and also that common questions do not predominate over all of the claims against the five retailer defendants, both in relation to one another and in relation to Whirlpool.

Reasons **(2)** and **(3)** both concern differences in state law. Defendants assert (2) that state laws differ in terms of reliance or scienter and (3) that the state warranty claims have different pre-suit notice requirements. Those concerns have been largely addressed in subsection V.A.iii, which discusses differences in state law. I accept that dividing this multi-state action into seven subclasses, one for each state, would tend to minimize the choice of law problem as to Whirlpool.

However, reason (2) underscores the predominance and manageability problems that arise in this suit when the claims against the five retailers are joined to those against Whirlpool. If the putative class is certified against the retailers, in many instances a jury would have to determine whether each retailer made actions or omissions *and* whether each retailer's acts or omissions give rise to liability under the laws of different states. For instance, a jury would have to determine whether Home Depot made acts or omissions relevant to the claims—and whether those acts or omissions give rise to liability

under the laws of New Jersey, California, and Texas. This problem is multiplied and compounded in relation to the four other retailers and Whirlpool. Manageability problems aside, this circumstance suggests that common issues may not predominate as to all defendants.

Reason **(4)** asserts that plaintiffs' unjust enrichment claims are inappropriate for class certification. Defendants argue that courts regularly choose not to certify unjust enrichment class actions. That is not, however, an ironclad rule; courts may certify unjust enrichment class actions where variations among some states' laws "do not significantly alter the central issue or the manner of proof." *In re Abbott Labs. Norvir Anti-Trust Litig.*, Nos. 4-1511 & 4-4203, 2007 WL 1689899, at *9 (N.D. Cal. June 11, 2007). In this case, I have already evaluated the various states' unjust enrichment laws and found that New Jersey law is typical and can be applied. *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 330 (D.N.J. 2014).

### B. Superiority

For certification under Rule 23(b)(3), a putative class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This superiority inquiry "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative methods of adjudication." *In re Prudential*, 148 F.3d at 316 (internal quotations omitted). This requirement is met when "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Fed. R. Civ. P. 23(b)(3) advisory committee's notes (1996 amendment, subdivision (b)(3)).

A class action against Whirlpool is in one important respect superior to other available methods of litigating these claims. It is not economically feasible to litigate these claims individually within the traditional framework of individual suits for damages. *See Despoit Guar. Nat'l Bank v. Roper*, 445 U.S.

326, 339 (1980). If class action treatment were not available, these claims would likely never be heard, because the modest amount of damages makes individual prosecution impractical. *See* Fed. R. Civ. P. 23(b)(3) advisory committee's notes (1996 amendment). Alternatively, if thousands of such suits were brought individually, they might burden and overwhelm the judiciary.

For similar reasons, individual class members would have no overriding interest in pursuing their claims individually. *See Yandle v. PPG Indus., Inc.*, 65 F.R.D. 566, 572 (E.D. Tex. 1974) (finding that "members of the purported class have a vital interest in controlling their own litigation because it involves serious personal injuries and death in some cases"). There is no fear that plaintiffs with specific, acute harms may become bound to an inadequate judgment or settlement. *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996) (finding that asbestos-exposure plaintiffs may be bound by a settlement that would not adequately compensate them if they eventually contracted a fatal disease). Here, each plaintiff's harm is economic and is related to a single appliance purchase.

I easily conclude, therefore, that class treatment of the claims against Whirlpool is superior to other methods of adjudication.

Not so, however, as to the plaintiffs' bloated and unmanageable claims against the retailers. Much of this discussion, of course, was presaged by the court's prior predominance analysis, *supra*. I will, however, briefly discuss in particular how the certification of a class against the retailers would violate Rule 23(b)(3)'s superiority requirement.

First, certifying the class against the retailers would involve fracturing the seven subclasses into many sub-subclasses. For example, the California class would be subdivided into four separate classes: (1) California purchasers who sue only Whirlpool; (2) California purchasers who sue Whirlpool and Sears; (3) California purchasers who sue Whirlpool and Fry's; and (4) California purchasers who sue Whirlpool and Home Depot. *See supra* subsection V.A.iii. This would quickly lead to manageability problems at later stages, and at trial.

This problem is compounded because many retailers are subject to suit in multiple states. A jury would have to determine Home Depot's liability under the laws of three different states—and consider Home Depot's liability separately from the other four retailers' liability.

