## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CHARLENE DZIELAK, SHELLEY
BAKER, FRANCIS ANGELONE,
BRIAN MAXWELL, JEFFREY
McLENNA, JEFFREY REID, KARI
PARSONS, CHARLES BEYER,
JONATHAN COHEN, JENNIFER
SCHRAMM, and ASPASIA CHRISTY,

      Plaintiffs,

      v.

WHIRLPOOL CORPORATION,
LOWE'S COMPANIES, INC., SEARS
HOLDING CORPORATION, THE
HOME DEPOT, INC., FRY'S
ELECTRONICS, INC., APPLIANCE
RECYCLING CENTERS OF AMERICA,
INC., LOWE'S HOME CENTER, AND
LOWE'S HOME CENTER, LLC,

      Defendants.

Civ. No. 12-89 (KM) (JBC)

**OPINION**

KEVIN MCNULTY, U.S.D.J.:

      Now before the Court in this class action are two motions for summary judgment: one filed by defendants Whirlpool Corporation, Lowe's Home Centers, LLC, Sears Holding Corporation, and Fry's Electronics, Inc. (DE 309); and one filed by defendant The Home Depot, Inc. (DE 315).[1] For the reasons set forth below, the motions are **GRANTED**. Also before the Court is defendant Whirlpool Corporation's motion to decertify classes (DE 312), which is **DENIED** as moot.

      The named plaintiffs, purchasers of Maytag washing machines, are Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffrey

---

[1]    "DE ___" refers to the docket entry number in this case.

McLenna, Jeffrey Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy.

The first named defendant is the manufacturer of Maytag washing machines, Whirlpool Corporation ("Whirlpool").[2] The remaining defendants are the retailers from whom the plaintiffs purchased the Maytag washers: Lowe's Home Center ("Lowe's"), Sears Holding Corporation ("Sears"), The Home Depot, Inc. ("Home Depot"), Fry's Electronics, Inc. ("Fry's"), and Appliance Recycling Centers of America, Inc. ("ARCA").[3]

The Department of Energy ("DOE") Energy Star program authorizes manufacturers to affix an Energy Star label signifying that an appliance meets certain standards of energy efficiency. Each Maytag washing machine at issue in this case bore an Energy Star label at the time of purchase. Thereafter, however, the DOE determined that Maytag Centennial washing machine model number C6-1 did not comply with Energy Star requirements, and the

---

[2]    Whirlpool is a Delaware corporation with its principal place of business in Benton Harbor, Michigan. (DE 29 ¶ 15).

[3]    Lowe's is a North Carolina corporation with its principal place of business in Mooresville, North Carolina; Sears is a Delaware corporation with its principal place of business in Hoffman Estates, Illinois; The Home Depot is a Delaware corporation with its principal place of business in Atlanta, Georgia; Fry's Electronics is a California corporation with its principal place of business in San Jose, California; and ARCA is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. (DE 29 ¶¶ 16–20).

Via stipulation, Plaintiffs voluntarily dismissed Lowe's Companies, Inc., a party named in the First Amended Complaint. (DE 63). Lowes Home Center, a wholly owned subsidiary of Lowe's Companies, Inc., agreed to be substituted as a named defendant in the case, as it is responsible for the sale of the appliances at issue in this action. *Id.*

The original complaint, which was filed on January 1, 2012 and captioned *Dzielak v. Whirlpool Corp.*, No. 12-cv-89, alleged claims against Whirlpool, Sears, and Lowe's. (DE 1). Those defendants proposed to consolidate Dzielak with a related case, *Angelone v. Whirlpool Corp.*, No. 12-cv-1039. The Home Depot, a defendant only in *Angelone*, consented to the consolidation. (DE 28). On April 30, 2012, Plaintiffs filed the First Amended Consolidated Complaint ("FAC"). The FAC included claims against defendants The Home Depot, Frye's Electronics, and ARCA, in addition to the defendants originally named in the unconsolidated *Dzielak* case. (DE 29).

Environmental Protection Agency ("EPA") disqualified the machine from the Energy Star program. That noncompliance determination and disqualification allegedly apply equally to Maytag Centennial model numbers C6-0, C6-1, and C7-0.[4]

According to Plaintiffs, Energy Star-qualified washing machines cost more than others but save consumers money over time because they consume less energy. Plaintiffs allege that they paid a price premium attributable to the "Mislabeled Washing Machine's supposed energy efficiency and ENERGY STAR® qualification." (DE 29 ¶ 46). But those non-compliant machines, say Plaintiffs, wound up costing more to operate than a truly Energy Star-compliant machine. (*Id.* ¶ 47).

The complaint asserts causes of action for breach of express warranty, breach of the implied warranty of merchantability, unjust enrichment, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA"), and violations of California, Florida, Indiana, Michigan, New Jersey, Ohio, and Texas consumer fraud statutes.[5] Other purchasers of these washing machines, Plaintiffs say, stand in precisely the same shoes, and Plaintiffs therefore filed their action as a putative class action on behalf of such purchasers.

---

[4]     Plaintiffs allege that C6-0 is the "basic model" machine. According to Plaintiffs, C6-1 adds an EMI/RFI filter to reduce electrical and radio interference, while C7-0 adds a glass top for cosmetic purposes. The interior and exterior parts are otherwise virtually identical, and the machines have identical energy usage, water usage, and load capacity. The three models share the same motor, cabinet, electric wiring, control knobs, timer knobs, wash basket, agitator, drive tube, pump, and clutch. (DE 29 ¶ 2, n.1).

[5]     Those state consumer fraud statutes are: California Consumer Legal Remedies Act, Civil Code § 17200, *et seq.*; California Unfair Competition Law, Bus. & Prof. Code§ 17200, *et seq.*; California False Advertising Law, Business and Professions Code § 17500, *et seq.*; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*; Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*; Michigan Consumer Protection Act, Mich. Comp. Laws§ 445.901, *et seq.*; New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1; Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.*; and Texas Deceptive Trade Practices Act, Tex. Bus. Com. Code § 17.41, *et seq.* The Michigan statutory (DE 78 at 40) and MMWA (DE 127 at 1) claims were dismissed in their entirety.

Named plaintiffs Maxwell, Christy, and Baker bought their washers in California; Reid in Florida; Beyer in Indiana; McLenna in Michigan; Dzielak and Angelone in New Jersey; Parsons in Ohio; Cohen in Texas; and Schramm in Virginia.

Plaintiffs moved to certify the class on two theories of harms: (1) that the washers' price was inflated because consumers pay a premium for Energy Star-qualified machines; and (2) that each purchaser incurred greater water and energy costs than he or she would have if the washer had been truly Energy Star-qualified. I certified Plaintiffs' class on the price-premium energy theory only, against Whirlpool only (because it was Whirlpool that was responsible for obtaining Energy Star certification and placing the Energy Star labels on the washers). The class now comprises subclasses of purchasers in those seven states: California, Florida, Indiana, New Jersey, Ohio, Texas, and Virginia.

I did not certify the class against the retailer defendants, *i.e.,* Lowe's, Sears, The Home Depot, Fry's, and ARCA. Against them, only the *individual* claims of Dzielak, Angelone, Baker, Maxwell, Reid, Parsons, Beyer, Cohen, Schramm, and Christy are currently pending.

## I. FACTS

### A. Background

The Energy Policy and Conservation Act of 1975 ("EPCA"), 42 U.S.C. §§ 6291, *et seq.*, together with the National Energy Conservation Policy Act of 1978 ("NECPA") and National Appliance Energy Conservation Act of 1987 ("NAECA"), established an energy conservation program for major household appliances. (DE 78 at 4). These statutes and related regulations led to the Energy Star program, "a voluntary program to identify and promote energy-efficient products and buildings in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards." 42 U.S.C. § 6294(a). To qualify for the

Energy Star program, a product must meet certain efficiency standards promulgated by the DOE. *See* C.F.R. §§ 430.1, *et seq.*

The Energy Star program was authorized by the Energy Policy and Conservation Act. 42 U.S.C. §§ 6291–6309. (DE 349 ¶ 1). Energy Star is a "voluntary program to identify and promote energy-efficient products." 42 U.S.C. § 6294a(a). (DE 349 ¶ 2). Under the program, the DOE creates Energy Star testing standards, and the EPA enforces them. (DE 349 ¶ 3). Products can earn Energy Star-qualification by meeting the energy efficiency testing standards and, if applicable, the water efficiency testing standards set by the DOE. (DE 349 ¶ 4). Products that earn Energy Star-qualification may display the Energy Star logo. (DE 349 ¶ 5).

Separately, the Federal Trade Commission ("FTC") requires that all clothes washers display an EnergyGuide label. (DE 349 ¶ 10). Consumers may consult the EnergyGuide label to obtain information about a clothes washer's relative electricity consumption and operational costs compared to other similar models. (DE 349 ¶ 11). For clothes washers, the EnergyGuide label contains information about how many kWh per year the clothes washer will use under certain laboratory conditions, and how the operational costs compare to other, similar models, based on an assumed number of washes per year and using national average energy costs. (DE 349 ¶ 12). Until 2011, there existed no analogous federal labeling requirement that included the absolute and relative water consumption of a clothes washer. (DE 349 ¶ 13).

In September 2010, the EPA published a presentation entitled "Energy Star® Sales Associate Training – Clothes Washers." (DE 325 ¶ 11). The EPA's presentation also included a slide showing the ENERGY STAR® label has an influence on 91% of consumers. (DE 325 ¶ 13). In 2014, the EPA published a book entitled "Energy Star® Products – 20 Years of Helping America Save Energy, Save Money and Protect the Environment." In the book, the EPA stated that "ENERGY STAR is a global symbol for energy efficiency. . . . More than 80 percent of U.S. consumers recognize and understand the label . . . ." (DE 325 ¶ 14).

Michael Todman, President of Whirlpool North America, explained that

> ENERGY STAR qualifications essentially say that there are significant savings from a consumer perspective. So against the conventional appliances for electricity, okay, with an appliance that's ENERGY STAR qualified is on average about a 31% savings. . . . If you put it into real terms, there is a slight premium that consumers will pay for [Energy Star] appliances. But they're looking for pay back and right now on average the pay[-]back period for [Energy Star] qualified appliances is around three, a little over three years, 3.4 years.

(DE 325¶ 16). Whirlpool's Chairman and Chief Executive Officer, Jeff Fettig explained that

> [y]ou can see the conventional appliance, which is what I would call a non-ENERGY STAR appliance. Although the initial purchase price is less, the cost of ownership over a 10-year cycle is higher. The product on the right is a comparable product with energy efficiency ratings. You pay a little bit more on the front end, but you save about 20% over the life of the product.

(DE 325 ¶ 18).