Second, as discussed above, there is no proof, or even really a factual allegation, that the retailers engaged in any uniform, common course of action. The differences between the retailers' actions mean that their liability is not "susceptible to generalized, class-wide proof." 2 W. Rubenstein, Newberg on Class Actions § 4.50 (5th ed. 2012). Different evidence would be necessary to prove each retailer's liability. Jurors would need to consider each retailer's evidence separately and, in many cases, under the laws of multiple states.

Third, a class action against Whirlpool and the retailers together would not be a superior method of litigating these claims. Retailer-by-retailer suits, if viable, would be a superior, much more manageable process. The need to apply different standards of liability across subclasses and sub-subclasses creates immense manageability problems that would likely confound a jury. *See* Wright & Miller, Federal Practice & Procedure § 1780.1 (3d ed. 2005).

The solution is to certify the class action against Whirlpool, but to deny certification as to the retailers. It is well within the court's discretion to certify part of a class action and eliminate certain subclasses to solve manageability problems. *See, e.g., Dei Rossi v. Whirlpool Corp.*, No. 12-125, 2015 WL 1932484 (E.D. Cal. Apr. 28, 2015) (certifying a California class but declining to certify a 33-jurisdiction class). This limitation will ameliorate the manageability problems and encourage the efficient adjudication of the plaintiffs' claims.

### C. Ascertainability

While reserving their rights as to other certification issues, the parties appear to agree that the class is ascertainable. (Pl. Br. 14; ECF no. 125; Bursor Decl. ¶¶ 24-26 & Exh. 24-25). I nevertheless briefly discuss the ascertainability requirement and find that it is satisfied.

In the Third Circuit, Rule 23(b)(3) certification requires an independent determination that (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (citing *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).

This class is defined with reference to objective criteria. Each subclass is defined by two: (a) purchase of a Maytag Centennial MVWC6ESWW0, MVWC6ESWW1, or MVWC7ESWW0 clothes washer and (b) the State in which the purchase took place. (2AC ¶¶ 1 n.2, 123-24, 126-30). Second, it is probably easy to ascertain whether class members fall within this class definition based on ordinary business records.[19] Thus the class is ascertainable.

## VI.   Conclusion

After a thorough analysis of the Rule 23(a) and 23(b)(3) requirements, I certify the plaintiffs' class on the price-premium theory of injury as against defendant Whirlpool. I do not certify the class on the energy-expense theory and I do not certify the class against defendant retailers—Lowe's, Sears, Home Depot, Fry's, and ARCA. Certifying the energy-expense theory and defendant retailers would violate the predominance and superiority requirements of Rule 23(b)(3).

An appropriate order accompanies this opinion.

Dated: December 20, 2017

**KEVIN MCNULTY**
**United States District Judge**

---

[19]    While it would be difficult to define the class of persons who may have experienced energy-expense damages, the class has not been certified as to that theory. *See supra* subsection V.A.i.b.

**Chart 1a: State-Law-Specific Sub- and Sub-subclasses**

| Putative Sub-Class | Defendant(s) | Count(s) |
|---|---|---|
| NJ Lowe's purchasers | Whirlpool, Lowe's | II, III, V, VI |
| NJ Home Depot purchasers | Whirlpool, Home Depot | II, III, V, VI |
| All other NJ purchasers | Whirlpool | II, III, V, VI |
| CA Sears purchasers | Whirlpool, Sears | II, VII, VIII, IX |
| CA Fry's purchasers | Whirlpool, Fry's | II, VII, VIII, IX |
| CA Home Depot purchasers | Whirlpool, Home Depot | II, VII, VIII, IX |
| All other CA purchasers | Whirlpool | II, VII, VIII, IX |
| FL purchasers | Whirlpool | II, XI |
| OH ARCA purchasers | Whirlpool, ARCA | II, XII |
| All other OH purchasers | Whirlpool | II, XII |
| IN Sears purchasers | Whirlpool, Sears | II, III, XIII |
| All other IN purchasers | Whirlpool | II, III, XIII |
| TX Home Depot purchasers | Whirlpool, Home Depot | II, III, XIV |
| All other TX purchasers | Whirlpool | II, III, XIV |
| VA Lowe's purchasers | Whirlpool, Lowe's | II, III |
| All other VA purchasers | Whirlpool | II, III |

**Chart 1b: Sub-Classes Applying Uniform Unjust Enrichment Law**

| Putative Sub-Class | Defendant(s) | Count |
|---|---|---|
| NJ, VA Lowe's purchasers | Lowe's | IV |
| CA, IN Sears purchasers | Sears | IV |
| NJ, CA, TX Home Depot purchasers | Home Depot | IV |
| CA Fry's purchasers | Fry's | IV |
| OH ARCA purchasers | ARCA | IV |