Plaintiffs now maintain that the Energy Star logo is widely recognized and understood to be a key influencer of appliance purchase decisions. (DE 325 ¶ 19–28). Plaintiffs allege that they all understood the Energy Star label when they purchased their Maytag washing machines. (DE 325 ¶ 19–28). Defendants disagree with this characterization and that any plaintiff's testimony was similar to the others. (DE 325 ¶ 19–28). Instead, Defendants allege that Plaintiffs gave widely disparate interpretations of what they understood the Energy Star logo to mean. (DE 325 ¶ 19–28).

Tests employed by the DOE to calculate compliance with Energy Star are the same as those used to populate the data on the EnergyGuide label. (DE 349 ¶ 15). In fact, "[a]ll of the metrics used by the EnergyGuide and ENERGY STAR labeling programs are based on the DOE test procedure." (DE 349 ¶ 16). Between 1997 and 2012, those tests were found in 10 CFR 430, Subpart B, Appendix J1 (the "J1 Test Procedure"). (DE 349 ¶ 17).

## B. The J1 Test Procedure

The J1 Test Procedure is designed to be repeatable between laboratories. (DE 349 ¶ 18). Under the J1 Test Procedure, a clothes washer's energy efficiency is measured by the Modified Energy Factor ("MEF") (DE 349 ¶ 21) and a clothes washer's water efficiency is measured by the Water Factor ("WF") (DE 349 ¶ 22). The MEF is calculated by dividing the capacity of the clothes washer's "clothes container" by the total electricity consumption of the clothes washer. (DE 349 ¶ 23). The WF is calculated by dividing the per-cycle water consumption (in gallons) by the capacity of the clothes washer's "clothes container." (DE 349 ¶ 24).

Beginning in January 2007, all standard top-loading clothes washers were required to have an MEF of no less than 1.26, and as of January 2011, a WF no greater than 9.5. (DE 349 ¶ 26). Before January 2011, there was no federal minimum WF for clothes washers. (DE 349 ¶ 27). Between 2009 and 2011, all Energy Star top-loading clothes washers were required to have an MEF no less than 1.8, and a WF no greater than 7.5. (DE 349 ¶ 28). To determine the capacity of a clothes washer's "clothes container," the J1 Test Procedure instructed manufacturers to "[m]easure the entire volume which a dry clothes load could occupy within the clothes container during washer operation" by lining the container with a plastic sheet and filling it with "the maximum amount of water" to its "uppermost edge." (DE 349 ¶ 30).

## C. The DOE Instructed Whirlpool How to Measure Its Top-Loading Washers for Energy Star Compliance

The DOE established the testing procedure waiver regulations found in 10 CFR 430.27 (DE 349 ¶ 45), and on March 20, 2007, Whirlpool sent a "Petition for Waiver & Application for Interim Waiver regarding Measurement of Clothes Container Capacity in Vertical Axis Clothes Washers" ("Petition") to the DOE, (DE 349 ¶ 46). Whirlpool expressed to the DOE that the J1 Test Procedure "does not identify or limit specific components of the clothes washer that form the clothes container." (DE 349 ¶ 49). Whirlpool further explained that "[i]n the absence of more specific language, it is permissible and fully

consistent with [the J1 Test Procedure] to construe clothes container to mean the space formed by inter-related components within the clothes washer, such as the top of the tub cover." (DE 349 ¶ 50). Accordingly, Whirlpool requested from the DOE approval "to measure the clothes container capacity to the upper edge of the tub cover in vertical axis clothes washers containing such a component." (DE 349 ¶ 51).

### D. Whirlpool Revised Its Internal Test Procedure for All Top-Loading Clothes Washers in Light of the DOE's Guidance

Whirlpool revised its internal test procedure. (DE 349 ¶ 64). Accordingly, for all top-loading clothes washers, Whirlpool filled the "clothes container" to the upper edge, or "top," of the tub cover to determine its capacity. (DE 349 ¶ 65). Specifically, the T-396 Test Procedure's instruction were to "[m]easure the entire volume, which a dry clothes load could occupy within the clothes container while the machine is in operation." (DE 349 ¶ 66). In the T-396 Test Procedure, Whirlpool included several figures showing several clothes washers and their various clothes container configurations. (DE 349 ¶ 67). These figures show the wide variability of clothes washers and clothes container configurations. (DE 349 ¶ 68). These differences are functions of engineering, design, and aesthetic choices made during the design and production process. (DE 349 ¶ 69).

The DOE later designated the "top of the tub cover" as "Fill Level 4." (DE 349 ¶ 71).

### E. The Washers Met Energy Star Requirements When Tested in Accordance with the DOE's May 14, 2007 Guidance

Before 2009, most Energy Star top-loading clothes washers cost hundreds of dollars more than conventional machines. (DE 349 ¶ 72). Whirlpool designed Maytag Centennial models MVWC6ESWW0 ("C6-0") and MVWC6ESWW1 ("C6-1") (together, the "C6") and MVWC7ESWW0 ("C7-0") with an "Auto Load Sensing" feature. (DE 349 ¶ 74).

To describe components and features of clothes washers that pertain to energy and water consumption, Whirlpool uses "energy categories." (DE 349

¶ 75). The C6-0 was designated energy category V9Ua2H5T(3B). (DE 349 ¶ 76). The C6-1 and C7-0 were designated energy category V9Ua2H5W(3B). (DE 349 ¶ 77). To test the C6-0, Whirlpool measured the capacity of the "clothes container" to the "top of the tub cover," or Fill Level 4. (DE 349 ¶ 79). To test the C6-1, Whirlpool measured the capacity of the "clothes container" to the "top of the tub cover," or Fill Level 4. (DE 349 ¶ 83). The C7-0 was not separately tested by Whirlpool because it has the same energy category as the C6-1 and thus should have the same results. (DE 349 ¶ 88).

Whirlpool started shipping the washers to retailers in April 2009. (DE 349 ¶ 90).

### F. Nearly Every Named Plaintiff—and Most Washer Purchasers— Bought Washers Before the DOE Changed Its Interpretation of "Clothes Container"

Roughly twenty-three percent of all C6 sales occurred during November 2009, when The Home Depot[6] and Lowe's held Black Friday sales promotions. (DE 349 ¶ 97). During the Black Friday sales, The Home Depot and Lowe's dramatically reduced the price of the C6—below the MSRP. (DE 349 ¶ 98).

Francis Angelone represents a New Jersey subclass of washer purchasers. (DE 349 ¶ 98). On November 27, 2009, Angelone bought his washer at The Home Depot. (DE 349 ¶ 100). Angelone paid $299.99 for his washer. (DE 349 ¶ 101). Angelone waited until Black Friday to buy his washer and "got a good deal on it." (DE 349 ¶ 102). Angelone discussed the washer's price and the approaching Black Friday sale, but he did not recall discussing the washer's Energy Star status with the salesperson. (DE 315-5 at 31:22–33:1).

Brian Maxwell represents a California subclass of washer purchasers. (DE 349 ¶ 107). On November 27, 2009, Maxwell bought his washer. (DE 349 ¶ 108). Maxwell paid $399.99 for his washer. (DE 349 ¶ 109).

---

[6] Three plaintiffs purchased their washer from Home Depot: Francis Angelone, Aspasia Christy and Jonathan Cohen (collectively, the "Home Depot Plaintiffs").

Jonathan Cohen represent a Texas subclass of washer purchasers. (DE 349 ¶ 119). On November 28, 2009, Mr. Cohen bought his washer. (DE 349 ¶ 120). Mr. Cohen paid $299.00 for his washer and bought his washer during a Black Friday sale. (DE 349 ¶ 121). Cohen specifically waited for Black Friday to buy his washer, and it "absolutely" affected the timing of when he bought his washer—so he could "get a better deal." (DE 349 ¶ 122). Price was "[d]efinitely a factor" and probably Cohen's first criteria. (DE 349 ¶ 123). Cohen bought his washer because it "was priced right" and "[t]here wouldn't have been enough savings on a non-Energy Star to make it worth it." (DE 349 ¶ 124). Cohen did not speak to a salesperson about the washer before he bought it. (DE 315-9 at 32:23–33:1).

Charlene Dzielak represents a New Jersey subclass of washer purchasers. (DE 349 ¶ 130). On November 30, 2009, Dzielak bought her washer. (DE 349 ¶ 131). Dzielak paid $409.00 for her washer. She does not recall who put out Energy Star advertisements. (DE 349 ¶ 136).

Jennifer Schramm represent a Virginia subclass of washer purchasers. (DE 349 ¶ 138). On January 9, 2010, Schramm bought her washer. (DE 349 ¶ 139). Schramm paid $493.20 for her washer. (DE 349 ¶ 140). At the time Schramm bought her washer, she had not read any technical regulations of the Energy Star program. (DE 349 ¶ 142). She had also not read any Energy Star test procedures. (DE 349 ¶ 145). Schramm did not have any specific understanding of how the government controls the Energy Star program. (DE 349 ¶ 146). She also did not know whether the test procedures called for measuring the capacity of the clothes washer. (DE 349 ¶ 147).

Charles Beyer represents an Indiana subclass of washer purchasers. (DE 349 ¶ 148). On March 18, 2010, Beyer bought his washer. (DE 349 ¶ 149). Beyer paid $457.49 for his washer. (DE 349 ¶ 150).

Kari Parsons represents an Ohio subclass of washer purchasers. (DE 349 ¶ 156). On March 27, 2010, Parsons bought her washer. (DE 349 ¶ 157). Parsons paid $492.99 for her washer. (DE 349 ¶ 158).

Aspasia Christy represents a California subclass of washer purchasers. (DE 349 ¶ 193). On September 15, 2010, Christy bought her washer. (DE 349 ¶ 194). Christy paid $464.09 for her washer. (DE 349 ¶ 195). Christy does not recall discussing the Energy Star status of the washer with an employee of The Home Depot. (DE 315-7 at 125:11–126:2)

Jeffery Reid represents a Florida subclass of washer purchasers. (DE 349 ¶ 204). "[I]n or about October 2010," Reid bought his washer. (DE 349 ¶ 205). Reid paid "approximately" $549.00 for his washer. (DE 349 ¶ 206). Reid has no "specific" understanding of either "absolute numbers or percentages" of savings that the Energy Star logo supposedly implied above what was displayed on the Energy Guide label. (DE 349 ¶ 210).

Shelley Baker represents a California subclass of washer purchasers. (DE 349 ¶ 212). On December 1, 2010, Baker bought her washer. (DE 349 ¶ 213). Baker paid $439.93 for her washer. (DE 349 ¶ 214).

Each Maytag washing machine at issue contains the Energy Star logo permanently affixed to the machine's control panel. (DE 325 ¶ 1). That particular Energy Star logo is roughly the size of a postage stamp. (DE 325 ¶ 2). Every unit purchased by every class member had one or more Energy Star logos affixed. (DE 325¶ 9).

## G. The DOE and EPA Reached a Memorandum of Understanding

On September 30, 2009, the DOE and the EPA signed a Memorandum of Understanding ("MOU"), designating the EPA as the "brand manager" for the Energy Star program and the DOE as responsible for "monitoring and verifying test procedure compliance and the development of Federal test procedures and metrics." (DE 349 ¶¶ 92 & 93). In late 2009, the DOE created a webpage on the program website for "Frequently Asked Questions." (DE 349 ¶ 95).

## H. The DOE Changed Its Interpretation of the Term "Clothes Container"

On May 13, 2010, the DOE issued draft guidance in FAQ form, which contained proposed guidance about how to interpret the term "clothes container." (DE 349 ¶ 162). According to the DOE's draft guidance, "Fill Level

3" corresponded to "the highest horizontal plane that a clothes load could occupy." (DE 349 ¶ 166). The DOE requested that industry members submit comments on the DOE's proposal. (DE 349 ¶ 167). On June 9, 2010, Whirlpool submitted its "Response to DOE's draft interpretation of the test procedure for measuring the capacity of clothes washers." (DE 349 ¶ 168). Whirlpool's position was that the DOE's proposed "Fill Level 3" was inconsistent with the text of the J1 Test Procedure, was inconsistent with actual consumer use habits, and would undermine the certainty and reliability of the test procedures. (DE 349 ¶ 169).

On July 6, 2010, the DOE issued its final guidance in FAQ format. (DE 349 ¶ 170). The DOE stated that "the upper-most edge of the clothes container shall be considered the highest point of the inner-most diameter of the tub cover"—what the DOE now calls "Fill Level 3." (DE 349 ¶ 171). The DOE did not explicitly set an effective date or phase-in period for the FAQ. (DE 349 ¶ 179).

Whirlpool changed its testing procedures for all new models of washers. (DE 349 ¶ 181). Whirlpool had only a limited number of energy and water testing labs that it could use to accomplish this effort. (DE 349 ¶ 182). This constituted a multi-month effort, and completion required more than two-thousand hours of laboratory time. (DE 349 ¶ 183). During this time, Whirlpool kept the DOE apprised of its progress. (DE 349 ¶ 184).

## I. The DOE Notified Whirlpool That a Single C6-1 Failed Stage I Verification Testing

In August 2010, the DOE issued an "FAQ for: ENERGY STAR Verification Testing Pilot Program." (DE 349 ¶ 189). In that FAQ, the DOE announced that it had "initiated a pilot testing program to ensure that products bearing the ENERGY STAR logo deliver the efficiency consumers expect." (DE 349 ¶ 190).

Regarding the testing process, the DOE stated that "[c]onsistent with ENERGY STAR appliance specifications, if the results of the Stage I test indicate that the energy consumption is no more than 5% greater than the ENERGY STAR program requirements, the unit will be deemed to have passed

the screening test and no further testing will be conducted." (DE 349 ¶ 191). The DOE further declared that "[i]f the results of the screening test show energy consumption exceeding the program requirements, the manufacturer will be given 10 days to request that product be moved to Stage II testing." (DE 349 ¶ 192).

On September 20, 2010, Whirlpool received a letter from the DOE indicating that "[t]he Maytag clothes washer model [C6-1] was selected for testing as part of the ENERGY STAR® Verification Testing Pilot Program." (DE 349 ¶ 198). In this "Stage I" testing, the DOE calculated the single washer's MEF as 1.78 (1.1% below the minimum requirement of 1.8) and the WF as 8.3 (10.7% above the maximum requirement of 7.5). (DE 349 ¶ 199). Accordingly, the DOE declared that "the clothes washer model identified below [Maytag Model C6-1] does not satisfy the ENERGY STAR Program's energy-efficiency specifications." (DE 349 ¶ 200). The DOE informed Whirlpool that it could request Stage II testing of additional units. (DE 349 ¶ 201). The DOE further instructed Whirlpool that, if it did not request additional testing by September 30, 2010, "DOE will find that Maytag model [C6-1] failed testing, and refer the matter to Environmental Protection Agency to begin the process of disqualifying the model and its derivatives from the ENERGY STAR Program." (DE 349 ¶ 202). On September 30, 2010, Whirlpool requested Stage II testing. (DE 349 ¶ 203).

In December 2010, Whirlpool discontinued production of the washers in accordance with its long-term plan to replace one engineering platform with another. (DE 349 ¶ 221). Whirlpool manufactured no units in 2011. (DE 349 ¶ 222). Whirlpool shipped only a handful of washer units to retailers in the seven states at issue in 2011. (DE 349 ¶ 223).

## J. The DOE Notified Whirlpool That Its Washers Would Remain Energy Star Qualified

On January 19, 2011, the DOE notified Whirlpool that it had tested three additional C6-1 units plus the same unit the DOE previously tested. (DE 349 ¶ 224). The DOE informed Whirlpool that those units did not comply with

Energy Star requirements. (DE 349 ¶ 225). The DOE instructed Whirlpool that it could "respond to this notification no later than February 9, 2011." (DE 349 ¶ 227). The DOE stated further, "In your response, you may present to DOE conclusive manufacturing or design evidence or quality assurance information on why this product did not meet the ENERGY STAR Program's energy-efficiency specifications." (DE 349 ¶ 228). The DOE made clear that the C6-1would remain designated "ENERGY STAR qualified" in the interim: "The product will remain designated as ENERGY STAR qualified during this twenty[-]day period." (DE 349 ¶ 229). The DOE stated further, "If you do not respond within twenty days or your response does not adequately demonstrate to DOE's satisfaction that the model complies with ENERGY STAR program requirements, DOE will find that the Maytag clothes washer model [C6-1] failed testing, and refer the matter to the U.S. Environmental Protection Agency (EPA) to begin the process of disqualifying the model and its derivatives from the ENERGY STAR Program." (DE 349 ¶ 230). The DOE's January 19, 2011 letter included the DOE's preliminary findings and provided notice to Whirlpool of potential final findings, subject to Whirlpool's actions. (DE 349 ¶ 231).

On February 8, 2011, Whirlpool responded to the DOE's January 11, 2010 letter. (DE 349 ¶ 232). Whirlpool noted that while using Fill Level 4, the clothes container of a C6-1 had a measured capacity of 3.43 cubic feet, whereas under Fill Level 3, the DOE measured the capacity of the clothes container of a C6-1 as either 3.06 cubic feet or 3.07 cubic feet. (DE 349 ¶ 235). Whirlpool informed the DOE that "Whirlpool discontinued manufacture of the Washer in December[] 2010." (DE 349 ¶ 237). Whirlpool also informed the DOE that it "has none of these units remaining in inventory for sale in the United States." (DE 349 ¶ 238).

### K. The Washers Failed Testing Because the Tested Capacity Changed, but the Washers Remained the Same

The four C6-1 units failed the DOE's verification testing solely because the measurement under Whirlpool's tests differed from that under the DOE's tests. (DE 349 ¶ 239). The washers themselves did not change; between the

Whirlpool tests and the DOE tests, the only "feature" that changed about the washers was their tested capacity. (DE 349 ¶ 241). This change in tested capacity affected the washers' MEF and WF values. (DE 349 ¶ 243).

## L. The DOE Referred the Matter to the EPA for "Appropriate Action"

On March 16, 2011, the DOE notified the EPA of its verification testing. (DE 349 ¶ 255). The DOE notified the EPA that "Whirlpool explained that the discrepancy between DOE's test results and Whirlpool's own testing stemmed from the measurement of the clothes container capacity." (DE 349 ¶ 256). The DOE did not refer the matter to the EPA "to begin the process of disqualifying the model and its derivatives from the ENERGY STAR Program." (DE 349 ¶ 257). Rather, the DOE referred the matter to EPA "for appropriate action." (DE 349 ¶ 258).

On March 17, 2011, Whirlpool informed DOE that it had "undertaken significant effort to re-rate our current washers in conformance with the new Capacity Guidance." (DE 349 ¶ 260). On March 23, 2011, the DOE wrote to Whirlpool noting Whirlpool's progress in "retesting and recertifying its pre-existing clothes washer models to conform" to the revised Fill Level guidance, and that Whirlpool was expected to complete that process by the end of April 2011. (DE 349 ¶ 261). The DOE's letter continued that "[i]n light of these developments, the Department is interested in bringing this investigation to a close." (DE 349 ¶ 262).

On approximately May 7, 2012, the EPA added model C6-1to its list of "Non-Lighting Products Disqualified from the ENERGY STAR® Program." (DE 349 ¶ 263). Between March 16, 2011, the date on which the matter was referred to the EPA, and May 7, 2012, Whirlpool had received no communication from the EPA concerning the washers. (DE 349 ¶ 264). According to the EPA's own published disqualification procedures, when the EPA believes a product may warrant disqualification from the Energy Star program, the EPA should notify the manufacturer in advance and provide

twenty days to submit a written response to that proposed action. (DE 349 ¶ 266).

## M. Plaintiffs' Understanding of Energy Star

Plaintiffs hired two survey experts, Dr. J. Michael Dennis and Dr. R. Sukumar. (DE 349 ¶ 267). Dr. Dennis was retained to perform a "contingent valuation" survey to "measure the price premium, if any, attributable to the Energy Star label" on the washers. (DE 349 ¶ 268). Dr. Sukumar was retained "to estimate the price premium, if any, attributable to the Energy Star logo on [the washers] through the use of a conjoint analysis." (DE 349 ¶ 269).

Defendants engaged Dr. Carol Scott as a survey expert. (DE 349 ¶ 273). Among other things, Dr. Scott was retained "to determine what the Energy Star logo means to purchasers of top-loading washing machines, and whether or not there is any consistent understanding among consumers of the type and specific amount of savings they may expect to experience when purchasing a top loading washing machine because it carries the Energy Star logo." (DE 349 ¶ 274). More specifically, Dr. Scott "was asked to determine whether consumers who purchase top-loading washing machines are aware of the criteria used to qualify washing machines as Energy Star, whether they have any consistent understanding of how much water, energy, or money they expect to save because the washing machine they purchased is labeled as Energy Star, and whether they understood the Energy Star logo as a representation that they would save at least 37% energy and 50% water, compared to a similar non-Energy Star washing machine." (DE 349 ¶ 275).

Plaintiffs allege that their consumer-survey experts, Drs. Dennis and Sukumar and their damages expert Colin Weir found a common understanding of the Energy Star logo and a price premium for products that displayed the Energy Star logo. (*See generally* DE 325 ¶ 29-54). Defendants accept the experts' testimony but disagree with the experts' characterizations of consumers' understanding of the logo or the price premium it carried. (*See generally* DE 325 ¶ 29-54.)

## II.  PROCEDURAL HISTORY

Plaintiffs brought this action, alleging that they had purchased washing machines that were supposed to be compliant with Energy Star requirements, but in fact were not. (DE 86 ¶ 1). They alleged various theories, including breach of warranty and violation of state consumer fraud statutes.

On June 16, 2014, I filed an Opinion granting in part the defendants' motion to dismiss the First Amended Complaint. (DE 78). On July 28, 2014, the plaintiffs filed a Second Amended Complaint. (DE 86). In this revised complaint, they accused the defendants of violating the Magnuson Moss Warranty Act ("MMWA"), a federal statute dealing with warranties in consumer products (Count I); they brought state law claims for breach of express warranty (Count II) and the implied warranty of merchantability (Count III); they brought a state law claim of unjust enrichment (Count IV); and they asserted claims for violation of the consumer protection statutes of their home states (Counts V through XIV).

Whirlpool, joined by the other defendants, moved to dismiss the Second Amended Complaint. (DE 89 & 90). I found that the state law claims were not preempted by federal law, but that the MMWA claim should be dismissed for failure to state a claim and that the claim of unjust enrichment should also be dismissed as to Whirlpool only. (DE 127 at 4).[7]

---

[7]  The claims that remain at this stage are as follows:

Count II:    Breach of Express Warranty

Count III:   Breach of Implied Warranty of Merchantability (for NJ, IN, TX, and VA plaintiffs only)

Count IV:    Unjust Enrichment (asserted against retailers only; not against Whirlpool)

Count V:     New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJCFA")

Count VI:    New Jersey Truth-in-Consumer Contract, Warranty, and Notice Act, N.J. Stat. Ann. § 56:12-14, *et seq.* ("TCCWNA")

On February 5, 2016, Plaintiffs moved to certify the class (DE 162), claiming two harms: (1) that the price of the washers was inflated because consumers pay a premium for Energy Star-qualified machines; and (2) that each purchaser "paid more money in additional water and energy costs to operate his or her Mislabeled Washing machine" than he or she would have if the washer had actually met the Energy Star standards. (DE 282 at 1–2 (quoting DE 86 ¶ 118)). I certified Plaintiffs' class as against defendant Whirlpool. (*Id.* at 38). I did not certify the class against defendant retailers—ARCA, Home Depot, Fry's, Lowe's, and Sears. (*Id.*). Home Depot, a retailer, has moved separately for summary judgment. Its position, however, is similar to that of the other retailers—*i.e.*, it is a defendant only as to individual, not class, claims.

## III.   DISCUSSION

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

Count VII:    California's Consumer Legal Remedies Act, Cal. Civil Code § 1750, *et seq.* ("CLRA")

Count VIII:   California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")

Count IX:     California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL")

Count XI:     Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA")

Count XII:    Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.* ("OCSPA")

Count XIII:   Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.* ("IDCSA")

Count XIV:    Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41, *et seq.* ("DTPA").

(1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Nw. Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## B. Choice of Law

A court generally must decide which state's law applies to each state-law claim as to each plaintiff-defendant pair. *See Gray v. Bayer Corp.*, No. 08-4716, 2011 WL 2975768 at *5 (D.N.J. July 21, 2011) ("While it might be desirable for the sake of efficiency to settle upon one state, such as New Jersey, and apply its law in lieu of the other 49 jurisdictions, due process requires individual consideration of the choice of law issues raised by each class member's case before certification.") (quoting *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 457 (D.N.J. 1998)).

"[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941)). New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA),* 793 F. Supp. 2d 696, 704 (D.N.J. 2011), *aff'd sub nom. Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453, 460 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143, 962 A.2d at 453).

If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. For contract claims, the applicable Restatement section is § 188. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 N.J. 96, 102, 629 A.2d 885, 888 (1993).

In an earlier opinion, I determined that, concerning *express* warranties, there exists no true conflict between the laws of New Jersey and those of the other relevant states. (DE 78 at 13–16). Accordingly, forum law—New Jersey's—applies to the express warranty claims. *See Snyder*, 792 F. Supp. at 717.

The parties agreed that New Jersey law governs the elements of the *implied* warranty claims and did not offer a choice-of-law analysis. (DE 78 at 21). However, the states' laws do differ as to whether privity is required. (DE 78 at 21). I conducted a choice-of-law analysis and found a false conflict between the laws of New Jersey, Michigan, Indiana, Texas, and Virginia. (DE 78 at 21). As to those states, I applied forum law to the implied warranty claims. (DE 78 at 21). There exists, a genuine conflict, however, between the law of New Jersey and those of Ohio, California, and Florida. Finding that those states had the most significant relationship to the dispute, I applied those states' privity requirements to washers bought in those states. Because there was no allegation that any plaintiff was in direct privity with Whirlpool, I dismissed the implied warranty claims originating in Ohio, California, and Florida. (DE 78 at 21–23). Therefore, I now apply New Jersey law to the remaining implied warranty claims—those originating in New Jersey, Indiana, Texas, and Virginia.

As to the unjust enrichment claim, I apply forum law. No relevant disparity among the states' laws has been suggested. Many courts have suggested that there are no significant disparities in the unjust enrichment laws of the fifty states. *See Snyder*, 792 F. Supp. 2d at 723 ("Numerous courts have held that unjust enrichment laws do not vary in any substantive manner from state to state."); *In re Mercedes–Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) (finding that any differences under the laws of the various states are "not material and do not create actual conflict"); *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 464 (D.N.J. 2009) (concluding that "there are no actual conflicts among the laws of unjust enrichment"); *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007) (examining the unjust

enrichment laws of the 50 states and concluding that, "[a]lthough there are numerous permutations of the elements of the cause of action in the various states, there are few real differences").

In the following sections, I first discuss the common-law claims (Section III.C) and then the statutory claims (Section III.D).

## C. Common-Law Claims

The following common-law claims remain in the case.

I certified the class only as against Whirlpool and only on the price-premium theory. (DE 283 at 2–3). The class represented by the individual named plaintiffs consists of California, Florida, Indiana, New Jersey, Ohio, Texas, and Virginia purchasers of the C6-0, C6-1, and C7-0 washers. (DE 283 at 2–3).

I denied Plaintiffs' motion to certify the class as against the retailer defendants. (DE 282 at 2). As against Lowe's, Sears, The Home Depot, Fry's, or ARCA, then, any common-law claims are asserted individually by the named Plaintiffs. (DE 282 at 3).

Finally, I dismissed the unjust-enrichment claim against Whirlpool. (DE 127 at 4). That claim remains as against the retailer defendants. (DE 127 at 4).

### 1. Breach of Express Warranty (California, Florida, Indiana, New Jersey, Ohio, Texas, and Virginia)

The named plaintiffs assert Count II (breach of express warranty) on a class basis against Whirlpool, but only individually against the retailer defendants. (*See* DE 282 at 39; *see also* DE 86 ¶¶ 145–50). Under New Jersey (*i.e.*, forum) law, a claim for breach of express warranty requires a plaintiff to show "(1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Snyder*, 792 F. Supp. 2d at 721 (citing N.J. Stat. Ann. § 12A:2–313) (other internal citation omitted); *see also Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 824 (3d Cir. 1999). "It is not necessary to the creation of an express warranty that the seller

use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." N.J. Stat. Ann. § 12A:2-313(2).

Defendants argue that the express-warranty claims must fail for two reasons: (1) there is no evidence of an affirmation, promise, or description that constitutes a warranty; and (2) the washers did not actually breach any such affirmation, promise, or description. (DE 309-1 at 4–12).[8]

Plaintiffs argue that Defendants frame the affirmation issue too narrowly, insisting that the law requires only *an* affirmation, promise, or description—not a *specific* one. (DE 319 at 3). Plaintiffs further maintain that there exists sufficient evidence that the Energy Star logo became the basis of the bargain and that Defendants breached the affirmation, promise, or description upon which Plaintiffs relied. (DE 319 at 4–11).

### i. Affirmation, promise, or description

The first element of an express warranty claim is an affirmation, promise, or description. "A statement can amount to a warranty, even if unintended to be such by the seller, 'if it could fairly be understood . . . to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance.'" *L.S. Heath & Son, Inc. v. AT & T Info.*

---

[8] Defendants also identify two other purported defects in the claims under the laws of certain states: (1) that in California, Florida, Indiana, Ohio, and Texas—where the law requires it—there is no evidence of class-wide reliance on an affirmation, promise, or description that became the basis of their bargain; and (2) Plaintiffs have no evidence of pre-suit notice, as required by the state laws of Florida, Ohio, and Texas. (DE 309-1 at 4–12; DE 326 at 4–6). Plaintiffs respond that they have presented evidence of both reliance and pre-suit notice where it is required. (DE 319 at 11–15).

I do not reach those issues. New Jersey express-warranty law requires neither reliance nor pre-suit notice. *See* N.J. Stat. Ann. § 12A:2-313. For the reasons discussed in Section III.C.1, immediately following, Plaintiffs are unable to prevail even under New Jersey's more plaintiff-friendly standard. I therefore do not discuss whether they meet the additional requirements of reliance and pre-suit notice.

*Sys., Inc.*, 9 F.3d 561, 570 (7th Cir. 1993) (applying New Jersey law and quoting *Gladden v. Cadillac Motor Car Div., Gen. Motors Corp.*, 83 N.J. 320 (1980)), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)). "[W]hether a given statement constitutes an express warranty is normally a question of fact for the jury." *Snyder*, 792 F. Supp. 2d at 721–22; *see also Union Ink Co., Inc. v. AT & T Corp.*, 352 N.J. Super. 617, 645 (App. Div. 2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact.").

Defendants contend that that the Energy Star logo is not an express affirmation, promise, or description about the product and that Plaintiffs fail to identify the specific affirmations that became a part of the basis of the bargain. Implicit in Defendants' argument is the incorrect notion that this first element requires an affirmation that is *specific. See* N.J. Stat. Ann. § 12A:2–313; *see also Snyder*, 792 F. Supp. 2d at 721. Defendants assert that the only specific affirmation alleged is one that their washers would require *37%* less energy and *50%* less water than standard models, and that proofs with respect to those precise figures are lacking. But Plaintiffs' claims do not rest on those exact figures. In effect, Plaintiffs allege that Defendants advertised their washers as meeting federal Energy Star efficiency standards—whatever they were—and that the buyers did not need to have mastered those standards themselves.

I do not believe that New Jersey warranty law would require proof that these buyers had a particular efficiency percentage figure in mind. Plaintiffs have demonstrated that the Energy Star logo could be interpreted as a representation of an environmentally friendlier product when compared to a traditional washer, and one that met federal standards of efficiency. That is enough; Plaintiffs have raised a genuine issue of material fact regarding the existence of an affirmation, promise, or description.

As to this issue, the retailer defendants stand apart from Whirlpool. As to them, the issue is not whether there was a representation; the issue is who

made it. The undisputed evidence shows that Lowe's, Sears, The Home Depot, Fry's, and ARCA made no representations to Plaintiffs about the Energy Star status of their washers, because neither the Energy Star logo nor the EnergyGuide label was attributable to the retailers. To the extent that either represents an express warranty, that warranty was made by Whirlpool, not the retailers. So as to them (as opposed to Whirlpool), proof of the first element of an express-warranty claim is absent.

### ii. Basis of the bargain

The second element of an express warranty claim is that the affirmation, promise, or description must have become the basis of the bargain:

> Under New Jersey law, a representation is presumed to be part of the basis of the bargain 'once the buyer has become aware of the affirmation of fact or promise' and can be rebutted by 'clear affirmative proof that the buyer knew that the affirmation of fact or promise was untrue.

*Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 469 (D.N.J. 2007) (quoting *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 825 (3d Cir. 1999) (internal quotation omitted)), *aff'd in part and denied in part on reconsideration*, No. 05-538, 2007 U.S. Dist. LEXIS 68882 (D.N.J. Sept. 18, 2007), *aff'd*, 385 F. App'x 195 (3d Cir. 2010).

Here, Plaintiffs enjoy the benefit of a presumption that the affirmation represented by the Energy Star branding formed the basis of the bargain. Defendants have not rebutted that presumption to the point that a genuine issue is lacking. Plaintiffs have provided sufficient evidence to demonstrate on a class-wide basis that Defendants' customers understand that Energy Star devices command an initial price premium, but over time generate savings in the form of reduced energy and water bills. That evidence includes deposition testimony, expert report, and statements from Whirlpool employees.

Defendants claim that Plaintiffs' depositions demonstrate fatally disparate interpretations of the Energy Star logo. However, each Plaintiff testified in essence that he or she understood the Energy Star logo to symbolize

the exchange of upfront cost for back-end efficiency savings. Moreover, Plaintiffs' survey experts each testified that customers have a core common understanding of what the Energy Star logo represents. Deposition testimony bears this out, even if that understanding is not precisely identical from one customer to the next.

For example, Dr. Sukumar's survey results indicated that consumers have a common understanding of what the Energy Star logo symbolizes. Dr. Dennis testified that his survey results would not be impacted by whether customers had additional knowledge of the Energy Star logo, beyond that common-core understanding. And damages expert Colin Weir testified that this common understanding affected the price paid:

> [Drs.] Sukumar and Dennis measure the portion of the washing machines' price that consumers did pay solely attributable to the presence of the Energy Star Logo (the price premium) or stated in the reverse, the price premium is the amount of value that they have been denied in the Benefit of the Bargain because consumers would have paid substantially less for the washing machines had the Energy Star Logo not been used.

(DE 323-9 ¶ 5–6). Finally, the evidence suggests that Defendants themselves recognized the financial value that Energy Star represented to them and their customers. Todman told investors that "there is a slight premium that consumers will pay for [Energy Star] appliances. But they're looking for pay back . . . ." (DE 328-38 at 3). And Fettig explained that, with respect to Energy Star appliances, "[y]ou pay a little bit more on the front end, but you save about 20% over the life of the product." (DE 323-40 at 8).

In short, this evidence supports Plaintiffs' contention that an Energy Star label constituted at least some part of their motivation to purchase the washers at issue at the price offered. Coupled with the principle that the law requires belief only in *an* affirmation—without requiring a particular level of precision—Plaintiffs' evidence is sufficient to show that there was a class-wide understanding of the Energy Star logo and that this understanding informed

Plaintiffs' purchasing decisions. There is, then, at least an issue of fact as to the second element.

### iii. Product conformity to the affirmation, promise or description (breach)

The third element, breach of the affirmation, promise, or description, is the weak point in Plaintiffs' express-warranty claim.[9] The evidence now in the record does not demonstrate a breach under either warranty theory—*i.e.*, (a) that the washers were improperly branded as Energy Star-qualified; or (b) that they were generally more efficient than standard models. Here, I look to whether the product contemporaneously conformed to any representation that was made at the time of sale.

(a) First, the "branding" theory of liability fails because the washers were all manufactured and purchased at a time when they were, according to the DOE's guidance, Energy Star-qualified. Neither side now disputes that the Energy Star logo was authorized when the washers were sold to the class members. Before producing the washers, Whirlpool consulted the DOE for guidance, and the DOE confirmed to Whirlpool that its proposed design met the current standards. Whirlpool then affixed an Energy Star logo to its washers.

Then, in July 2010, the DOE changed the interpretation of its testing regulations and protocols. (As noted above, the washers remained the same, but the testing protocols—for example, the use of Fill Level 3 rather than Fill Level 4 to measure capacity—were revised. *See* pp. 11–15, *supra*.) In January 2011, DOE notified Whirlpool that under the new testing standards its washers

---

[9] To some degree, the difficulty in establishing a breach is the downside of the first element's relatively lax requirement of a non-specific affirmation, promise, or description. The vaguer the statement, the more difficult to prove it false; the more general the promise, the more difficult to prove it has been breached. Plaintiffs insist, for purposes of the first element, that they only expected the Energy Star logo to indicate *some* measure of better performance, but they must take the bitter with the sweet. For purposes of the third element, they may not now insist that Defendants are liable because Plaintiffs were warranted a *specific* measure of performance.

now no longer qualified to carry the Energy Star brand.[10] By this time, however, each named plaintiff had purchased his or her washing machine. Accordingly, Plaintiffs are unable to prove that that the Energy Star logo was false or that Defendants failed to live up to their end of the bargain on the Energy Star-branding theory of liability.

(b) Second, the plaintiffs might be pressing a more general "energy efficiency" theory, independent of Energy Star specifics. Such an alternative theory would fail because it is undisputed that the washers were more efficient than a standard model would have been. The washers provided class members a 46.1% water reduction and a 34.3% energy reduction as compared to a traditional model. (DE 349 ¶ 252). True, Energy Star required a 50% water and 37% energy reduction (however measured). Setting aside whether the washers met that standard pursuant to one or another measuring protocol, they represented a significant gain in efficiency. There is no genuine issue of fact that the washers were more energy- and water-efficient than comparable standard models. Accordingly, Defendants did not breach an express warranty under the more general efficiency theory.

In sum, Plaintiffs have raised a triable issue of fact as to whether the Energy Star logo carried an affirmation, promise, or description that formed the basis of their bargain—together, the first two elements of a cause of action for a breach of an express warranty against Whirlpool. However, they have not established the third element—a corresponding breach of that affirmation,

---

[10]     The DOE reinterpreted its own guidance in July 2010. (DE 349 ¶ 170–74). At this point, all but three named plaintiffs—plaintiffs Christy (California), Reid (Florida), and Baker (California)—had already purchased their washers. However, the DOE did not inform Whirlpool that the washers failed testing until January 2011, when it notified Whirlpool that the washers would "remain designated as ENERGY STAR qualified" until February 2011. (DE 349 ¶¶ 224–29). By this point, when Whirlpool became aware of the change, all named plaintiffs had purchased their washers. The class members do not dispute that Whirlpool tested and labeled its washers in accordance with the DOE's 2007 Energy Star guidance. Even assuming that the class contains persons who purchased washers later, these Plaintiffs could not adequately represent them.

promise, or description. Whirlpool's washers were undisputedly Energy Star qualified at the time they were sold, and they delivered efficiency benefits when compared to standard machines.[11] Summary judgment is granted and Plaintiffs' claim for breach of an express warranty is **DISMISSED**.

### 2. Breach of Implied Warranty (Indiana, New Jersey, Texas, and Virginia)

Count III, brought on behalf of the plaintiffs in Indiana, New Jersey, Texas, and Virginia, alleges a breach of implied warranty because the washers were "[un]fit for their intended purpose." (SAC ¶ 148).[12] According to Plaintiffs, the washers did not "function properly as water and energy-efficient washing machines within the parameters established by federal law and the ENERGY STAR® program." (SAC ¶ 148). Defendants argue that there is no breach because the evidence shows that the washers—whatever their Energy Star shortcomings—washed clothes and delivered substantial efficiency benefits. (DE 309-1 at 12–13). In other words, Defendants maintain that the washers were fit for their intended purpose and did not breach any implied promise that clothes would be washed at some level of efficiency.

"[T]he UCC, as adopted by New Jersey, specifically states that an implied warranty of merchantability ensures that goods sold are 'fit for the ordinary purposes for which such goods are used.'" *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 706 (D.N.J. 2011) (quoting N.J. Stat. Ann. § 12A:2–314(f); *Henderson v. Volvo Cars of N. Am., LLC*, No. 09-4146, 2010 WL 2925913 at *9, 2010 (D.N.J. July 21, 2010)). It "does not impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a

---

[11]     As against the retailers, the claim is also dismissed because they did not make an affirmation, promise, or description that would subject them to express-warranty liability. *See* pages 24–25, *supra.*

[12]     As with the express-warranty claim, *see* Section III.C.1, the class is certified solely as against Whirlpool. (DE 283 at 2). The claims against the retailer defendants survive only insofar as they are prosecuted individually by the named plaintiffs in Indiana, New Jersey, Texas, and Virginia.

minimum level of quality." *Lieberson v. Johnson & Johnson Consumer Companies, Inc.*, 865 F. Supp. 2d 529, 542 (D.N.J. 2011) (internal quotations and citations omitted). "[M]erchantability is defined as the product sold 'should be of the general kind described and reasonably fit for the *general* purpose for which it should have been sold.'" *Id.* (quoting *Ferrari v. Am. Honda Motor Co., Inc.*, A-1532-07T2, 2009 WL 211702 at *3 (N.J. Super. Ct. App. Div. Jan. 30, 2009)) (other internal quotation and citation omitted) (emphasis added). Generally, a court will find a good to be unfit for its ordinary purpose "when [it] can identify one of three general types of defects: manufacturing defects, design defects, and failure to give the buyer proper instructions with respect to the goods." *Id.* This test for defects is essentially the same as that required when the theory is strict tort liability under Section 402A of the Restatement (Second) of Torts, except that goods may violate [the implied warranty of merchantability] without being "unreasonably dangerous," as is generally required under strict tort." *Lieberson*, 865 F. Supp. 2d at 542 (citing Barkley Clark & Christopher Smith, The Law of Product Warranties § 5.5 (2010)).

The "ordinary purpose" of a product is one that is central to the product's value or function. *Compare Zabriskie Chevrolet, Inc. v. Smith*, 99 N.J. Super. 441, 450 (Law Div. 1968) (where the car the plaintiff purchased broke down less than a mile from the dealership, the car was "substantially defective" and in breach of the implied warranty of merchantability), *with Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 283 (D.N.J. 2011) (rejecting implied warranty of merchantability claim that a single-cup brewing system, although it brewed beverages, failed to brew precisely one cup), *and Lieberson*, 865 F. Supp. 2d at 543 (finding no breach of the implied warranty of merchantability where soap and lotion did not help babies sleep, as advertised, because the soap was "clearly manufactured for the purpose of washing and moisturizing babies' skin" and it did do that).

Thus, Plaintiffs can sustain their implied-warranty claims only if the washers failed to wash clothes or failed to provide the level of efficiency consumers had a right to expect in goods of that kind.

Plaintiffs have not alleged that the washers fail to get clothes clean. There is no triable dispute that the goods function within the parameters of any such implied warranty. *See Green*, 279 F.R.D. at 283. Moreover, it is not alleged that the washers suffer from manufacturing or design defects, and there is no evidence that Defendants failed to properly instruct the buyers on the use of the washers.

Nor is there a genuine issue of fact as to whether the washers did so efficiently. All agree that they provided a substantial level of efficiency (providing 93% of the energy savings and 92% of the water savings required by EnergyStar, even under the 2010–11 testing regime). That surely met the standard of being fit for the ordinary intended purposes of a washer—even an energy-efficient one—and met ordinary expectations of quality.

In my view, the implied warranty standard is not so specific as to incorporate the changing particulars of the Energy Star program; it is a more general one, based on consumers' reasonable expectations of quality for goods of that kind. New Jersey courts have never required that products be perfect to overcome implied-warranty claims. *Cf. Lieberson*, 865 F. Supp. 2d at 542. And I do not see evidence that consumers' reasonable efficiency expectations encompassed, *e.g.*, a measuring method that used Fill Level 4, as opposed to Fill Level 3.

Because the washers cleaned clothes and did so efficiently, summary judgment is granted and Plaintiffs' claims under the implied warranty of merchantability are **DISMISSED**.

### 3. Unjust Enrichment (California, Indiana, New Jersey, Ohio, Texas, and Virginia)

Count IV alleges a claim of unjust enrichment. I earlier dismissed Plaintiffs' unjust enrichment claims against defendant Whirlpool (DE 78 at 26–27), and for purposes of unjust enrichment I did not certify the class against

31

the retailer defendants (DE 282 at 34–37). The only unjust-enrichment claims remaining are the individual plaintiffs' claims against the defendant retailers. (DE 309-1 at 29).

Under New Jersey law, to state a claim for unjust enrichment, "a plaintiff must allege that (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it." *Snyder*, 792 F. Supp. 2d at 723–24. Defendants argue that summary judgment is now appropriate "because Plaintiffs have an adequate remedy at law under both contractual (warranty) and statutory (consumer protection) theories." *Id.* (citing *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 983–84 (E.D. Cal. 2018); *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007); *Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 WL 1372308 at *16 (D.N.J. Mar. 31, 2010); *Nossen v. Hoy*, 750 F. Sup. 740, 744 (E.D. Va. 1990). "New Jersey law appears to preclude *recovery* . . . where, as here, there is a legally subsisting express agreement, no rescission is sought and no contention that the express contract is void or did not exist." *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 311 (3d Cir. 1982) (emphasis added) (citing *C. B. Snyder Realty Co. v. Nat'l Newark & Essex Banking Co.*, 14 N.J. 146, 162–63 (1953); *Moser v. Milner Hotels, Inc.*, 6 N.J. 278, 280–81 (1951)).

For the reasons discussed more fully *supra* and *infra*, these retailer defendants were not unjustly enriched by selling these washers. Equity recognizes certain basic principles of fairness—classically, a party who made a payment for items never received, even if not entitled to contract damages, may recover that payment. No such general principle of justice is in play here. Consumers paid for washers and got them. If there was any incremental "injustice," it must be because there was, *e.g.*, a fraud or a breach of express or implied warranty. I have already found, however, that there was not. Plaintiffs received washers that were certified Energy Star-compliant according to the testing protocols current at the time of purchase. Even by the more stringent

2010–11 standards, those washers delivered a 46.1% water reduction and a 34.3% energy reduction (as opposed to a 50% and 37% reduction, respectively, as prescribed by the Energy Star program). I do not perceive the kind of flaw in this transaction that would give rise to an injustice. Defendants did not, at Plaintiff's expense, receive a benefit "under circumstances that would make it unjust for defendant [retailers] to retain the benefit without paying for it." *See Snyder*, 792 F. Supp. 2d at 723–24. Accordingly, summary judgment is granted, and the unjust enrichment claim is **DISMISSED**.

### D. Statutory Claims

Plaintiffs also allege causes of action under various consumer fraud/consumer protection statutes of California, Florida, Indiana, New Jersey, Ohio, and Texas.[13] (*See* Counts V–XIV.) A plaintiff may bring such state-law claims under the law of the state where he or she lives or the state where the alleged injury occurred. *See, e.g., Cooper*, 374 F. App'x 250, 255 (3d Cir. 2010). I therefore consider these claims state-by-state, in relation to the relevant plaintiffs. Like the express- and implied-warranty claims, *see* Sections C.1 & C.2, the statutory claims proceed on a class-wide basis only against Whirlpool. (DE 283 at 2–3). Insofar as any named plaintiff's claim against a retailer defendant survives, the plaintiff proceeds only on an individual basis and only against the retailer from which he or she purchased a washer. (*Id.*).

#### 1. California

Plaintiffs bring three statutory claims under California law: the Consumer Legal Remedies Act, Cal. Civil Code § 1750, *et seq.* ("CLRA"), the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL"), and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"). The California purchaser/plaintiffs are Maxwell, Christy, and Baker. Plaintiff Maxwell bought his washer in November 2009. (DE 349 ¶ 109). Plaintiff Christy

---

[13]     The statutory claims of the Michigan class were dismissed for failure to state a claim (DE 78 at 40), and the Virginia class did not plead a statutory claim (*see* DE 86).

bought her washer in September 2010. (DE 349 ¶ 194). Plaintiff Baker bought her washer in December 2010. (DE 349 ¶ 213).

### i. Consumer Legal Remedies Act, Cal. Civil Code § 1750, et seq. ("CLRA")

California's Consumer Legal Remedies Act, Cal. Civil Code § 1750, *et seq.* ("CLRA"), prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Conduct that is "likely to mislead a reasonable consumer" violates the CLRA. *Colgan v. Leatherman Tool Grp., Inc.,* 38 Cal. Rptr. 3d 36 (Cal. Ct. App. 2006) (quoting *Nagel v. Twin Labs., Inc.,* 134 Cal. Rptr. 2d 420 (Ct. App. 2003)).

The CLRA provisions cited by Plaintiffs are:

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

. . .

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

. . .

(9) Advertising goods or services with intent not to sell them as advertised.

Cal. Civ. Code § 1770(a)(5), (7) & (9). A successful CLRA claim here would require Plaintiffs to show that the Energy Star logo was false or likely to mislead *and* that Defendants knew at the time of sale that the washers did not meet Energy Star criteria. *See Wilson v. Hewlett-Packard Co.,* 668 F.3d 1136, 1140, 1145 (9th Cir. 2012).

The record here demonstrates that the Energy Star representation was not false or likely to mislead when made. Instead, Defendants' Energy Star representation was true at the time the washers were sold (November 2009–

34

December 2010). At that time, the washers had not yet failed testing under the new standards, and the DOE had not yet removed them from their list of approved appliances. The CLRA requires a knowingly *false* statement of fact made to induce a buyer to purchase. The evidence is clear that Defendants' statements concerning Energy Star were not false when made because Plaintiffs bought their washers while the washers remained Energy Star-qualified, as per the DOE.

The claim also fails on the knowledge element. Plaintiffs have not produced evidence that shows that Defendants *knew* the washers did not meet Energy Star criteria when sold. Instead, the record reveals that Whirlpool tried to comply with the DOE's Energy Star criteria by seeking guidance from the agency. Whirlpool then labeled its washers with the Energy Star logo after the DOE responded positively to Whirlpool's request. When Plaintiff Maxwell bought his washer in November 2009, the DOE had not yet revised its 2007 interpretation of its regulation. And when Plaintiffs Christy and Baker bought their washers in September and December 2010, the DOE had not yet tested the washers, found that they fell short of the new standards, or informed Whirlpool of the test results. Plaintiffs have not produced evidence that shows the intent to mislead that a successful CLRA claim requires. Summary judgment is therefore granted, and this claim is **DISMISSED**.

> ii.  **False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL")**

California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*, ("FAL") prohibits misleading statements in connection with advertising material:

> It is unlawful for any person . . . to make or disseminate or cause to be made or disseminated before the public in this state . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

Cal. Bus. & Prof. Code § 17500. Plaintiffs' FAL claim fails for the same reason that the CLRA claim did: the evidence reveals that at the time Defendants sold Plaintiffs the washers, the statements were neither misleading nor known as such. Summary judgment is granted, and this claim is **DISMISSED**.

### iii. Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")

The Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, ("UCL") prohibits acts or practices that are: (1) unlawful; (2) fraudulent; or (3) unfair. Each prong of the UCL constitutes a separate and distinct theory of liability. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). The UCL proscribes "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." § 17200. The California Supreme Court has held that the UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999) (internal quotations and citation omitted).

At the same time, however, the available relief is limited: "A UCL action is equitable in nature; damages cannot be recovered." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003).

The fraudulent-practice prong of the UCL "has been understood to be distinct from common law fraud." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312, 207 P.3d 20, 29 (Cal. 2009). "'A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for injunctive relief' under the UCL." *Id.* (quoting *Day v. AT & T Corp.*, 74 Cal. Rptr. 2d 55, 60 (Cal. 1998)); *see also In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1092 (S.D. Cal. 2010) ("Unlike common law fraud, a party can show a violation of the UCL's 'fraudulent practices' prong without allegations of actual deception."). The term fraudulent, as used in the statute, then, requires only a

likelihood: "a showing [that] members of the public 'are likely to be deceived.'" *Id.* (quoting *Puentes v. Wells Fargo Home Mortg., Inc.*, 72 Cal. Rptr. 3d 903, 909 (Dist. Ct. App. 2008)). Claims under this prong still require a plaintiff to show that the alleged misrepresentation was directly related to the injurious conduct and that the plaintiff actually relied on the alleged misrepresentation. *Id.*

Here, Plaintiffs have not shown that Defendants' conduct was (1) unlawful; (2) fraudulent; or (3) unfair, each an element that constitutes a separate and distinct theory of liability. *See Kearns,* 567 F.3d at 1125. The "unlawful" prong fails because Plaintiffs have neither alleged nor proven that Defendants committed any illegal act. The "fraudulent" prong fails because, as discussed in connection with the CLRA and FAL claims, Plaintiffs have no evidence that Defendants issued statements that were misleading at the time. Accordingly, Plaintiffs were unable to show that "members of the public [were] likely to be deceived." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

Finally, Plaintiffs have not sustained the "unfair" prong, where the inquiry is "whether the challenged practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Graham v. VCA Animal Hosps., Inc.*, 729 F. App'x 537, 540 (9th Cir. 2018). If the conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious, it is then "weigh[ed against] the utility of the defendant's conduct against the gravity of the harm." *Id.* Here, Plaintiffs have not carried their burden of coming forward with proof to establish a triable issue. The DOE-sanctioned conduct—labeling the washers as Energy Star compliant while they were so designated—was neither immoral, unethical, oppressive, unscrupulous nor substantially injurious. Moreover, the gravity of the harm—purchasing a washing machine that provided a 46.1% water reduction and a 34.3% energy reduction (instead of a 50% and 37% reduction, respectively)—is outweighed by the utility of Defendants' sale of washing machines that represented an improvement in efficiency and were excusably believed to comply with Energy Star Standards at

the time. Accordingly, summary judgment is granted, and the UCL claim is **DISMISSED**.

### 2. Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA")

A claim under the Deceptive and Unfair Trade Practice Act, Fla. Stat. § 501.201, *et seq.*, ("FDUTPA") has three elements: (1) a deceptive or unfair practice; (2) causation; (3) actual damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d Dist. Ct. App. 2006).

> FDUTPA is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2). *See also Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So. 2d 602, 605–06 (Fla. 2d Dist. Ct. App. 1997) (discussing the purpose of FDUTPA in light of its legislative history).

*Id.* However, an FDUTPA claimant must prove more than a mere warranty breach. *See PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 n.2 (Fla. 2003) ("[T]his opinion does not operate to convert every breach of contract or breach of lease case into a claim under the [FDUTPA]. Indeed, such a construction would be precluded by the FDUTPA, which only reaches conduct that is unfair or deceptive as judged by controlling case law."). Also, a plaintiff "cannot insert the magic words 'deceptive' and 'unfair' to state a claim without including any further details." *Krush Commc'ns, LLC v. Network Enhanced Telecom, LLP,* 2014 WL 12625758, at *4 (M.D. Fla. Apr. 29, 2014).

Under the FDUTPA, a deceptive act is one that is "likely to mislead a consumer acting reasonably," *Zlotnick v. Premier Sales Grp.*, 480 F. 3d 1281, 1284 (11th Cir. 2007), and an unfair practice is one that "offends established public policy" or is otherwise "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR*, 842 So. at 777 (citation and internal quotations omitted). A deceptive act occurs when "there is a representation, omission, or practice that is likely to mislead the consumer

acting reasonably in the circumstances, to the consumer's detriment." *Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1302 (S.D. Fla. 2011) (quoting *PNR, Inc.*, 842 So. 2d at 777).

Here Plaintiffs have not provided evidence of wrongdoing that would satisfy the statute. Plaintiff Reid bought his washer around October 2010. (DE 349 ¶ 205). At the motion to dismiss stage, I allowed the claim to proceed because "the mislabeling of the washers would be likely to mislead a reasonable consumer about the energy efficiency of the washers." (DE 78 at 41–42) The record has not developed in such a manner as to establish that Defendants intentionally misled a reasonable consumer or offended established public policy. To be sure, the FDUTPA covers misleading conduct, but it also has a volitional element. The evidence in the record reveals only that Defendants used the Energy Star logo until the DOE advised otherwise. There is no evidence that Defendants used the logo in an unfair or deceptive way or intended to do so. Indeed, Whirlpool itself was not informed of the logo suspension until January 2011. Because Plaintiffs have not shown evidence of a breach of warranty, and because they have not produced the additional evidence required by the FDUTPA, summary judgment is granted, and the Florida statutory claim is **DISMISSED**.

### 3. Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.* ("IDCSA")

The Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*, [14] ("IDCSA") prohibits "incurable" and "uncured" deceptive acts. An "incurable" act is one committed with intent to defraud or mislead, whereas an "uncured" deceptive act is one the supplier failed to "cure" after receiving notice. *See Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 647 (Ind. Ct. App. 2004). There is no catchall fraud category under the IDSCA; a plaintiff's

---

[14]     Various sections of the IDCSA were recently amended by the Indiana Legislature. These amendments are effective as of July 1, 2014. Therefore, the previous version of the statute is applicable here.

allegations must fit into one of the enumerated acts proscribed under the statute. *Lawson v. Hale*, 902 N.E.2d 267, 274 (Ind. App. 2009). This is a claim under the incurable-act portion of the IDCSA. (Plaintiffs' uncured-act claim has been dismissed.) (DE 78 at 47). Thus, if Plaintiffs are to prevail, the Indiana class must prove that Defendants *intended* to mislead them. *See McKinney v. State*, 693 N.E.2d 65, 68 (Ind. 1998) ("Intent to defraud or mislead is thus clearly an element of an incurable deceptive act.").

Plaintiffs allege that "before marketing [the washers] and, at all times relevant hereto, [Defendants] knew that the models were non-compliant" or that they affixed Energy Star labels "without testing them." (DE 86 ¶ 244). Those allegations were sufficient to withstand Defendants' motion to dismiss, but mere allegations will not withstand summary judgment. Plaintiffs have not shown evidence of an intent to mislead. Rather, the facts suggest that Whirlpool attempted to comply with the Energy Star criteria by seeking DOE guidance on Energy Star testing. The evidence revealed during discovery tends to suggest that Whirlpool labeled their washers as Energy Star-compliant only after the DOE blessed this course of conduct. Specific to the Indiana class, Plaintiff Beyer bought his washer in March 2010. (DE 349 ¶ 149). By that point, the DOE had not revised its interpretation, no washer had failed the new testing standards, the DOE had not informed Whirlpool of the test results, and the washers remained Energy Star-qualified. Thus, Plaintiffs have not produced evidence that shows the intent to mislead required that Indiana law requires. Summary judgment is granted, and the IDCSA claim is **DISMISSED**.

### 4. New Jersey

Plaintiffs bring two claims under two New Jersey statutes: the Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, ("NJCFA") and the Truth-in-Consumer Contract, Warranty, and Notice Act, N.J. Stat. Ann. § 56:12-14, *et seq.*, ("TCCWNA"). The New Jersey purchaser/plaintiffs, Angelone and Dzielak, both bought their washers in November 2009. (DE 349 ¶¶ 100 & 131).

### i. Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJCFA")

The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, ("NJCFA"), requires a plaintiff to prove three elements: "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009) (citations omitted).

**Unlawful conduct**: Unlawful conduct under the NJCFA falls into three general categories: "affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. §§ 56:8-2, 56:8-4." [15] *Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641, 648 (D.N.J. 2013), *reconsideration denied*, 12-608, 2013 WL 1890276 (D.N.J. May 3, 2013) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 (N.J. 1994). "A plaintiff must allege the 'who, what, when, where, and how' of" a NJCFA claim. *Crozier v. Johnson & Johnson Consumer Companies, Inc.*, 901 F. Supp. 2d 494, 506 (D.N.J. 2012) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004)).

> An unlawful practice under the CFA is the
>
> use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or

---

[15] N.J. Stat. Ann. § 56:8–2.provides that:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

*Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576–77 (2011) (quoting N.J.S.A. § 56:8-2)

**Ascertainable loss and causation**: "New Jersey courts have been chary to ascribe the term [ascertainable loss] a precise meaning." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 300 (D.N.J. 2009) (citing *Thiedemann v. Mercedes–Benz USA, LLC*, 183 N.J. 234, 248 (2005)). An ascertainable loss under the NJCFA "occurs when a consumer receives less than what was promised." *Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J. Super. 617, 646 (App. Div. 2002) (citation omitted). The statute does not, however, "require that the loss be monetary []or that it must be pled beyond a reasonable degree of certainty." *Arcand*, 673 F. Supp. 2d at 300.

Accordingly, a plaintiff must allege that a misrepresentation induced an objectively reasonable expectation about a product and that this expectation was not met. *Smajlaj*, 782 F. Supp. 2d at 99–100. A cognizable injury, however, must consist of more than just any unmet expectation. *Id.* (citing *Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. Appx. 257, 259 (3d Cir. 2010)). Thus, for example, "[a] consumer who expects a car that never requires resort to its comprehensive warranty . . . or who expects the life of a toner cartridge to be linked precisely to the amount of toner in the cartridge . . . has not experienced a loss when that expectation is not met." *Id.* (internal citations omitted). Only a consumer who has received a product that is worth objectively less than he or she may reasonable expect has endured an injury under the statute. *Id.* Under such a benefit-of-the-bargain theory, a plaintiff must proffer a "quantification of the difference in the value between the product received and the product promised." *Id.*

Plaintiffs' NJCFA claim is deficient for two reasons: (1) Defendants' Energy Star representation was not false or misleading; and (2) the allegations do not reflect anything more than a garden-variety warranty claim, for which

the NJCFA does not provide a remedy. *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *D'Ercole Sales v. Fruehauf Corp.*, 206 N.J. Super. 11, 25 (App. Div. 1985) ("[A] breach of warranty, or any breach of contract, is not *per se* unfair or unconscionable . . . and a breach of warranty alone does not violate a consumer protection statute.").

A claim under the NJCFA requires "a statement of fact, found to be false, made to induce the buyer to make the purchase." *Chaudhri v. Lumileds LLC*, No. 18-2167, 2018 WL 6322623 at *6 (D.N.J. Dec. 3, 2018). Defendants did not make a material misrepresentation when they sold washers with the Energy Star branding in New Jersey. As in other states, the evidence reveals that Plaintiffs in the New Jersey class bought their washers while they carried the Energy Star designation under the DOE's authority. Indeed, the DOE did not reclassify the washers until over a year after the New Jersey plaintiffs had purchased their machines. Because Defendants—and, more importantly, the DOE—considered the washers to be Energy Star-qualified when sold, any statement to that effect was not misleading or false when made.

A breach-of-warranty claim—without more—does not constitute a violation under the NJCFA. *Palmucci v. Brunswick Corp.*, 311 N.J. Super. 607 (App. Div. 1998). Instead, there must be "substantial aggravating circumstances" to elevate the warranty claim to a consumer fraud violation. *See S. Jersey Gas Co. v. Mueller Co.*, No. 09–4194, 2011 WL 5873028 at *6 (D.N.J. Nov. 18, 2011) (quoting *Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997)). Here, Plaintiffs have not shown those aggravating circumstances. Once again, Whirlpool attempted to comply with the Energy Star criteria by seeking—and receiving—DOE guidance on Energy Star testing. Whirlpool labeled its washers as Energy Star-compliant only after the DOE sanctioned that decision. Plaintiffs Angelone and Dzielak bought their washers in November 2009. (DE 349 ¶¶ 100 & 131). At that time, the DOE had not revised its interpretation, no washer had failed the new testing standards, the DOE had not informed Whirlpool of the test results, and the washers remained

Energy Star-qualified. Plaintiffs have not produced evidence that shows the intent to mislead that New Jersey law requires. Accordingly, summary judgment is granted and the NJCFA claim is **DISMISSED**.

### ii. Truth-in-Consumer Contract, Warranty, and Notice Act, N.J. Stat. Ann. § 56:12-14, *et seq.* ("TCCWNA")

The Truth-in-Consumer Contract, Warranty, and Notice Act, N.J. Stat. Ann. § 56:12-14, *et seq.*, ("TCCWNA") does not "recognize any new consumer rights but merely impose[s] an obligation on sellers to acknowledge clearly established consumer rights and provided remedies for posting or inserting provisions contrary to law." *Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 68 (2017) (quoting *Shelton v. Restaurant.com, Inc.*, 214 N.J. 419, 432 (2013):

> It is intended "to prevent deceptive practices in consumer contracts." *Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 67 (2017) (quoting *Kent Motor Cars, Inc. v. Reynolds & Reynolds Co.*, 207 N.J. 428, 457 (2011)). When it enacted the TCCWNA in 1981, the Legislature acknowledged the presence of legally invalid provisions in "[f]ar too many consumer contracts, warranties, notices and signs," which acted to "deceive[] a consumer into thinking [the provisions] are enforceable," and deterred consumers from enforcing their legal rights. Sponsor's Statement to A. 1660 at 2 (1980). In the TCCWNA, the Legislature sought not to confer new legal rights, but to require sellers "to acknowledge clearly established consumer rights," and to "provide[] remedies for posting or inserting provisions contrary to law." *Shelton*, 214 N.J. at 432; *see also* Governor's Statement on Signing A. 1660 (Jan. 11, 1982) (noting that TCCWNA would "strengthen[] provisions of the Consumer Fraud Act").

*Spade v. Select Comfort Corp.*, 232 N.J. 504, 515–16 (2018). The TCCWNA statute does not establish consumer rights or seller responsibilities; instead, it "bolsters rights and responsibilities established by other laws." *Watkins v. DineEquity, Inc.*, 591 F. App'x 132, 134 (3d Cir. 2014).

> A plaintiff pursuing a TCCWNA cause of action must prove four elements: first, that the defendant was a "seller, lessor, creditor, lender or bailee or assignee of any of the aforesaid"; second, that the defendant offered or entered into a "written consumer contract or [gave] or display[ed] any written consumer warranty, notice or

sign"; third, that at the time that the written consumer contract is signed or the written consumer warranty, notice or sign is displayed, that writing contains a provision that "violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee" as established by State or Federal law; and finally, that the plaintiff is an "aggrieved consumer."

*Id.* at 516 (quoting N.J.S.A. 56:12-15, -17).

Here, Plaintiffs have not sustained their burden because a TCCWNA claim cannot survive without (in this context) a sufficient and corresponding NJCFA claim:

> TCCWNA does not establish consumer rights or seller responsibilities. Rather, the statute bolsters rights and responsibilities established by other laws. TCCWNA creates liability whenever a seller presents a consumer with a covered writing that "contains terms contrary to any established state or federal right of the consumer." *Shelton v. Restaurant.com*, 214 N.J. 419 (2013). *The rights and responsibilities to be enforced by TCCWNA are drawn from other legislation. One such piece of legislation is the CFA. See Bosland v. Warnock Dodge, Inc.*, 396 N.J. Super. 267 (App. Div. 2007) (A covered writing containing a provision that "violates a clearly established legal right under the CFA regulations is also a violation of the TCCWNA.").

*Watkins v. DineEquity, Inc.*, 591 F. App'x 132, 134 (3d Cir. 2014) (emphasis added). For the reasons, discussed above, Plaintiffs have not produced evidence sufficient to establish a violation of the NJCFA. It follows that they have failed to support a claim under the TCCWNA. Summary judgment is granted, and the TCCWNA claim is **DISMISSED**.

### 5. Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann.§ 1345.01, *et seq.* ("OCSPA")

The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann.§ 1345.01, *et seq.*, ("OCSPA") prohibits suppliers from committing "an unfair or deceptive act or practice in connection with a consumer transaction." Ohio Rev. Code Ann. § 1345.02. That statute requires a showing of a material representation, a deceptive act, or an omission that affected a plaintiff's decision to purchase an

item. *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 265 (6th Cir. 2005). An OSCPA claim requires that a statement, when made, "amounted to a deceptive, unfair, or unconscionable act," and that the "speaker" had "prior notice" that its statement was deceptive. *See Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 34 (Ohio 2006); *Tsirikos–Karapanos v. Ford Motor Co.*, 99 N.E.3d 1203, 1215 (Ohio Ct. App. 2017).

Plaintiffs allege that Defendants knew that the models were non-compliant and that the Energy Star labels were inappropriately affixed to the washers. Such allegations were sufficient at the motion to dismiss stage, but here, as elsewhere, Plaintiffs have not brought forth evidence to support their contentions. They have not created an issue of fact that Defendants intended to mislead them, which is an integral element of an OCSPA claim.

Instead, the evidence shows that that Whirlpool tested the washers in accordance with the DOE's 2007 Energy Star regulations; that Plaintiff Parsons bought her washer in March 2010; and that the DOE *later* reinterpreted its regulations and disqualified the washers. Accordingly, the Energy Star logo was not inappropriately affixed at the time the washers were sold and Defendants did not violate the OCSPA. Plaintiffs have not produced evidence that shows the intent to mislead required that Ohio law requires. Summary judgment is granted, and the OCSPA claim is **DISMISSED**.

### 6. Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41-17.63 ("TDTPA")

The Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41-17.63, ("TDTPA") has three essential elements: (1) the plaintiff is a consumer; (2) the defendant violated a specific provision of the TDTPA; and (3) the defendant's violation caused damages to the plaintiff. The statute specifically allows a plaintiff to pursue a claim under the TDTPA for a breach of an express or implied warranty, as well as for an "unconscionable act." *See Brittan Commc'ns. Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 907 (5th Cir. 2002).

Plaintiffs claim that "Defendants engaged in false, misleading, and deceptive practices," in violation of TDTPA. (DE 86 ¶ 174). Specifically, they allege that Defendants misrepresented the washers' Energy Star compliance. They also allege that Defendants breached express and implied warranties and are therefore liable under TDTPA §§ 17.50(a)(2) & 17.50(b). Finally, they allege that Defendants violated the TDTPA because their actions constitute "an unconscionable action or course of action" under TDTPA § 17.50(a)(3). (DE 86 ¶ 179). The Texas purchaser/plaintiff, Cohen, bought his washer in November 2009. (DE 349 ¶ 120).

### i. Misrepresentation

Tex. Bus. & Com. Code § 17.50(a)(1) creates a cause of action based on false, misleading, or deceptive acts or practices that are relied upon to the consumer's detriment.

> [T]he term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:
>
> > (1) passing off goods or services as those of another;
> >
> > (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> >
> > (3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;
> >
> > (4) using deceptive representations or designations of geographic origin in connection with goods or services;
>
> . . .

Tex. Bus. & Com. Code § 17.46(b). This quoted list is merely illustrative; the statute contains more than thirty other examples and, by its own terms, is not exhaustive. *Id.*

Plaintiffs seek to establish a TDTPA misrepresentation under both an act theory and an omission theory. The alleged bad act is that the Defendants affirmatively represented that the washers had features they did not have. The alleged omission is that Defendants did not disclose that the washers did not

meet Energy Star criteria. As with other states' consumer fraud statutes, the defendants' intent is key:

> Mere nondisclosure of material information is not enough to establish an actionable DTPA claim. *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 744 (Tex. App. 2005); *Century 21 Real Estate Corp. v. Hometown Real Estate Co.*, 890 S.W.2d 118, 126 (Tex. App. 1994). The plaintiff must also show that the information was withheld with the intent of inducing the consumer to engage in a transaction. *Willowbrook Foods, Inc. v. Grinnell Corp.*, 147 S.W.3d 492, 507 (Tex. App. 2004).

*Patterson v. McMickle*, 191 S.W.3d 819, 827 (Tex. App. 2006)

Plaintiffs' "act" theory is insufficient because, as in other states, they have not produced evidence that the Energy Star branding was incorrect at the time of sale. Cohen bought his washer while it was designated as Energy Star-qualified according to the DOE, well before the DOE reinterpreted its testing regulations and informed Whirlpool of the results. Plaintiffs' "omission" theory is also inadequate, because they have not "show[n] that the information was withheld with the intent of inducing the consumer to engage in a transaction," as required by *Willowbrook Foods. See* 147 S.W.3d at 507. Indeed, Defendants did not yet know that at some future time the presently compliant washers would not satisfy as-yet-unpromulgated regulatory interpretations.

Plaintiffs misrepresentation claim also fails for a failure to demonstrate reliance, because Tex. Bus. & Com. Code § 17.50 prohibits "the use . . . of a false, misleading, or deceptive act or practice that is . . . *relied on by a consumer* . . . ." Cohen testified that he did not speak to a salesperson about the washer before he bought it (DE 315-9 at 32:23–33:1), and he has produced no other evidence of reliance of his reliance on Defendants' representations concerning Energy Star.

### ii. Breach of warranty

The TDTPA does more than mirror the common law: "a mere breach of contract, without more, is not a DTPA violation." *Rocky Mountain Helicopters v. Lubbock Cty. Hosp. Dist.*, 987 S.W.2d 50, 53 (Tex. 1998) (citing *Crawford v. Ace*

*Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996); *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex. 1984); *Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.*, 661 S.W.2d 933, 935 (Tex. 1983)). Instead, the TDTPA provides remedies for rights created elsewhere. Because the Texas plaintiffs have not raised a genuine issue of material fact with regard to the common-law warranty claims, *see* Section III.C, *supra*, the statutory warranty claims also fail.

### iii. Unconscionable act

The TDPTA also provides a cause of action where economic damages are caused by "any unconscionable action or course of action by any person." Tex. Bus. & Com. Code § 17.50(a)(3). In this context, an unconscionable act is one that, to the consumer's detriment, takes advantage of the consumer's lack of knowledge, ability, experience, or capacity to a grossly unfair degree. *McCoy v. Homestead Studio Suites Hotels*, 390 F. Supp. 2d 577 (S.D. Tex. 2005). Again, Plaintiffs have produced no evidence that Defendants hoodwinked them based on an unequal balance of sophistication or knowledge. Rather, they received a washer that provided significant energy and water savings (and was believed to be Energy-Star compliant at the time). Plaintiffs have not shown that Defendants behaved to a "grossly unfair degree."

Plaintiffs have not brought forth the evidence required under the TDTPA. Summary judgment is granted, and the Texas statutory claim is **DISMISSED**.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment (DE 309 & 315) are **GRANTED**. Whirlpool's motion to decertify classes (DE 312) is **DENIED** as moot, in that (a) the causes of action have been dismissed, and (b) the named plaintiffs would not be appropriate representatives of any hypothetical persons who retained viable claims.

A separate order will issue.

Dated: December 5, 2019

**Hon. Kevin McNulty**
**United States District Judge**